UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]            Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                       Chapter 11

      Debtor.

_____/

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN POST-
PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 364(C) AND (D) AND
FED.R.BANKR.P. 4001(C); AND (B) SCHEDULING FINAL HEARING**
**(Emergency Hearing Requested)**

**Basis for Requested Emergency Hearing**

The Debtor respectfully requests that the Court conduct a hearing on this Motion consistent with Local Rule 9013-1(F).  The Debtor has determined that, in order to ensure that wages, insurance premiums, and other necessary expenses of the Debtor can be timely paid, the hearing on this Motion is an emergency.  The Debtor respectfully requests that the Court waive the provisions of Local Rule 9075-1 (B), which requires an affirmative statement that a *bona fide* effort was made in order to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

Miami International Medical Center, LLC d/b/a The Miami Medical Center (the

***"Debtor"***), by and through its undersigned counsel, respectfully moves this Court for entry of

interim and final orders pursuant to Section 364(c) and (d) of the Bankruptcy Code, Rule 4001(c)

of the Federal Rules of Bankruptcy Procedure, and Local Rules 4001-3 and 9013-1 (F) and (H),

(i) authorizing the Debtor to enter into a debtor-in-possession financing facility (the ***"DIP***

***Loan"***) with Variety Children's Hospital d/b/a Nicklaus Children's Hospital (the ***"Lender" or***

***"VCH"***) in accordance with the terms and conditions set forth herein and the term sheet attached

---

[1] The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

hereto as **Exhibit A** (the ***"Term Sheet"***), and (ii) scheduling a final hearing with respect to the relief requested herein (the ***"Motion"***).  In support of this Motion, the Debtor states as follows:

### Summary of Relief Requested

1.      This Motion is a request to approve a commercially reasonable lending facility between the Debtor and its existing prepetition lender, which has agreed to make a debtor-in-possession loan on the terms specified herein and in the Term Sheet.

2.      The proposed financing is necessary to the Debtor because it provides critical debtor-in-possession financing during the pendency of the Debtor's chapter 11 case. Generally, the financing is needed to fund the Debtor's operations (including payment of professionals, necessary staff, insurances, utilities, monthly maintenance items, and fees necessary to maintain it AHCA license) while the Debtor pursues a Section 363 sale.

3.      As is discussed in greater detail below, the Lender is the Debtor's landlord, as well as an affiliate of Children's Health Ventures, Inc. (***"CHV"***).  CHV owns fifty percent (50%) of the issued and outstanding membership interests of Miami Hospital Holdings, LLC (***"MHH"***), which, in turn, owns a majority interest in the Debtor.

4.      As discussed in more detail below, in January 2018, the Lender purchased all rights and remedies to that certain Term Note (as defined herein) under that certain Loan Agreement, dated August 4, 2015 (as amended on January 29, 2016, June 24, 2016 and August 4, 2017)(the ***"Loan Agreement"***) between the Debtor and MidFirst Bank.  The Term Loan is secured pursuant to that certain UCC-3Assignment Document No. 201803973682 which assigned to the Lender a lien on:

> All of the Debtor's equipment, medical equipment, computer equipment, computer hardware, computer software, computer software licenses, medical supplies, furniture and hospital beds and all proceeds and products thereof as described in the Lender's UCC-1 Financing Statement

No. 201504643818 filed with the Florida Secured Transaction Registry (the "UCC-1"), including without limitation, the items set forth on [Schedule 1] attached [to this Motion] (the "Assigned Assets"), but excluding all other collateral described in the UCC-1, including but not limited to. all accounts, accounts receivable, government and non-government health care accounts receivable and health care insurance receivables and all proceeds and products thereon.

5.      MidFirst Bank is currently owed approximately $9,400,000.00 on its $11,200,000 Revolver Promissory Note to the Debtor (the ***"Revolver Note"***), which Revolver Note is secured by the Debtor's cash and accounts receivable.

### Summary of the  Proposed Post-Petition Financing
### (In Accordance with the Court's Guidelines)

6.      The pertinent terms of the DIP Loan are set forth below for summary and notice purposes, as required by Fed. R. Bankr. P. 4001(c), Local Rules 4001-3 and 9013-1(H), as well as the Court's Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Post-Petition Financing (the "***Guidelines***"):

| | |
|---|---|
| **Commitment:** | **Up to $3,372,781.00 superpriority, senior secured debtor in possession credit facility (pg. 1 of Term Sheet).** |
| **Use of Proceeds:** | **The DIP Loan shall be used only to fund operating expenses, the costs and expenses of administering the Chapter 11 Case, and other payments, in each case as set forth in and subject to the budget attached hereto (the *"Budget"*)(pg. 2 of Term Sheet).** |
| **Interest Rate:** | **LIBOR plus 2.0% per annum (pg. 3 of Term Sheet).** |
| **Term:** | **At the Lender's election, the earliest to occur of: (a) the date on which the Lender provides written notice to the Debtor, counsel for the Debtor, and counsel for any official committee of unsecured creditors (a "<u>Committee</u>") of the occurrence of an Event of Default under the DIP Loan; (b) the effective date of a confirmed plan in the Case; (c) the closing date of any sale of assets in the Case; (d) the entry of an order converting the Case to a case under chapter 7 of the Bankruptcy Code, subject to all accrued Chapter 11 administrative expenses to such date; (e) the entry of an order dismissing the case, subject to all accrued Chapter 11 administrative expenses to such date; (f) the entry of an order appointing a chapter 11 trustee or** |

**examiner in the Case, subject to all accrued Chapter 11 administrative expenses to such date; (g) the failure of the Debtor to timely obtain entry of an interim order and final order approving the DIP Loan, each of which must be in a form acceptable to the Lender in its reasonable discretion; and (h) 180 days after the Petition Date (pg. 2 of Term Sheet).**

**Fees:**    **None.**

**Carveout:**    **The DIP Loan shall be subject to a Carveout ("<u>Carveout</u>") for the payment of any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (pg.8 of Term Sheet).**

