UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]　　　　　Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,　　　　　　　　　　　Chapter 11

　　　　Debtor.
_____/

**DECLARATION IN SUPPORT OF FIRST DAY AND EXPEDITED MOTIONS**

**I.　Introduction**

1.　My name is Jeffrey Mason. I am over the age of 18 and am competent to testify. From June 2016 through December 2017, I was the Chief Executive Officer of the Miami International Medical Center, LLC d/b/a The Miami Medical Center (the **"Debtor"**). Since January 2018, I have served as the Debtor's Chief Administrative Officer. In such capacities, I acquired a detailed knowledge of, and became familiar with, the Debtor's assets and liabilities; day-to-day operations; business and financial affairs; and books and records. I have also been the principal representative of the Debtor with respect to its restructuring initiatives.

2.　I have an undergraduate degree in nursing from the University of Toledo, a masters in business administration from Cardinal Stritch University, and hold the following licenses and certifications: Fellow of the American College of Healthcare Executives; and, licensed as a registered nurse in the states of Ohio, Wisconsin, and previously Michigan. In addition, I am the past president of the board of managers of BayCare-Aurora, LLC, and a regular featured guest editor in the "Business of Healthcare" in the Green Bay Gazette.

---

[1] The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

3. To minimize any adverse effects on its business as a result of the commencement of this chapter 11 case (the "**Chapter 11 Case**"), the Debtor intends to request various types of relief in certain "first day" applications and motions (collectively, the "**First Day Motions**"). The First Day Motions seek relief, among other things, to: (a) maintain the Debtor's limited operations while in chapter 11 with as little disruption as possible; (b) facilitate the sale of substantially all of the Debtor's assets in order to maximize the value of the Debtor's assets; and (c) establish procedures for the smooth and efficient administration of this Chapter 11 Case. The various types of relief requested in the First Day Motions are crucial to the success of the Debtor's efforts in this Chapter 11 Case.

4. I submit this declaration (the "**Declaration**") to provide an overview of the Debtor and this Chapter 11 Case and to support the Debtor's petition and First Day Motions. In addition to the personal knowledge I have acquired while working with the Debtor, I have general knowledge of the Debtor's books and records and am familiar with the Debtor's financials and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, management or advisors, or my opinion based upon my experience with the Debtor's operations and financial condition. I have relied upon the Debtor's employees and management company to accurately record, prepare and collect any such documentation and other information.

5. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

6. I am authorized to submit this Declaration on behalf of the Debtor.

7. Parts II and III of this Declaration describe the Debtor's business and developments that led to the Debtor's filing of this Chapter 11 Case, the relevant facts in support of the First Day Motions, and the Debtor's objectives in this Chapter 11 Case.

## II. Background

8. The Debtor owns and operated a regional acute care hospital (the "***Hospital***") that provided a limited suite of medical services since its opening in February 2016.

9. The Debtor is a Florida limited liability company. The Debtor's members are comprised of (i) Miami Hospital Holdings, LLC (***"MHH"***), which owns approximately sixty-nine percent (69%) of the Debtor's membership interests; and (ii) individual physicians and physician groups (but no individual group owns more than 10% of the Debtor), which collectively own thirty-one (31%) of the Debtor's remaining membership interests.

10. MHH, in turn, is owned equally by Children's Health Ventures, Inc. (***"CHV"***), and NueHealth, LLC (***"NueHealth"***). CHV is an affiliate of Variety Children's Hospital d/b/a Nicklaus Children's Hospital (***"VCH"***).

11. Prior to shutting down its operations (as discussed below), the Debtor was principally managed by NueHealth.

### A. Debtor's Leasehold Obligations

12. The land and building housing the Hospital (the ***"Property"***) was acquired by the Debtor in early 2014, and then sold to HC-5959 N.W. 7th Street, LLC (***"HC-5959"***), on April 21, 2014.

13. On April 30, 2014, the Debtor entered into that certain Amended and Restated Lease Agreement with HC-5959 (the "***Lease***") pursuant to which the Debtor agreed to lease the Property from HC-5959. Pursuant to the Lease, the Debtor was required to make monthly rent

payments to HC-5959 in the approximate amount of $970,000.00. VCH was a limited guarantor of the Lease, along with NueHealth.

14. After April 30, 2014, the Debtor renovated the Hospital into a state-of-the-art, high-end facility that offered patients concierge medical care across a number of different specialties.

15. In October 2017, the Debtor defaulted on its obligations under the Lease by, among other things, failing to pay rent due thereunder.