**Superpriority Administrative Expense Claim:**    **The DIP Loan shall have the status of an allowed superpriority administrative expense claim in the Chapter 11 Case pursuant to section 364(c)(1), having priority over any all administrative expenses, whether heretofore or hereafter incurred, of any kind or nature specified in sections 503(b), 507(b) or any other section of the Bankruptcy Code, subject only to the Carveout (pg. 2 of Term Sheet).**

**Collateral:**    **The obligations in respect of the DIP Loan, including all principal, interest, expenses, fees and other amounts owing in respect thereof, shall be secured pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code by (i) second priority senior liens on and security interests on that Collateral (as defined below) which is already the subject of liens of MidFirst Bank; and (ii) first priority senior liens on and security interests in all of Debtor's remaining Collateral, subject only to the Carveout (pg. 2 of Term Sheet).**

**"<u>Collateral</u>" shall include all of the Debtor's right, title, and interest in and to pre and post-petition property and assets of the Debtor's estate, whether now existing or owned or hereafter arising or acquired, including, without limitation, all real and personal property, leasehold interests, receivables, general intangibles and payment intangibles, contract rights, commercial tort claims, causes of action of whatever nature, intellectual property, insurance proceeds, insurance premium refunds, tax refunds, deposits and deposit accounts, goods, inventory, machinery and equipment, goodwill and investment property, and all cash, cash equivalents, and non-cash proceeds of the foregoing.**

**Borrowing**

**Conditions:**    The Debtor shall: (a) on the Petition Date, file a motion to approve the DIP Loan, which motion shall be in form and substance acceptable to the Lender, in its sole discretion; (b) no later than five (5) business days after the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits, obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the Lender, in its sole discretion, approving the DIP Loan on an interim basis (an *"Interim Order"*); (c) no later than thirty (30) days after the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits, obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the Lender, in its sole discretion, approving the DIP Loan on a final basis (a *"Final Order"* and, together with the Interim Order, the *"Orders"*); and (d) additional milestones to be mutually agreed upon by Debtor and Lender  (pg. 3 of Term Sheet).

In addition, the Debtor shall: (a) no later than the later of five (5) days after the Petition Date or approval by the Lender of the Bidding Procedures, file a motion requesting approval of a comprehensive sale process, including bidding procedures, for the sale of substantially all of the Debtor's assets (a *"Sale"*), which motion, bidding procedures, and any related proposed orders shall be in form and substance acceptable to the Lender; (b) no later than thirty (30) days after the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits, obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the Lender, approving bidding procedures for the Sale (the *"Sale Procedures Order"*); (c) no later than sixty (60) days after entry of the Sale Procedures Order, conduct an auction (an *"Auction"*) to determine the highest or otherwise best bid for a Sale; (d) no later than three (3) days after conclusion of the Auction, obtain entry of an order of the Bankruptcy Court approving the Sale to the successful bidder, which order shall be in form and substance acceptable to the Lender (a *"Sale Order"*); and (e) no later than ten (10) days after entry of the Sale Order of AHCA approval, cause the Sale to be consummated.

**Release:**    In connection with the indefeasible payment in full in cash, and the termination of, the DIP Loan, the Debtor covenants and agrees that at such time it shall execute and deliver in favor of the Lender a valid and binding termination and release agreement, in form and substance acceptable to the Lender (pg. 8 of Term Sheet).

**Events of Default:**    The occurrence of any of the Events of Default set forth in the Events of Default Section of the Term Sheet, and the Debtor's failure to

> **comply with any of the terms in the interim or final orders approving this Motion (pg. 4 of Term Sheet).**

7.      Notwithstanding anything to the contrary set forth in this Motion or any attachments hereto, and as required by the Guidelines, the DIP Loan shall be subject to a carveout for fees due the clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930.

### Introduction and Jurisdiction

8.      On March 9, 2018 (the ***"Petition Date"***), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the ***"Bankruptcy Code"***), and an order for relief under section 301 of the Bankruptcy Code was entered in this case (the ***"Chapter 11 Case"***).

9.      The Debtor has been authorized to remain in possession of its property and to continue in the operation and management of its business as a debtor in possession pursuant to Section 1107 and 1108 of the Bankruptcy Code.

10.     No official committee of unsecured creditors has been appointed by the Office of the United States Trustee for the Southern District of Florida in this Chapter 11 Case.

11.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this Motion is proper under 28 U.S.C. § 1408 and 1409.

12.     The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and 364(c) and (d) of 11 U.S.C. § 101 *et seq.* (the "***Bankruptcy Code***") and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Local Rules 4001-3 and 9013-1(F) and (H).

### Background

13.     The Debtor owns and operated a regional acute care hospital (the "**Hospital**") that provided a limited suite of medical services since its opening in February 2016.

14.     The Debtor is a Florida limited liability company.  The Debtor's members are comprised of MHH, which owns approximately sixty-nine percent (69%) of the Debtor's membership interests, and individual physicians and physician groups (but no individual group owns more than 10% of the Debtor), which collectively own thirty-one (31%) of the Debtor's remaining membership interests.

15.     MHH, in turn, is owned equally by CHV and NueHealth, LLC ("**NueHealth**"). CHV is an affiliate of VCH.

16.     From the date the Debtor commenced operations through October 2017, the Debtor has struggled to generate sufficient revenue to cover its expenses due to, among other reasons, obstacles in attracting sufficient patient volume.  As a result of its liquidity constraints, the Debtor has been unable to pay its expenses as they became due, including its obligations under the Lease and Loan Agreement.  Since its inception, the Debtor has relied on funding from its members in order to sustain its operations.

17.     Prior to shutting down its operations, the Debtor was principally managed by NueHealth.

**Debtor's Leasehold Obligations**

18.     The land and building housing the Hospital (the "**Property**") was acquired by the Debtor in early 2014, and then sold to HC-5959 N.W. 7th Street, LLC ("**HC-5959**"), on April 21, 2014.

19.     On April 30, 2014, the Debtor entered into that certain Amended and Restated Lease Agreement with HC-5959 (the "**Lease**") pursuant to which the Debtor agreed to lease the

Property from HC-5959.  Pursuant to the Lease, the Debtor was required to make monthly rent payments to HC-5959 in the approximate amount of $970,000.00.  VCH was a limited guarantor of the Lease, along with NueHealth.