16. On December 28, 2017, HC-5959 transferred, sold, assigned, and conveyed all of its right, title and interest in and to, among other things, the Property and Lease to VCH. Accordingly, as of the Petition Date (as defined below), VCH is the owner of the Property and the "Landlord" under the Lease with the Debtor.

17. The Debtor has not made any payments due under the Lease to either HC-5959 or VCH since September 2017.

### B. Debtor's Financing Structure

18. On August 4, 2015, the Debtor entered into that certain Loan Agreement (the "***Loan Agreement***") with MidFirst Bank ("***MidFirst***") pursuant to which MidFirst agreed to lend Forty Million Dollars ($40,000,000) (the "***Loan***") to the Debtor. The Loan was evidenced by that certain revolving promissory note in the principal face amount of Eleven Million Two Hundred Thousand Dollars ($11,200,000) (the "***Revolving Note***") and that certain promissory note in the principal face amount of Twenty-Eight Million Eight Hundred Thousand Dollars ($28,800,000) (the "***Term Note***"). VCH was a limited guarantor of the Loan, along with NueHealth.

19. Pursuant to certain amendments to the Loan Agreement dated as of January 29, 2016, June 24, 2016 and August 4, 2017, the principal balance of the Revolving Note was increased to Nineteen Million Six Hundred Thousand Dollars ($19,600,000).

20. On January 14, 2018, Variety entered into that certain Assignment for Note Purchase and Partial Assignment of Security Agreement dated as of January 24, 2018 (the *"Assignment"*), pursuant to which MidFirst assigned all of its right, title and interest to the Term Note as well as that portion of that certain Security Agreement (Assets) dated August 4, 2015 signed by Debtor in favor of MidFirst to VCH, which covers all of the Debtor's equipment, medical equipment, computer equipment, computer hardware, computer software, computer software licenses, medical supplies, furniture and hospital beds and all proceeds and products thereof described in that certain UCC-1 Financing Statement No. 201504643818 filed with the Florida Secured Transaction Registry (the *"Equipment"*). At the time of the Assignment, the Loan was in default. Currently, the outstanding balance under the Term Note is approximately $26,270,000.00.

21. On or around December 1, 2017, MidFirst exercised its security interest and has refused the Debtor access to its cash and accounts receivable collections since that time. MidFirst has been applying such cash and accounts receivable collections to pay down the Revolving Note. As of the Petition Date, the Debtor owes approximately $9,000,000 to MidFirst on account of the Revolving Note.

22. Without access to its cash or accounts receivable, the Debtor has relied on funding from its members, including a loan from MHH totaling $13,000,000.

23. On February 15, 2018, the Debtor entered into that certain Loan Agreement with VCH, which was subsequently amended on March 8, 2018, through which VCH loaned the

5

Debtor $2,232,392.03 (the "***VCH Loan Agreement***").  The VCH loan is evidenced by that certain Promissory Note dated as of February 15, 2018 by the Debtor in favor of NCH (as amended on March 8, 2018, the "***VCH Note***" and together with the VCH Loan Agreement, the ***"Prepetition Credit Agreement"***).  As of the Petition Date, the Debtor was indebted to VCH, without defense, counterclaim, or offset of any kind, in respect of the Prepetition Credit Agreement in the amount of $2,232,392.03, plus accrued and unpaid interest with respect thereto.

    C. <u>**Events Leading to Chapter 11**</u>

24.    From the date the Debtor commenced operations through October 2017, the Debtor has struggled to generate sufficient revenue to cover its expenses due to, among other reasons, obstacles in attracting sufficient patient volume.  As a result of its liquidity constraints, the Debtor has been unable to pay its expenses as they became due, including its obligations under the Lease and Loan Agreement.  Since its inception, the Debtor has relied on funding from its members in order to sustain its operations.

25.    On October 20, 2017, the Debtor sent a letter to the State of Florida Agency for Health Care Administration ("***AHCA***") requesting its license be placed on inactive status while it pursued its restructuring alternatives.  On October 23, 2017, AHCA granted the Debtor's request, and October 30, 2017, the Debtor's AHCA became inactive. Since then, the Debtor has not had any patients under its care and today employees a handful of employees necessary to maintain the Debtor's assets and govern the Debtor's reorganization efforts in this case.

26.    Due to the Debtor's financial situation, on July 26, 2017, the Debtor retained Bayshore Partners, LLC (***"Bayshore"***), to provide the Debtor investment banking services and market the Debtor's assets for sale.  Prepetition, twelve of forty-eight parties contacted by

6

Bayshore executed confidentiality agreements and were provided a copy of the Confidential Information Memorandum regarding the Debtor. However, none of the twelve parties consummated a transaction with the Debtor.