20.    After April 30, 2014, the Debtor renovated the Hospital into a state-of-the-art, high-end facility that offered patients concierge medical care across a number of different specialties.

21.    In October 2017, the Debtor defaulted on its obligations under the Lease by, among other things, failing to pay rent due thereunder.

22.    On December 28, 2017, HC-5959 transferred, sold, assigned, and conveyed all of its right, title and interest in and to, among other things, the Property and Lease to VCH. Accordingly, as of the Petition Date (as defined below), VCH is the owner of the Property and the "Landlord" under the Lease with the Debtor.

23.    The Debtor has not made any payments due under the Lease to either HC-5959 or VCH since September 2017.

### Debtor's Financing Structure

24.    On August 4, 2015, the Debtor entered into the Loan Agreement with MidFirst Bank ("**MidFirst**") pursuant to which MidFirst agreed to lend Forty Million Dollars ($40,000,000) (the "**Loan**") to the Debtor.  The Loan was evidenced by that certain revolving promissory note in the principal face amount of Eleven Million Two Hundred Thousand Dollars ($11,200,000) (the "**Revolving Note**") and that certain promissory note in the principal face amount of Twenty-Eight Million Eight Hundred Thousand Dollars ($28,800,000) (the "**Term Note**").  VCH was a limited guarantor of the Loan, along with NueHealth.

25.     Pursuant to certain amendments to the Loan Agreement dated as of January 29, 2016, June 24, 2016 and August 4, 2017, the principal balance of the Revolving Note was increased to Nineteen Million Six Hundred Thousand Dollars ($19,600,000).

26.     On January 14, 2018, VCH entered into that certain Assignment for Note Purchase and Partial Assignment of Security Agreement dated as of January 24, 2018 (the *"Assignment"*), pursuant to which MidFirst assigned all of its right, title and interest to the Term Note as well as that portion of that certain Security Agreement (Assets) dated August 4, 2015 signed by Debtor in favor of MidFirst to VCH, which covers all of the Debtor's equipment, medical equipment, computer equipment, computer hardware, computer software, computer software licenses, medical supplies, furniture and hospital beds and all proceeds and products thereof described in that certain UCC-1 Financing Statement No. 201504643818 filed with the Florida Secured Transaction Registry (the *"Equipment"*).  At the time of the Assignment, the Loan was in default.  Currently, the outstanding balance under the Term Note is approximately $26,270,000.00.

27.     On or around December 1, 2017, MidFirst exercised its security interest and has refused the Debtor access to its cash and accounts receivable collections since that time. MidFirst has been applying such cash and accounts receivable collections to pay down the Revolving Note.  As of the Petition Date, the Debtor owes approximately $9,000,000 to MidFirst on account of the Revolving Note.

28.     Without access to its cash or accounts receivable, the Debtor has relied on funding from its members, including a loan from MHH totaling $13,000,000.

29.     On February 15, 2018, the Debtor entered into that certain loan agreement with VCH, which was subsequently amended on March 8, 2018, through which VCH loaned the

Debtor $2,232,392.03 (the "**VCH Loan Agreement**"). The VCH loan is evidenced by that certain Promissory Note dated as of February 15, 2018 by the Debtor in favor of NCH (as amended on March 8, 2018, the "**VCH Note**" and together with the VCH Loan Agreement, the "**Prepetition Credit Agreement**"). As of the Petition Date, the Debtor was indebted to VCH, without defense, counterclaim, or offset of any kind, in respect of the Prepetition Credit Agreement in the amount of $2,232,392.03, plus accrued and unpaid interest with respect thereto.

### Need for the DIP Loan

30.     Pending the disposition of the Debtor's Assets, the Debtor has an immediate need for cash to fund the expenses of the Debtor and this Chapter 11 Case, including paying its bankruptcy and sale related professionals, insurances, security personnel, and related maintenance obligations, which are necessary to preserve the Debtor's business and preserve and maximize the value of the Debtor's Assets.

31.     Given the estate's current financial condition due to lack of cash flow, and the timing of the need for funds, the Debtor is unable to obtain financing from any lender on terms more favorable than those provided by the Lender.

32.     The Debtor requests that the Court approve the DIP Loan on a senior secured basis. Given the extent of outstanding secured indebtedness owing by the Debtor, the Debtor's lack of any unencumbered cash, and the time constraints surrounding the Debtor's immediate need for financing, the range of realistic financing alternatives is extremely limited.[2]

---

[2] The Debtor submit that efforts to obtain financing from other sources would have been futile given (a) the Debtor's capital structure, (b) the lack of cash flow to the Debtor, (c) the lack of available credit alternatives in the market generally, and (d) the lack of available collateral necessary to secure a post-petition loan.

33.     The Debtor submits that the terms and conditions of the DIP Loan, as reflected in the Term Sheet attached hereto, are fair and reasonable under the circumstances, and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

34.     As such, the Debtor seeks authority, pursuant to Section 364(c) and (d) of the Bankruptcy Code, to obtain the DIP Loan on the terms and conditions set forth in the Term Sheet.

## Relief Requested and Basis for Relief

35.     The Debtor requests that the Court enter interim and final orders (A) authorizing the Debtor to obtain the DIP Loan in accordance with the terms and conditions set forth in this Motion and the Term Sheet, and (B) scheduling a final hearing.

36.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." 11 U.S.C. § 364(c), *see also*, *In re Nat'l Litho, LLC*, Case No. No. 12–27566, 2013 WL 2303786 at *1 (Bankr. S.D. Fla., May 24, 2013) (slip op.); *In re Levitt & Sons, LLC*, 384 B.R. 630, 640-41 (Bankr. S.D. Fla. 2008).

37.     Section 364(c) "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Assn.* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c). *In re Snowshoe*, 789 F.2d 1085, 1088 (4th Cir. 1086). When there are few lenders likely, able or willing to extend necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct

such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*; *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 at n.4 (N.D. Ga. 1989).