27. On the date hereof (the "***Petition Date***"), the Debtor commenced the instant case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C §§ 101 et. seq. (the "***Bankruptcy Code***"). The Debtor intends to sell substantially all of its assets via a Court approved Section 363 auction, which will include a transfer of the Debtor's AHCA hospital license.

### III. First Day and Expedited Motions[2]

28. Concurrently with the filing of this Chapter 11 Case, the Debtor filed several First Day Motions and will be filing several motions seeking expedited relief. With respect to the First Day Motions, the Debtor requests that the Court conduct a hearing as soon as possible after the commencement of the Debtor's Chapter 11 Case (the ***"First Day Hearing"***), during which the Court will hear arguments of counsel with respect to the First Day Motions.

### First Day Motions

29. I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to maximize the value of the Debtor's assets for all creditors of its estate, and to avoid immediate and irreparable harm to same.

**A. Debtor's Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Debtor In Possession To Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 364(C) and (D) and Fed.R.Bankr.P. 4001(C); and (B) Scheduling Final Hearing**

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the respective motion or application, as defined, in this section of the Declaration.

30. Concurrently herewith, the Debtor filed an emergency motion seeking approval of a $3,372,781.00 credit facility (the **"DIP Loan"**) funded by VCH pursuant to section 364(c) and (d) of the Bankruptcy Code. The DIP Loan will be used to fund the Debtor's monthly expenses over a six (6) month period, which expenses include (but are not limited to) insurance premium payments, AHCA audit payments, utility payments, payroll, expenses to maintain the Hospital Facility, and bankruptcy professionals' administrative expenses. The Debtor has no source of funding other than the DIP Loan, is not generating any revenue and has no unencumbered cash.

31. The DIP Loan will be secured by first priority liens on assets which are already the subject of first priority liens held by VCH related to the Term Note, and second priority liens on assets which are subject to MidFirst's first priority liens related to the Revolving Note.

**B. Debtor's Emergency Motion for Authorization to Pay Certain Prepetition Employee Obligations and Maintain and Continue Employee Benefits and Programs (the "*Wage Motion*")**

32. Concurrently herewith, the Debtor filed its Wage Motion seeking payment of its Worksite Employees. The Debtor seeks such relief because any delay in paying employee compensation, deductions, or benefits will negatively impact the Debtor's relationship with its employees. The Debtor's Worksite Employees are important to the success of the Debtor's efforts in this Chapter 11 Case in order to maintain the Hospital Facility and the status quo pending the closing of a sale transaction.

33. Because the amounts represented by employee compensation, benefits, and deductions are needed to enable the employees to meet their own personal obligations, absent the relief requested in the Wage Motion, the Worksite Employees could suffer undue hardship if the Wage Motion is not granted.

**C. Debtor's Emergency Motion for Entry of an Order Directing the Filing of Patient Information Under Seal and Related Relief (the "*Patient Motion*")**

34. Concurrently herewith, the Debtor filed an emergency motion to establish procedures relating to certain patient information. The Debtor believes that certain patients of the Debtor may have claims against its estate and that publishing the names of such patients may constitute a violation of HIPAA (Health Insurance Portability and Accountability Act of 1996). HIPAA is federal legislation that provides data privacy and security provisions for safeguarding medical information.

35. Specifically, the Debtor seeks through its Patient Motion a Court order directing it to file a separate Schedule F and patient matrix under seal and requiring that any notices that the BNC or Clerk of the Court has served on the Court's matrix in this Chapter 11 Case be served by the Debtor's counsel upon the patients and file a certificate of service under seal.

### D. Debtor's Emergency Application for Approval of Employment of Trustee Services, Inc. as Claims Agent of the Bankruptcy Court (the "*Claims Agent Motion*")

36. Concurrently herewith, the Debtor filed an emergency application to employ Trustee Services, Inc. (*"TSI"*) as Claims Agent. The Debtor believes that certain former patients of the Debtor may have claims against its estate and that publishing the names of such patients may constitute a violation of HIPAA (Health Insurance Portability and Accountability Act of 1996). Therefore, the Claims Agent is necessary to restrict the claims register and e-POCs in this case to protect patients' privacy. This is an emergency matter in as much as the Court would need to customize the notice of meeting of creditors to reflect the Claims Agent and process of filing claims.

37. Specifically, the Debtor seeks through its Claims Agent Motion a Court order authorizing the Debtor to employ the Claims Agent in this case and setting forth the establishment and handling of the claims filed in this case, especially claims filed by patients.