38.     Moreover, in the event the debtor is unable to obtain credit under the provisions of § 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien." 11 U.S.C. § 364(d). *See Levitt & Sons*, 384 B.R. at 641; *In re Devlin*, 185 B.R. 376, 377 (Bankr.M.D.Fla.1995)(stating "Section 364(d)(1) permits the Court to authorize financing secured by a senior lien on any property of the estate if the Debtor is unable to obtain such credit otherwise"). Such relief may be granted so long as (1) the debtor is unable to obtain financing in any other permissible manner and (2) there is adequate protection of the interests of the holder of the lien on the property on which the senior lien is proposed to be granted. 11 U.S.C. 364(d)(1).

39.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors and trustees considerable deference in acting in accordance with its reasonable business judgment in obtaining such credit. *See In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

40.     Here, the DIP Loan provides the Lender with second priority senior liens on and security interests in, pursuant to Section 364(c)(2), (3), and (d), the Collateral (as defined in the Term Sheet) which is already the subject of MidFirst Bank's liens, and first priority senior liens on and security interests in all of the Debtor's remaining Collateral, subject only to the Carveout (as defined in the Term Sheet).

41.     In the exercise of its business judgment, the Debtor has concluded that the Lender is the only lender able to offer any sort of postpetition loan that meets the Debtor's working-capital needs on the terms, and within the time frame, required by the Debtor.  Courts routinely defer to the business judgment of the debtors on most business decisions, including borrowing decisions. *See, e.g., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985)("business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)(same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981)(courts generally will not second-guess a debtor's business decisions where those decisions constitute "a business judgment made in good faith, upon a reasonable basis, and within the scope of its authority under the Code"). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

42.     After appropriate investigation and analysis, the Debtor concludes that the DIP Loan is in the best interest of the estate.  Indeed, given the economic realities of this Chapter 11 Case and the fact that the Debtor does not have any unencumbered Assets, the Debtor does not believe it will be able to obtain a debtor-in-possession loan upon terms more favorable than those proposed by the Lender under the DIP Loan.

43.     Without the liquidity provided by the DIP Loan, the Debtor will be unable to insure, preserve, and maintain its Assets pending their sale, or employ the appropriate and necessary Chapter 11 professionals to represent it in this Chapter 11 Case.

44.    In addition, in the event the legal fees and costs of Debtor's undersigned counsel in any given month are less than the $50,000.00 allotted monthly amount in the Budget, then any amounts not used will be rolled over to the following month and available for payment of undersigned counsel's legal fees and costs for any following months in which such legal fees and costs exceed $50,000.00.

**<u>Interim Relief Requested</u>**

45.    Within the meaning of Fed. R. Bankr. P. 4001(c)(2), the Court may conduct a final hearing on a motion for authority to obtain post-petition financing no earlier than fourteen (14) days following service of the motion, but if requested, and as set forth in the Guidelines, the Court may conduct an interim hearing within such interim period and authorize the obtaining of credit to the extent necessary to avoid imminent and irreparable harm to the estate pending a final hearing.

46.    Absent interim approval of the DIP Loan, the Debtor's estate may suffer immediate and irreparable harm because the Debtor will be unable to pay the anticipated expenses necessary to preserve and maintain its Assets, including insurance premiums in the amount of $883,000 now due.

47.    The Debtor respectfully requests that an interim hearing be conducted by the Court on an expedited basis, followed by a final hearing not less than fourteen (14) days thereafter.

48.    Pending a final hearing on the Motion, the Debtor seeks approval to obtain an initial advance of up to but not more than $1,149,477 of the DIP Loan, in order to pay payroll, utilities, required insurance premiums, bankruptcy legal fees, and required maintenance expenses (the ***"Initial Advance"***).    The Debtor submits the initial advance is necessary to prevent

immediate and irreparable harm which could occur if insurance lapses, security personnel are not paid or the Debtor's Assets are not otherwise maintained and protected. Accordingly, the Debtor requests that the Initial Advance be made immediately upon the entry of the interim order approving this Motion (the ***"Interim Order"***).

49.     With respect to the Initial Advance, the Debtor requests that the Court find that the Lender be granted the protections of Section 364(e) of the Bankruptcy Code, and unless the Interim (or final) Order approving this Motion is stayed pending appeal prior to the funding of the Initial Advance, the reversal or modification on appeal or otherwise of the approval of the DIP Loan shall not affect the validity of the DIP Loan to the extent of the Initial Advance; and that the Lender is authorized and directed to make the Initial Advance immediately upon entry of the Interim Order with the full protections sought herein, unless a stay of the Interim Order is granted prior to the making of the Initial Advance.

50.     In connection therewith, the Debtor requests the Court waive the fourteen (14) day stay period provided by Fed. R.Civ.P. 6004(h), to the extent applicable.

## Notice

51.     Notice of this Motion has been provided to, amongst others, (i) the Office of the United States Trustee, (ii) the attorneys for the Debtor's Lender, (iii) the Debtor's secured creditors, and (iv) all parties that have requested notice in this case.

**WHEREFORE**, the Debtor respectfully requires that the Court enter an interim and final order substantially in the form attached hereto as **Exhibit B**: (i) authorizing the Debtor to enter into and borrow under DIP Loan from the Lender upon the terms and conditions set forth in the Term Sheet; (ii) authorizing the repayment of the DIP Loan pursuant to Section 364(b) of the

Bankruptcy Code; (iii) authorizing the Initial Advance; (iv) scheduling a final hearing; and (v)

for any and all further relief this Court deems just and proper.

s/ Peter D. Russin
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Florida Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Proposed Attorneys for Debtor*