**Expedited Motions**

### E. Debtor's Motion for Entry of an Order Finding Appointment of Patient Care Ombudsman Unnecessary (the "*Ombudsman Motion*")

38. Concurrently herewith, the Debtor filed a motion for entry of an order finding that the appointment of a patient care ombudsman ("***PCO***"), pursuant to section 333(a)(1), is not necessary.

39. Specifically, and as detailed in the Ombudsman Motion, the Debtor is not currently operating and has no patients under its care. Accordingly, because the role of the PCO is to monitor ongoing patient care, the statutory purpose would not be served by the appointment of a PCO in this Chapter 11 Case. Further, all patient records are being managed by Nicklaus Children's Hospital Health Information Management pursuant to an IT Management Services Agreement with the Debtor. Thus, I believe the appointment of a PCO is unwarranted in this Chapter 11 Case.

### F. Debtor's Motion for an Order Authorizing Payment of Prepetition Claims of Critical Vendors (the "*Critical Vendor Motion*")

40. Concurrently herewith, the Debtor filed an expedited motion seeking the payment of critical vendors related to the maintenance of the Hospital Facility. Specifically, the Debtor requests a Court order approving the Critical Vendor Motion in order to ensure the maintenance of the Hospital Facility.

### G. Debtor's Application, on an Interim and Final Basis, Authorizing the Employment of Peter D. Russin, Esq., and the Law Firm of Meland, Russin & Budwick, P.A., as Attorneys for the Debtor and Debtor in Possession *Nunc Pro Tunc* to Petition Date (the "*MRB Application*").

41. The Debtor seeks authority to retain, on an interim and final basis, Peter D. Russin, Esq., and the law firm of Meland, Russin & Budwick, P.A. (***"MRB"***) as general bankruptcy counsel *nunc pro tunc* to the Petition Date. As detailed in the MRB Application, the

Debtor understands that Mr. Russin and MRB have extensive experience representing chapter 11 debtors in this district and that they are well-qualified to serve as general bankruptcy counsel to the Debtor. The Debtor believes it is in its best interests, and those of its creditors, that Mr. Russin and MRB be retained to serve as Debtor's general bankruptcy counsel in its Chapter 11 Case.

42. To the best of the Debtor's knowledge, except as disclosed in the Declaration of Peter D. Russin, Esq., neither Mr. Russin nor MRB have any connection with the Debtor's creditors or other parties in interest or their respective attorneys. Because there is a myriad of relief that must be sought from the Court immediately, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtor requires the Court's approval to obtain a DIP Loan (as defined herein) and approve a Section 363 sale process of its assets. Without the ability to obtain the DIP Loan, the Debtor will be unable to pay necessary operating expenses to maintain and maximize the value of its assets for the benefit of its creditors. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain MRB as the Debtor's general bankruptcy counsel.

### H. Debtor's Application for and Order (I) Approving the Employment of Bayshore Partners, LLC as Investment Banker to the Debtor in Possession and (II) Assuming Prepetition Engagement Agreement (the "*Bayshore Motion*")

43. The Debtor seeks authority to retain Bayshore as its investment banker and assume Bayshore's prepetition engagement agreement with the Debtor, subject to certain limited modifications. As detailed in the Bayshore Motion, Bayshore began marketing the Debtor's

assets prepetition and has extensive knowledge regarding such assets and the Debtor's business operations.

44. I believe that the employment of Bayshore is critical to efficiently and properly market the Debtor's assets for an eventual section 363 sale. Moreover, given the timing of the proposed auction of the Debtor's assets (and the transfer of the Debtor's AHCA license), it is critical that Bayshore be employed immediately so that it can begin to market the Debtor's assets.

**I. Debtor's Application, on an Interim and Final Basis, Authorizing the Employment of Barry E. Mukamal, CPA and KapilaMukamal as Accountants *Nunc Pro Tunc* to Petition Date (the "*KM Application*")**

45. The Debtor seeks authority to retain Barry Mukamal and KapilaMukamal as its general accountants in its Chapter 11 Case.

46. Specifically, the Debtor requires KM's assistant with the following:

   a. Preparing or reviewing the monthly operating reports required by the bankruptcy court, as requested by Debtor;

   b. Preparing or reviewing the financial budgets, projections, project cost and profitability estimates, as requested by Debtor;

   c. Providing assistance in developing or reviewing plans of reorganization or disclosure statements, including tax ramifications, as requested by Debtor;

   d. Other bankruptcy related issues to facilitate a Plan of Reorganization, as requested by Debtor;

   e. Tax compliance filings and matters, as requested by Debtor; and

   f. Review and analyze the reporting of any DIP financing arrangements and budgets, as requested by Debtor.