### Miami International Medical Center, LLC
### Nonbinding Term Sheet
### Secured Debtor-in-Possession Loan

Dated: March 8, 2018

*This Term Sheet is <u>not</u> intended to be and should not be construed as an offer, commitment, or agreement to enter into an agreement to or to provide debtor-in-possession financing. Neither the Lender (as defined below) nor any of its affiliates shall have any obligation to commence or thereafter continue any negotiations to enter into any definitive, binding agreement, and no person or entity should rely on an eventual formation of any agreement. The foregoing shall apply to this Term Sheet, as well as to any prior and subsequent communications between the Borrower (as defined below) or its representatives and the Lender or its affiliates and representatives with respect to any debtor-in-possession credit facility and related documents, and only a definitive, written, and duly executed agreement shall be binding.*

| | |
|---|---|
| **Borrower:** | Miami International Medical Center, LLC, in its capacity as debtor and debtor in possession in a case to be filed under chapter 11 of the United States Bankruptcy Code (the "<u>Borrower</u>"). |
| **Lender:** | Variety Children's Hospital d/b/a Nicklaus Children's Hospital or an affiliate thereof (the "<u>Lender</u>"). |
| **Venue:** | United States Bankruptcy Court for the Southern District of Florida (the "<u>Bankruptcy Court</u>"). |
| **Petition Date:** | On or before March 9, 2018 (the "<u>Petition Date</u>"). |
| **DIP Facility:** | Up to $3,372,781.00 superpriority, senior secured (except as provided herein) debtor in possession credit facility (the "<u>DIP Facility</u>"), which will be advanced in separate monthly tranches, subject to satisfaction of all applicable conditions, milestones, and covenants, to cover operating expenses plus the costs and expenses of administering the Borrower's chapter 11 case (the "<u>Case</u>"), subject to and in accordance with the Budget (as defined below). Upon the Bankruptcy Court's entry of an interim order approving the DIP Facility (in a form acceptable to Lender, in its sole discretion), Lender will advance up to $1,149,447.00 of the DIP Facility, with the balance of the DIP Facility available (subject to the foregoing with respect to separate monthly tranches) upon the Bankruptcy Court's entry of a final order approving the DIP Facility (in a form acceptable to Lender in its sole discretion). |

**EXHIBIT A**

**Use of Proceeds:** The DIP Facility shall be used only to fund operating expenses, the costs and expenses of administering the Case, and other payments, in each case as set forth in and subject to the budget attached hereto (the "<u>Budget</u>"). The Borrower shall provide Lender with weekly variance reports against the Budget. All professional fees shall be subject to the requirements of section 330 of the Bankruptcy Code and Lender reserves the right to review and object to any fee application filed in the Case.

**Superpriority Administrative Expense Claim:** The DIP Facility shall have the status of an allowed superpriority administrative expense claim in the Case pursuant to section 364(c)(1), having priority over any and all administrative expenses, whether heretofore or hereafter incurred, of any kind or nature specified in sections 503(b), 507(b) or any other section of the Bankruptcy Code, subject only to the Carveout (as defined below).

**Security:** The obligations in respect of the DIP Facility, including all principal, interest, expenses, fees and other amounts owing in respect thereof, shall be secured pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code by (i) second priority senior liens on and security interests on that portion of the Collateral (as defined below) which is currently the subject of liens of MidFirst Bank; and (ii) first priority senior liens on and security interests in all of Borrower's remaining Collateral, subject only to the Carveout.

"<u>Collateral</u>" shall include all of the Borrower's right, title, and interest in and to pre and post-petition property and assets of the Borrower's estate, whether now existing or owned or hereafter arising or acquired, including, without limitation, all real and personal property, leasehold interests, receivables, general intangibles and payment intangibles, contract rights, commercial tort claims, causes of action of whatever nature, intellectual property, insurance proceeds, insurance premium refunds, tax refunds, deposits and deposit accounts, goods, inventory, machinery and equipment, goodwill and investment property, and all cash, cash equivalents, and non-cash proceeds of the foregoing.

**Termination Date:** At the Lender's election, the earliest to occur of: (a) the date on which the Lender provides written notice to the Borrower, counsel for the Borrower, and counsel for any official committee of unsecured creditors (a "<u>Committee</u>") of the occurrence of an Event of Default under the DIP Facility; (b) the effective date of a confirmed plan in the Case; (c) the closing date of any sale of assets in the Case; (d) the entry of an order converting the Case to

a case under chapter 7 of the Bankruptcy Code, subject to all accrued Chapter 11 administrative to such date; (e) the entry of an order dismissing the Case, subject to all accrued Chapter 11 administrative to such date; (f) the entry of an order appointing a chapter 11 trustee or examiner in the Case, subject to all accrued Chapter 11 administrative to such date; (g) the failure of the Borrower to timely obtain entry of an interim order and final order approving the DIP Facility, each of which must be in a form acceptable to the Lender in its reasonable discretion; and (h) 180 days after the Petition Date.

**Interest Rate:**  LIBOR plus 2.0% per annum.

**Default Interest Rate:**  1.25% in excess of the otherwise applicable non-default interest rate.

**Prepetition Obligations**  As of the date of this Term Sheet, the Borrower owes certain obligations to Lender under that certain (i) Loan Agreement, dated as of August 4, 2015 and amended on January 29, 2016, June 24, 2016 and August 4, 2017 (collectively, the "Term Loan Agreement") between the Borrower and MidFirst Bank; and (ii) Loan Agreement, dated as of February 15, 2018, between Borrower and Lender (as amended on March 8, 2018, the "Loan Agreement" and together with the Term Loan Agreement, the "Variety Loan Documents").  Borrower acknowledges, agrees and stipulates to such obligations to Lender under the Variety Loan Documents and the liens assigned to Lender thereunder. Borrower further acknowledges, agrees and stipulates that Lender shall be permitted to credit bid the total amount owed to Lender under the DIP Facility and Term Loan Agreement.

**Chapter 11 Milestones:**  *Financing Milestones*:

The Borrower shall: (a) on the Petition Date, file a motion to approve the DIP Facility, which motion shall be in form and substance acceptable to the Lender, in its sole discretion; (b) no later than five (5) business days after the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits, obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the Lender, in its sole discretion, approving the DIP Facility on an interim basis (an "Interim Order"); (c) no later than thirty (30) days after the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits, obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the Lender, in its sole discretion, approving the DIP Facility on a final basis (a "Final Order" and, together with the Interim Order, the "Orders"); and (d) additional milestones to be mutually agreed upon by Borrower

3

and Lender.