47. The above enumerated tasks are necessary as the Debtor navigates through its Chapter 11 Case.

**J. Debtor's Application for an Order, on an Interim and Final Basis, For Employment of Special Regulatory Counsel (the "*Acuff Application*")**

48.  The Debtor seeks authority to retain, on an interim and final basis, Karl D. Acuff, Esq., as special regulatory counsel to the Debtor advising on regulatory compliance matters.

49.  As detailed in the Acuff Application, Mr. Acuff will advise the Debtor regarding its Acute Care Hospital license with AHCA, in connection with the contemplated asset sale, and maintaining the license during this period of transition, which includes discussions with AHCA staff and counsel regarding any outstanding matters or any new matters which may arise during the course of this Chapter 11 Case.

50.  Because Mr. Acuff has extensive health care law experience representing hospitals in dealings with AHCA, I believe it is in the Debtor's best interests, and those of its creditors, that Mr. Acuff be retained to serve as Debtor's special regulatory counsel in its Chapter 11 Case.

**K. Debtor's Application for an Order, on an Interim and Final Basis, Authorizing the Employment of Tim J. Wilson, CPA, and BKD, LLP, as Limited Purpose Accountants *Nunc Pro Tunc* to Petition Date (the "*BKD Application*").**

51.  The Debtor seeks authority to retain, on an interim and final basis, Tim J. Wilson and BKD, to perform limited tax work encompassing preparation of the Debtor's 2017 tax returns, W-2's, 1099's, and K-1's, which are now due.

52.  BKD was the Debtor's prepetition accounting firm, and accordingly has in its possession the Debtor's tax work papers and an institutional understanding of the Debtor's business and capital structure.

53.  Given the evident synergy between BKD and the Debtor, coupled with simple efficiency, I believe it is in the best interest of the Debtor and its creditors to retain BKD on an interim and final basis so that it can prepare and complete the aforementioned tax work.

**L. Debtor's Motion for Entry of (A) an Order Approving Bidding Procedures and Notice Procedures and (B) an Order (I) Approving the Asset Purchase Agreement (II) Authorizing the Sale of All or Substantially All of the Assets of the Debtor Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Scheduling Dates To Conduct Auction And Hearing To Consider Final Approval of Sale, and (V) Granting Related Relief (the "*Sale Motion*")**

54. Concurrently herewith, the Debtor filed its Sale Motion through which it is seeking a Court order approving a proposed stalking horse purchase agreement with VCH for substantially all of the Debtor's assets (including its ACHA license) free and clear of all liens, claims and encumbrances, authorizing the assumption of certain contracts and unexpired leases, scheduling an auction approximately 60 days after the Court enters an order approving the Sale Motion, and approving bidding procedures.

55. Currently, the Debtor's AHCA license is set to expire in October 2017. Therefore, it is imperative that the Court approve the Sale Motion as soon as possible to allow the Debtor to begin the sale process and obtain an auction date. Once a winning bidder is approved by the Court, the winning bidder will need to begin the AHCA license transfer process by filing a CHOW application with AHCA – which process can take over three months to complete (and sometimes longer).

56. Given the foregoing timing, I believe it is in the Debtor's and its creditors best interest that the Court approve the Sale Motion as soon as possible.

**IV.  Debtor's Objectives in the Chapter 11 Case**

57. The primary purposes of the filing of this Chapter 11 Case are to (a) maintain the Debtor's current operations while in chapter 11 with as little disruption as possible, including maintaining the AHCA license and the Hospital Facility; and to (b) facilitate the sale of some or substantially all of the Debtor's assets, including the transfer of the AHCA license, in order to

maximize the value of the Debtor's enterprise for all creditor constituents. The various types of relief requested in the First Day Motions are crucial to the success of the Debtor's sale efforts. Through the First Day Motions described above and other motions and applications the Debtor intends to file shortly after the Petition Date, the Debtor hopes to minimize any adverse effects that this Chapter 11 Case might otherwise have on the current state of its business. For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

## 28 U.S.C. § 1746 DECLARATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this _____ day of _____ 2018 in Miami, Florida.

_____
Jeffrey Mason
Chief Administrative Offer
Miami International Medical Center, LLC d/b/a The Miami Medical Center

these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

## 28 U.S.C. § 1746 DECLARATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this __8th__ day of __MARCH__ 2018 in Miami, Florida.

_____
Jeffrey Mason
Chief Administrative Offer
Miami International Medical Center, LLC d/b/a The Miami Medical Center

15