*Sale Milestones*:

The Borrower shall: (a) no later than the later of five (5) days after the Petition Date or approval by the Lender of bidding procedures, file a motion requesting approval of a comprehensive sale process, including bidding procedures, for the sale of substantially all of the Borrower's assets (a "<u>Sale</u>"), which motion, bidding procedures, and any related proposed orders shall be in form and substance acceptable to the Lender; (b) no later than thirty (30) days after the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits, obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to the Lender, approving bidding procedures for the Sale (the "<u>Sale Procedures Order</u>"); (c) no later than sixty (60) days after entry of the Sale Procedures Order, conduct an auction (an "<u>Auction</u>") to determine the highest or otherwise best bid for a Sale; (d) no later than three (3) days after conclusion of the Auction, obtain entry of an order of the Bankruptcy Court approving the Sale to the successful bidder, which order shall be in form and substance acceptable to the Lender (a "<u>Sale Order</u>"); and (e) no later than ten (10) days after entry of the Sale Order or ACHA approval, cause the Sale to be consummated.

| | |
|---|---|
| **Events of Default:** | The following shall constitute an event of default: |

(i)   The Interim Order is not entered within five (5) business days following the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits, and/or the Final Order is not entered within thirty (30) days following the Petition Date or as soon as possible thereafter that the Bankruptcy Court's schedule permits.

(ii)   The Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

(iii)   Filing of a proposed plan of reorganization or liquidation by Borrower which is not acceptable to Lender.

(iv)   Appointment in the Case of a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code.

(v)   Entry of an order amending, supplementing, staying,

vacating, revoking, reversing or otherwise modifying the DIP Facility, the Orders, or any agreement relating to the DIP Facility (the "<u>DIP Loan Agreements</u>"), without the prior written consent of the Lender.

(vi) Borrower shall request approval of any post-petition financing, other than the DIP Facility, which would not immediately repay all indebtedness and other obligations under the DIP Facility and Variety Loan Documents in full, in cash, on the date of the closing of such post-petition financing.

(vii) Entry of an order permitting any claim against, or obligation of, the Borrower (now existing or hereafter arising, of any kind or nature whatsoever), to have priority equal or superior to the priority of the Lender in respect of the DIP Facility and the liens securing the DIP Facility (the "<u>DIP Liens</u>"), other than the Carveout.

(viii) Any attempt by the Borrower to invalidate, reduce, or otherwise impair any of the Lender's rights, claims, or liens under the DIP Facility, the Orders, or other DIP Loan Agreements, or any such rights, claims, or liens shall, for any reason, cease to be valid.

(ix) Any attempt by the Borrower to invalidate, reduce, or otherwise impair any of the Lender's rights, claims, or liens related to Borrower's obligations to Lender under the Variety Loan Documents.

(x) Any attempt by the Borrower to invalidate, reduce or otherwise impair the Lender's right to credit bid the entire amount owed under the DIP Facility and the Term Loan Agreement in the Borrower's sale process.

(xi) The assertion by the Borrower of a surcharge right or claim or the entry of an order which subjects the Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code.

(xii) An order is entered granting any creditor relief from the automatic stay to exercise rights with respect to property which has a material effect on the ability of the Borrower to operate the business consistent with historical practice, maintain any material license or privilege, or dispose of the Collateral as an enterprise or going concern.

(xiii) The termination of Borrower's license to operate as a

hospital.

(xiv)   Breach of any obligation of the Borrower set forth in this Term Sheet, the Orders, or the other DIP Loan Agreements, which breach is not cured within five (5) days of the Borrower's receipt of written notice of such breach by the Lender; provided that such notice and cure period shall not be applicable to any payment obligation to Lender or of the other specifically enumerated Events of Defaults in this Term Sheet.

(xv)    Any advances under the DIP Facility are utilized to prosecute actions, claims, demands, or causes of action against the Lender or to object to or contest in any manner or to raise any defense in any pleading to the entry of the Orders, the validity, perfection, priority, or enforceability of the DIP Facility, or the rights, claims, liens, and security interests granted to the Lender prior to the Petition Date or the Orders.

(xvi)   Entry of an order authorizing or approving the Borrower's assumption, assignment, and/or rejection of any executory contract or unexpired lease without the Lender's prior written consent, which consent shall not be unreasonably withheld.

(xvii)  The sale by the Borrower, or the entry of an order approving the sale by the Borrower, of any material assets outside of the ordinary course of business without the Lender's prior written consent.

(xviii) A motion or application shall be made by any person, including the Committee, without the Lender's prior written consent challenging the amounts owed or liens provided in connection with the DIP Facility and Variety Loan Documents, and such motion or application either is in collusion with or supported, directly or indirectly, by the Borrower, or is not actively contested by the Borrower in good faith within the applicable objection period.

(xix)   Without prior written consent of the Lender, Borrower shall have failed to satisfy any of the Chapter 11 Milestones (provided that any such Milestones may be extended upon prior written consent of the Lender in its sole and absolute discretion).

(xx)    Plan exclusivity shall have been terminated.

(xxi)  After entry thereof, either of the Sale Procedures Order or Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the express written consent of Lender.

(xxii)  The occurrence and notice of (a) a material adverse effect on the business, assets, liabilities, operations, prospects, or condition (financial or other) of the Borrower, recognizing that the Borrower is filing the Case; (b) the material impairment of the ability of the Borrower to meet its obligations substantially as set forth in the Budget or to otherwise perform its obligations in connection with the DIP Facility; (c) the imposition of any obligation on the Lender, compliance with which would materially impair the Lender's ability to receive its contemplated economic benefits hereunder; (d) the material impairment of the validity or enforceability of, or the rights, claims, liens, remedies, or benefits available to the Lender under, the Orders, this Term Sheet, or any other DIP Loan Agreement; or (e) the material impairment of the validity, perfection, or priority of the DIP Liens or any lien granted in favor of the Lender.

**Remedies:** Among the other remedies to be specified, upon the occurrence of an Event of Default and following the giving of five (5) days' notice to the Borrower and any Committee, the Lender shall no longer have any obligations to fund under the DIP Facility, have relief from the automatic stay and may foreclose on all or any portion of the security for the DIP Facility and in connection with the Variety Loan Documents, take possession of all cash and collect all accounts receivable not otherwise subject to the liens of MidFirst Bank, and apply the proceeds thereof to the obligations arising under the DIP Facility and otherwise exercise remedies against the security for the DIP Facility permitted by applicable non-bankruptcy law.

**Performance Covenant:** The Borrower shall: (a) beginning the second week after the Petition Date and as of each Friday thereafter, maintain aggregate expenditures no greater than 110% of the aggregate amount projected by the Budget to be expended during the cumulative period commencing on the Petition Date and ending on such testing date; and (b) deliver to Lender, on a bi-weekly basis, a budget compliance report that sets forth on a week-to-week and cumulative basis a comparison of actual cash receipts and disbursements to projected cash receipts and disbursements for each applicable measuring period, together with a certification from the Borrower's Chief Administrative Officer that no

deviation from the Budget in excess of the permitted deviations set forth in (a) above has occurred.

**Carveout:**

The DIP Facility shall be subject to a Carveout ("Carveout") for the payment of any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a).

**Indemnification:**

The Borrower and its estate will indemnify and hold harmless the Lender, its members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (collectively, the "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with (a) the DIP Facility, the transactions contemplated thereby, and any use made or proposed to be made with the proceeds thereof, (b) the Case, or (c) the actual or alleged presence of hazardous materials on any property of the Borrower or any environmental action or proceeding relating in any way to the Borrower or any of its properties, in each case, whether or not such investigation, litigation or proceeding is brought by the Borrower, its members or creditors or an Indemnified Party, or an Indemnified Party is otherwise a party thereto, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

**Release:**

In connection with the indefeasible payment in full in cash, and the termination of, the DIP Facility, the Borrower covenants and agrees that at such time it shall execute and deliver in favor of the Lender a valid and binding termination and release agreement, in form and substance acceptable to the Lender.

**Governing Law:**

Florida (without regard to conflict of law principles), except as governed by the United States Bankruptcy Code.

**Other Terms and Conditions:**

The Lender's current intention is that the Orders will contain, in addition to those items set forth in this Term Sheet, usual and customary budget variances, representations and warranties, financial, affirmative and negative covenants, indemnities and such other terms and conditions as are typically included in debtor-in-possession facilities, all of which shall be acceptable to the Lender, in its sole discretion.

8

The Miami Medical Center (TMMC)
Budget 6 Months

| Month | Interim | 1<br>Mar-18 | 2<br>Apr-18 | 3<br>May-18 | 4<br>Jun-18 | 5<br>Juy-18 | 6<br>Aug-18 | Total |
|---|---|---|---|---|---|---|---|---|
| **Cash outflows:** | | | | | | | | |
| 9 Payroll | (40,000) | (100,000) | (80,000) | (80,000) | (100,000) | (80,000) | (100,000) | (580,000) |
| 10 Utilities (FPL, Sewer, Water) | (75,000) | (188,757) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (638,757) |
| 11 Misc. Operating Expenses | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (35,000) |
| 12 Required Insurances | (883,000) | (1,300) | (1,300) | (1,300) | (175,234) | (1,300) | (1,300) | (1,064,734) |
| 13 ACHA and Other Regulatory Fees | - | - | (59,912) | - | - | (59,912) | - | (119,824) |
| 14 Legal Fees- Bankruptcy Support | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (350,000) |
| 15 Legal Fees- Regulatory Support | - | (10,000) | (10,000) | (10,000) | - | - | - | (30,000) |
| 16 Accountant Fees | - | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (18,000) |
| 18 Investment Banker Fees | | (45,000) | (45,000) | (25,000) | (35,000) | (25,000) | (25,000) | (200,000) |
| 19 Maintenance | (96,477) | (105,163) | (5,040) | (6,165) | (5,040) | (5,040) | (5,040) | (227,967) |
| 20 BKD limited tax work | | (15,500) | | | | | | (15,500) |
| 21 MBAF Indendepent Audit ACHA | - | (25,000) | (25,000) | (25,000) | - | - | - | (75,000) |
| 22 Claims Agent | - | (500) | (500) | (1,000) | (3,000) | - | - | (5,000) |
| 23 UST Quarterly Payment | - | - | (6,500) | - | - | (6,500) | - | (13,000) |
| Total cash disbursements operating | (1,149,477) | (549,220) | (366,252) | (281,465) | (451,274) | (310,752) | (264,340) | (3,372,781) |
| | | | | | | | | |
| Total Cash Flow (Deficit) | (1,149,477) | (549,220) | (366,252) | (281,465) | (451,274) | (310,752) | (264,340) | (3,372,781) |

**Notes and Assumptions**

Line 10 - This includes adequate assurance payments required per 11 U.S.C. § 366 to FPL of $113,757.

Line 12 - This includes tail coverage on healthcare professional liability in the approximate premium amount of $883,000.

Line 14 - These amounts are estimates. It cannot be anticipated what matters will be contested and therefore these months amounts may be higher or lower. To the extent fees do not exceed the monthly amount, the balance shall be rolled over.

Line 18- The additional $10,000 payment is for marketing reimbursement and other expenses in connection with the Debtor's proposed 363 sale and that amount is subject to actual amount expended.

Line 22 - This is an estimate based on discussions with Claims Agent.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]          Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                            Chapter 11

      Debtor.

_____/

**INTERIM ORDER (A) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 364(C) AND (D) AND FED. R. BANKR. P. 4001(C); AND (B) SCHEDULING FINAL HEARING**

**THIS CAUSE** came before the Court on March ___, 2018, at ___:00 a.m./p.m. (the *"Interim Hearing"*) upon Miami International Medical Center, LLC's d/b/a The Miami Medical Center (the *"Debtor"*), Motion for Entry of Interim and Final Orders (A) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 364(c) and (d) and Fed.R.Civ.P. 4001(c), and (B) Scheduling Final Hearing [ECF No. _____] (the *"Motion"*).

_____
[1]The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

1

**EXHIBIT B**

The Court having reviewed the Motion, having heard arguments of counsel, and based upon the reasons set forth on the record which are incorporated herein by reference, makes the following **FINDINGS OF FACT**:

A.      On March 9, 2018 (the ***"Petition Date"***), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the ***"Bankruptcy Code"***), and an order for relief under section 301 of the Bankruptcy Code was entered in this case (the ***"Chapter 11 Case"***);

B.      The Debtor has been authorized to remain in possession of its property and to continue in the operation and management of its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

C.      This Court has jurisdiction over this proceeding, and over the property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in and pursuant to 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Case and for the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. § 1408.  The statutory predicate for the relief sought in the Motion is Section 364 of the Bankruptcy Code.

D.      The Debtor has demonstrated its need to obtain postpetition financing pursuant to Section 364(c) and (d) of the Bankruptcy Code.  In the absence of the DIP Loan[2] provided by the Lender, the Debtor will be unable to insure, preserve, and maintain its Assets pending sale nor will it be able to pay its Chapter 11 bankruptcy professionals, to the detriment of the estate, its creditors, and other parties in interest.   The Debtor does not otherwise have sufficient funds available to fund the administration of this Chapter 11 Case.

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

E.      Given the Debtor's current financial condition, lack of cash flow, as well as the timing of the need for the DIP Loan, coupled with the Debtor's belief it cannot obtain post-petition financing on terms more favorable than those under the DIP Loan, the Debtor has not obtained financing on terms more favorable than those provided by the Lender.  The Debtor has been unable to obtain credit allowable solely as an administrative expense pursuant to Sections 364(b), 364(c), and 503(b) of the Bankruptcy Code.

F.      Owing to the urgent need to pay for the preservation and maintenance of the Assets, immediate and irreparable damage may be caused to the estate if immediate and interim relief is not granted before a final hearing on the Motion (the ***"Final Hearing"***).

G.      The proposed financing from the Lender is fair and reasonable in all respects. As provided herein, creditors and parties in interests will have an opportunity to raise objections prior to the Final Hearing.  The DIP Term Sheet filed with the Court at ECF No. _____ is fair and reasonable and approved in all respects.

H.      The Lender is extending financing to the Debtor in good faith and, therefore, should be accorded the protections of Sections 364(e) of the Bankruptcy Code.

I.      The Court finds that the Initial Advance is necessary to avoid immediate and irreparable harm to the estate pending the Final Hearing on the Motion.

J.      Based on the Debtor's proffer and representations by its counsel on the record at the hearing, notice of the Motion and the Interim Hearing was provided by the Debtor to, among others, the Debtor's secured creditors, all parties that have requested notice in this Chapter 11 Case, all parties asserting a lien on the Assets, and the Office of the United States Trustee.  The Court finds that this notice was sufficient under the circumstances and pursuant to Fed. R. Bankr. P. 4001(c)(1)(C).

K.      Notice of the Motion and the Interim Hearing was provided by the Debtor to, *inter alia*, all parties that have requested notice in this Chapter 11 Case and the United States Trustee. The Court finds that this notice was sufficient under the circumstances.

The Court, having reviewed the Motion, having heard arguments of counsel, and based upon the reasons set forth on the record which are incorporated herein by reference, hereby **ORDERS** that:

1.      The Motion is **GRANTED** on an interim basis as set forth herein.

2.      The Debtor is authorized, on an interim basis, to obtain postpetition financing from the Lender pursuant to Section 364(c)(2) and (3), and (d), of the Bankruptcy Code subject to the terms and conditions set forth in the Motion and Term Sheet.

3.      The Debtor is authorized to take any and all actions necessary to effectuate the postpetition financing on an interim basis.

4.      The Lender is authorized to make the Initial Advance to the Debtor in the amount not to exceed $1,149,477.00 immediately upon the entry of this Order.

5.      The Initial Advance shall be used in accordance with the Budget and to maintain, insure, and preserve the Assets.

6.      Effective immediately upon the entry of this Order, the Lender is hereby granted in the amount of the Initial Advance second priority senior liens on and security interests in, pursuant to Section 364(c)(2), (3), and (d), the Collateral which is already the subject of MidFirst Bank's liens, and first priority senior liens on and security interests in all of the Debtor's remaining Collateral.

4

7.     The payment priority granted hereunder to Lender shall be subject to a carve-out for fees due the clerk of the Court or the United States Trustee pursuant to 28 U.S.C. § 1930 (the "Carveout").

8.     The Lender shall be entitled to an allowed superpriority administrative expense claim in the Chapter 11 Case in the amount of the Initial Advance, pursuant to section 364(c)(1), having priority over any and all administrative expenses, whether heretofore or hereafter incurred, of any kind or nature specified in sections 503(b), 507(b) or any other section of the Bankruptcy Code, subject only to the Carveout.

9.     With respect to the Initial Advance, the Lender is accorded the protections of Sections 364(e) of the Bankruptcy Code, and unless this Order is stayed pending appeal or otherwise prior to the funding of the Initial Advance, the reversal or modification on appeal of the approval of the DIP Loan shall not affect the validity of the DIP Loan or the priority of the liens granted to Lender to the extent of the Initial Advance. Moreover, in the event this Court modifies any of the provisions of this Order or the DIP Loan following a further hearing, then such modification shall not affect the rights and priorities granted to Lender pursuant to this Order with respect to the liens granted hereby, the DIP Loan and any portion of the indebtedness which arises or is incurred, advanced or paid pursuant to this Order and the DIP Loan, prior to such modification (or otherwise arising prior to such modification).

10.     This Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the liens granted hereunder without the necessity of filing or recording any financing statement, deeds of trust, mortgage or other instrument or document which otherwise may be required under the laws of any jurisdiction or federal or state governmental agency or the taking of any actions necessary to perfect such liens. Notwithstanding the foregoing, Lender

may, in its sole discretion, file such financing statements, notices of lien, or similar instruments or otherwise confirm perfection of such liens and security interests without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, and all such documents shall be deemed to have been filed or recorded at the time of and on the Petition Date and all recording fees and expenses shall be borne by the Debtor.

11.    The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h), to the extent applicable, are waived and shall not apply to this Interim Order. This Interim Order shall be immediately effective upon entry.

12.    This Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding by Fed. R. Bankr. P. 9014.

13.    The entry of this Order constitutes the granting of temporary and interim relief pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, and a Final Hearing on this matter shall be held **March ____, 2018 at ___:00 a.m./p.m.** at the United States Bankruptcy Court, _____.

###

**Submitted By:**
Daniel N. Gonzalez, Esquire
Florida Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
*Counsel for Debtor in Possession*
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone:    (305) 358-6363
Telefax:      (305) 358-1221

**Copies Furnished To:**
Daniel N. Gonzalez, Esquire, is directed to serve copies of this Order on all parties in interest and to file a Certificate of Service.