UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]          Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                      Chapter 11

     Debtor.

_____/

**DEBTOR'S MOTION FOR ENTRY OF (A) AN ORDER APPROVING BIDDING
PROCEDURES, (B) APPROVING CERTAIN PROTECTIONS TO STALKING HORSE
PURCHASER,  (C) APPROVING NOTICE PROCEDURES, AND (D) AN ORDER
(I) APPROVING THE ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE
SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV)
SCHEDULING DATES TO CONDUCT AUCTION AND HEARING TO CONSIDER
FINAL APPROVAL OF SALE, AND (V) GRANTING RELATED RELIEF**

*(Expedited Hearing Requested on April 12, 2018 at 1:30 p.m.)*

The Debtor is a regional acute care hospital that provided a limited
suite of medical services from its opening in February 2016 until it
voluntarily requested temporary suspension of its operating license
from the State of Florida Agency for Health Care Administration
("*AHCA*") in October 2017.  Since its shutdown in October 2017,
the Debtor has not had any patients under its care.  The Debtor
carries significant secured and unsecured debt, and despite
currently not operating, the Debtor continues to incur significant
monthly expenses which it proposes to fund with a DIP Loan (as
defined herein) funded by the Stalking Horse Purchaser (as defined
herein).  In addition, the Debtor's most valuable asset is its AHCA
hospital license (discussed in greater detail herein), which is
currently inactive and is set to expire in October 2018.  The
process to transfer the AHCA hospital license to a potential
purchaser other than the Stalking Horse Purchaser will require a

---

[1]The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

lengthy approval process (possibly up to 7 months).  Given the Debtor's monthly expenses and the amount of available funds under the DIP Loan, coupled with the time necessary to market and sell its assets and transfer the AHCA hospital license, the Debtor requests that the Court set the instant Motion for hearing on an expedited basis in order to allow the sale process (and related marketing) proposed herein to begin immediately.

Miami International Medical Center, LLC d/b/a The Miami Medical Center (the *"Debtor"*), by and through its undersigned counsel and pursuant to 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014, and Local Rules 2002-1(C)(2), 6004-1, 6006-1, and 9075-1, files this motion (the *"Motion"*) for the entry of (a) an order, substantially in the form attached hereto as **Exhibit A** (the *"Bidding Procedures Order"*), approving proposed bid and notice procedures (the *"Bidding Procedures"*) and proposed bid protections to be provided to the Stalking Horse Purchaser; and (b) an order, substantially in the form to be filed with the Court at a later date (the *"Sale Order"*), (i) approving an asset purchase agreement, substantially in the form attached hereto as **Exhibit B** (the *"Asset Purchase Agreement"*), for the sale of all or substantially all of the Debtor's assets to Variety Children's Hospital d/b/a Nicklaus Children's Hospital (the *"Stalking Horse Purchaser"* or *"VCH"*), or to the Successful Bidder[2] to be identified at the Auction, as defined below, (ii) authorizing the sale of all or substantially all of the assets of the Debtor free and clear of all liens, claims, encumbrances, and other interests (collectively, the *"Claims and Interests"*), (iii) scheduling dates to conduct the Auction and hearing to consider final approval of the sale, (iv) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the *"Assigned Contracts"*) to the Stalking Horse Purchaser or the Successful Bidder, and (v)

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, or the Bidding Procedures, as applicable.

granting such other and further relief as is just and proper.  In further support of the Motion, the

Debtor respectfully states as follows:

## LOCAL BANKRUPTCY RULE 6004-1 CONCISE STATEMENT

In accordance with Local Bankruptcy Rule 6004-1, below is a summary of the nature of

the Debtor's request:

- Identity of the Purchaser.  Because the sale is subject to higher and better offers, the identity of the purchaser is currently unknown.  However, the Stalking Horse Purchaser is Variety Children's Hospital d/b/a Nicklaus Children's Hospital, which is prepared to execute the Asset Purchase Agreement with the Debtor for the purchase of all or substantially all of the Debtor's Assets.  The Stalking Horse Purchaser is an affiliate of CHV, which in turns owns a membership interest in the Debtor through MHH, (pg. 1 of the Asset Purchase Agreement).

- The Sale Terms

  o The Purchase Price: Credit Bid in the approximate amount of $30,000,000.00, plus the Assumed Liabilities (pgs. 4-5 of the Asset Purchase Agreement).
  o Deposit: N/A
  o Warranties:  The sale is "AS IS, WHERE IS, WITH ALL FAULTS, AND NO WARRANTIES EXPRESS OR IMPLIED," as further detailed in the Asset Purchase Agreement (pg. 21 of the Asset Purchase Agreement).
  o Closing Date:  Within five (5) business days of all of the conditions to Closing set forth in Articles 7 and 8 of the Asset Purchase Agreement having been satisfied or waived, or (ii) such other date agreed to in writing by Buyer and Seller (pg. 4 of the Asset Purchase Agreement).
  o Closing Conditions:  Entry of the Sale Order in form and substance acceptable to the Stalking Horse Purchaser, among other conditions (pg. 16 of the Asset Purchase Agreement).

- The Auction Terms

  o Higher and Better Offers: The sale is subject to higher and better offers (pg. 5 of Bidding Procedures Order).
  o Proposed Auction Date:  Sixty (60) days following entry of the Bidding Procedures Order (as defined below) (pg. 5 of Bidding Procedures Order).
  o Proposed Bid Deadline:  Two (2) business days before the Auction (pg. 5 of Bidding Procedures Order).
  o Minimum Incremental Bid:  $100,000.00, unless the Debtor decides a higher/lower amount during the Auction (pg. 19 of Bidding Procedures Order).
  o Initial Overbid Amount: Credit Bid Amount, plus the Assumed Liabilities, plus $150,000.00, plus any adjustments required, if applicable, necessary to pay all

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

transaction fees (including to the Debtor's Investment Banker) to the extent the sale to an entity other than the Stalking Horse Purchaser produces insufficient cash to pay such transaction fees. (pg. 16 of Bidding Procedures Order).

- <u>Requirements of Competing Bidders</u>

  o Minimum Deposit: $1,500,000.00.
  o Documentation Requirements: Amongst other items, (i) documents evidencing the financial ability to consummate a transaction and substantial likelihood of obtaining necessary regulatory approvals in the sole and absolute discretion of the Debtor, (ii) executed Asset Purchase Agreement (in clean and redline) in substantially similar form as the Asset Purchase Agreement approved by the Court, and (iii) compliance with the Bidding Procedures (as defined below).

- <u>Purchaser Protections Not Otherwise Described</u>

  o Proposed Break-up Fee: Three percent (3%) of the outstanding DIP Loan amount.
  o There are no matching rights, except for the Stalking Horse Purchaser's right to credit bid.

- The Debtor does have a policy of prohibiting the transfer of personally identifiable information, the proposed sale is consistent with the policy, and the Debtor does not believe a consumer privacy ombudsman is required under Section 322 of the Bankruptcy Code.

- <u>Identity of All Known Lienholders</u>.  The Stalking Horse Purchaser has a first position senior secured lien on substantially all of the Assets being sold pursuant to the proposed Asset Purchase Agreement.  There are numerous junior lienholders claiming an interest in such Assets.

- <u>Statement Requesting Dates for Hearings and Auction</u>.  As discussed above, the Debtor requests an expedited hearing on this Motion.

## **Jurisdiction and Venue**

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.  The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the **"Bankruptcy Code"**), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), and Rules 2002-

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

1(C)(2), 6004-1, and 6006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Florida (the ***"Local Bankruptcy Rules"***).

<u>**Background**</u>

3.    On March 9, 2018 (the ***"Petition Date"***), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and an order for relief under section 301 of the Bankruptcy Code was entered in this case (the ***"Chapter 11 Case"***).

4.    The Debtor has been authorized to remain in possession of its property and to continue in the operation and management of its business as a debtor in possession pursuant to Section 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.  On March 22, 2018, the Office of the United States Trustee appointed an unsecured creditors committee.  *See* ECF No. 66.

5.    The Debtor is a regional acute care hospital that provided a limited suite of medical services from its opening in February 2016 until it voluntarily requested temporary suspension of its operating license from AHCA in October 2017.  Since its shutdown in October 2017, the Debtor has not had any patients under its care.

6.    The Debtor is a Florida limited liability company.   The Debtor's members are comprised of (i) Miami Hospital Holdings, LLC (***"MHH"***), which owns approximately sixty-nine percent (69%) of the Debtor's membership interests; and (ii) individual physicians and physician groups (but no individual group owns more than 10% of the Debtor), which collectively own thirty-one (31%) of the Debtor's remaining membership interests.

7.    MHH, in turn, is owned equally by Children's Health Ventures, Inc. (***"CHV"***), and NueHealth, LLC (***"NueHealth"***).  CHV is an affiliate of the Stalking Horse Purchaser.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

8. The land and building housing the hospital facility (the *"Hospital Facility"*) was acquired by the Debtor in early 2014, and then sold to HC-5959 N.W. 7th Street, LLC (*"HC59"*), on April 21, 2014.

9. On April 30, 2014, the Debtor entered into a lease agreement with HC59 pursuant to which the Debtor agreed to lease the Property from HC59 (the *"Lease"*). Pursuant to the Lease and subsequent modifications thereto, the Debtor was required to make monthly rent payments to HC-5959 in the approximate amount of $970,000.00. VCH was a limited guarantor of the Lease.

10. After April 30, 2014, the Debtor renovated the Hospital Facility into a state-of-the-art, high-end facility that offered patients concierge medical care across a number of different specialties.

11. On August 4, 2015, the Debtor entered into that certain Loan Agreement (the "*Loan Agreement*") with MidFirst Bank ("*MidFirst*") pursuant to which MidFirst agreed to lend Forty Million Dollars ($40,000,000) (the "*Loan*") to the Debtor. The Loan was evidenced by that certain revolving promissory note in the principal face amount of Eleven Million Two Hundred Thousand Dollars ($11,200,000) (the "*Revolving Note*") and that certain promissory note in the principal face amount of Twenty-Eight Million Eight Hundred Thousand Dollars ($28,800,000) (the "*Term Note*"). VCH was a limited guarantor of the Loan.

12. From the date the Debtor commenced operations through October 2017, the Debtor struggled to generate sufficient revenue to cover its expenses due to, among other reasons, obstacles in attracting sufficient patient volume. As a result of its liquidity constraints, the Debtor has been unable to pay its expenses as they became due, including its obligations under the Lease and Loan Agreement. Since its inception, the Debtor has relied on funding from its members in order to sustain its operations.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

13. Due to the Debtor's financial situation, on July 26, 2017, the Debtor retained Bayshore Partners, LLC (*"Bayshore"*), to provide the Debtor investment banking services and market the Debtor's assets for sale. With the aid of Bayshore, numerous companies in the healthcare industry expressed serious interest in acquiring the Assets (as defined below) of the Debtor. Specifically, as a result of Bayshore's pre-bankruptcy marketing efforts, twelve of forty-eight parties contacted by Bayshore executed confidentiality agreements and were provided a copy of the Confidential Information Memorandum regarding the Debtor. Of these twelve parties, several provided written indications of interest and conducted due diligence of the Debtor.

14. On January 14, 2018, VCH entered into that certain Assignment for Note Purchase and Partial Assignment of Security Agreement dated as of January 24, 2018 (the *"Assignment"*), pursuant to which MidFirst assigned all of its right, title and interest to the Term Note as well as that portion of that certain Security Agreement (Assets) dated August 4, 2015 signed by Debtor in favor of MidFirst to VCH, which covers all of the Debtor's equipment, medical equipment, computer equipment, computer hardware, computer software, computer software licenses, medical supplies, furniture and hospital beds and all proceeds and products thereof described in that certain UCC-1 Financing Statement No. 201504643818 filed with the Florida Secured Transaction Registry. At the time of the Assignment, the Loan was in default. As of the Petition Date, the outstanding balance under the Term Note was not less than $26,273,693.19 (together with accrued interest, costs, expenses, and fees, the *"Term Loan Balance"*). Pursuant to the Assignment, MidFirst retained its security interest and first position liens in the Debtor's cash and accounts receivable (which are not being used or sold by the Debtor).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

15. In addition, on February 15, 2018, the Debtor and the Stalking Horse Purchaser entered into that certain Loan Agreement and Promissory Note which were amended on March 8, 2018, through which the Stalking Horse Purchaser agreed to lend the Debtor $2,232,392.03

16. The Debtor believes the sale of its Assets through a Section 363 sale process will maximize the value of the Debtor's Assets.

<u>**Assets to be Sold**</u>

17. The purpose of the sale process will be to provide for a sale of substantially all of the Debtor's assets and operations, the assumption and assignment of certain executory contracts and the transfer of the Debtor's AHCA hospital license (collectively, the ***"Assets"***), as a going concernto the party that submits the highest and best offer in accordance with the Bidding Procedures (as described more fully below).

<u>**The Stalking Horse Purchaser's Proposal**</u>

18. Prior to the Petition Date, the Stalking Horse Purchaser expressed an interest in acquiring the Debtor's assets through a credit bid of amounts owed related to the Term Loan Balance and DIP Loan (as defined below). To facilitate an orderly sale process and maintain the Debtor's business and assets, the Stalking Horse Purchaser also agreed to fund the Debtor's postpetition financing needs, through a proposed senior secured debtor-in-possession credit agreement up to the amount of $3,372,781 (the ***"DIP Loan"***). Accordingly, on March 9, 2018, the Debtor filed its Emergency Motion for Entry of Interim and Final Orders (a) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. 364(c) and (d) and Fed.R.Bankr.P. 4001(c); and (b) Scheduling Final Hearing (the ***"DIP Motion"***)[ECF No. 9], which requests Court approval of the DIP Loan.

19. An Interim Order (a) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. 364(c) and (d) and Fed.R.Bankr.P. 4001(c); and (b) Scheduling

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Final Hearing was entered on March 15, 2018 [ECF No. 44], which provided interim relief through an advance of $40,000.00 to the Debtor under the DIP Loan. Thereafter, on March 23, 2018, the Court entered its Second Interim Order (a) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. 364(c) and (d) and Fed.R.Bankr.P. 4001(c); and (b) Scheduling Final Hearing [ECF No. 68], which provided interim relief through an additional advance of $1,099,477.00, and set a final hearing on the DIP Motion for April 12, 2018. As of the filing date of this Motion, the Stalking Horse Purchaser has advanced to the Debtor $1,139,477 on an interim basis under the DIP Loan.

20. As a result of the Term Loan Balance and the current amount funded pursuant to the DIP Loan, the Stalking Horse Purchaser holds today not less than approximately $27,400,000.00 in secured indebtedness owed by the Debtor (in addition to any other amounts funded under the DIP Loan, the *"Secured Debt Amount"* or *"Credit Bid Amount"*).

21. To ensure the Debtor receives the highest and best offer for the sale of substantially all of its assets, the Debtor, together with Bayshore, will pursue a marketing process for the sale of the Debtor's assets and contact a number of potential strategic investors and financial investors that might be interested in purchasing the Debtor's assets. To the extent the Debtor receives competitive offers, based on certain qualification criteria described in detail below, the Debtor will conduct an auction to determine the highest and best bid for the Debtor's assets (the *"Auction"*). The primary purpose of the sale process will be to provide for a sale of substantially all of the Debtor's Assets.

## The Asset Purchase Agreement

22. As described above, the Debtor has negotiated with the Stalking Horse Purchaser the terms of a possible acquisition. These negotiations culminated in the Asset Purchase Agreement with the Stalking Horse Purchaser. The Debtor believes that, subject to the receipt of higher and

better proposals through the Bidding Procedures, the Asset Purchase Agreement represents the best alternative currently available.

23. Through the Asset Purchase Agreement, the Stalking Horse Purchaser proposes to purchase the Assets via a credit bid of its Secured Debt Amount, as well as pay all costs and expenses necessary to consummate the transaction contemplated by the Asset Purchase Agreement.

### Bidding Procedures[3]

24. The Debtor will solicit bids for the Assets utilizing the Bidding Procedures, substantially in the form attached as **Exhibit 1** to the Bidding Procedures Order. The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among bidders and the Debtor, the receipt and negotiation of bids received, the conduct of any Auction, and the selection and approval of the Successful Bidder. The price to be paid by the Successful Bidder for the Assets will be established at the Auction.

25. The Bidding Procedures were developed to best meet the Debtor's competing needs to conduct an expedited sale process and to promote participation and active bidding. Moreover, the Bidding Procedures reflect the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion, while ensuring that the highest and best bid is generated for the Assets.

26. The following sets forth a summary of the key provisions of the Bidding Procedures:

---

[3]  The summary of the Bidding Procedures contained in this Motion is qualified in its entirety by reference to the Bidding Procedures. Any conflict between the terms described in this Motion and the Bidding Procedures shall be resolved in favor of the Bidding Procedures.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

**Marketing Process**

(a)  Contact Parties:  The Debtor, in consultation with Bayshore, will develop a list of parties (in addition to the Stalking Horse Purchaser) who the Debtor and Bayshore believe may potentially be interested in consummating a competing transaction for the Assets (any such transaction, an "Alternative Transaction") and have the financial ability to do so, which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties").  The Debtor and Bayshore will contact the Contact Parties to explore their interest in pursuing an Alternative Transaction. The Contact Parties may include parties whom the Debtor or its advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction.  The Debtor will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b)  Information Package:  The Debtor may distribute to each Contact Party an "Information Package," comprising:

(i)  A cover letter;

(ii)  A copy of these Bidding Procedures and the Motion;

(iii)  A copy of a confidentiality agreement; and

(iv)  Such other materials as the Debtor and Bayshore deem appropriate under the circumstances including, but not limited to, preliminary "teaser" information.

(c)  Access to Diligence Materials:  To receive access to due diligence information (the "Diligence Materials"), a party must submit to the Debtor an executed confidentiality agreement in the form and substance satisfactory to the Debtor and the Debtor shall have a reasonable basis to believe that the party has the financial capability to consummate an Alternative Transaction. A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Buyer." All due diligence requests must be directed to Bayshore.

(d)  Due Diligence from Bidders: Each Preliminary Interested Buyer and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtor or its advisors regarding such Bidder and its contemplated transaction.  Failure by a Preliminary Interested Buyer to comply with requests related to due diligence access will be a basis for the Debtor to determine that such bidder is not a Qualified Bidder.  Failure by a Qualified Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access will be a basis for the Debtor to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

## Auction Qualification Process

(a) To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtor to satisfy each of the conditions set forth below. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

  (i) <u>Good Faith Deposit</u>: Each Bid must be accompanied by a deposit in the amount of $1,500,000 to an non-interest-bearing escrow account to be identified and established by the Debtor (the "<u>Good Faith Deposit</u>"). The Stalking Horse Purchaser shall not be required to submit a Good Faith Deposit.

  (ii) <u>Bids for Portions of Debtor's Assets</u>: A Bid may offer to purchase all or substantially all of the Debtor's Assets or only a portion of the Debtor's Assets; <u>provided</u> that the Debtor determine, in its sole discretion, that the aggregate consideration offered by any Bid or combination of Bids for all or substantially all of the Debtor's assets satisfies the "Minimum Bid" requirements set forth in clause (v) below.

  (iii) <u>Same or Better Terms</u>: Each Bid must be on terms that, in the Debtor's business judgment, are the same or better than the terms of the Asset Purchase Agreement.

  (iv) <u>Executed Agreement</u>: Each Bid must be based on the Asset Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "<u>Modified Purchase Agreement</u>"). A Bid shall also include a copy of the Asset Purchase Agreement marked against the Modified Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove all provisions that apply only to the Stalking Horse Purchaser).

  (v) <u>Minimum Bid</u>: A Bid or any combination of Bids for all or substantially all of the Debtor's Assets must propose a minimum purchase price equal to or greater than $**[XX]** in cash, which amount would equal the Credit Bid Amount of the Stalking Horse Purchaser and include an additional $150,000, plus any Assumed Liabilities, plus any adjustments required, if applicable, necessary to pay all transaction fees (including to the Debtor's Investment Banker) to the extent the sale to an entity other than the Stalking Horse Purchaser produces insufficient cash to pay such transaction fees.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

(vi)    <u>Designation of Assigned Contracts and Leases</u>: A Bid must identify any and all executory contracts and unexpired leases of the Debtor that the Bidder wishes to have assumed and assigned to it at closing pursuant to an Alternative Transaction.

(vii)    <u>Assumption of Liabilities</u>:  A Bid must provide for the payment or assumption of at least all or substantially all of the Assumed Liabilities.

(viii)    <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Alternative Transaction; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternative Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Alternative Transaction by the equity holder(s) of such Bidder.

(ix)    <u>Proof of Ability to Perform</u>:  A Bid must include written evidence that the Debtor concludes in its sole discretion (in consultation with its advisors) demonstrates that the Bidder has the ability to close the Alternative Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternative Transaction. Such information must include, inter alia, the following:

a.    contact names and numbers for verification of financing sources;

b.    evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments to close the Alternative Transaction;

c.    evidence of the Bidder's ability to satisfy regulatory and licensing requirements;

d.    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtor; and

e.    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Bidder has the ability to close the Alternative Transaction.

(x)    <u>Contingencies</u>:  Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtor than those set forth in the Asset Purchase Agreement and (b) may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may

13

be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(xi)    <u>Irrevocable</u>:  Each Bid must be irrevocable through the Auction date, <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid at the Auction, such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(xii)    <u>Bid Deadline</u>:  The following parties must receive a Bid in writing, on or before **two business days before the Auction at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"):  (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn:  Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131, Attn: Joshua Kaye, Esq., Thomas Califano, Esq., and Rachel Nanes, Esq; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

*A Bid received from a Bidder before the Bid Deadline that meets the above requirements for the applicable assets shall constitute a "Qualified Bid" for such assets, and such Bidder shall constitute a "Qualified Bidder" for such assets.*  Notwithstanding anything herein to the contrary, the Asset Purchase Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder.  In addition, the Stalking Horse Purchaser will receive a copy of any Bids submitted to the Debtor, and the Debtor shall inform counsel to the Stalking Horse Purchaser whether the Debtor will consider such Bids to be Qualified Bids no later than three (3) days prior to the Auction.

## <u>Auction</u>

If one or more Qualified Bids for the Debtor's assets (other than the Asset Purchase Agreement submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Debtor will conduct an Auction to determine the highest and best Qualified Bid or combination of Qualified Bids for any of the Debtor's Assets.  This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate and may include, among other things, the following:  (a) the amount and nature of the consideration; (b) the number, type, and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale or sales of the Debtor's Assets and the cost to Debtor of such modifications or delay; (d) the total consideration to be received by Debtor; (e) the likelihood of the Bidder's ability to close a transaction, obtain necessary regulatory and licensing approvals and the timing thereof; and (f) the net benefit to the Debtor's estate (collectively, the "<u>Bid Assessment Criteria</u>").  If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtor may determine not to conduct the Auction.  Unless otherwise agreed to by the Stalking Horse Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

## Procedures for Auction

The Auction shall take place on [_____] at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, or such other place and time as the Debtor shall notify all Qualified Bidders, including, without limitation, the Stalking Horse Purchaser, counsel for the Stalking Horse Purchaser and other invitees.  The Auction shall be conducted according to the following procedures:

Only the Debtor, Bayshore, the Stalking Horse Purchaser, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction in person, and only the Stalking Horse Purchaser and any other Qualified Bidders will be entitled to make any Bids at the Auction.

(b)     The Debtor Shall Conduct the Auction:  The Debtor and its professionals shall direct and preside over the Auction.  Other than as expressly set forth herein, the Debtor may conduct the Auction in the manner it determines will result in the highest, best, or otherwise financially superior offer for the Debtor's Assets.  At the start of the Auction, the Debtor shall describe the terms of the highest and best Qualified Bid or Qualified Bids received prior to the Bid Deadline (each such highest and best Qualified Bid, the "Auction Baseline Bid").  Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein and (b) has reviewed and understands and accepts the Bidding Procedures.

(i)     Terms of Overbids:  An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the respective Auction Baseline Bid for such Auction.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(ii)     Minimum Overbid Increments:  Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $100,000.  Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration.

(iii)     Stalking Horse Purchaser May Credit Bid:  The Stalking Horse Purchaser shall be permitted to bid at the Auction, if any, and shall be permitted to credit bid the Credit Bid Amount pursuant to any Overbid in connection with each round of bidding in the Auction.

(iv)     Remaining Terms Are the Same as for Qualified Bids:  Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtor accept a higher Overbid.

15

At the Debtor's discretion, to the extent not previously provided (which shall be determined by the Debtor), a Bidder submitting an Overbid at any Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Bidder's ability to close the Alternative Transaction proposed by such Overbid.

(v)     <u>Announcement of Overbids</u>:  The Debtor shall announce at the Auction the material terms of each Overbid.

(vi)    <u>Consideration of Overbids</u>:   The Debtor reserves the right, in its reasonable business judgment, to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Debtor and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternative Transaction at the prevailing Overbid amount.

(c)    <u>Backup Bidder</u>:   Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Bidder or Bidders with the next highest or otherwise best Bid or combination of Bids at the Auction, as determined by the Debtor, in the exercise of its business judgment, will be designated as the potential backup bidder (collectively, the "<u>Potential Backup Bidder</u>").  In the event that a Bidder or Bidders other than the Stalking Horse Purchaser are identified by the Debtor as the Potential Backup Bidder, such Bidder or Bidders shall be required to serve as the backup bidder or backup bidders (collectively, the "<u>Backup Bidder</u>").  Except for the Stalking Horse Purchaser, the Backup Bidder shall be required to keep its initial Bid or combination of Bids (or if the Backup Bidder submitted one or more Overbids at the Auction, the final respective Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the date of the Auction (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder, which is later.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Debtor may designate the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction or transactions, with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder.  The deposit of the Backup Bidder shall be held by the Debtor until the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

earlier of 72 hours after (i) the closing of the transaction or transactions with the Successful Bidder and (ii) the Outside Backup Date.

(d)     <u>Additional Procedures</u>:  The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.

(e)     <u>Consent to Jurisdiction as Condition to Bidding</u>:  The Stalking Horse Purchaser, all Qualified Bidders, and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtor, this chapter 11 case, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternative Transaction documents and waived any right to a jury trial in connection with any disputes relating to the Debtor, this Chapter 11 case, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternative Transaction documents.

(f)     <u>Sale Is As Is/Where Is</u>:  The Assets of the Debtor sold pursuant to the Bidding Procedures, shall be conveyed at Closing in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED,**" as further detailed in the Asset Purchase Agreement.

(g)     <u>Closing the Auction</u>:  The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids for the Assets of the Debtor sold pursuant to the Bidding Procedures that the Debtor determines in its reasonable business judgment, after consultation with its financial and legal advisors, is the highest and best Qualified Bid at the Auction for the Assets.  Thereafter, the Debtor shall select one Qualified Bid, which produces the highest and best recovery to the estate, as the overall highest and best Qualified Bid (the "<u>Successful Bid</u>," and each Bidder submitting such Successful Bid, a "<u>Successful Bidder</u>").  In making this decision, the Debtor, in consultation with its financial and legal advisors, shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder for the Debtor's Assets submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

### Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in one or more non-interest-bearing escrow accounts by the Debtor, but shall not become property of the Debtor's estate absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the respective Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder for the Assets and (b) the Outside Backup Date. If a Successful Bidder timely closes its winning transaction, its Good Faith Deposit shall be credited towards the purchase price.

### Reservation of Rights

Except as otherwise provided in the Asset Purchase Agreement, the Bidding Procedures or the Sale Order, the Debtor further reserves the right as it may reasonably determine to be in the best interest of its estate, to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtor and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures or implement additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement. Notwithstanding the foregoing, the Stalking Horse Purchaser shall be a Qualified Bidder and shall be entitled to credit bid the Credit Bid Amount.

### Proposed Assumption Procedures

27. To facilitate and effect the sale of the Assets, the Debtor seeks authority to assume and assign certain of the Debtor's executory contracts and unexpired leases (each a *"Contract or Lease"* and, collectively, the *"Contracts and Leases"*) designated in the Asset Purchase Agreement, consistent with the procedures established in the Bidding Procedures Order and the Asset Purchase Agreement. The Debtor proposes that the procedures set forth in the Bidding Procedures Order apply whether the Stalking Horse Purchaser or another party is the Successful Bidder.

28. The proposed Assumption Procedures are as follows:

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

a)   **Notice**.    As soon as practicable after entry of the Bidding Procedures Order, the Debtor will serve the notice attached as **Exhibit 3** to the Bidding Procedures Order (the **"Cure Notice"**) on the counterparty to the Contract or Lease.

b)   **Content of Cure Notice**.   The Cure Notice will contain the following information: (i) the title of the Contract to be assumed; (ii) the name of the counterparty to the Contract; (iii) any applicable cure amounts, whether arising prepetition or postpetition (the **"Cure Amount"**); and (iv) the deadline by which any such Contract or Lease counterparty must object.

c)   **Objections**.   Objections to the proposed Cure Amount and adequate assurance of future performance of obligations to the counterparties to each Contract or Lease must: (i) be in writing; (ii) set forth the nature of the objector's claims against or interests in the Debtor's estate, and the basis for the objection and the specific grounds therefore; (iii) comply with the Bankruptcy Rules and the Local Bankruptcy Rules and Orders of this Court; and (iv) be filed with the Court and served upon the Debtor, the Stalking Horse Purchaser, and the U.S. Trustee, so as to be received no later than **4:00 p.m. (Eastern time) on** [_____].

d)   **Effects of Filing an Objection to a Cure Notice**. A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtor with respect to the relevant cure objection, but will not constitute an objection to the remaining relief requested in the Motion.

## Relief Requested

29. The Debtor respectfully requests the entry of (a) an order approving the Bidding Procedures and the bid protections; and (b) an order (i) approving the Asset Purchase Agreement for the sale of all of the Debtor's Assets to the Stalking Horse Purchaser or the Successful Bidder, (ii) authorizing the sale of all or substantially all of the Assets of the Debtor free and clear of all Claims and Interests, (iii) authorizing the assumption and assignment of the Assigned Contracts to the Stalking Horse Purchaser or the Successful Bidder, and (iv) granting such other and further relief as is just and proper.

19

**Basis for Relief**

**II.     The Bidding Procedures Are Appropriate and in the Best Interests of the Debtor, Its Estate, and Its Creditors.**

    **A.     The Proposed Notice of the Bidding Procedures Is Appropriate.**

30. The Debtor seeks to sell the Assets through a publicized sale and Auction.  The Debtor and Bayshore have prepared an initial list of Contact Parties who will receive a copy of the Information Package, and will contact the Contact Parties to explore their interest in pursuing an Alternative Transaction.  The list of Contact Parties will be specifically designed to encompass those parties who the Debtor believes may be potentially interested in pursuing an Alternative Transaction and who the Debtor reasonably believes may have the financial resources to consummate an Alternative Transaction.  The Bidding Procedures are designed to elicit bids from one or more parties and to encourage a robust Auction of the Assets, maximizing the value for the Debtor's estate and its creditors.

31. Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any Auction, the terms and conditions of a sale, and the deadline for filing any objections.

32. The Debtor will also serve the notice of this Motion on other interested parties as described below.  The Debtor believes that the foregoing notice is sufficient to provide effective notice of the Bidding Procedures and the Auction to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Debtor's marketing process, while minimizing costs to the estate.  Accordingly, the Debtor respectfully requests that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bidding Procedures or the Auction is required.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

**B.      The Bidding Procedures Are Appropriate and Will Maximize Value.**

33. Bidding procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets.  *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

34. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc.* (*In re Barn Stores, Inc.*), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

35. To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc.* (*In re Integrated Res. Inc.*), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding . . . maximize the value of the debtor's assets").

36. The Debtor believes that the Bidding Procedures will promote active bidding from any seriously interested parties that may exist and will dispel any doubt as to the best and highest offer reasonably available for the Assets.  The Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close an Alternative Transaction.  The Debtor also believes that the Bidding Procedures will establish the parameters under which the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

value of any Alternative Transaction may be tested at the Auction.  In summary, the Debtor believes that the Bidding Procedures will encourage bidding, that they are consistent with other procedures previously approved by courts in this and other districts and that the Bidding Procedures are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See In re Friendly's Ice Cream Corp.*, No. 11-13167 (Bankr. D. Del. Oct. 5, 2011).

37. Thus, the Bidding Procedures are reasonable, appropriate and within the Debtor's sound business judgment under the circumstances because the Bidding Procedures are designed to maximize the value to be received by the Debtor's estate.

### C.    The Initial and Subsequent Overbids Are Appropriate.

38. One important component of the Bidding Procedures is the "overbid" provision.  The Minimum Bid, which is the amount of the lowest possible first overbid above the Credit Bid Amount, must represent an amount equal to at least the Credit Bid Amount plus $150,000, plus any Assumed Liabilities, plus any adjustments required, if applicable, necessary to pay all transaction fees (including to the Debtor's Investment Banker) to the extent the sale an entity other than the Stalking Horse Purchaser produces insufficient cash to pay such transaction fees. ***Subsequent bids must be in minimum increments of at least*** $100,000 ***(the "<u>Minimum Overbid</u>"), provided that the Debtor shall retain the right to modify the bid increment requirements at the Auction.***

39. The Debtor believes that such Minimum Overbid is reasonable under the circumstances, and will enable the Debtor to maximize the value for such assets while limiting any chilling effect in the marketing process.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

**D.    The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate.**

40. Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed Cure Amount or (b) reserving amounts with respect to any disputed Cure Amounts.

**III.    Approval Of The Proposed Sale Transaction Is Appropriate And In The Best Interests Of The Estate.**

**A.    The Sale of the Assets is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtor's Business Judgment.**

41. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

42. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re Delaware & Hudson Ry. Co.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

43. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

44. Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.  Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions.  *See Pitt v. First Wellington Canyon Assocs.* (*In re First Wellington Canyon Assocs.*), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

45. The true value of the Assets will be tested through the Auction pursuant to the Bidding Procedures.  Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair Auction process — the best means for establishing whether a fair and reasonable price is being paid.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

46. Thus, the Debtor submits that the Asset Purchase Agreement with the Successful Bidder will constitute the highest and best offer for the Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Assets through an Auction process and subsequently to enter into the Asset Purchase Agreement with the Successful Bidder will be a valid and sound exercise of the Debtor's business judgment. The Debtor will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtor requests that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtor's business judgment and is rightly authorized.

## B.    The Sale of the Acquired Assets Free and Clear of Claims and Interests is Authorized by Section 363 of the Bankruptcy Code.

47. The Debtor further submits that it is appropriate to sell the Assets free and clear of all Claims and Interests, pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

(a)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided at least one of the subsections is met).

48. This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

49. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of all Claims and Interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

50. The Debtor believes that one or more of the tests of section 363(f) of the Bankruptcy Code will be satisfied with respect to the transfer of the Assets pursuant to the Asset Purchase Agreement.  In particular, the Debtor believes that at least section 363(f)(2) of the Bankruptcy Code will be met because each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this motion, will be deemed to have consented to, the sale and transfer of the Assets.  Any lienholder also will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtor for the sale of the Assets to the Successful Bidder, in the same order of priority, with the same validity, force and effect that such creditor had prior to

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

such sale, subject to any claims and defenses the Debtor and its estate may possess with respect

thereto.  Accordingly, section 363(f) of the Bankruptcy Code authorizes the sale and transfer of

the Assets free and clear any such Claims and Interests.

      **C.**      **The Successful Bidder is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer and Sale of the Assets Does Not Violate Section 363(n) of the Bankruptcy Code.**

51. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit

in *In re Abbotts Dairies of Pa., Inc.* held that:

> [t]he requirement that a [buyer] act in . . . good faith speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citation omitted).

52. As such, a party would have to show fraud or collusion between the

Successful Bidder and the Debtor or other Bidders to demonstrate a lack of good faith.  *See*

*Kabro Assocs. of West Islip, L.L.C. v. Colony Hill Assocs.* (*In re Colony Hill Assocs.*), 111 F.3d

269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith

status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the

trustee or an attempt to take grossly unfair advantage of other bidders"); *see also In re Angelika*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

*Films, 57th, Inc.*, 1997 WL 283412, at *7 (S.D.N.Y. 1997); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

53. By the time of execution of the Asset Purchase Agreement, the Debtor and the Successful Bidder will have engaged in thorough arms-length negotiations over the terms of the Asset Purchase Agreement. In addition, the Successful Bidder will have complied with the terms and conditions of the Bidding Procedures Order. Notwithstanding the fact that the Stalking Horse Purchaser is an affiliate of CHV, which in turns owns a membership interest in the Debtor through MHH, the Stalking Horse Purchaser has acted in the utmost good faith. The Stalking Horse Purchaser has funded the Debtor's expenses and operations in a manner calculated to maximize the value of the Debtor's assets.

54. Moreover, in this case, there will be absolutely no fraud of any kind. The Debtor will ensure that the Asset Purchase Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Successful Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtor requests that the Court make a finding at the Sale Hearing that the Asset Purchase Agreement reached with the Successful Bidder was at arms'-length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

**D.    Credit Bidding Should Be Authorized under Section 363(k) of the Bankruptcy Code.**

55. A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

56. The Stalking Horse Purchaser is entitled to credit bid some or all of its claims in the Debtor's collateral pursuant to section 363(k) of the Bankruptcy Code.  Because the Stalking Horse Purchaser holds claims that are secured by substantially all of the Assets, the Stalking Horse Purchaser should be allowed to credit bid the Credit Bid Amount in order to purchase the Assets under the Asset Purchase Agreement.

### E.     Assumption and Assignment of the Assigned Contracts Is Authorized by Section 365 of the Bankruptcy Code.

57. Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> > (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;
> >
> > (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

> such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

58. The standard in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)(describing business judgment test as "traditional") (superceded in part by 11 U.S.C. § 1113).

59. Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.")(citation omitted).

60. In the present case, the Debtor's assumption and assignment of the Assigned Contracts to the Successful Bidder will meet the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Asset Purchase Agreement will provide significant benefits to the Debtor's estate. Because the Debtor cannot obtain the benefits of the Asset Purchase

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Agreement without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtor's business judgment.

61. Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

62. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

63. Pursuant to the Bidding Procedures, the Debtor will require potential Bidders to provide evidence constituting adequate assurance of future performance, to be provided to counterparties to Assigned Contracts upon their request.    Moreover, counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

performance by any of the Bidders.  Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

64. In addition, under section 365(d)(4) of the Bankruptcy Code, the Debtor is allotted an initial 120-day period to assume or reject executory contracts and nonresidential real property leases.  A court may grant an extension of up to an additional 90 days after the initial 120-day period for cause shown.

65. To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtor also requests that the Sale Order provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

66. Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

67. Section 365(f)(l) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.  *See, e.g.*, *Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365") *cert. denied*, 522 U.S. 1148 (1998).  Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  *See, e.g.*, *In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

68. Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").  Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).  Thus, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## Notice

69. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the Southern District of

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Florida; (b) counsel to the proposed Stalking Horse Purchaser; (c) the Committee; and (d) any party that may have a particular interest in this Motion. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

70. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter (a) the Bidding Procedures Order, (b) the Sale Order, and (c) an Order granting such other and further relief as is just and proper.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that, on March 30, 2018, a true and correct copy of the foregoing was served via the Court's Notice of Electronic Filing upon Registered Users set forth on the attached list. Upon the docketing of the Notice of Hearing for the foregoing, service of both this motion and the Notice of Hearing thereon will be made via U.S. Mail upon all parties on the Matrix and Patient Matrix and a supplemental certificate of service shall be filed.

s/ Peter D. Russin
Peter D. Russin, Esquire
Fla. Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Fla. Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Counsel for Debtor in Possession*

# Mailing Information for Case 18-12741-LMI

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- Johanna Armengol     Johanna.Armengol@usdoj.gov, johanna.armengol@usdoj.gov
- Jorge L Fors     jfors@forslegal.com, info@forslegal.com
- Daniel N Gonzalez     dgonzalez@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com;dgonzalez@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- Harvey W Gurland     hwgurland@duanemorris.com, nmcastillo@duanemorris.com;pnmendoza@duanemorris.com;AutoDocketMIA@duanemorris.com
- Andrew R Herron     aherron@herronortiz.com, ndrubin@herronortiz.com
- Matthew L Lines     lines@irlaw.com
- Isaac M Marcushamer     imarcushamer@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Rachel Nanes     rachel.nanes@dlapiper.com, yohami.lamguerra@dlapiper.com;monica.tucker@dlapiper.com;docketingchicago@dlapiper.com
- Office of the US Trustee     USTPRegion21.MM.ECF@usdoj.gov
- Jordan L Rappaport     office@rorlawfirm.com, 1678370420@filings.docketbird.com
- Peter D. Russin     prussin@melandrussin.com, ltannenbaum@melandrussin.com;mrbnefs@yahoo.com;prussin@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- Paul Steven Singerman     singerman@bergersingerman.com, mdiaz@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Trustee Services, Inc.     kaw@trusteeservices.biz, sandirose.magder@gmail.com;laura@trusteeservices.biz

## **EXHIBIT A**

**Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]          Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,          Chapter 11

      Debtor.
_____/

**ORDER (A) APPROVING BIDDING PROCEDURES;
(B) APPROVING CERTAIN PROTECTIONS TO STALKING HORSE PURCHASER;
(C) APPROVING FORM AND MANNER OF NOTICES; (D) APPROVING
FORM OF ASSET PURCHASE AGREEMENT; (E) AUTHORIZING THE SALE OF
ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (F)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (G)  SCHEDULING DATES**

---

[1] The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

## TO CONDUCT AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE; AND (H) GRANTING RELATED RELIEF

**THIS CAUSE** came before the Court on April ___, 2018 at __:__ _.m., upon the motion (the "Motion") of the above-captioned debtor in possession (the "Debtor") for entry of an order (A) approving  Bidding Procedures,[2] substantially in the form attached hereto as **Exhibit 1**, (B) approving certain protections to Variety Children's Hospital, d/b/a Nicklaus Children's Hospital, a Florida non-profit corporation (the "Stalking Horse Purchaser"), (C) approving form and manner of notices, (D) approving form of asset purchase agreement, (E)   authorizing the sale of substantially all of the Debtor's Assets free and clear of all liens, claims, encumbrances and other interests, (F) authorizing the assumption and assignment of certain executory contracts and unexpired leases, (G) scheduling dates to conduct an auction and hearing to consider final approval of sale, and (H) certain related relief (this "Bidding Procedures Order"); and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the  proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is

**FOUND, CONCLUDED AND DETERMINED THAT**:

  A.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

---

[2]Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Asset Purchase Agreement, or the Bidding Procedures, as applicable.

B.      The Court has jurisdiction over the Motion and the transactions contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"); Bankruptcy Rules 2002(a)(2), 6004, and 6006; and Rules 2002-1(C)(2), 6004-1, and 6006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Florida (the "Local Bankruptcy Rules").

D.      Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein with respect to the Sale Hearing.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

E.      The Debtor's proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the sale of substantially all of the Debtor's Assets, the Bidding Procedures to be employed in connection therewith, and the Sale Hearing.

F.      The Cure Notice (defined below) attached hereto as **Exhibit 2** is reasonably calculated to provide all non-Debtor counterparties (the "Contract Parties") to the Debtor's executory contracts and unexpired leases (each a "Contract or Lease" and, collectively, the "Contracts and Leases") with proper notice of the potential assumption and assignment of their executory contract or unexpired lease and any Cure Amounts (defined below) relating thereto, although the mere listing of any executory contract or unexpired lease on the Cure Notice does

3

not require or guarantee that such executory contract or unexpired lease will be assumed and assigned, and all rights of the Debtor with respect to such Contracts and Leases are reserved.

G.      The Debtor has articulated good and sufficient reasons for the Court to: (1) approve the Bidding Procedures; (2) set the Sale Hearing and approve the manner of notice of the Motion and the Sale Hearing; (3) approve the procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assigned Contracts"), including notice of proposed Cure Amounts (defined below); and (4) approve the Break-Up Fee as provided in the Asset Purchase Agreement and in this Bidding Procedures Order.

H.      The Break-Up Fee to be paid under the circumstances described herein to the Stalking Horse Purchaser (1) is an actual and necessary cost of preserving the Debtor's estate within the meaning of Bankruptcy Code section 503(b); (2) is commensurate to the real and substantial benefits conferred upon the Debtor's estate by the entry of the Stalking Horse Purchaser into the Asset Purchase Agreement; and (3) is reasonable and appropriate in light of the size and nature of the proposed transaction, the commitments that have been made and the efforts that have been or will be expended by the Stalking Horse Purchaser.

I.      The Debtor has demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee to the Stalking Horse Purchaser under the circumstances, timing and procedures set forth in the Motion.

J.      The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

K.      The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Assets.

L.      The proposed sale of the Assets is consistent with section 363(b)(1)(A) of the

4

Bankruptcy Code and the Debtor's existing privacy policy, and no consumer privacy ombudsman is necessary in connection with the sale or sales of the Debtor's Assets.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.   The Motion is GRANTED to the extent set forth herein.

2.   Any and all objections and responses to the Motion that have not been withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

3.   The Bidding Procedures, attached hereto as **Exhibit 1**, are hereby approved in all respects and shall govern all bid and bid proceedings relating the sale of the Debtor's Assets. The Debtor is authorized to take any and all actions necessary to implement the Bidding Procedures.

4.   The failure specifically to include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impact the effectiveness of such procedure, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

5.   The Debtor may pursue a sale of the Assets and enter into the transactions contemplated by the Asset Purchase Agreement by conducting an Auction in accordance with the Bidding Procedures.

6.   The Bid Deadline is [_____].   All Potential Bidders are required to provide copies of their bids so as to be received by the following parties on or before the Bid Deadline: [INSERT PARTIES].

7.   The Auction, if necessary under the Bidding Procedures, shall take place on **[_____] at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtor,

Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, or such other place and time as the Debtor shall notify all Qualified Bidders, including, without limitation, the Stalking Horse Purchaser, counsel for the Stalking Horse Purchaser and other invitees.  The Auction shall be conducted in accordance with the Bidding Procedures.

8.  The Sale Hearing shall be held before the Court on **[_____ at __:_0 _.m. (prevailing Eastern Time)]**.

9.  Objections, if any, to the sale of the Assets and the transaction contemplated by the Asset Purchase Agreement, or the relief requested in the Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on **[_____]** (the "Sale Objection Deadline"); and be served such that they are actually received by the Sale Objection Deadline to:  (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn:  Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500,  Miami, Florida 33131, Attn: Joshua Kaye, Esq., Thomas Califano, Esq., and Rachel Nanes, Esq.,; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

10. The Stalking Horse shall constitute a Qualified Bidder (as defined in the Bidding Procedures) for all purposes and in all respects with regard to the Bidding Procedures.   The

Stalking Horse is permitted to credit bid the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code.

11. The Debtor is hereby authorized, in the exercise of its sound business judgment, to pay the Stalking Horse, as set forth in the Asset Purchase Agreement and pursuant to the Bidding Procedures, and the Break-Up Fee, subject to the terms of this Bidding Procedures Order and the Asset Purchase Agreement.  The payment of the Break-Up Fee shall be conditioned on the consummation of a sale to a party that is not the Stalking Horse Purchaser.

12. The notice of the proposed sale of the Debtor's Assets, substantially in the form attached hereto as **Exhibit 3** (the "Sale Notice"), is hereby approved.

13. On or before three (3) business days after entry of this Bidding Procedures Order, the Debtor will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following:  (a) all creditors or their counsel known to the Debtor to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Assets; (b) the U.S. Trustee; (c) the creditors listed on the Debtor's list of 20 largest unsecured creditors; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtor or recording offices or any other governmental authorities that, as a result of the sale of the Assets, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Assets or have any known interest in the relief requested by the Motion; (e) counsel to the Stalking Horse Purchaser; (f) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (g) all parties to any litigation involving the Debtor; (h) all Contract Parties of the Debtor; and (i) all potential Bidders previously identified or otherwise known to the Debtor.

7

14. The notice of potential assumption and assignment of the Contracts and Leases, substantially in the form attached hereto as **Exhibit 2** (the "Cure Notice"), is hereby approved.

15. On or before ten (10) business days after the entry of this Bidding Procedures Order, the Debtor shall serve by first class mail, overnight delivery, facsimile or electronic mail, as the case may be and in the Debtor's sole discretion, the Cure Notice on all Contract Parties.  The Cure Notice shall identify the Contracts and Leases and provide the corresponding cure amounts that the Debtor believes must be paid to cure all prepetition defaults under the Contracts and Leases (the "Cure Amounts").

16. Unless the Contract Party to any Contract or Lease files an objection to its scheduled Cure Amount or to the assumption and assignment of a Contract or Lease, and serves a copy of the such objection so as to be received no later than the Sale Objection Deadline to:  (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn:  Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131, Attn: Joshua Kaye, Esq., Thomas Califano, Esq. and Rachel Nanes, Esq.; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman; such Contract Party shall be forever barred and estopped from objecting (1) to the Cure Amount and from asserting that any additional amounts are due or defaults exist, (2) that any conditions to assumption and assignment must be satisfied under such Contract or Lease before it can be assumed and assigned or that any required consent to assignment has not been given or (3) that the Stalking Horse Purchaser has not provided adequate assurance of future performance.

17. In accordance with the Bidding Procedures, promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall announce the Successful Bid and shall file with the Bankruptcy Court a notice of the Successful Bid and Successful Bidder.  Only if the Stalking Horse Purchaser is not the Successful Bidder for the Debtor's assets, the Contract Parties shall have until the Sale Hearing to object to the assumption and assignment of a Contract or Lease solely on the issue of whether the Successful Bidder (if not the Stalking Horse Purchaser) can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (each an "Adequate Assurance Objection"); provided, however, that if the Stalking Horse Purchaser is the sole Successful Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline.  All objections to the assumption and assignment of Contracts and Leases that do not relate to the issue of whether the Successful Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

18. In the event of a timely filed objection and dispute regarding:  (a) any Cure Amount with respect to any of the Contracts and Leases; (b) the ability of the Successful Bidder (including the Stalking Horse Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under a Contract or Lease; or (c) any other matter pertaining to assumption, the Cure Amount shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Contract of Lease; provided, however, that the Debtor is authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder (including the Stalking Horse Purchaser) without any further notice to or action, order or approval of the Court.

19. Within five (5) business days after the Closing Date, the Debtor will file a complete list of the Contracts and Leases that were assumed and assigned as Assigned Contracts, as of the Closing Date, in connection with the sales of the Assets.

20. The Auction and/or Sale Hearing may be continued by the Debtor from time to time, for an aggregate period of up to five business (5) days without further notice to creditors or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for the Sale Hearing.

21. Except as otherwise provided in the Asset Purchase Agreement or this Bidding Procedures Order, the Debtor's rights are reserved, as they may reasonably determine to be in the best interests of its estate, to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtor and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures or implement additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.  Notwithstanding the foregoing, the Stalking Horse Purchaser shall be deemed a Qualified Bidder and shall be entitled to credit bid the Credit Bid Amount in the Sale.

22. To the extent that any Chapter 11 plan confirmed in this case or any order confirming any such plan or any other order in this case (including any order entered after any conversion of this case to a case under Chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding Procedures Order shall control, including, without limitation, provisions related to the payment of the Break-Up Fee to the Stalking Horse Purchaser.  The Debtor's obligations under this Bidding Procedures Order, the provision of this Bidding Procedures Order and the portions of the Asset Purchase Agreement pertaining to the Bidding Procedures (including all obligations to pay the Expense Reimbursement) shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtor, and the reorganized or reconstituted Debtor, as the case may be, after the effective date of a confirmed plan in the Debtor's case (including any order entered after any conversion of this case to a case under Chapter 7 of the Bankruptcy Code).

23. Notwithstanding anything to the contrary contained herein, (1) any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtor under any order approving debtor-in-possession financing (a "<u>DIP Order</u>"), and (2) any claim for which payment is authorized pursuant to this Order that is treated as an administrative expense of the Debtor's estate shall be and is subject and subordinate to any and all claims, liens, security interests, and priorities granted to the Lender (as defined in the DIP Order) in accordance with and subject to the terms of the applicable DIP Order, and payment on any such claim shall be subject to any and all restrictions on payments in the DIP Order and any other order of the Court.

24. The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Bidding Procedures Order shall be effective immediately upon its entry.

25. All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26. The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the motion.

27. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Bidding Procedures Order.

###

**Submitted By:**
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
Attorneys for Debtor-in-Possession
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone:     (305) 358-6363
Telefax:        (305) 358-1221

**Copies Furnished To:**
Peter D. Russin, Esquire, is directed to serve copies of this Order on all parties in interest and to file a Certificate of Service.

## **EXHIBIT 1**

**Bidding Procedures**

# BIDDING PROCEDURES[1]

By the Motion dated March [__], 2018, Miami International Medical Center, LLC d/b/a The Miami Medical Center (the "Debtor"), sought approval of, among other things, the procedures through which it will determine the highest or otherwise best price for the sale of substantially all of its assets (the "Assets") described in the Asset Purchase Agreement by and among, Variety Children's Hospital d/b/a Nicklaus Children's Hospital, as purchaser (the "Stalking Horse Purchaser"), and the Debtor, as seller, dated as of March [__], 2018 (the "Asset Purchase Agreement"), a copy of which is attached as **Exhibit C** to the Motion.

On [_____], 2018 the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtor to determine the highest or otherwise best price for the Assets through the process and procedures set forth below (the "Bidding Procedures").

## Marketing Process

(a)    Contact Parties:  The Debtor, in consultation with Bayshore, will develop a list of parties (in addition to the Stalking Horse Purchaser) who the Debtor and Bayshore believe may potentially be interested in consummating a competing transaction for the Assets (any such transaction, an "Alternative Transaction") and have the financial ability to do so, which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties").  The Debtor and Bayshore will contact the Contact Parties to explore their interest in pursuing an Alternative Transaction. The Contact Parties may include parties whom the Debtor or its advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction.  The Debtor will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b)    Information Package:  The Debtor may distribute to each Contact Party an "Information Package," comprising:

(i)    A cover letter;

(ii)    A copy of these Bidding Procedures and the Motion;

(iii)    A copy of a confidentiality agreement; and

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion for approval of, among other things, these Bidding Procedures or in the Asset Purchase Agreement, as applicable.

(iv)    Such other materials as the Debtor and Bayshore deem appropriate under the circumstances including, but not limited to, preliminary "teaser" information.

(c)    <u>Access to Diligence Materials</u>:  To receive access to due diligence information (the "<u>Diligence Materials</u>"), a party must submit to the Debtor an executed confidentiality agreement in the form and substance satisfactory to the Debtor and the Debtor shall have a reasonable basis to believe that the party has the financial capability to consummate an Alternative Transaction. A party who qualifies for access to Diligence Materials shall be a "<u>Preliminary Interested Buyer</u>."  All due diligence requests must be directed to Bayshore.

(d)    <u>Due Diligence from Bidders</u>: Each Preliminary Interested Buyer and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtor or its advisors regarding such Bidder and its contemplated transaction.  Failure by a Preliminary Interested Investor to comply with requests related to due diligence access will be a basis for the Debtor to determine that such bidder is not a Qualified Bidder.  Failure by a Qualified Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access will be a basis for the Debtor to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

## **Auction Qualification Process**

(a)    To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtor to satisfy each of the conditions set forth below.  A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

(i)    <u>Good Faith Deposit</u>:  Each Bid must be accompanied by a deposit in the amount of $1,500,000 to an non-interest-bearing escrow account to be identified and established by the Debtor (the "<u>Good Faith Deposit</u>").  The Stalking Horse Purchaser shall not be required to submit a Good Faith Deposit.

(ii)    <u>Bids for Portions of Debtor's Assets</u>:  A Bid may offer to purchase all or substantially all of the Debtor's Assets or only a portion of the Debtor's Assets; <u>provided</u> that the Debtor determine, in its sole discretion, that the aggregate consideration offered by any Bid or combination of Bids for all or substantially all of the Debtor's assets satisfies the "Minimum Bid" requirements set forth in clause (v) below.

(iii)    <u>Same or Better Terms</u>:  Each Bid must be on terms that, in the Debtor's business judgment, are the same or better than the terms of the Asset Purchase Agreement.

2

(iv) <u>Executed Agreement</u>:  Each Bid must be based on the Asset Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "<u>Modified Purchase Agreement</u>").  A Bid shall also include a copy of the Asset Purchase Agreement marked against the Modified Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove all provisions that apply only to the Stalking Horse Purchaser).

(v) <u>Minimum Bid</u>:  A Bid or any combination of Bids for all or substantially all of the Debtor's Assets must propose a minimum purchase price equal to or greater than $**[XX]** in cash, which amount would equal the Credit Bid Amount of the Stalking Horse Purchaser and include an additional $150,000, plus any Assumed Liabilities, plus any adjustments required, if applicable, necessary to pay all transaction fees (including to the Debtor's Investment Banker) to the extent the sale to an entity other than the Stalking Horse Purchaser produces insufficient cash to pay such transaction fees.

(vi) <u>Designation of Assigned Contracts and Leases</u>: A Bid must identify any and all executory contracts and unexpired leases of the Debtor that the Bidder wishes to have assumed and assigned to it at closing pursuant to an Alternative Transaction.

(vii) <u>Assumption of Liabilities</u>:  A Bid must provide for the payment or assumption of at least all or substantially all of the Assumed Liabilities.

(viii) <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Alternative Transaction; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternative Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Alternative Transaction by the equity holder(s) of such Bidder.

(ix) <u>Proof of Ability to Perform</u>:  A Bid must include written evidence that the Debtor concludes in its sole discretion (in consultation with its advisors) demonstrates that the Bidder has the ability to close the Alternative Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternative Transaction. Such information must include, inter alia, the following:

3

      a.   contact names and numbers for verification of financing sources;

      b.   evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments to close the Alternative Transaction;

      c.   evidence of the Bidder's ability to satisfy regulatory and licensing requirements;

      d.   the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtor; and

      e.   any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Bidder has the ability to close the Alternative Transaction.

(x)   <u>Contingencies</u>:  Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtor than those set forth in the Asset Purchase Agreement and (b) may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(xi)   <u>Irrevocable</u>:  Each Bid must be irrevocable through the Auction date, <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid at the Auction, such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(xii)   <u>Bid Deadline</u>:  The following parties must receive a Bid in writing, on or before **[two business days before the Auction] at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"):  (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn:  Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131, Attn:  Joshua Kaye, Esq., Thomas Califano, Esq. and Rachel Nanes, Esq.; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

    ***A Bid received from a Bidder before the Bid Deadline that meets the above requirements for the applicable assets shall constitute a "<u>Qualified Bid</u>" for such assets, and such Bidder shall constitute a "<u>Qualified Bidder</u>" for such assets.***  Notwithstanding anything

4

herein to the contrary, the Asset Purchase Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder. In addition, the Stalking Horse Purchaser will receive a copy of any Bids submitted to the Debtor, and the Debtor shall inform counsel to the Stalking Horse Purchaser whether the Debtor will consider such Bids to be Qualified Bids no later than three (3) days prior to the Auction.

## Auction

If one or more Qualified Bids for the Debtor's assets (other than the Asset Purchase Agreement submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Debtor will conduct an Auction to determine the highest and best Qualified Bid or combination of Qualified Bids for any of the Debtor's Assets. This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate and may include, among other things, the following: (a) the amount and nature of the consideration; (b) the number, type, and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale or sales of the Debtor's Assets and the cost to Debtor of such modifications or delay; (d) the total consideration to be received by Debtor; (e) the likelihood of the Bidder's ability to close a transaction, obtain necessary regulatory and licensing approvals and the timing thereof; and (f) the net benefit to the Debtor's estate (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtor may determine not to conduct the Auction. Unless otherwise agreed to by the Stalking Horse Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

## Procedures for Auction

The Auction shall take place on **[_____] at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, or such other place and time as the Debtor shall notify all Qualified Bidders, including, without limitation, the Stalking Horse Purchaser, counsel for the Stalking Horse Purchaser and other invitees. The Auction shall be conducted according to the following procedures:

Only the Debtor, Bayshore, the Stalking Horse Purchaser, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction in person, and only the Stalking Horse Purchaser and any other Qualified Bidders will be entitled to make any Bids at the Auction.

(b)    The Debtor Shall Conduct the Auction: The Debtor and its professionals shall direct and preside over the Auction. Other than as expressly set forth herein, the Debtor may conduct the Auction in the manner it determines will result in the highest, best, or otherwise financially superior offer for the Debtor's Assets. At the start of the Auction, the Debtor shall describe the terms of the highest and best Qualified Bid or Qualified Bids received prior to the Bid Deadline (each such highest and best Qualified Bid, the "Auction Baseline Bid"). Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any

collusion with respect to the bidding or sale of any of the assets described herein and (b) has reviewed and understands and accepts the Bidding Procedures.

(i)       <u>Terms of Overbids</u>:  An "<u>Overbid</u>" is any bid made at the Auction subsequent to the Debtor's announcement of the respective Auction Baseline Bid for such Auction.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(ii)     <u>Minimum Overbid Increments</u>:  Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $100,000.  Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration.

(iii)    <u>Stalking Horse Purchaser May Credit Bid</u>:  The Stalking Horse Purchaser shall be permitted to bid at the Auction, if any, and shall be permitted to credit bid the Credit Bid Amount pursuant to any Overbid in connection with each round of bidding in the Auction.

(iv)    <u>Remaining Terms Are the Same as for Qualified Bids</u>:  Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, <u>provided</u>, <u>however</u>, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtor accept a higher Overbid.

At the Debtor's discretion, to the extent not previously provided (which shall be determined by the Debtor), a Bidder submitting an Overbid at any Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Bidder's ability to close the Alternative Transaction proposed by such Overbid.

(v)      <u>Announcement of Overbids</u>:  The Debtor shall announce at the Auction the material terms of each Overbid.

(vi)    <u>Consideration of Overbids</u>:  The Debtor reserves the right, in its reasonable business judgment, to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Debtor and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternative Transaction at the prevailing Overbid amount.

(c)    <u>Backup Bidder</u>:    Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Bidder or Bidders with the next highest or otherwise best Bid or combination of Bids at the Auction, as determined by the Debtor, in the exercise of its business judgment, will be designated as the potential backup bidder (collectively, the "<u>Potential Backup Bidder</u>").   In the event that a Bidder or Bidders other than the Stalking Horse Purchaser are identified by the Debtor as the Potential Backup Bidder, such Bidder or Bidders shall be required to serve as the backup bidder or backup bidders (collectively, the "<u>Backup Bidder</u>").   Except for the Stalking Horse Purchaser, the Backup Bidder shall be required to keep its initial Bid or combination of Bids (or if the Backup Bidder submitted one or more Overbids at the Auction, the final respective Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the date of the Auction (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder, which is later.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Debtor may designate the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction or transactions, with the Backup Bidder without further order of the Bankruptcy Court.   In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder.   The deposit of the Backup Bidder shall be held by the Debtor until the earlier of 72 hours after (i) the closing of the transaction or transactions with the Successful Bidder and (ii) the Outside Backup Date.

(d)    <u>Additional Procedures</u>:    The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.

(e)    <u>Consent to Jurisdiction as Condition to Bidding</u>:  The Stalking Horse Purchaser, all Qualified Bidders, and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtor, this chapter 11 case, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternative Transaction documents and waived any right to a jury trial in connection with any disputes relating to the Debtor, this Chapter 11 case, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternative Transaction documents.

(f)    <u>Sale Is As Is/Where Is</u>:  The Assets of the Debtor sold pursuant to the Bidding Procedures, shall be conveyed at Closing in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTIES**

7

**WHATSOEVER, EXPRESS OR IMPLIED,**" as further detailed in the Asset Purchase Agreement.

(g)    <u>Closing the Auction</u>:  The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids for the Assets of the Debtor sold pursuant to the Bidding Procedures that the Debtor determines in its reasonable business judgment, after consultation with its financial and legal advisors, is the highest and best Qualified Bid at the Auction for the Assets.  Thereafter, the Debtor shall select one Qualified Bid, which produces the highest and best recovery to the estate, as the overall highest and best Qualified Bid (the "<u>Successful Bid</u>," and each Bidder submitting such Successful Bid, a "<u>Successful Bidder</u>").  In making this decision, the Debtor, in consultation with its financial and legal advisors, shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder for the Debtor's Assets submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

### Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in one or more non-interest-bearing escrow accounts by the Debtor, but shall not become property of the Debtor's estate absent further order of the Court.  The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing.  The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the respective Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder for the Assets and (b) the Outside Backup Date.  If a Successful Bidder timely closes its winning transaction, its Good Faith Deposit shall be credited towards the purchase price.

### Reservation of Rights

Except as otherwise provided in the Asset Purchase Agreement, the Bidding Procedures or the Sale Order, the Debtor further reserves the right as it may reasonably determine to be in the best interest of its estate, to:   (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtor and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court

without further notice; and (i) modify the Bidding Procedures or implement additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.  Notwithstanding the foregoing, the Stalking Horse Purchaser shall be a Qualified Bidder and shall be entitled to credit bid the Credit Bid Amount.

Dated [_____]

s/ Peter D. Russin
Peter D. Russin, Esquire
Fla. Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Fla. Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Counsel for Debtor in Possession*

## **EXHIBIT 2**

**Cure Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]        Case No. 18--12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                        Chapter 11

      Debtor.

_____/

## NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES[2]

**PLEASE TAKE NOTICE** that on March [___], 2018, Miami International Medical Center, LLC d/b/a The Miami Medical Center (the "Debtor"), filed a motion [ECF No. **[XX]**] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") which seeks approval of key dates, times and procedures related to the sale of substantially all of the Debtor's Assets (the "Assets") to Variety Children's Hospital d/b/a Nicklaus Children's Hospital (the "Stalking Horse Purchaser") contemplated by the Asset Purchase Agreement.    On [_____], 2018, the Bankruptcy Court approved the Bidding Procedures.   On [_____], 2018, the Debtor intends to seek approval of, among other things, the sale of the Assets, including the assumption and assignment of certain executory contracts and unexpired leases.     To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bidding Procedures shall control.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH THE DEBTOR AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.[3]**

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures, the Debtor **may** assume and assign to the Stalking Horse Purchaser the executory contract(s) or unexpired lease(s) listed on **<u>Exhibit A</u>** attached hereto (each, an "Assigned Contract") to which you are a counterparty.  The Debtor has conducted a review of its books and records and has determined that the cure amount for unpaid monetary obligations under such Assigned Contract

---

[1]    The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Bidding Procedures Order, as applicable.

[3]    This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases.  This Notice is <u>not</u> an admission by the Debtor that such contract or lease is executory or unexpired.

1

is as set forth on **Exhibit A** attached hereto (the "Cure Amount"). **If you disagree with the proposed Cure Amount, object to the proposed assignment to the Stalking Horse Purchaser of the Assigned Contract(s) or object to the Stalking Horse Purchaser's ability to provide adequate assurance of future performance with respect to any Assigned Contracts, you must file an objection with the Bankruptcy Court no later than 4:00 p.m. (prevailing Eastern Time) on [_____](the "Objection Deadline") and serve such objection upon:** (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn: Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, Joshua Kaye, Esq., Thomas Califano, Esq., and Rachel Nanes, Esq., DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

PLEASE TAKE FURTHER NOTICE that the Debtor proposes that if no objection to (a) the Cure Amount(s), (b) the proposed assignment of the Assigned Contract(s) to the Stalking Horse Purchaser or (c) adequate assurance of the Stalking Horse Purchaser's ability to perform is filed by Objection Deadline, (1) you will be deemed to have stipulated that the Cure Amount(s) as determined by the Debtor is correct, (2) you shall be forever barred, stopped, and enjoined from asserting any additional cure amount under the Assigned Contract(s) and (3) you will be forever barred from objecting to the assignment of the Assigned Contract(s) to the Stalking Horse Purchaser.

PLEASE TAKE FURTHER NOTICE that, promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder. In the event the Stalking Horse Purchaser is not the Successful Bidder at the Auction, any counterparty to an Assigned Contract shall have the right to object to the Successful Bidder's ability to perform on or before the Sale Hearing scheduled for [_____] at [_____] **(prevailing Eastern Time)**. To the extent such counterparty does not object in accordance herewith, the Bankruptcy Court may enter an order forever barring such counterparty to an Assigned Contract from objecting to the adequate assurance of the Successful Bidder's ability to perform.

PLEASE TAKE FURTHER NOTICE that with respect to any Assigned Contract assumed and assigned to the Successful Bidder (including the Stalking Horse Purchaser), no assumption and assignment or rejection shall be effective until the filing of a Notice of Closing and Contract Treatment, which shall be filed within two (2) days after Closing. In addition, the assumption of each such Assigned Contract may be conditioned upon the disposition of all issues with respect to such Assigned Contract.

PLEASE TAKE FURTHER NOTICE that pursuant to the Bidding Procedures, with respect to any Assigned Contract, in the event of a dispute regarding: (a) the amount of any Cure Amount; (b) the ability of the Successful Bidder (including the Stalking Horse Purchaser) to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under such Assigned Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Assigned Contract; provided, however, that the Debtor may settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder

2

(including the Stalking Horse Purchaser) without any further notice to or action, order or approval of the Bankruptcy Court.

**PLEASE THAT FURTHER NOTICE THAT** notwithstanding anything herein, this Notice shall not be deemed to be an assumption, adoption, rejection or termination of the Assigned Contracts.  Moreover, the Debtor explicitly reserves its rights, in its sole discretion, to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and nothing herein (a) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority or amount of any claims of a counterparty to an Assigned Contract against the Debtor that may arise under such Assigned Contract, (b) creates a postpetition contract or agreement, or (c) elevates to administrative expense priority any claims of an counterparty to an Assigned Contract against the Debtor that may arise under such Assigned Contract.

Dated [_____]

<div align="right">

s/ Peter D. Russin
Peter D. Russin, Esquire
Fla. Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Fla. Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Counsel for Debtor in Possession*

</div>

## **<u>EXHIBIT A</u>**

[Counterparty Name]                    [Contract/Lease]                                        Cure Amount

## **EXHIBIT 3**

**Sale Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]          Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                     Chapter 11

      Debtor.

_____/

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On March **[__]**, 2018, Miami International Medical Center, LLC d/b/a The Miami Medical Center (the "Debtor"), filed a motion for entry of an order (the "Bidding Procedures Order"), among other things, (a) approving Bidding Procedures[2] for the sale of substantially all of the assets owned by the Debtor (the "Assets"), as described in the Asset Purchase Agreement by and between Variety Children's Hospital d/b/a Nicklaus Children's Hospital (the "Stalking Horse Purchaser") and the Debtor, dated as of **[_____]**, 2018 (the "Asset Purchase Agreement"); (b) approving the Asset Purchase Agreement and payments thereunder; (c) approving the form and manner of notice of the Auction on the Assets and the Sale Hearing; (d) approving procedures relating to the assumption and assignment of contracts and leases; and (e) scheduling a sale hearing (the "Sale Hearing") to consider the sale of the Assets and setting objection and bidding deadlines with respect to the Sale. The motion additionally requests entry of an order (the "Sale Order") approving (1) the sale of the Assets free and clear of liens, claims, encumbrances and interests contemplated by the Asset Purchase Agreement; (2) assumption and assignment of certain executory contracts and unexpired leases; and (3) certain related relief.

2.      On April **[_____]**, 2018, the United States Bankruptcy Court for the Southern District of Florida entered the Bidding Procedures Order [ECF No. ___]. Pursuant to the Bidding Procedures Order, the Auction for the Assets shall take place on **[_____]**, 2018 **at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, or such other place and time as the Debtor shall notify all Qualified

---

[1]    The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion.

Bidders, including, without limitation, the Stalking Horse Purchaser. Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding Procedures Order as **Exhibit 1**, by no later than **[_____]**, 2018 **at 4:00 p.m. (Eastern Time)** (the "Bid Deadline") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Assets must submit a competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures. Parties interested in receiving information regarding the sale of the Assets should contact the Debtor's investment bankers, Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman, telephone (954) 358-3800 x302 for Scott Saunders and x308 for Steve Zuckerman, and email addresses ssaunders@farlieturner.com and szuckerman@farlieturner.com.

3.    The Sale Hearing to consider approval of the Sale of the Assets to the Stalking Horse Purchaser or to a Successful Bidder (as defined in the Bidding Procedures) free and clear of all liens, claims and encumbrances will be held before the Honorable **[_____]**, United States Bankruptcy Judge, [_____], Courtroom No. [___] Miami, Florida 33131 on [_____], 2018 **at [_____]** **(prevailing Eastern Time)**, **[or at such earlier date as counsel may be heard]**. The Sale Hearing may be continued from time to time without further notice to creditors or parties in interest other than by announcement of the continuance in open court on the date scheduled for the Sale Hearing.

4.    Objections, if any, to the sale of the Assets contemplated by the Asset Purchase Agreement, or the relief requested in the motion (including with respect to Cure Amounts and adequate assurance) must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, [_____], Miami, Florida 33131 (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on [_____], 2018, or such earlier date and time as the Debtor may agree and (d) be served, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon: (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn: Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, Joshua Kaye, Esq., Thomas Califano, Esq. and Rachel Nanes, Esq., DLA Piper LLP (US), 2500 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

5.    In the event that the Stalking Horse Purchaser is not the Successful Bidder at the Auction, the non-Debtor party to any Assigned Contract(s) will have until the Sale Hearing to object to the Successful Bidder's ability to perform under such Assigned Contract(s).

6.    This Notice and the Sale Hearing are subject to the fuller terms and conditions of the motion, the Bidding Procedures Order and the Bidding Procedures, which

shall control in the event of any conflict and the Debtor encourages parties in interest to review such documents in their entirety. Copies of the motion, the Asset Purchase Agreement, the Bidding Procedures, and/or the Bidding Procedures Order may be obtained by written request to counsel to the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq. In addition, copies of the aforementioned pleadings may be found on the Pacer website, http://ecf.flsb.uscourts.gov.

Dated [_____]

<div align="right">

s/ Peter D. Russin
Peter D. Russin, Esquire
Fla. Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Fla. Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Counsel for Debtor in Possession*

</div>

# EXHIBIT B

**Sale Order**

[**To Be Provided**]

# EXHIBIT C

**Asset Purchase Agreement**

Exhibit C

## <u>ASSET PURCHASE AND SALE AGREEMENT</u>

THIS ASSET PURCHASE AND SALE AGREEMENT (this "<u>Agreement</u>") is made and entered into as of March [__], 2018 (the "<u>Effective Date</u>"), between **Miami International Medical Center, LLC,** a Florida limited liability company ("<u>Seller</u>") and **Variety Children's Hospital d/b/a Nicklaus Children's Hospital,** a Florida not-for-profit corporation, or its assigns ("<u>Variety</u>").

### RECITALS

A.    Prior to the Petition Date (as defined below), Seller operated a hospital licensed under Chapter 395, Part I and Chapter 408, Part II, of the Florida Statutes, located at 5959 NW 7th Street, Miami, Florida 33126-3129 (the "<u>Facility</u>"), and owns the "Assets" as described below plus the continuing business operations in the Facility (collectively, the "<u>Business</u>").

B.    On August 4, 2015, Seller entered into that certain Loan Agreement, by and between Seller and MidFirst Bank, a federally charted savings association ("<u>MidFirst</u>"), as amended on January 29, 2016, June 24, 2016 and August 4, 2017 (collectively, the "<u>Loan Agreement</u>"), and in connection therewith, Seller signed that certain Amended and Restated Promissory Note (Revolver) dated August 4, 2017 in the original principal face amount of $17,600,000.00, and a certain Amended and Restated Promissory Note (Term) dated January 29, 2016 in the principal face amount of $28,800,000.00 (the "<u>Term Note</u>").

C.    Pursuant to that certain Assignment for Note Purchase and Partial Assignment of Security Agreement dated as of January 24, 2018, by and between Variety and MidFirst, MidFirst assigned to Variety all of its right, title and interest to the Term Note as well as that portion of that certain Security Agreement (Assets) dated August 4, 2015 (the "<u>MidFirst UCC Assignment</u>") signed by Seller in favor of MidFirst which covers all of Seller's equipment, medical equipment, computer equipment, computer hardware, computer software, computer software licenses, medical supplies, furniture and hospital beds and all proceeds and products thereof described in that certain UCC-1 Financing Statement No. 201504643818 filed with the Florida Secured Transaction Registry, including, without limitation, those items owned by Seller as more particularly described on Exhibit "A" thereto (the "<u>Equipment</u>").

D.    Accordingly, as of the Petition Date, Seller owes Variety not less than $26,273,693.19 under the Term Note (together with accrued interest, costs, expenses and fees, the "<u>Term Note Balance</u>") and Variety holds a first priority security interest in the Equipment.

E.    On March 9, 2018 (the "<u>Petition Date</u>"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of Florida (the "<u>Bankruptcy Court</u>"), thereby commencing a chapter 11 case (Case No. 18-12741-LMI) (the "<u>Bankruptcy Case</u>").

F.    Pursuant to that certain *Order Granting Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364(c) and (d) and Fed. R. Bankr. P. 4001(c); and (B) Scheduling Final Hearing* entered by the Bankruptcy Court [ECF No. __], Variety has agreed to provide Seller with debtor-in-possession financing up to the amount of $3,372,781.00 (the "<u>DIP Loan</u>").

G.     Subject to the terms and conditions of this Agreement, the Bidding Procedures Order and the Sale Order (as defined below), Seller desires to sell, assign and transfer, and Variety or its designated affiliate (the "Buyer") desires to purchase and acquire, the Assets (as defined below) of the Seller (the "Sale").

H.     Variety believes that Buyer's acquisition of the Assets is in furtherance of Buyer's not-for-profit purposes and mission.

I.      If deemed necessary by Buyer, Seller agrees to enter into such agreements including, without limitation an Operations Transfer Agreement and Interim Management Agreement, to facilitate the transactions contemplated herein.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements hereinafter contained, the parties agree as follows:

## TERMS AND CONDITIONS

## ARTICLE 1. PURCHASE AND SALE OF ASSETS

1.1     Purchase and Sale.  Subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, transfer, assign and deliver to Buyer free of all liens, interests, encumbrances, leases, security interests, restrictions, pledges, claims, causes of action, liabilities, obligations, options, contractual commitments, rights of first refusal, successor liabilities, rights of offset and recoupment and defenses (collectively, the "Claims and Encumbrances"), and Buyer agrees to purchase from Seller, all of Seller's right, title and interest in and to substantially all of the assets of Seller used primarily in connection with the operation of the Business, including, without limitation, the following assets of Seller as such assets shall exist on the Closing Date (as defined below), all of which are referred to herein collectively as the "Assets" (but excluding Excluded Assets (as defined below)):

(i)     all tangible personal property used or held for use in the Business, including, without limitation, the furniture, equipment, and inventory located at the Facility and otherwise set forth on Schedule 1.1(i);

(ii)    the Equipment set out on Schedule 1.1(ii);[1]

(iii)   to the extent assignable or transferable, all non-residential real property and personal property leases with respect to the operation of the Business as set out on Schedule 1.1(iii) to be identified by the Buyer;

(iv)    to the extent assignable or transferable, that certain hospital license issued to Seller by the State of Florida, Agency for Health Care Administration ("AHCA"), under license number 4008 (the "License"), and any other general intangibles identified by Buyer related to the ownership, possession, lease or use of the Assets of the Business, including, without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use

---

[1] The Equipment listed on Schedule 1.1(ii) is a copy of Exhibit "A" to the MidFirst UCC Assignment, which may include items already listed on Schedule 1.1(i).

agreements, covenants, commitments, licenses, permits, certificates, regulatory approvals, entitlements, service marks, intellectual property, trademarks, and trade names owned or employed by Seller in conjunction with the operation of the Business (the "Intangible Property") as set out on Schedule 1.1(iv); and

        (v)    to the extent permitted under applicable law, all of Seller's claims, lawsuits, and avoidance actions, including, without limitation, under 11 U.S.C. § 550 against Buyer and its affiliates.

provided, however, that the Assets shall not include the "Excluded Assets," as defined in Section 1.2 below.

        1.2    Excluded Assets.  Notwithstanding anything to the contrary in Section 1.1, Seller shall retain all of the following assets owned directly or indirectly by it, and such assets below shall not be included in the Assets to be transferred to Buyer (collectively, the "Excluded Assets"):

        (i)    cash, cash equivalents and short-term investments;

        (ii)    all accounts receivable and proceeds therefrom for services provided prior to the Closing Date;

        (iii)    all items listed in Schedule 1.2(iii);

        (iv)    all claims, lawsuits, and avoidance actions under 11 U.S.C. § 550, except those claims, lawsuits and avoidance actions against Buyer and its affiliates; and

        (v)    any applicable state and/or federal tax refunds.

        1.3    Liabilities Excluded.  THIS AGREEMENT EXCLUDES, AND BUYER DOES NOT ASSUME, ANY LIABILITIES OF SELLER NOT EXPRESSLY ASSUMED BY BUYER IN WRITING IN THIS AGREEMENT OR IN ANY OTHER AGREEMENT CONTEMPLATED HEREBY INCLUDING, BUT NOT LIMITED TO THE FOLLOWING (COLLECTIVELY, THE "EXCLUDED LIABILITIES"):  ALL OF SELLER'S ACCOUNTS PAYABLE SPECIFICALLY NOT ASSUMED BY BUYER AND ALL OBLIGATIONS ARISING OUT OF OR RELATED TO THE OPERATION OF THE BUSINESS PRIOR TO THE EFFECTIVE TIME (AS DEFINED IN SECTION 1.6), INCLUDING COSTS, EXPENSES AND OTHER LIABILITIES AND OBLIGATIONS ARISING FROM THE OPERATION OF THE BUSINESS; LIABILITY FOR TORT CLAIMS; LIABILITY FOR OVERPAYMENTS AND ANY FRAUD UNDER MEDICARE, MEDICAID OR ANY THIRD-PARTY PAYOR AGREEMENT; ANY OBLIGATIONS UNDER ANY COLLECTIVE BARGAINING AGREEMENT, EMPLOYMENT AGREEMENT, PENSION OR RETIREMENT PLAN, PROFIT-SHARING PLAN, STOCK PURCHASE OR STOCK OPTION PLAN, MEDICAL OR OTHER BENEFITS OR INSURANCE PLAN, COMPENSATION OR BONUS AGREEMENT, VACATION OR SEVERANCE PAY PLAN OR AGREEMENT AND ANY OTHER EMPLOYEE BENEFIT PLAN.  ANY AND ALL ACCOUNTS PAYABLE OR OTHER OBLIGATIONS ACCRUING TO AND EXISTING AS OF THE EFFECTIVE TIME ARE AND SHALL REMAIN THE SOLE OBLIGATION AND

RESPONSIBILITY OF SELLER EXCEPT AS EXPRESSLY ASSUMED BY BUYER IN WRITING. WITHOUT IN ANY MANNER LIMITING THE GENERALITY OF THE FOREGOING, THIS AGREEMENT SPECIFICALLY EXCLUDES, AND BUYER DOES NOT ASSUME, ANY LIABILITY WHATSOEVER WITH RESPECT TO (A) ANY DEBT OF SELLER, INCLUDING BUT NOT LIMITED TO ANY MORTGAGE DEBT OR OTHER SECURED DEBT, OR ANY UNSECURED DEBT OF ANY TYPE OR CHARACTER, AND (B) ANY DEBTOR-IN-POSSESSION FINANCING PROVIDED TO SELLER BY ANY LENDER.

NOTWITHSTANDING THE FOREGOING, AT CLOSING, BUYER SHALL ASSUME OR SHALL OTHERWISE BE RESPONSIBLE FOR ALL AMOUNTS PAYABLE AS CURE AMOUNTS PURSUANT TO 11 U.S.C. § 365 (THE "ASSUMPTION CURE AMOUNTS") BY SELLER TO CONTRACTUAL COUNTERPARTIES UNDER ANY CONTRACTS SPECIFICALLY SCHEDULED AND ASSUMED BY BUYER (THE "ASSUMED CONTRACTS").

1.4    Liabilities Assumed. Buyer assumes liability for all (i) Assumption Cure Amounts and (ii) any obligations arising on or after the Effective Time under any Assumed Contracts (collectively, the "Assumed Liabilities").

1.5    AHCA License Approval Expenditures. Notwithstanding any other provision in this Agreement, the parties recognize that effectuating the transfer of the Business will require the transfer of the License. The transfer of the License will require approval of AHCA. AHCA's approval may require the payment of any outstanding balance owed to AHCA related to the License and licensed operation of the Facility, including fines, penalties, and assessments (including assessments for support of the Medicaid program) (collectively, the "AHCA Payments"). To the best of Seller's chief administrative officer's (the "CAO") knowledge, Seller represents and warrants that a true and complete description of the nature and amount of the AHCA Payments is set forth in Schedule 1.5. Buyer agrees to be solely responsible for payment of said outstanding amounts and balances to AHCA as part of this Agreement. Seller shall cooperate fully with Buyer in providing any information or records as necessary to develop the applications and obtain AHCA's approval of the transfer of the License.

1.6    The Closing. The transaction contemplated hereby shall close (referred to herein interchangeably as the "Closing," the "Closing Date" or by similar words or phrases) within five (5) business days of all of the conditions to Closing set forth in Articles 7 and 8 having been satisfied or waived, or (ii) such other date agreed to in writing by Buyer and Seller. The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time. For purposes of this Agreement, the term "Effective Time" shall mean 12:01 A.M. Eastern Time on the day after the Closing Date.

1.7    Purchase Price.

(i)    The aggregate purchase price (the "Purchase Price") for the Assets shall be as follows: (a) a credit bid by Buyer in the amount of the Term Note Balance plus the total amount of the DIP Loan (collectively, the "Credit Bid Amount"); and (b) assumption of the

4

Assumed Liabilities.  The Purchase Price shall be allocated in accordance with Section 1.8 below.

(ii)    At the Closing, Buyer shall pay to Seller an amount equal to the Purchase Price less the Credit Bid Amount, with any cash portion of such Purchase Price payable in immediately available funds by wire transfer to Seller's account pursuant to instructions to be delivered to Buyer in advance of the Closing or as the Sale Order may otherwise direct.

1.8    Allocation of Purchase Price.  Within sixty (60) days after the Closing Date, Buyer shall deliver to Seller a statement (the "Allocation Statement") allocating, for tax purposes, the Purchase Price among the Assets in accordance with Section 1060 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any other corresponding tax forms), and (iii) take no position inconsistent with the Allocation Statement for any tax purpose (including, without limitation, in any audit, judicial or administrative proceeding), provided, however, that the Seller reserves the right to assert any reasonable good faith objection to the accuracy, legality, validity or propriety of the Allocation Statement.

## ARTICLE 2. BANKRUPTCY COURT.

2.1    Seller is currently a debtor in possession in the Bankruptcy Case.  In connection with the transactions contemplated by this Agreement, the Seller shall file a motion with the Bankruptcy Court on or about March 29, 2018, seeking, among other things, an order approving the bidding procedures for the sale of the Assets (the "Bid Procedures") and an order authorizing the sale of substantially all of the Seller's Assets free and clear of all Claims and Encumbrances pursuant to the Sale Order (as defined below) (the "Bid Procedures Motion"), and shall use reasonable efforts to cause the Bankruptcy Court to enter the associated bidding procedures order on or before April 23, 2018 (the "Bid Procedures Order Deadline") substantially in the form attached hereto as Exhibit 2.1 (the "Bid Procedures Order").

2.2    The Seller shall provide notice to all required parties of the Bid Procedures Motion, Bid Procedures and Sale, and shall use reasonable best efforts to cause the Bankruptcy Court to enter an order approving the sale of the Assets, and assumption and assignment of contracts and leases, consistent with this Agreement (the "Sale Order"), on or before June 22, 2018 and seek affirmation of the Sale Order in the event it is challenged or appealed.

2.3    In connection with the Sale, the Seller shall include in its pleadings relief to assume and assign all executory contracts and unexpired leases related to the Assets and the Business, or, in the event that Buyer chooses not to take assignment of a contract or lease, to reject such contract or lease.  Buyer shall have the right until the later of Closing or determination of cure amounts, in its sole and absolute discretion (including without limitation because a cure amount is determined to be greater than anticipated), to determine whether such contracts and leases are to be assumed and assigned; any such contracts and leases not assumed and assigned to Buyer shall be rejected by the Seller.  No assumption and assignment or rejection shall be effective until the filing of a Notice of Closing and Contract Treatment (the "Closing

Notice"), which shall be filed within two (2) days after Closing.  At Buyer's reasonable request, Seller shall also file and serve any updates to the contract schedules which may be made prior to the filing of the Closing Notice.  Assumption and assignment of the Assumed Contracts shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the Seller has rights or licenses granted in connection with or under the Assumed Contracts, so long as such ancillary or related agreements do not create additional obligations of Seller or Buyer beyond those set out in the Assumed Contracts (unless Buyer subsequently agrees to such obligations) or as set forth herein.

## ARTICLE 3. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, as of the Effective Date, Closing Date and Effective Time:

    3.1    <u>Organization and Standing</u>.  Seller is a corporation duly organized and validly existing under the Laws of the state of its incorporation.  Seller is duly qualified to do business, and is in good standing, in each jurisdiction in which the character or location of the property owned, leased or operated or the nature of the business conducted makes such qualification necessary.

    3.2    <u>Capacity; Authority</u>.  Subject to the approval of the Bankruptcy Court, Seller has full power, legal capacity and authority to execute and deliver this Agreement and the ancillary agreements to be entered into herewith, to consummate the transactions contemplated hereby and thereby, to perform its obligations under this Agreement and the ancillary agreements to be entered into herewith and to own, lease and operate its properties and assets.  Subject to the entry of the Sale Order, the execution and delivery by Seller of this Agreement and the ancillary agreements to be entered into herewith and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all necessary organizational action on the part of Seller.  This Agreement and the ancillary agreements to be entered into herewith have been duly executed and delivered by Seller and, assuming the execution and delivery by Buyer and the entry of the Sale Order, constitute valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceedings therefor may be brought.

    3.3    <u>No Violation; Consents</u>.  To the best of Seller's CAO's knowledge, neither the execution and delivery by Seller of this Agreement and the ancillary agreements to be entered into herewith nor the consummation of the transactions contemplated hereby or thereby nor compliance with any of the provisions hereof or thereof by Seller will (i) conflict with or result in any breach of any provision of the organizational documents of Seller, (ii) violate any applicable law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order, judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority (as defined below) ("<u>Laws</u>"), (iii) except for licensing approvals from AHCA, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority or other natural person, corporation, association, partnership, joint venture or other entity (each, a "<u>Person</u>") which has not otherwise been obtained or made, or (iv)

result in the creation or imposition of any Claims and Encumbrances upon the Assets, except as are excused by or unenforceable as a result of the filing of the Bankruptcy Case or the applicability of any provision of, or any Law under, the Bankruptcy Code.

3.4    Seller's Broker.  Other than Bayshore Partners, LLC ("Bayshore"), Seller has not engaged any finder or broker in connection with the transactions contemplated hereby.  Other than with respect to the Transaction Fee to be paid to Bayshore (as described below), Seller agrees to indemnify, defend and hold Buyer harmless from and against any and all losses, claims, damages, costs or expenses (including attorneys' fees) which Buyer may incur as a result of any claim made by any individual or entity to a right to a sales or brokerage commission or finder's fee in connection with this transaction to the extent such claim is based, or purportedly based, on the acts or omissions of Seller.  In the event Buyer is the successful purchaser of the Assets in accordance with the terms herein, Buyer shall provide the Seller with up to $300,000 to fund any success fee due to Bayshore pursuant to the engagement agreement between Bayshore and the Seller (the "Transaction Fee").  For the avoidance of doubt, Buyer's obligation to fund the Transaction Fee is subject to Bayshore obtaining Bankruptcy Court approval for the payment of the Transaction Fee.

3.5    Title to Assets.  To the best of Seller's CAO's knowledge, Seller is the sole and lawful owner of, and holds good, valid, and marketable title to, the Assets (or, in the case of leased or licensed assets, good, valid, and marketable leasehold or license interests in and to the Assets). Title to the Assets will be conveyed free and clear of all Claims and Encumbrances, except as consented to in writing by Buyer.  No officer, director or employee of Seller owns or has any interest, directly or indirectly, in any of the Assets.

3.6    Knowledge.  For purposes of the Agreement, the term "knowledge" and other similar knowledge qualifiers means actual knowledge after reasonable inquiry.

3.7    Full Disclosure.  To the best of Seller's CAO's knowledge, all of the Seller's warranties, representations and covenants in this Agreement:  (i) constitute a material part of the consideration hereunder; (ii) are true and complete, current and accurate as of the date hereof; (iii) shall be true and complete, current and accurate as of the Closing Date; and (iv) and shall survive the Closing Date.  To the best of Seller's CAO's knowledge, none of the statements, representations or warranties of Seller misstates or omits any fact which would make such statements, representations or warranties incomplete, misleading or incorrect in any material respect.  Seller shall inform Buyer if any statement, representation or warranty becomes incorrect, misleading or incomplete subsequent to the date hereof.

3.8    Taxes.  Except as set forth on Schedule 3.8 and to the best of the Seller's CAO's knowledge, all material federal, state and local Tax Returns and other tax filings required to be filed by Seller with respect to the Assets or Seller's Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects.  Except as set forth on Schedule 3.8, and to the best of the Seller's CAO's knowledge, no adjustment related to such Tax Returns has been proposed formally or informally by any taxing authority.  Except as set forth on Schedule 3.8, and to the best of the Seller's CAO's knowledge, the Seller has timely paid all taxes due with respect to the Assets or the Business, the non-payment of which would result in a lien or other Claim and Encumbrance on any of the Assets or would result in Buyer

7

becoming liable or responsible therefore.  There are no Claims and Encumbrances for Taxes upon the Assets.  The Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.  The Seller has withheld and paid all Taxes required with respect to any employees.  No power of attorney currently in force has been granted by the Seller with respect to the Business that would be binding on the Buyer with respect to the taxable periods commencing on or after the Closing Date.  As used in this Agreement, (i) "<u>Tax</u>" and "<u>Taxes</u>" means all federal, state, local or foreign taxes, charges, fees, levies or other assessments, including income, excise, gross receipts, premium, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, payroll, alternative or add-on minimum, estimated, severance, occupation, value added, license and stamp taxes or other taxes (whether payable directly or by withholding), custom, duty or governmental fee, or other like assessment or charge of any kind whatsoever, imposed by the United States (or any of its political subdivisions) or any other Government Authority, together with any interest and any penalties thereon or additional amounts with respect thereto and (ii) "<u>Tax Return</u>" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

3.9    <u>Regulatory Compliance</u>.  To the best of the Seller's CAO's knowledge, Seller represents and warrants that <u>Schedule 3.9</u> reflects all licenses, permits, certificates of need, certificates of use, and other approvals from any government authority with respect to the Seller, Assets and operation of the Business.  Except as set forth herein, and to the best of Seller's CAO's knowledge, Seller is in compliance with all applicable Laws and requirements of all Governmental Authorities (as defined hereinafter) having jurisdiction over the Seller and the Assets and the operations of the Assets and the Business.    As used in this Agreement, "<u>Governmental Authorities</u>" shall mean any United States federal, state, local, possession or foreign governmental, regulatory or administrative authority, agency or commission, or any political subdivision thereof, or any court, tribunal or arbitral body (whether governmental or not).

3.10    <u>Insurance Policies</u>.  To the best of Seller's CAO's knowledge, <u>Schedule 3.10</u> sets forth a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by Seller relating to the Assets and the Business (collectively, the "<u>Insurance Policies</u>").  All premiums due on such Insurance Policies have either been paid or, if not yet due, accrued.  All such Insurance Policies (a) are in full force and effect and enforceable in accordance with their terms; (b) are sufficient for material compliance with all legal requirements and of all agreements to which seller is a party or by which it is bound (c) to Seller's CAO's knowledge, are provided by carriers who are financially solvent; and (d) have not been subject to any lapse in coverage as of the Effective Date and as of the Effective Time.

3.11    <u>Litigation</u>.  Other than as set forth on the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by Seller in its Bankruptcy Case, and to the best of Seller's CAO's knowledge, there are no private or governmental actions, suits, proceedings, claims, arbitrations, judgments or decrees or, to the best of Seller's CAO's knowledge, investigations pending against Seller or, to the best of Seller's CAO's knowledge, affecting Seller or the Assets

or the Assumed Liabilities, which (i) contest or challenge Seller's authority, right or ability to perform its obligations under this Agreement or any of the ancillary agreements to be entered into herewith, as applicable, (ii) challenge Seller's right, title or ownership in any of the Assets, or (iii) would impair or have an adverse effect on Buyer's right or ability to own, use, commercialize or otherwise exploit any of the Assets, or impair or have an adverse effect on the value of any of the Assets following the Closing.  To the best of Seller's CAO's knowledge, there are no proceedings threatened that assert any claim described in clauses (i), (ii) or (iii) of the preceding sentence.

3.12    Employees.  Except as described in Schedule 3.12, Seller is not a party to any labor, collective bargaining, employee association or other agreement which contains provisions governing the terms and conditions of employment of any employee, and no labor union or employee association has been certified as exclusive bargaining agent for any group of Employees.

3.13    Intellectual Property.  To the best of Seller's CAO's knowledge, Seller has all right, title, and interest to all such Intangible Property, without any conflict with the rights of others.  No Person other than Seller has the right to use the Intangible Property owned by Seller.  Seller has the valid right to use, pursuant to a valid, enforceable, written license, sublicense or other agreement, any Intangible Property used in the operation of the Business that is owned by a party other than Seller.  To the best of Seller's CAO's knowledge, Schedule 3.13 sets forth a complete list, as of the date hereof, of all registered and applied for Intangible Property owned by Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).    All such Intangible Property is subsisting, valid, and enforceable and all fees necessary to maintain Intangible Property registrations and applications in good standing have been paid.  There is no action, suit, proceeding, claim, investigation, or complaint pending, or, to the best of Seller's CAO's knowledge, threatened against Seller that (A) challenges (y) the validity or ownership of any Intangible Property owned by Seller or (z) Seller's use of any Intangible Property, or (B) alleges infringement, dilution, misappropriation, or other violation of the Intangible Property of any Person by Seller.  To the best of Seller's CAO's knowledge, no third Person's operations or products infringe any Intangible Property owned by or exclusively licensed to Seller in any material respect.  To the best of Seller's CAO's knowledge, Seller's operations and products do not infringe, dilute, misappropriate, or otherwise violate the Intangible Property of any third Person and there is no valid basis for such a claim.  Seller has not received during the two (2) year period preceding the date hereof any written claim of infringement, dilution, misappropriation, or other violation with respect to any Intangible Property owned by any third Person.

3.14    Contracts and Leases.

(i)    Contracts.  To the best of Seller's CAO's knowledge, Schedule 3.14(a) sets forth the complete list of contracts and agreements to which Seller is a party or by which it is bound and that are used in or related to the Business or the Assets (the "Existing Contracts").  Seller shall assign and transfer any Existing Contracts identified by Buyer provided that (i) such Existing Contract is assumable and assignable, and (ii) at the time of Closing, Buyer will be required to pay the applicable cure amounts and provide adequate assurance of future performance.

9

(ii)    Leases.  To the best of Seller's CAO's knowledge, Schedule 3.14(b) sets forth the complete list of leases, subleases, licenses, and other agreements to which Seller is a party or by which it is bound (the "Existing Leases").  Seller shall assign and transfer to Buyer those Existing Leases identified by Buyer provided that (i) such Existing Leases are assumable and assignable, and (ii) at the time of Closing, Buyer will be required to pay the applicable cure amounts and provide adequate assurance of future performance.  Each Existing Lease (i) is the legal, valid, binding, and enforceable obligation of Seller that is lessee thereunder, (ii) to the best of Seller's CAO knowledge, is in full force and effect and the binding obligation of the other parties thereto, and (iii) will, if designated as an Assumed Contract, continue to be the legal, valid, binding, and enforceable obligation of the Buyer following the consummation of the transactions contemplated hereunder.

3.15    Schedules.  To the best of Seller's CAO's knowledge, the Schedules attached hereto are accurate in all material respects subject to any disclaimers in the respective schedules.  If Seller shall elect to supplement, modify or update any Schedule, submit a Schedule not attached at execution hereof, or add a new Schedule, through and including Closing, Buyer shall be entitled to review any such changed or new Schedule, and to terminate this Agreement if the disclosures revealed therein are (i) material and in an amount reasonably calculated to have an negative effect upon the value of the Assets or Assumed Liabilities, and (iii) not acceptable to Buyer, following a five (5) business day period during which Buyer and Seller shall attempt to resolve any concerns expressed by Buyer as a result thereof; provided, however, Buyer shall not be entitled to terminate this Agreement for updates to Schedules reflecting ordinary course changes, and Buyer shall not be entitled to terminate this Agreement if Buyer receives a credit at Closing against the Purchase Price for the change under this paragraph.

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that, as of the Effective Date, Closing Date and Effective Time:

4.1    Organization and Standing.  Buyer is a not-for-profit corporation formed, validly existing, and in good standing under the Laws of its state of formation and is qualified, or will be qualified at Closing, to do business under the Laws of the State.  Subject to the approval of certain Governmental Authorities, Buyer has the requisite power and authority to own and operate the Assets in the manner in which they are presently being operated.

4.2    Capacity; Authority.  Buyer has full power, legal capacity and authority to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations under this Agreement.  The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance of Buyer's obligations hereunder have been duly authorized by Buyer's sole member, members, board of directors or other governing authority, as applicable, and no other proceedings on the part of Buyer are necessary in connection therewith.  This Agreement constitutes, and each other instrument to be executed and delivered by Buyer will constitute, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.  The individual(s) executing and delivering this Agreement on Buyer's behalf are duly authorized and empowered to bind the Buyer as contemplated hereby.

10

4.3     No Violation; Consents.   Neither the execution and delivery by Buyer of this Agreement and the ancillary agreements to be entered into herewith nor the consummation of the transactions contemplated hereby or thereby nor compliance with any of the provisions hereof or thereof by Buyer will (i) conflict with or result in any breach of any provision of the organizational documents of Buyer, (ii) violate any applicable Law, or (iii) except as contemplated by Section 5.2 of this Agreement, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority or other Person which has not otherwise been obtained or made.

4.4     No Brokers or Finders.   Neither Buyer nor any affiliate of Buyer has engaged any finder or broker in connection with the transactions contemplated hereby.

4.5     Ability to Perform.   Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price less the Credit Bid Amount by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price less the Credit Bid Amount and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

4.6     Full Disclosure.   All of Buyer's warranties, representations or covenants in this Agreement: (i) constitute a material part of the consideration hereunder; (ii) are true and complete, current and accurate as of the date hereof; (iii) shall be true, complete, current and accurate as of the Closing Date and Effective Time; and (iv) and shall survive the Closing Date and delivery of the Assets to Buyer.   None of the statements, representations or warranties of Buyer misstates or omits any fact which would make such statements, representations or warranties incomplete, misleading or incorrect in any material respect.   Buyer shall inform Seller if any statement, representation or warranty becomes incorrect, misleading or incomplete subsequent to the date hereof.

## ARTICLE 5. MUTUAL COVENANTS

5.1     General Covenants.   Following the execution of this Agreement, Seller and Buyer agree:

(i)     To cooperate fully with each other in preparing, filing, prosecuting, and taking any other actions which are or may be reasonable and necessary to obtain the consent of any governmental instrumentality or any third party, to accomplish the transactions contemplated by this Agreement;

(ii)     To deliver such other instruments of title, certificates, consents, endorsements, assignments, assumptions and other documents or instruments, in form reasonably acceptable to the party requesting the same and its counsel, as may be reasonably necessary to carry out and/or to comply with the terms of this Agreement and the transactions contemplated herein; and

(iii)     To confer on a regular basis with the other, report on material operational matters and promptly advise the other orally and in writing of any change or event having, or which, insofar as can reasonably be foreseen could have, a material adverse effect on such party

or which would cause or constitute a material breach of any of the representations, warranties or covenants of such party contained herein.

5.2     Licensing.   Buyer and Seller shall work in good faith and use commercially reasonable efforts to cause Buyer to obtain prior to the Closing Date (or as soon thereafter as practicable): (i) all consents, approvals, licenses, certifications, Medicare and Medicaid enrollment participation and payor contracting to permit the consummation of the transactions contemplated by this Agreement and to enable the Buyer to lawfully operate the Business (collectively, the "Regulatory Approvals"); (ii) all consents required for the transfer or assignment of any personal property leases to be assumed by Buyer; and (iii) all consents required for the transfer or assignment of the Assumed Contracts.  Seller shall cooperate in all reasonable respects with Buyer in its efforts to obtain such consents, approvals and licenses.

5.3     Public Announcements.   Other than statements in pleadings or in open court made in the Bankruptcy Case, or in furtherance of Bayshore's duties as broker in the Bankruptcy Case, the parties may not issue any press release or any written statement with respect to this Agreement or the transactions contemplated hereby; provided, however, that nothing herein shall be construed as prohibiting (i) public disclosures in connection with securing any licensing or certification approvals, subject to the restriction in Section 5.2 of this Agreement, or complying with regulations promulgated by the Securities and Exchange Commission or other government agencies, or (ii) private disclosures to the employees, shareholders, agents, contractors, consultants, attorneys, accountants, lenders and affiliates of the disclosing party or (iii) pursuant to public announcements (including, without limitation, press releases) made with the prior written approval of Seller and Buyer.

5.4     Utilities.   Buyer and Seller shall cooperate to take all steps necessary to transfer all utilities related to the operation of the Business including without limitation electric service, gas service, telephone service, cable service, internet service, sewage, water and trash removal, into Buyer's name, as directed by Buyer, effective as of the Effective Time.

## ARTICLE 6. COVENANTS

6.1     Covenants of Seller.

(i)     Seller Information.   Seller will provide Buyer with access to Bayshore's data room (the "Data Room"), as well as copies of any other materials relating to the transfer of the Assets as may be reasonably requested by Buyer (collectively the "Seller Information").  If, prior to the Closing Date, Seller receives, discovers or becomes aware of any material change in the Assets or any matter affecting the Assets which would render any of the materials previously given false or misleading, then Seller shall disclose such changes in writing to Buyer and deliver any additional related materials in Seller's possession to Buyer as soon as reasonably possible after such receipt or discovery.

(ii)     Right of Inspection.   From the date of this Agreement until the termination of this Agreement or through the Closing Date, as applicable, and subject to Section 6.2, Seller shall permit Buyer's authorized representatives to have full access to the Facility during regular business hours, shall make its officers and key employees available to confer with Buyer and its

authorized representatives, shall make available to Buyer's representatives all books and records relating to the Business and the obligations and liabilities of Seller including, but not limited to contracts and agreements, filings with any regulatory authority, any financial operating data and any other information relating to Seller's business activities with respect to the Business, as Buyer may from time to time request; provided, that Seller shall not be obligated to make available books and records or other information relating to the Excluded Assets.

(iii)    <u>Operations Transfer Agreement</u>.  To the extent deemed necessary by the Buyer, Seller shall execute the Operations Transfer Agreement in a form mutually acceptable by Buyer and Seller on the Effective Date.

(iv)    <u>Interim Management Agreement</u>.  If required under the terms of the Operations Transfer Agreement, Seller shall execute an interim management agreement on or before the Closing Date in a form mutually acceptable by Buyer and Seller on the Effective Date, enabling Buyer to manage and operate the Business as contemplated by the Operations Transfer Agreement (the "<u>Interim Management Agreement</u>").

## ARTICLE 7. CONDITIONS TO OBLIGATION OF BUYER TO PERFORM

The obligations of Buyer under this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions (the "<u>Closing Conditions</u>"), each of which are for the sole benefit of Buyer and may be waived by Buyer at Buyer's sole option by delivery to Seller of a written notice of such waiver.

7.1    <u>Compliance with Agreement</u>.  Seller shall have performed all of its obligations hereunder, including, without limitation, completing all schedules hereto, and Seller's representations and warranties in this Agreement and in the Seller Closing Items (as defined in <u>Section 10.1</u>) shall be true and correct in all material respects (without giving effect to any materiality qualifiers therein) on and as of the Closing Date and the Effective Time.

7.2    <u>Regulatory Approvals</u>.  Buyer shall have received all approvals from AHCA necessary to transfer the License to Buyer and to allow Buyer to operate the Business. Additionally, Buyer shall not have received any notice, letter, omissions letter or other document from the Centers for Medicare & Medicaid Services or any other Governmental Authority that negatively impacts Buyer's ability to operate the Business in such manner as Buyer determines in its reasonable discretion.

7.3    <u>Operation Transfer Agreement</u>.  To the extent deemed necessary by the Buyer, Seller and Buyer shall have entered into the Operations Transfer Agreement and shall not be in default of any warranty, covenant, agreement, condition or other obligation under the Operations Transfer Agreement.

7.4    <u>Interim Management Agreement</u>. To the extent deemed necessary by the Buyer, Seller and Buyer shall have entered into the Interim Management Agreement.

7.5    <u>Bankruptcy Court Approval</u>.  The Sale Order (a) shall have been entered by the Bankruptcy Court in a form reasonably acceptable to Buyer and shall include a good faith finding under section 363 of the Bankruptcy Code and provide for the sale of the Assets free and

clear of all Claims and Encumbrances;  (b) shall be unappealed, unappealable, unstayed, and not subject to a motion for reconsideration (the "Final Order") by no later than June 22, 2018, which date may be waived or extended by mutual agreement of the parties, (c) shall not have been stayed, modified, amended, dissolved, revoked or rescinded without Buyer's consent, and (d) shall be in full force and effect on the Closing Date.  Buyer, in its sole discretion, may waive in writing the requirement that the Sale Order shall be a Final Order.

7.6    Unfavorable Action or Proceeding.  On the Closing Date, no orders, decrees, judgments or injunctions of any court or Governmental Authority shall be in effect, and no claims, actions, suits, proceedings, arbitrations or investigations shall be pending or threatened in writing to the Seller, which challenge or seek to challenge, or which could prevent or cause the rescission of, the consummation of the transactions contemplated in this Agreement.

## ARTICLE 8. CONDITIONS TO OBLIGATION OF SELLER TO PERFORM

The obligations of Seller under this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, each of which may be waived by Seller by delivery to Buyer of a written notice of such waiver.

8.1    Compliance with Agreement.  Buyer shall have performed all of its obligations hereunder, and Buyer's representations and warranties in this Agreement and in the Buyer Closing Items (as defined in Section 10.2) shall be true and correct in all material respects on and as of the Closing Date and the Effective Time.

8.2    Unfavorable Action or Proceeding.  On the Closing Date, no orders, decrees, judgments or injunctions of any court or Governmental Authority shall be in effect, and no claims, actions, suits, proceedings, arbitrations or investigations shall be pending or threatened in writing to the Seller, which challenge or seek to challenge, or which could prevent or cause the rescission of, the consummation of the transactions contemplated in this Agreement; provided, however, that Seller shall use commercially reasonable efforts to prevent the entry of such order, decree, judgment or injunction before terminating this Agreement, and Buyer shall cooperate in such efforts by Seller.

## ARTICLE 9. TERMINATION

9.1    Termination.  This Agreement may be terminated prior to the Closing:

(i)    by the Seller or Buyer if the Bid Procedures Motion is withdrawn prior to the entry of the Bid Procedures Order or if, following entry of the Bid Procedures Order, the Seller determines to abandon or end the sale process established pursuant thereto;

(ii)    by mutual written consent of the Seller and Buyer;

(iii)    by Buyer:

(a)    if there has been a material breach by Seller of any representation or warranty contained herein or in the due and timely performance of any covenant or agreement contained herein, the Seller has notified Buyer of such breach in writing, and the breach has not

been cured within five (5) business days after delivery of such notice (or such longer notice and cure period as may be set forth in any other provision of this Agreement);

(b)    if the Closing shall not have occurred within six (6) months of the Sale Order or such later date as agreed to by the Buyer (the "Outside Closing Date");

(c)    if the Sale Order shall not have been entered substantially in the form of Exhibit 9.1(iii)(c) (unless any changes thereto have been approved by the Buyer), or if the Sale Order has been entered but stayed as of such Outside Closing Date or if the Sale Order has not been entered within ten (10) days of the conclusion of the Auction;

(d)    if the Seller has filed any pleading or entered into any agreement (other than this Agreement and other than the Bid Procedures Motion) relating to or otherwise regarding the sale, transfer, lease or other disposition, directly or indirectly, of all or a material portion of the Assets or regarding an Alternative Transaction (as defined below);

(e)    if the Bankruptcy Court approves a sale, lease, or transfer of all or a material portion of the Assets, directly or indirectly, to any other person or entity other than Buyer, or if the Seller selects a bid by someone other than Buyer as the "highest and best offer" in accordance with the Bid Procedures Order, and said selection is not overruled by the Bankruptcy Court within seven (7) days following the conclusion of the Auction, or if the Bankruptcy Court approves or the Seller consummates a sales, lease or transfer transaction related to any of the Assets with a third party other than as contemplated in the Bid Procedures Order (including in either instance, for the avoidance of doubt a credit bid, deed in lieu, exercise of rights and remedies or foreclosure with respect to some or all of the Assets), or an Alternative Transaction is approved by the Bankruptcy Court and consummated.  The term "Alternative Transaction" means, any transaction (other than the sale of Assets to Buyer under this Agreement) involving:  (i) the issuance, sale, transfer or other disposition of any class of equity securities, ownership interests or voting securities of Seller, (ii) the merger, consolidation, asset sale, recapitalization, business combination or other similar transaction involving Seller, or (iii) the entry of an order confirming a Chapter 11 plan for Seller under which all or a material portion of Assets vests in Seller or in a successor to Seller or another person or entity;

(f)    the Bid Procedures Order has not been entered substantially in the form of Exhibit 2.1 (unless any changes thereto have been approved by the Buyer) on or before the Bid Procedures Order Deadline (for which no cure period shall apply); or

(g)    this Agreement otherwise provides Buyer with a right of termination.

(iv)    by the Seller:

(a)    if there has been a material breach by Buyer of any representation or warranty contained herein or in the due and timely performance of any covenant or agreement contained herein, the Seller has notified Buyer of such breach in writing, and the breach has not been cured within five (5) business days after delivery of such notice (or such longer notice and cure period as may be set forth in any other provision of this Agreement); or

15

(b)     if the Closing shall not have occurred on or before the Outside Closing Date by reason of the failure of any condition precedent set forth in Article 8 (unless such failure was solely within the control of the Seller); or

(c)     Buyer is not diligently pursuing the Closing so that such Closing can occur on or before the Outside Closing Date, as determined by the Bankruptcy Court

9.2    Effect of Termination.  No termination of this Agreement pursuant to Section 9.1 shall be effective until written notice thereof is given to the non-terminating party specifying the provision hereof pursuant to which such termination is made.  If validly terminated pursuant to Section 9.1 this Agreement shall be void and of no effect, and all further obligations of the parties under or pursuant to this Agreement shall terminate without further liability of any party to the other; provided that the provisions of any confidentiality agreement between the parties, this Section 9.2 (Effect of Termination) and Section 12.3 (Miscellaneous) of this Agreement shall survive the termination of this Agreement; provided, further, that nothing contained in this Section 9.2 shall relieve any party from liability for any breach of this Agreement.

## ARTICLE 10. CLOSING

10.1    Seller's Obligations at Closing.  On or before the Closing Date, Seller shall deliver or cause to be delivered directly to Buyer, all of the following, which are referred to herein as "Seller Closing Items":

(i)     Evidence of all required board approvals authorizing the execution and performance of this Agreement;

(ii)    The Operations Transfer Agreement, executed by Seller, if not previously delivered to Buyer;

(iii)   If required under the terms of the Operations Transfer Agreement, the Interim Management Agreement, executed by Seller;

(iv)    All necessary instruments of transfer, properly executed by Seller acknowledged, conveying, transferring and assigning to Buyer all of Seller's right, title and interest in and to the Assets and any and all warranties or rights in connection therewith, all in form and substance reasonably satisfactory to Buyer and Seller, including without limitation, a Bill of Sale and Assignment and Assumption Agreement from Seller to Buyer; and

(v)     Such other forms and documents as Buyer may reasonably request in order to effectuate the transactions contemplated hereby.

10.2    Buyer's Obligations at Closing.  On or before the Closing Date, Buyer shall deliver or cause to be delivered directly to Seller the following, which are referred to herein as the "Buyer Closing Items":

(i)     The Purchase Price, with any cash portion thereof payable by wire transfer of immediately available funds to Seller's account;

(ii)    If required by the Buyer, the Operations Transfer Agreement, executed by Buyer, if not previously delivered to Seller;

(iii)    If required by the Buyer, the Interim Management Agreement executed by Buyer; and

(iv)    Such other documents, forms, certifications, instructions or items as Seller may reasonably request to effectuate the transactions contemplated hereby.

10.3    <u>Costs and Prorations</u>.  The costs of the transaction and the expenses related to the ownership and operation of the Facility shall be allocated between Seller and Buyer as follows:

(i)    Buyer shall pay any sales tax due on the transfer of title to the Assets to Buyer;

(ii)    Buyer shall pay any outstanding personal property taxes, assessments and other impositions required to effectuate the Agreement;

(iii)    Seller and Buyer shall each pay their own attorneys' fees and costs;

(iv)    Buyer shall pay all costs associated with obtaining and recording any releases necessary to cause the full release of; (A) monetary liens or any other liens affecting the Assets to be discharged in accordance with the terms of this Agreement, (B) any liens encumbering the motor vehicles of Seller, and (C) any lien, encumbrance or other security interest affecting any of the Assets which is unpaid as of the Closing; and

(v)    Buyer shall pay any outstanding utility charges required to effectuate this Agreement.

## ARTICLE 11. POST-CLOSING ACCESS

11.1    <u>Access</u>.  In connection with (i) the transition of the Business pursuant to the transaction contemplated by this Agreement, (ii) Seller's rights to the Excluded Assets, and (iii) Seller's obligations under the Excluded Liabilities, Buyer shall after the Closing Date give Seller, Seller's affiliates and their respective representatives and any liquidating trust that may be established pursuant to a plan of reorganization for the benefit of Seller's estate access during normal business hours to Buyer's books, accounts and records and all other relevant documents and information with respect to the assets, liabilities and operation of the Business as representatives of Seller and Seller's affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Business.

## ARTICLE 12. GENERAL PROVISIONS

12.1    <u>Notices</u>.  All notices, requests, demands and other communications required under this Agreement shall be in writing and shall be deemed duly given and received (i) if personally delivered, on the date of delivery, (ii) if mailed, three (3) days after deposit in the United States Mail, registered or certified, return receipt requested, postage prepaid and addressed as provided below, (iii) if by a courier delivery service providing overnight or "next- day" delivery, on the

next business day after deposit with such service, or (iv) electronic mail (with receipt of such email acknowledged by the recipient (provided, that any email sent after 5:00 p.m. Eastern Standard Time shall be deemed to have been sent as of 8:00 a.m. as of the next following business day), addressed as follows:

<u>If to Seller</u>:

Miami International Medical Center, LLC
5959 NW 7th Street
Miami, Florida 33126-3129
Attn:  Jeffrey Mason
Chief Administrative Officer
Phone:  (786) 646-5020
Email: Jeffrey.Mason@miamimedicalcenter.com

<u>with a copy to</u>:

Peter Russin, Esq.
Meland Russin & Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Blvd.
Miami, Florida 33131
Phone:  (305) 358-6363
Email: prussin@melandrussin.com

<u>If to Buyer</u>:

Variety Children's Hospital
3100 S.W. 62nd Ave
Miami, Florida 33155
Attn:  Tim Birkenstock
Phone:  (786) 624-5701
Email: Tim.Birkenstock@nicklaushealth.org

<u>with a copy to</u>:

Joshua Kaye, Esq.
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131-5341
Phone:  (305) 423-8521
Email:  Joshua.Kaye@dlapiper.com

and

Thomas Califano, Esq.
DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
Phone:  (212) 335-4990
Email:  Thomas.Califano@dlapiper.com

Any party may change its above-designated address by giving the other party written notice of such change in the manner set forth herein.

12.2    <u>Effect of Termination</u>.    The termination of this Agreement shall operate to terminate the Operations Transfer Agreement, the Interim Management Agreement, if any, and any other agreements and documents executed in connection with the transfer of the Assets to Buyer; provided, that such termination shall not diminish a party's rights and remedies for a breach or default by another party.

12.3    <u>Miscellaneous</u>.    This Agreement, and the related agreements referred to herein, constitute the <u>entire</u> agreement among the parties and supersede all prior and contemporaneous agreements and undertakings of the parties with respect to the subject matter hereof.   No supplement, modification or amendment of this Agreement shall be binding and enforceable unless executed in writing by the parties hereto.   No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision hereof (whether or not similar) nor shall such waiver constitute a continuing waiver, and no waiver shall be binding unless executed in writing by the party making the waiver.   Schedules and Exhibits referred to in this Agreement, whether attached hereto at the time of this Agreement's execution and delivery or thereafter, are hereby incorporated into this Agreement and made a part hereof. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.   In the event an action, suit or arbitration proceeding is brought by any party hereto to enforce the terms of this Agreement, the prevailing party shall be entitled to the payment of its reasonable attorneys' fees and costs, as determined by the judge of the court or the arbitrator, as applicable.   The invalidity or unenforceability of any particular provision, or any part thereof, of this Agreement shall not affect the other provisions hereof and this Agreement shall be continued in all respects as if such invalid or unenforceable provision were omitted.   Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the respective heirs, executors, administrators, personal representatives, successors

and assigns of any of the parties to this Agreement. The parties hereto agree that each party and its counsel have reviewed this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement. Headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or of any provision hereof. As used herein, the term "Medicaid" shall mean and refer to the Medicaid program or any similar reimbursement program established by Florida. Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

12.4    Governing Law; Jurisdiction.    Except as expressly provided herein, this Agreement shall be construed in accordance with, and governed by, the Laws of Florida, without regard to the application of conflicts of law principles. The parties agree that any legal suit, action or proceeding arising out of or relating to this Agreement must be instituted in the Bankruptcy Court, and they hereby irrevocably submit to the jurisdiction of any such court. EACH OF THE PARTIES HERETO KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT WHICH IT MAY HAVE TO HAVE ANY DISPUTE WITH RESPECT TO THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT TRIED BEFORE A JURY AND AGREES THAT ALL SUCH DISPUTES SHALL BE TRIED BEFORE A JUDGE AND NOT A JURY.

12.5    Further Documentation.    Each party will execute and deliver such further instruments and do such further acts and things as may be reasonably required to carry out the intent and purpose of this Agreement.

12.6    Bulk Sales.    Buyer hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Assets are located and all other similar Laws applicable to bulk sales and transfers.

12.7    Business Day.    As used in this Agreement, a "business day" shall mean a day other than Saturday, Sunday or any day on which banking institutions in Miami, Florida, are required or authorized by Law or other governmental action to close. All other references to "days" or "calendar days" in this Agreement shall refer to calendar days. If any period expires, or if any delivery date or any date on which a party is to take a specified action falls, on a date that is not a business day under this Agreement, such period shall be deemed to expire and such delivery date or such date for taking such specified action shall be deemed to fall on the next succeeding business day.

12.8    Subsequent Chapter 11 Plan/Conversion.    In the event of a Closing, no Chapter 11 plan of reorganization or plan of liquidation subsequently proposed or confirmed in Seller's Bankruptcy Case shall contain any provisions which are inconsistent with or purport to override the terms of this Agreement and the ancillary agreements to be entered into herewith, all of which shall be expressly preserved under the terms of such plan. Further, in the event of a conversion of the Bankruptcy Case to Chapter 7 or dismissal, the post-closing obligations under this Agreement shall be unaffected and fully preserved, so that the Chapter 7 Trustee shall be obligated and required to comply with all post-Closing duties, including further assurances, without cost to, or the necessity of a motion or administrative claim from, Buyer.

12.9    <u>Bankruptcy Approval</u>.  Seller is currently a debtor in a Bankruptcy Case pending in the Bankruptcy Court, and, notwithstanding anything herein to the contrary, Seller's obligations hereunder are contingent upon the entry of an order from the Bankruptcy Court in form acceptable to the Buyer which contains a finding pursuant to Bankruptcy Code Section 363(m) and provides for the transfer of the Assets free and clear of all liens, encumbrances and claims.

12.10    <u>"AS IS" TRANSACTION</u>.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT DELIVERED IN CONNECTION WITH THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO SELLER'S BUSINESS, TO THE ASSETS, TO THE ASSUMED CONTRACTS OR TO THE ASSUMED LIABILITIES.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSETS.  IF THE CLOSING OCCURS, BUYER WILL ACCEPT THE ASSETS, AT THE CLOSING DATE "AS IS," "WHERE IS," SUBJECT TO THE PROVISIONS OF THIS AGREEMENT, THE SELLER ANCILLARY DOCUMENTS, AND THE SALE ORDER PROVIDING, AMONG OTHER THINGS, THAT THE SALE OF THE ASSETS IS FREE AND CLEAR OF ALL CLAIMS AND ENCUMBRANCES.

12.11    <u>NO CONSEQUENTIAL OR PUNITIVE DAMAGES; LIMITATION OF LIABILITY</u>.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES CLAIMS BY SUCH PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT, OR IN ANY OTHER DOCUMENT, INSTRUMENT OR AGREEMENT DELIVERED IN CONNECTION WITH THIS AGREEMENT, TO THE CONTRARY, THE MAXIMUM AGGREGATE LIABILITY OF BUYER AND ITS REPRESENTATIVES TO SELLER AND ITS REPRESENTATIVES ARISING OUT OF ANY AND ALL BREACHES OR VIOLATIONS BY BUYER THAT OCCUR AT OR BEFORE THE CLOSING, INCLUDING WITHOUT LIMITATION ANY BREACH BY BUYER OF ITS OBLIGATION TO EFFECT THE CLOSING HEREUNDER, OR FAILURES AT OR BEFORE THE CLOSING OF BUYER TO COMPLY WITH, THIS AGREEMENT OR SUCH OTHER DOCUMENTS, INSTRUMENTS OR AGREEMENTS, SHALL NOT EXCEED AN AMOUNT EQUAL TO TEN PERCENT (10%) OF THE PURCHASE PRICE.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first set forth above.

**SELLER**:                                                    **BUYER**:

Miami International Medical Center, LLC, a        Variety Children's Hospital d/b/a Nicklaus
Florida limited liability company                        Children's Hospital, a Florida not-for- profit
                                                                        corporation

By: _____        By: _____
    Name:  Jeffrey Mason                                   Name:
    Title:  Chief Administrative Officer            Title:

**SCHEDULE 1.1(i)**

**INVENTORY**

Schedule 1.1(i)

# The Miami Medical Center

Lsiting of Medical Equipment and Instruments

| TRX Date | Originating Documer | Originating Master Name | |
|---|---|---|---|
| 9/22/2015 | 17558 | OrthoScan | Mini-Arm |
| 9/30/2015 | 500650083 | GE Healthcare | Precision 500 D Used |
| 9/30/2015 | 500649811 | GE Healthcare | Brivo System |
| 9/30/2015 | 520586757 | GE Healthcare | GS Logiq |
| 10/8/2015 | MIMC1146725GG02 | Edward Don & Company | Kitchen Equipment |
| 10/14/2015 | 11134031 | InterMetro | Equipment |
| 10/25/2015 | 47809 | Cosman Medical Inc | Generator - Radiofrequency |
| 10/25/2015 | 7629703 | Hologic | MySource Control Unit |
| 10/25/2015 | 2521710515 | Medtronic USA Inc | AEX Generator |
| 10/25/2015 | 9338018 | Mortara Instruments, Inc | EKG with Cart |
| 10/25/2015 | 361849 | Steris Corporation | Water Control Sensor |
| 10/25/2015 | 2296037 | Zoll | Advisory R Series |
| 10/31/2015 | AP601660B | Amico | Oxygen Flowmeters |
| 10/31/2015 | 6003306612 | Bayer Healthcare | Solarius |
| 10/31/2015 | 6000016049-4 | Carefusion Solutions | pharmogistics |
| 10/31/2015 | 167650 | GE Healthcare | Procedure Table |
| 10/31/2015 | 500657838 | GE Healthcare | GS Logiq |
| 10/31/2015 | 500657848 | GE Healthcare | GS Logiq |
| 10/31/2015 | 5759904 | Steris Corporation | Carts |

| Date | Number | Vendor | Description |
|---|---|---|---|
| 10/31/2015 | 5748823 | Steris Corporation | 4 CEILING LIGHT |
| 10/31/2015 | 5751039 | Steris Corporation | OR LIGHTS (3) |
| 10/31/2015 | 5768731 | Steris Corporation | Connector Kit |
| 10/31/2015 | 358094 | Steris Corporation | SURG LIGHT W MONITOR MOUN |
| 10/31/2015 | 358248 | Steris Corporation | OR EQUIPMENT |
| 10/31/2015 | 5760205 | Steris Corporation | HARNESS ASSEMBLY |
| 11/16/2015 | PO TMMC-1041 | Jeffrey Allen Inc | 8 Passenger Vehicle |
| 11/30/2015 | 6003304042 | Bayer Healthcare | MARK 7 ARTERION PEDESTAL SY |
| 11/30/2015 | 11153750 | InterMetro | Back Panel of Equpment |
| 11/30/2015 | 5759904-2 | Steris Corporation | MEDVAC |
| 11/30/2015 | 360528 2 | Steris Corporation | VISION, PLUS TAX |
| 11/30/2015 | 360459 | Steris Corporation | VPRO, AMSCO- PLUS TAX |
| 11/30/2015 | 361427 | Steris Corporation | HARMONY AIR |
| 11/30/2015 | 361512 | Steris Corporation | CAVIWAVE PRO SONIC CONSOL |
| 11/30/2015 | 5886275 | Steris Corporation | V-Pro Max |
| 11/30/2015 | 5768731-2 | Steris Corporation | CONNECTOR KITS (14) |
| 11/30/2015 | 5760205-2 | Steris Corporation | HARNESS ASSEMBLY |
| 12/31/2015 | OMMC77515689 | Allen Medical Systems, Inc | Leg Holder System |
| 12/31/2015 | OMMC77515969 | Allen Medical Systems, Inc | Chair Cart |
| 12/31/2015 | AA236065 | Amico | Adjustable Arm |
| 12/31/2015 | 20165572 | CLAFLINMedical Equipment | Malignant Hyperthermia Deluxe |
| 12/31/2015 | 20165222 | CLAFLINMedical Equipment | Supplies: Medical Equipment |
| 12/31/2015 | 520594937 | GE Healthcare | Logiq Required Items |
| 12/31/2015 | 24361555 | HIll-Rom | Vercacare Beds |
| 12/31/2015 | 24365549 | HIll-Rom | Versacare Bed Accessories |

| | | | |
|---|---|---|---|
| 12/31/2015 | 24361554 | HIll-Rom | Equipment of beds |
| 12/31/2015 | 117583 | HIll-Rom | Varsacare Beds asseccories |
| 12/31/2015 | 2522054586 | Medtronic USA Inc | Balloon Seeker |
| 12/31/2015 | 2522475075 | Medtronic USA Inc | Hydrodebrider |
| 12/31/2015 | 2521906000 | Medtronic USA Inc | Instrument kit |
| 12/31/2015 | 2521993417 | Medtronic USA Inc | Instrument Kit |
| 12/31/2015 | 2521963816 | Medtronic USA Inc | Instruments |
| 12/31/2015 | 2-R | MIAMI CHILDREN'S HEALTH | Elecom System and Hill-Rom Cor |
| 12/31/2015 | 3 | MIAMI CHILDREN'S HEALTH | Cerner Hill-Rom Greenline |
| 12/31/2015 | 4 | MIAMI CHILDREN'S HEALTH | Hill-Rom Lexmark RoundTower |
| 12/31/2015 | 5 | MIAMI CHILDREN'S HEALTH | HIll-Rom IT outlet RoundTower |
| 12/31/2015 | 166814 | OEC Medical | Spectre footswitch |
| 12/31/2015 | 169070 | OEC Medical | 12" Vascular 9800 upgrade kit |
| 12/31/2015 | 166809 | OEC Medical | 9900 Elite motor driven |
| 12/31/2015 | 166812 | OEC Medical | 9900 Elite motor driven |
| 12/31/2015 | 0381703-IN | Pedigo Products, Inc | Cart with Casters |
| 12/31/2015 | 14329070 | Smith's Medical | Pump kits |
| 12/31/2015 | 5897715 | Steris Corporation | Universal Port Connection |
| 12/31/2015 | 1811015M | Stryker Sales | Surgi Stool (2) |
| 1/11/2016 | 20341698 | Alcon Laboratories, Inc | Constellation 3 kits |
| 1/11/2016 | AA235834 | Amico | AHM Falcon station (65) |
| 1/11/2016 | 20165900 | CLAFLINMedical Equipment | Miller fiber optic blades |
| 1/11/2016 | 20165961 | CLAFLINMedical Equipment | Miller fiber optic blades |
| 1/11/2016 | 20167258 | CLAFLINMedical Equipment | Miller fiber optic blades |
| 1/11/2016 | 80189054 | Datex Ohmeda, Inc | Infant warmer, care system |

| 1/11/2016 | 112009 | HIll-Rom | Wireless Bed |
| 1/11/2016 | 24364523 | HIll-Rom | Patient Monitors |
| 1/11/2016 | 24364523 | HIll-Rom | Patient Monitors |
| 1/11/2016 | 23741552 | Integra Lifescience | Light Source |
| 1/11/2016 | 901158879 | Intuitive Surgical | IS4000 Da Vinci System |
| 1/11/2016 | 91731999 | Olympus | Cart |
| 1/13/2016 | 20356513 | Alcon Laboratories, Inc | Constellation LXT |
| 1/13/2016 | 41036 | DB Surgical | Table Clamp - Equipment |
| 1/13/2016 | INV096428 | Innovative Medical Products | MorphBoards |
| 1/13/2016 | 0600444380 | Mindray | Equipment |
| 1/13/2016 | 932108355 | PHILIPS HEALTHCARE | Patient Monitor |
| 1/13/2016 | 932108126 | PHILIPS HEALTHCARE | Equipment and Installation |
| 1/13/2016 | 932108046 | PHILIPS HEALTHCARE | Installation and quipment- OB |
| 1/17/2016 | 11176678 | InterMetro | Shelving Assembly Charge |
| 1/20/2016 | 14306733 | Smith's Medical | Supplies: Medical |
| 1/20/2016 | 14305590 | Smith's Medical | Medfusion pump (16) |
| 1/20/2016 | 693618 | Verathon | Equipment |
| 1/20/2016 | 680432 | Verathon | Largyngoscope cart |
| 1/31/2016 | AA235953 | Amico | Falcon workstation accessories |
| 1/31/2016 | AP602805 | Amico | Bassinets |
| 1/31/2016 | 90409471 | Arthrex | trimano adapter (2) |
| 1/31/2016 | 90409470 | Arthrex | Positioners |
| 1/31/2016 | 6044767938 | Carl Zeiss, Meditec, Inc | Microscope |
| 1/31/2016 | 7647176 | Hologic | Hysteroscope Equipment |
| 1/31/2016 | 2523327026 | Medtronic USA Inc | Tables and Frames |

| Date | Number | Vendor | Description |
|---|---|---|---|
| 1/31/2016 | 2523357352 | Medtronic USA Inc | Foot Control Console |
| 1/31/2016 | 7 | MIAMI CHILDREN'S HEALTH | Cerner, Computer, and Zone inv |
| 1/31/2016 | 91960508 | Olympus | airway mobilscope intubation s |
| 1/31/2016 | 931852396 | PHILIPS HEALTHCARE | Patient Monitor |
| 1/31/2016 | 932116277 | PHILIPS HEALTHCARE | Patient Monitor Station |
| 1/31/2016 | 5997536 | Steris Corporation | Medium Sterilizer |
| 1/31/2016 | 5990089 | Steris Corporation | Harmony Equipment |
| 2/11/2016 | 912882378 | Aesculap | Medical Equipment |
| 2/11/2016 | 912882379 | Aesculap | Medical Equipment |
| 2/11/2016 | 912869685 | Aesculap | MEdical Equipment |
| 2/11/2016 | OMMC77515471 | Allen Medical Systems, Inc | Medical Equipment |
| 2/11/2016 | 6044765896 | Carl Zeiss, Meditec, Inc | Kmat opmi Lumera 700 |
| 2/11/2016 | 22037820 | Covidien | Equipment |
| 2/11/2016 | IV068648 | Keeler Instruments | Equipment |
| 2/11/2016 | 2523386423 | Medtronic USA Inc | Equipment |
| 2/11/2016 | 2523505584 | Medtronic USA Inc | Equipment |
| 2/11/2016 | 1040313396 | Natus | Endo Screen Equipment |
| 2/11/2016 | 1040278421 | Natus | Papoose Board |
| 2/11/2016 | 6371933-E | Stryker Endoscopy | Video Cart |
| 2/11/2016 | 6369427-E | Stryker Endoscopy | Cameras |
| 2/11/2016 | 6377086-E | Stryker Endoscopy | Medical Equipment |
| 2/11/2016 | 492426A | Stryker Sales | Equipment Drill |
| 2/17/2016 | 22556607 | Covidien | monitors |
| 2/21/2016 | 92026800 | Olympus | Ultra-Light Camera |
| 2/21/2016 | 1798568M | Stryker Sales | Equipment |

| Date | Number | Vendor | Description |
|---|---|---|---|
| 2/29/2016 | 113015 | ADVANCED ELECTRONICS | 42" and 55" TV |
| 2/29/2016 | 913227007 | Aesculap | Supplies: Instruments |
| 2/29/2016 | 913018802 | Aesculap | Medical Insturments |
| 2/29/2016 | 913386270 | Aesculap | Medical Insturments |
| 2/29/2016 | 913273464 | Aesculap | Medical Insturments |
| 2/29/2016 | 20663982 | Alcon Laboratories, Inc | Equipment Medical |
| 2/29/2016 | 20605317 | Alcon Laboratories, Inc | Occular Implants |
| 2/29/2016 | 90693744 | Arthrex | Medical Equipment |
| 2/29/2016 | 90669372 | Arthrex | Supplies; Medical |
| 2/29/2016 | 50209666 | Baxter Healthcare Corp | IV Connector |
| 2/29/2016 | 50211312 | Baxter Healthcare Corp | pump implementation |
| 2/29/2016 | 18906650 | Edward Don & Company | Medical Stand |
| 2/29/2016 | 18679956 | Edward Don & Company | Ice Dispenser |
| 2/29/2016 | 18679828 | Edward Don & Company | Diswasher. Trash collector |
| 2/29/2016 | 1234290 | INtegrated Medical Systems | Medium Autoclave |
| 2/29/2016 | 30094147684 | Merry X-Ray, Inc | Wheelchair equipment |
| 2/29/2016 | 92039300 | Olympus | Instruments |
| 2/29/2016 | 92054922 | Olympus | Medical Equipment |
| 2/29/2016 | 92026799 | Olympus | Medical Equipment |
| 2/29/2016 | 107572 | Southern Medical | Dose Packing Machine |
| 2/29/2016 | 6373977-e | Stryder Endscopy | Arthoscope |
| 2/29/2016 | k01191650104 | Zones | 45 desks |
| 2/29/2016 | k01191650102 | Zones | wristband printers and radios |
| 2/29/2016 | k01191650101 | Zones | image scanner |
| 4/1/2016 | 571314A | Stryker Insturments | Misc drills, saws, laproscopes |

| | | | |
|---|---|---|---|
| 4/23/2016 | 90680474 | Arthrex | Offset Guide |
| 4/23/2016 | 90772186 | Arthrex | Ankle Arthoroscopy |
| 4/23/2016 | 90630979 | Arthrex | Scope Sheath |
| 4/23/2016 | 200718 | HIll-Rom | Affinity Mattress |
| 4/23/2016 | I0104876 | MOPEC | Disposal and Foot Pedal |
| 4/23/2016 | I0105003 | MOPEC | Equipement |
| 4/23/2016 | 92226572 | Olympus | Optical Sheath |
| 4/23/2016 | 6131284 | Steris Corporation | INstall Sonic Console |
| 4/23/2016 | 6130459 | Steris Corporation | wire case with power |
| 4/26/2016 | 90843353 | Arthrex | HD C Mount |
| 4/26/2016 | 20165740 | CLAFLINMedical Equipment | Pediatric Scale Weighting Cart |
| 4/27/2016 | 22969446 | Covidien | Platform |
| 4/27/2016 | 107746 | Southern Medical | Thermal label printer |
| 4/29/2016 | 90827562 | Arthrex | Prep Board |
| 4/29/2016 | 90823954 | Arthrex | Metal Cannula instruments |
| 4/29/2016 | 20165769 | CLAFLINMedical Equipment | Insturments |
| 4/29/2016 | 20166446 | CLAFLINMedical Equipment | Equipemnt |
| 4/29/2016 | 20162492 | CLAFLINMedical Equipment | MRI & CT transfer Boards |
| 4/29/2016 | 22505178 | Covidien | Monopolar Adapter |
| 4/29/2016 | 92039301 | Olympus | Insturments |
| 4/29/2016 | 92026802 | Olympus | Equipment |
| 4/29/2016 | 92002689 | Olympus | Equipment |
| 4/29/2016 | 723437 | Verathon | Equipment - Minor |
| 6/30/2016 | | Stryker | Equipment |
| 6/30/2016 | 80208233, 80208266 | GE Healthcare | 12 Anesthesia Machines |

| Date | Number | Vendor | Description |
|---|---|---|---|
| 6/30/2016 | 500657848-2 | GE Healthcare | Equipment |
| 6/30/2016 | 500554455 | GE Healthcare | Equipment |
| 12/31/2014 | | | Assets Aquired from Metropolita |
| 10/14/2015 | 11133162 | InterMetro | Lifeline Code Response cart |
| 10/14/2015 | 11132872 | InterMetro | Cart with Casters |
| 10/25/2015 | 5845909 | Steris Corporation | Camera and Supplies |
| 10/31/2015 | 11139187 | InterMetro | LINEN TRUCKS (7) |
| 1/20/2016 | 14305584 | Smith's Medical | 16 pumps |
| 3/31/2016 | 913394629 | Aesulap | Cervical Curettes (8) |
| 3/31/2016 | 913386272 | Aesulap | Misc drills, distractors |
| 3/31/2016 | 20847394 | Alcon | Passive Dr Filter (2) |
| 3/31/2016 | OMMC77534236 | Allen Medical | Allen Bow Frame |
| 3/31/2016 | 90711174 | Arthrex | Misc Instruments |
| 3/31/2016 | 90729794 | Arthrex | Ankle Arthroscopy Case |
| 3/31/2016 | 90734972 | Arthrex | C-mount AR Scope |
| 3/31/2016 | 90666361 | Arthrex | instrument sets (6) |
| 3/31/2016 | 90669371 | Arthrex | ACL instrument set |
| 3/31/2016 | 90579721 | Arthrex | Misc Equipment |
| 3/31/2016 | 90559609, 90559608 | Arthrex | Misc Equipment |
| 3/31/2016 | 1002428440 | Bausch and Lomb | Instrument Tray |
| 3/31/2016 | 20174439 | Claflin | Mobile floor lift |
| 3/31/2016 | 20173115 | Claflin | Laryng blades |
| 3/31/2016 | 20177488 | Claflin | Misc Instruments |
| 3/31/2016 | 206165740 | Claflin | Misc Instruments |
| 3/31/2016 | 158853 | Conmed | Airseal IFS, 110V |
| 3/31/2016 | 161247 | Conmed | IFS Cart with Valve |
| 3/31/2016 | 42382 | DB Surgical | Cobb-type Elev w lighweight han |
| 3/31/2016 | 42410 | DB Surgical | Kennison Rongeur Micro (4) |
| 3/31/2016 | 901167206 | Intuitive | Mega Suturecut ND, IS4000 |
| 3/31/2016 | 901169798 | Intuitive | Instrument Starter Kit |
| 3/31/2016 | 915994134 | Johnson & Johnson | CMC-V Generator System |
| 3/31/2016 | 2523994836 | Medtronic | Misc Instruments |
| 3/31/2016 | 753477 | Network | Misc Instruments |
| 3/31/2016 | 0389628-in | Pedigo | IV Stands (20) |
| 3/31/2016 | 932430944 | Philips | Fetal monitoring system |

| Date | ID | Manufacturer | Description |
|---|---|---|---|
| 3/31/2016 | 932466766 | Philips | Fetal monitoring system |
| 3/31/2016 | 370093 | Steris | Anesthesia Armboard (6) |
| 3/31/2016 | 500656538 | Steris | Eagle st3med Vac install labor |
| 3/31/2016 | 500656542 | Steris | Eagle st3med Vac |
| 3/31/2016 | 6124780 | Steris | Misc Instruments |
| 3/31/2016 | 362498 | Steris | Misc Instruments |
| 3/31/2016 | 1845089 M | Stryker | Eye Surgery Stretcher |
| 3/31/2016 | 6701565 | The Bimeco | Transport Incubator |
| 3/31/2016 | 7232437 | Verathon | Laryngiscope Cart |
| 7/31/2016 | 11243282 | Intermetro | Chrome Med carts |
| 8/31/2016 | 6074045545 | Carl Zeiss, Meditec, Inc | Equipment |
| 8/31/2016 | 1188627 | intermetro | Equipment |
| 8/31/2016 | 92026801 | Olympus | Cam head (3), telescope (5) |
| | 247348a | Stryker | Equipment |
| 1/31/2017 | OMMC77569582 | Allen Medical Systems | Pal Pro Stirrups with clamp |
| 5/31/2017 | 901531779 | Intuitive Surgical | IS3000 sealer |
| 5/31/2017 | 901523772 | Intuitive Surgical | Endoscopes (4) |
| 2/29/2016 | OW13192 | 3m | 2 attest auto reader |
| 4/27/2016 | 913304528 | Aesculap | Tenaculum Grasper (2) |
| 4/27/2016 | 913273466 | Aesculap | Right Angle Dissector (2) |
| 4/29/2016 | 913863987 | Aesculap | Henly Retractor Set w/ accessorie |
| 4/29/2016 | 913367819 | Aesculap | OB instruments |
| 6/21/2016 | 914236163 | Aesculap | Micro Pituitary Rongeur |
| 2/29/2016 | 20583256 | Alcon | forceps, scrappers |
| 2/29/2016 | 93506863 | Applied Medical | reusable grasper handle |
| 3/31/2016 | 90630979 | Arthex | Con OBT Sheath w/ handle (7) |
| 4/29/2016 | 90823954 | Arthex | metal cannula |
| 2/29/2016 | 90619618 | Arthrex | Shoulder instrument set |
| 2/29/2016 | 90618371 | Arthrex | Tenodesis Instrument set |
| 4/29/2016 | 90843353 | Arthrex | coupler, zoom, hd, c mount (2) |
| 4/29/2016 | 7053099359 | cardinal | Holder triple glove box stainless |
| 3/31/2016 | 20175206 | CLAFLINMedical Equipment | LED Exam lamp (2) |
| 4/29/2016 | 20165750 | CLAFLINMedical Equipment | Wis-Hipple fiber optic blades |
| 4/26/2016 | 901165434 | Intuitive Surgical | Misc Instruments- forceps, grasp |
| 5/1/2016 | 3561802 | Labsco | nerve Stimulator (3) |
| 9/20/2016 | 600467500 | Mindray | Ultasonic Transducer |

| | | | |
|---|---|---|---|
| 4/29/2016 | 828804 | network | mounting bracket |
| 3/31/2016 | | Olympus | Vacuum curettage system |
| 4/29/2016 | 92226572 | Olympus | Optical Urethrotome Sheath |
| 4/29/2016 | 9130459 | steris | Extron USB extender Plus |
| 5/31/2017 | 12813 | Karl Storz | flexible cystoscope |

| TRX Date | Originating Document | Originating Master Name | |
|---|---|---|---|
| 5/18/2015 | 3172 | BENSONWEDD, LLC | Conference Room Chairs |
| 7/10/2015 | 0360.15 | JE & SON SUPPLY | tankless Water Heater |
| 9/22/2015 | 3214 | BENSONWEDD, LLC | Interior Design, IKEA furniture |
| 9/24/2015 | 3219 | BENSONWEDD, LLC | Signage |
| 10/8/2015 | PO TMMC 1027 | BENSONWEDD, LLC | Furniture |
| 10/8/2015 | PO TMMC 1028 | BENSONWEDD, LLC | Furniture |
| 10/14/2015 | 116004 | Future Health Concepts Inc | Cabinet and Shelving (9) |
| 10/31/2015 | 500657764 | GE Healthcare | File Holder Cabinets |
| 10/31/2015 | 23130349, 23160420 | Direct Supply | Frigerators (49), Microwaves (14) |
| 10/31/2015 | 9865539515, 98659660 | Grainger | Trash Cans, fire blanket |
| 10/31/2015 | 0380993-in | Pedigo | Carts, hampers, stools |
| 12/20/2015 | 102815 | ADVANCED ELECTRONICS | TV (56) and Cables |
| 12/31/2015 | 3255R | BENSONWEDD, LLC | Furniture - 3rd floor support |
| 12/31/2015 | 3256R | BENSONWEDD, LLC | Furniture - patient room |
| 12/31/2015 | 3253R | BENSONWEDD, LLC | Furniture - 3rd floor ptnt rm |
| 12/31/2015 | 3254R | BENSONWEDD, LLC | Furniture - 2nd floor support |
| 12/31/2015 | 3252R | BENSONWEDD, LLC | Furniture - 2nd floor ptnt room |
| 12/31/2015 | 3223R | BENSONWEDD, LLC | Furniture Purchase |
| 12/31/2015 | 9000322141 | MIZUHO | Table and Traction Boot |
| 12/31/2015 | 9000324107 | MIZUHO | Control, Imaging TOp |
| 12/31/2015 | 3263 | BENSONWEDD, LLC | Furniture - 1st Floor Furn |
| 12/31/2015 | 3264 | BENSONWEDD, LLC | Furniture - 2nd floor |
| 12/31/2015 | 3265 | BENSONWEDD, LLC | Furniture - 1st Floor |
| 12/31/2015 | 3266 | BENSONWEDD, LLC | Furniture- 1st Floor |

| | | | |
|---|---|---|---|
| 12/31/2015 | 3267 | BENSONWEDD, LLC | QS Recliners |
| 12/31/2015 | 3268 | BENSONWEDD, LLC | Furniture - 3rd floor add on |
| 12/31/2015 | 3269 | BENSONWEDD, LLC | furniture - Mirror/Evac |
| 12/31/2015 | 3270 | BENSONWEDD, LLC | Furniture installation |
| 12/31/2015 | F15344 | ASR | Keypad Control |
| 12/31/2015 | 24340967 | HIll-Rom | 2nd FLoor ICU |
| 12/31/2015 | 301340 | Schaerer Medical | Surgery Table |
| 12/31/2015 | 96180698 | Leica | Microtome, Crystat |
| 12/31/2015 | 6953000024 | Maquet | Universal Core and Freight |
| 1/31/2016 | 753478 | Network | Roll Towel Dispenser (400) |
| 2/11/2016 | 23199106 | Direct Supply | Side by Side Fridge |
| 2/29/2016 | 80192070 | Datex Ohmeda, Inc | Infant warmer system |
| 4/23/2016 | 2016022 | BENSONWEDD, LLC | Mirrors and Plexi Glass |
| 4/27/2016 | 3219R | BENSONWEDD, LLC | Signs in Braille |
| 4/29/2016 | 2016073 | BENSONWEDD, LLC | Moulding Supplies |
| 4/30/2016 | 2016072 | BENSONWEDD, LLC | Misc Furniture |
| 5/31/2016 | 10.1.15 - 01.01.16, Adj I | Aramark, BensonWedd | Smallwares |
| 6/30/2016 | 2511 | Office Furniture Warehouse | Conference Table |

| The Miami Medical Center - Anesthesia Inventory 10/27/2017 | | |
|---|---|---|
| Description | Cat # | QTY EA |
| ANESTHESIA CIRCUITS | AMN520X4 | 120 |
| LOWER BODY WARMING BLANKET | MA2250-PB | 80 |
| UPPER BODY WARMING BLANKET | MA2260PMB | 110 |
| GLOVE NON-STERILE SMALL | 8811NB | 14 |
| GLOVE NON-STERILE MEDIUM | 8812NB | 15 |
| GLOVE NON-STERILE LARGE | 8813NB | 14 |
| CHLORAPREP 10.5ML | 260715 | 75 |
| SYRINGE TB 1CC | 309626 | 85 |
| GAUZE SPONGE UNSTERILE 4X4 | NON25444 | 10 |
| ALCOHOL PREP PAD | PHX1007 | 9 |
| NEEDLE BLUNT FILLED 18G X 1-1/2" | 305180 | 1000 |
| CANNISTER SUCTION 1200CC | 65651-212 | 58 |
| CATH IV 20GA X 1.16" | 381534 | 200 |
| CATH IV 18GA X 1.16" | 381544 | 200 |
| CATH IV 22GA X 1" | 381523 | 75 |
| DRESSING TEGADERM 4 X 4-3/4" | 1626W | 350 |
| DRESSING TEGADERM 2-1/4 X 2-3/4" | 1624W | 400 |
| ELECTRODE RED DOT | 2259-50 | 5 |
| EYE GUARD ADULT | S2020 | 4 |
| MEDISORB ABSORBER | M1173311 | 37 |
| D-FEND WATER TRAP | M1182629 | 46 |
| TEMP PROBE | 21090A | 24 |
| GLIDESCOPE SIZE 3 | 0270-0769 | 15 |
| GLIDESCOPE SIZE 4 | 0270-0770 | 12 |
| SYRINGE 3ML W/18GA X 1-1/2" NEEDLE | 305060 | 150 |
| SYRINGE 5ML W/21GA X 1-2.5" NEEDLE | 309633 | 120 |
| SYRINGE 10ML W/BLUNT CANNULA | 303348 | 120 |
| SYRINGE 30ML LUER-LOCK | 302832 | 240 |
| SYRINGE 60ML LUER -LOCK | 309653 | 80 |
| CANNULA O2 CO2 7FT ADULT | 2812F-10 | 160 |
| NEEDLE ECHO STIM 20GA X 4" | 333648 | 60 |
| NEEDLE ECHO STIM 22GA X 2" | 333642 | 45 |
| CANNULA NASAL CURVED 14FT | 001326 | 105 |
| MASK OXYGEN REBREATHER W/7FT TUBING | 001205 | 90 |
| TUBE NASOGASTRIC 14FR | DC4614 | 60 |
| TUBE NASOGASTRIC 16FR | DC4616 | 45 |
| TUBE NASOGASTRIC 18FR | DC4618 | 50 |
| TUBE BOUGIE 15FR | 9-0212-70 | 15 |
| INFUSER PRESSURE 1000ML | IN900012 | 40 |
| SET RANGER WARMING | 24250 | 13 |
| SENSOR LNCS O2 ADULT | 2317 | 45 |
| JELLY 3GRAM | LJ33107 | 100 |
| I.V. START KIT | 01-9000A | 80 |
| TONGUE BLADE | T10446 | 300 |
| SENSOR BIS MONITOR | 186-0106 | 55 |
| TRAY SPINAL 25GA X 3.5 | 405721 | 33 |
| TRAY CONTINUOUS EPIDURAL | 332079 | 16 |
| PROECTOR EYE BLUE STERILE | 9-0210-00 | 55 |
| STYLET 14FR | 85865 | 60 |
| TUBE ENDOTRACH 6MM | 86109 | 10 |
| TUBE ENDOTRACH 6.5MM | 86110 | 10 |
| TUBE ENDOTRACH 7.0MM | 86111 | 45 |
| TUBE ENDOTRACH 7.5MM | 86112 | 40 |
| TUBE ENDOTRACH 8.0MM | 86113 | 15 |
| TUBE ENDOTRACH 8.5MM | 86114 | 12 |
| AIRWAY GUEDEL 60MM | 311060 | 10 |
| AIRWAY GUEDEL 70MM | 311070 | 10 |
| AIRWAY GUEDEL 80MM | 311080 | 120 |
| AIRWAY GUEDEL 90MM | 311090 | 150 |
| AIRWAY GUEDEL 100MM | 311100 | 120 |
| HANDLE YANKAUER SUCTION | K86 | 65 |
| AIRWAY I-GEL SIZE 3 | 8203000 | 60 |
| AIRWAY I-GEL SIZE 4 | 8204000 | 75 |
| AIRWAY I-GEL SIZE 5 | 8205000 | 53 |
| SET PRESSURE MONITORING A-LINE | PX284AN | 5 |
| KIT MULTI-LUMEN CDC | AK-45703-CDC | 4 |
| TOTAL | | |

| DESCRIPTION | CAT # | LOT# | EXP. DATE | QTY |
|---|---|---|---|---|
| MASK O2 NON-REBREATH ADULT 7FT | 1211 | | | 1 |
| SENSOR LNCS ADTX-3 ADULT | 2317 | | | 5 |
| SENSOR LNCS INFANT DISP | 2319 | | | 5 |
| TAPE SURG MEDIPORE 2INX10YD | 2862 | | | 3 |
| SHOECOVER DURA FIT XL 200/PR | 4854 | | | 1 |
| ULTRASOUND GEL 250ML BTL | 5010 | | | 1 |
| WASHCLOTH COMFORT MOIST ADULT | 7900 | | | 4 |
| TISSUE FACIAL 5.7X7IN 2PLY 40E | 48550 | | | 1 |
| BELT LIFE TRACE AB | 56101 | | | 1 |
| SLEEVE SCD KNEE MEDIUM | 74022 | | | 9 |
| SLEEVE SCD KNEE LARGE | 74023 | | | 6 |
| FOOTWEAR HIGH RISK YELLOW LG | 90381 | | | 1 |
| SUTURE SURGIDAC ENDO STITCH 2-0 ES-9 | 173023 | LBK069 | 1/31/2022 | 1 |
| APPLICATOR 26ML 2 PERCENT | 260815 | | | 2 |
| SYR 10CC SLIP TIP | 301604 | | | 2 |
| SYRINGE 20ML LUER SLIP | 302831 | | | 4 |
| SYRINGE 30ML LUER LOCK | 302832 | | | 4 |
| NDL HYPODRMIC SAFETY 21GX1 | 305915 | | | 2 |
| NEEDLE HYPO 22GX1.5 IN | 309626 | | | 1 |
| SYR INSLN 1CC 29GX1/2 SFTYLOK | 329464 | | | 1 |
| BACTEC LYTIC/10 ANAER | 442021 | | | 1 |
| FOLEY CATHETER TRAY 16F STATLK | 800361 | | | 1 |
| MASK SUG FOG WITH EYESHIELD | 1074635 | | | 1 |
| 12ML SYRINGE REGULAR LUER TIP | 1181200555 | | | 1 |
| SYRINGE LUER LOCK WOUT TIP 35C | 1183500777 | | | 3 |
| CUFF PHILIPS SMALL  ADULT DISP | 989803182291 | | | 1 |
| SPIROMETER INC DISP ADULT 4000 | 001902A | | | 1 |
| KIT IV START 1624 FREPP | 01-9000A | | | 1 |
| SYR SALINE FLUSH 10ML | 14011-240 | KJZ333 | 7/31/2021 | 1 |
| SUTURE CHROMIC GUT 4-0 P-3 18" | 1654G | KGK072 | 5/2022 | 1 |
| SUTURE ETHILON 3-0 PS-1 18" | 1663H | LEH105 | 4/30/2022 | 1 |
| SUTURE ETHILON 5-0 PS-2 18" | 1666H | LJJ294 | 7/31/2022 | 1 |
| SUTURE ETHILON 4-0 PS-2 18" | 1667H | LDP549 | 3/31/2022 | 1 |
| SUTURE ETHILON 3/0 18IN BLACK PS-2 | 1669H | LCH391 | 2/28/2022 | 1 |
| SUTURE ETHILON 3/0 18IN BLACK PS-2 | 1669H | JMB848 | 10/31/2020 | 1 |
| SUTURE ETHILON 3-0 PS-2 18" | 1669H | LEJH555 | 4/30/2022 | 1 |
| SUTURE PROLENE 9-0 TG140-8 6" | 1754G | KMJ078 | 10/31/2021 | 1 |
| SUTURE PROLENE 9-0 TG140-8 6" | 1754G | JPP145 | 11/30/2020 | 1 |
| SUTURE ETHIBOND 9-0 BV130-5 | 2809G | KMZ865 | 10/31/2021 | 2 |
| SUTURE ETHILON 8-0 BV130-4 | 2815G | LAM919 | 12/31/2021 | 1 |
| TOWEL OR 17X24 BLUE STER 4/PK | 28700-004 | | | 8 |
| RESUSCITATOR BAG NEONATE | 2K7201 | | | 1 |
| BACTEC PEDS PLUS/F | 4402194A | | | 1 |
| SUTURE CHROMIC GUT 1 BP 27" | 48G | JMH305 | 10/31/2020 | 1 |
| SUTURE ETHILON 2 LR 30" | 490T | JDJ615 | 7/2019 | 1 |
| SUTURE ETHILON 2-0 FS 18" | 664H | KLH120 | 9/30/2021 | 1 |
| FOOTWEAR PATIENT XL GREY | 68123-GRY | | | 1 |
| FOOTWEAR PATIENT LARGE TAN | 68123-TAN | | | 1 |
| SUTURE ETHILON 5-0 P-3 18" | 698H | LHH410 | 6/30/2022 | 1 |
| SUTURE ETHILON 4-0 P-3 18" | 699H | KPH494 | 11/30/2021 | 1 |
| SUTURE ETHILON 4-0 P-3 18" | 699H | KLH799 | 9/30/2020 | 1 |
| SUTURE ETHILON 4-0 P-3 18" | 699H | KJQ202 | 7/31/2021 | 1 |
| FOLEY CATHETER KIT 5CC 16FR | 710016S | | | 1 |
| BAG BELONGING PERSONAL | 75-834-190 | | | 1 |
| SUTURE CHROMIC GUT 2-0 CT-1 27" | 811H | JL6348 | 9/2020 | 1 |
| SUTURE CHROMIC GUT 0 27IN CT-1 | 812H | LDM988 | 3/31/2022 | 1 |
| SUTURE CHROMIC GUT 0 27IN CT-1 | 812H | JMH956 | 10/31/2020 | 1 |
| SUTURE PROLENE 2-0 CT-2 30" | 8411H | JMJ602 | 10/31/2020 | 1 |
| SUTURE PROLENE 3-0 CT-1 30" | 8422H | JME576 | 10/31/2020 | 1 |
| SUTURE PROLENE 1 CT-1 30" | 8425H | LEJ217 | 4/30/2022 | 1 |
| SUTURE PROLENE 3-0 SH 36" | 8522H | JKP513 | 8/31/2020 | 1 |
| SUTURE PROLENE 2-0 SH 36" | 8523H | JLI482 | 9/30/2020 | 1 |
| SUTURE PLAIN 2/0 27IN CT GS-24 CT | 853H | LGK304 | 5/31/2021 | 1 |
| SUTURE PROLENE 4-0 RB-1 36" | 8557H | JMJ468 | 10/31/2020 | 1 |
| SUTURE PROLENE 3-0 KS 30" | 8622H | JEQ775 | 4/1/2020 | 1 |
| SUTURE PROLENE 3-0 PS-2 18" | 8687H | LCH849 | 2/28/2022 | 1 |
| SUTURE PROLENE 6-0 RB-2 30" | 8711H | LCJ941 | 10/31/2020 | 1 |
| SUTURE PROLENE 5-0 C-1 36" | 8720H | LBB369 | 1/31/2022 | 1 |
| SUTURE PROLENE 5-0 C-1 36" | 8720H | KLQ081 | 9/30/2020 | 1 |
| SUTURE PROLENE 2-0 SH 30" | 8833H | LAJ203 | 12/31/2021 | 1 |

| | | | | |
|---|---|---|---|---|
| SUTURE ETHILON 10-0 CS140-8 10" | 9033G | JLZ470 | 9/30/2020 | 1 |
| SUTURE CHROMIC GUT 2-0 CTX 36" | 903H | JLK816 | 9/2020 | 2 |
| SUTURE CHROMIC GUT 0 36IN CTX | 904H | JLQ670 | 9/30/2020 | 3 |
| SUTURE CHROMIC GUT 0 36IN CTX | 904H | KJS899 | 7/31/2021 | 3 |
| SUTURE CHROMIC GUT 0 CTX 36" | 904H | JL5390 | 9/2020 | 1 |
| SUTURE CHROMIC GUT 2/0 36IN CT-1 | 923H | KEB902 | 4/30/2021 | 1 |
| SUTURE CHROMIC GUT 2/0 36IN CT-1 | 923H | KJ2728 -KHM635 | 7/31/2021-6/30/21 | 4 |
| SUTURE CHROMIC GUT 0 CT-1 36" | 924H | KM6740 | 10/2021 | 1 |
| SUTURE CHROMIC GUT 1 36IN CT-1 | 925H | KKJ519 | 8/31/2021 | 1 |
| SUTURE CHROMIC GUT 1 36IN CT-1 | 925H | LEM661 | 4/30/2021 | 1 |
| SUTURE CHROMIC GUT 1 CT-1 36" | 925H | JL6853 | 9/2020 | 1 |
| SUTURE CHROMIC GUT 1 V-34 36" | 945H | JK5591 | 8/2020 | 2 |
| CLOTH CHLORHEXIDINE GLUCONATE | 9707A | | | 1 |
| CIRCUIT ANES ADULT 72IN LIMBO | AMN520X4 | | | 1 |
| SET COMB AND BRUSH BABY | BBRCMSET | | | 1 |
| CANNULA NASAL CRVD 14FT | CF1326 | | | 1 |
| TUBING  SUCTION CONNECTING 10' | CFN510 | | | 2 |
| SUTURE ETHIBOND 0 CT-1 18" | CX21D | KLQ183 | 9/30/2021 | 1 |
| SUTURE CHROMIC GUT 4-0 SH 27" | G121H | JMK870 | 10/2020 | 1 |
| SUTURE CHROMIC GUT 2/0 27IN SH | G123H | LC6866 | 2/28/2022 | 1 |
| SUTURE CHROMIC GUT 2/0 27IN SH | G123H | LAM104 | 12/31/2021 | 1 |
| SUTURE CHROMIC GUT 2 TP-1 60" | GL31G | JEP433 | 4/2020 | 1 |
| UNDERPAD 30X30 SUPERABSORB | H-3030/5 | | | 8 |
| SUTURE VICRYL 4-0 STRAND 12X18" | J109T | JKM365 | 8/31/2020 | 1 |
| SUTURE VICRYL 4-0 RB-1 27" | J214H | KLK437 | 9/30/3021 | 1 |
| SUTURE VICRYL 3-0 RB-1 27" | J215H | KMM822 | 10/31/2021 | 1 |
| SUTURE VICRYL 3-0 RB-1 27" | J215H | LD6725 | 3/31/2022 | 1 |
| SUTURE VICRYL 3-0 CT-2 27" | J232H | LG2324 | 5/31/2022 | 2 |
| SUTURE VICRYL 0 CT-2 27" | J270H | LA7875 | 12/31/2021 | 1 |
| SUTURE VICRYL 3-0 CT-1 36" | J344H | LJ8026 | 7/31/2022 | 2 |
| SUTURE VICRYL 0 CT 36" | J358H | KH2997 | 6/30/2021 | 1 |
| SUTURE VICRYL 0 CT 36" | J358H | LG2811 | 5/31/2022 | 1 |
| SUTURE VICRYL 1 CTX 27" | J365H | KHZ049 | 6/30/2021 | 1 |
| SUTURE VICRYL 1 CTX 27" | J365H | KM6930 | 10/31/2021 | 2 |
| SUTURE VICRYL 0 CTX 36" | J370H | LGZ328 | 5/31/2022 | 1 |
| SUTURE VICRYL 1 36IN VIOLET CTX | J371H | LAP477 | 12/31/2021 | 3 |
| SUTURE VICRYL 1 36IN VIOLET CTX | J371H | KKK858 | 8/31/2021 | 4 |
| SUTURE VICRYL 2/0 27IN UNDYED | J417H | KG7101 | 5/31/2021 | 2 |
| SUTURE VICRYL 2-0 SH 27" | J417H | LG8530 | 5/31/2022 | 1 |
| SUTURE VICRYL 4-0 PS-2 27" | J426H | LAG911 | 12/31/2021 | 1 |
| SUTURE VICRYL 5-0 P-3 18" | J493H | KPZ766 | 11/30/2021 | 1 |
| SUTURE VICRYL 4-0 P-3 18" | J494H | KJM936 | 7/31/2021 | 1 |
| SUTURE VICRYL 2-0 UR-6 27" | J602H | JM6373 | 10/31/2020 | 2 |
| SUTURE VICRYL 2-0 STRAND 54" | J607H | LAZ439 | 12/31/2021 | 1 |
| SUTURE VICRYL 0 STRAND 54" | J608H | JLK274 | 9/30/2020 | 1 |
| SUTURE VICRYL 0 STRAND 54" | J608H | LHM383 | 6/30/2022 | 1 |
| SUTURE VICRYL 0 STRAND 54" | J608H | JLK274 | 9/30/2020 | 1 |
| SUTURE VICRYL 2-0 STRAND 3X18" | J645H | LAM733 | 12/31/2021 | 1 |
| SUTURE VICRYL 2 TP-1 4X27" | J649G | KDM026 | 5/31/2021 | 1 |
| SUTURE VICRYL 2-0 SH 8X18" | J775D | LBK156 | 1/31/2022 | 2 |
| SUTURE VICRYL 2-0 SH 8X27" | J785G | LAK455 | 12/31/2021 | 5 |
| SUTURE VICRYL 0 CT-1 8X18" | J840D | LJ2301 | 7/31/2022 | 1 |
| SUTURE VICRYL 3/0 36IN UNDYED CT-1 | J912G | JMH735 | 10/31/2020 | 1 |
| SUTURE VICRYL 3/0 36IN UNDYED CT-1 | J912G | JMK382 | 10/31/2020 | 1 |
| SUTURE VICRYL 1 STRAND 12X18" | J913G | JKM234 | 8/31/2020 | 1 |
| SUTURE VICRYL 4-0 PS-1 27" | J935H | KE6963 | 4/30/2021 | 1 |
| SUTURE VICRYL 3/0 36IN UNDYED CT-1 | J944H | KEJ512 | 4/30/2021 | 2 |
| SUTURE VICRYL 3/0 36IN UNDYED CT-1 | J944H | LDK091 | 3/31/2021 | 2 |
| SUTURE VICRYL 2-0 CT-1 36" | J945H | LJZ826 | 7/31/2022 | 1 |
| SUTURE VICRYL 0 CT-1 36" | J946H | JK6426 | 8/31/2020 | 1 |
| SUTURE VICRYL 1 CT-1 36" | J947H | LGZ880 | 5/31/2022 | 1 |
| SUTURE VICRYL 1 36IN UNDYED CTX GS-25 | J977H | KLZ664/KGZ522/KJM479 | 9/30/2021-5/31/21 | 5 |
| SUTURE VICRYL 1 CTX 36" | J977H | LEZ479 | 4/30/2022 | 1 |
| SUTURE VICRYL 0 36IN UNDYED CTX | J978H | LE6708 | 4/30/2022 | 1 |
| SUTURE VICRYL 0 CT-1 8X27" | JJ41G | LJ7027 | 7/31/2022 | 1 |
| SUTURE PERMAHAND SILK 0 SH 30" | K834H | LDP757 | 3/31/2022 | 1 |
| SUCTION YANKAUER CLEAR BULB TP | K86 | | | 1 |
| CIRCUIT NEONATAL T-PIECE | M1091335VS | | | 3 |
| SUTURE ETHIBOND 5 V-40 30" | MB46G | LB6393 | 1/31/2022 | 1 |

| | | | | |
|---|---|---|---|---|
| MESH PANTS LARGE | MP71040 | | | 1 |
| SUTURE MERSILENE 12IN WHITE CTX | RS22 | KPB982 | 11/30/2021 | 1 |
| SUTURE MERSILENE 12IN WHITE CTX | RS22 | JLJ131 | 8/30/2020 | 1 |
| SUTURE MERSILENE 5.0MM CTX 12" | RS22 | KGD908 | 5/31/2021 | 1 |
| SUTURE MERSILENE 5.0MM CTX 12" | RS22 | KLQ568 | 9/30/2021 | 1 |
| SUTURE CHROMIC GUT 1 STRAND 54" | S115H | JKZ922 | 8/2020 | 1 |
| SUTURE CHROMIC GUT 2-0 STRAND 12X18" | SG13T | JH2998 | 6/2020 | 1 |
| SUTURE CHROMIC GUT 0 STRAND 12X18" | SG14T | KH6557 | 6/2021 | 1 |
| SUTURE CHROMIC GUT 1 STRAND 12X18" | SG15T | JK5423 | 8/2020 | 1 |
| SUTURE STRATAFIX 3-0 SH | SXMD1B405 | KA6415 | 12/31/2020 | 1 |
| SUTURE STRATAFIX 3-0 RB-1 16X16 | SXMD2B402 | KP2982 | 11/30/2021 | 3 |
| SUTURE STRATAFIX 2-0 CT-1 | SXPD1B400 | KP2101 | 11/30/2021 | 2 |
| SUTURE STRATAFIX 1 CTX 36X36CM | SXPD2B405 | AAA0292 | 12/31/2021 | 2 |
| SUTURE STRATAFIX 2-0 MH 36X36 | SXPD2B412 | LB6629 | 1/31/2022 | 2 |
| SUTURE STRATAFIX 1 CT-1 18" | SXPP1A404 | LC6970 | 2/28/2019 | 2 |
| SUTURE STRATAFIX 1 CT-1 18" | SXPP1A404 | LB1416 | 1/31/2019 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 2-0 12X18" | VCP111G | LGM081 | 5/31/2022 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 0 6X18" | VCP112G | LHZ715 | 6/30/2022 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 1 CT-2 27" | VCP335H | KB7CB5 | 1/31/2021 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 1 CT-2 27" | VCP335H | KD2637 | 3/31/2021 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 3-0 PS-2 27" | VCP427H | KEZ539 | 4/30/2021 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 1 MO-4 8X18" | VCP702D | LCZ708 | 2/28/2022 | 2 |
| SUTURE VICRYL ANTIBACTERIAL 0 CT 8X18" | VCP752D | KP2527 | 11/30/2021 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 0 CT 8X18" | VCP752D | KPZ155 | 11/30/2021 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 0 CT 8X18" | VCP752D | LHZ581 | 6/30/2022 | 2 |
| SUTURE VICRYL ANTIBACTERIAL 2-0 CP-2 18" | VCP762D | KPM885 | 11/30/2021 | 2 |
| SUTURE VICRYL ANTIBACTERIAL 2-0 MO-6 18" | VCP789D | LA6574 | 12/31/2021 | 1 |
| SUTURE VICRYL ANTIBACTERIAL 1 CT-1 8X18" | VCP841D | KL8213 | 9/30/2021 | 1 |
| SUTURE VICRYL RAPIDE 4-0 PS-2 18" | VR496 | LE7067 | 4/30/2022 | 1 |
| SUTURE VICRYL RAPIDE 3/0 27IN UNDYED PS1 | VR935 | LBJ483 | 1/31/2022 | 1 |
| SUTURE VICRYL RAPIDE 3/0 27IN UNDYED PS1 | VR935 | AE9282 | 4/30/2021 | 1 |
| BONE WAX | W31G | AE8552 | 3/31/2021 | 1 |
| SUTURE ETHIBOND 0 30IN GREEN CT-1 | X424H | EKHZ552 | 6/30/2021 | 4 |
| SUTURE ETHIBOND 0 30IN GREEN CT-1 | X424H | JMH964 | 04/31/2020 | 1 |
| SUTURE ETHIBOND 0 CT-1 30" | X424H | KLJ021 | 9/30/2021 | 1 |
| SUTURE ETHIBOND 1 OS-4 30" | X518H | LDM814 | 3/31/2022 | 2 |
| SUTURE ETHIBOND 2-0 SH 36" | X523H | JMZ686 | 10/31/2020 | 1 |
| SUTURE ETHIBOND 1 CTX 30" | X865H | KM6646 | 10/31/2021 | 3 |
| SUTURE ETHIBOND 0 V-7 36" | X905H | LBZ573 | 1/31/2022 | 1 |
| SUTURE MONOCRYL 4-0 RB-1 27" | Y214H | J7F1846X | 6/30/2022 | 1 |
| SUTURE MONOCRYL 3-0 RB-1 27" UNDYED | Y215H | MDVM730 | 3/31/2022 | 1 |
| SUTURE MONOCRYL 3-0 RB-1 27" VIOLET | Y305H | MDTJ910 | 5/31/2021 | 1 |
| SUTURE MONOCRYL 2-0 CT-1 27" | Y339H | MDVM720 | 3/31/2022 | 1 |
| SUTURE MONOCRYL 0 36IN VIOLET CTX GS-25 | Y398H | KJZ800 | 7/31/2021 | 4 |
| SUTURE MONOCRYL 1 36IN VIOLET CTX GS-25 | Y399H | KKM015 | 8/31/2021 | 3 |
| SUTURE MONOCRYL 4-0 SH 27" | Y415H | JMM824 | 10/31/2020 | 4 |
| SUTURE MONOCRYL 3-0 SH 27" | Y416H | MBAN420 | 2/28/2021 | 2 |
| SUTURE MONOCRYL 3-0 SH 27" | Y416H | JMZ686 | 10/31/2020 | 3 |
| SUTURE MONOCRYL 4-0 P-3 18" | Y494G | MDVA950 | 10/31/2021 | 3 |
| SUTURE MONOCRYL 4-0 PS-1 27" | Y935H | MDVG620 | 1/31/2022 | 1 |
| SUTURE MONOCRYL 4-0 PS-1 27" | Y935H | JLZ470 | 9/30/2020 | 2 |
| SUTURE MONOCRYL 0 4X27IN VIOLET CT1 | YY31G | KHM431 | 6/30/2021 | 4 |
| SUTURE PDS II CT-2 27" | Z334H | JMM386 | 10/31/2020 | 2 |
| SUTURE PDS II 2/0 27IN CT-1 | Z339H | KKJ009 | 8/31/2021 | 2 |
| SUTURE PDS II 2/0 27IN CT-1 | Z339H | KJZ804 | 8/31/2021 | 2 |
| SUTURE PDS II 0 CT-1 27" | Z340H | JL6547 | 9/30/2022 | 2 |
| SUTURE PDS II 1 36IN CTX GS-25 CTX/GS-25/T-20 | Z371T | KCM872 | 2/28/2021 | 1 |
| SUTURE PDS II 0 CT-1 8X18" | Z740D | JLK295 | 9/30/2020 | 2 |
| SUTURE PDS II CT-1 8X18" | Z741D | JLZ280 | 9/30/2020 | 2 |
| CUTTER PROXIMATE LINEAR 55MM | TLC55 | N4LAIA | 2/28/2021 | 3 |
| CUTTER PROXIMATE LINEAR 55MM | TLC55 | N4L82W | 2/28/2021 | 3 |
| CUTTER PROXIMATE LINEAR 75MM | TLC75 | M4JA56 | 11/30/3020 | 6 |
| APPLIER LIGACLIP LARGE | MCL20 | N4LX28 | 7/31/2021 | 6 |
| APPLIER LIGACLIP LARGE | MCL20 | N4M474 | 9/30/2021 | 6 |
| APPLIER ENDOCLIP 5MM | 176620 | N6K0760CX | 10/31/2021 | 2 |
| APPLIER ENDOCLIP 5MM | 176620 | N5C0703X | 3/31/2022 | 5 |
| STAPLER PROXIMATE LINEAR 60MM | TX60B | M4J77J | 10/31/2020 | 6 |
| STAPLER SKIN INSORB | 2030 | 170901 | 2/1/2019 | 6 |
| STAPLER SKIN INSORB | 2030 | 170701 | 2/1/2019 | 6 |
| STAPLER SKIN INSORB | 2030 | 172601 | 6/1/2019 | 6 |
| TROCAR WITH SLEEVE 12MM X 100MM | CB12LT | P4RA1G | 2/28/2022 | 6 |

| | | | | |
|---|---|---|---|---|
| BAG ENDO RETRIEVAL 4" X 6" | POUCH | P4T207 | 8/31/2022 | 6 |
| ENDO PADDLE RETRACTOR 12MM | 173046 | P7G0262X | 7/31/2021 | 8 |
| ENDO STITCH DEVICE 10MM | 173016 | J7D0665X | 4/30/2022 | 1 |
| LIGASURE CURVED LARGE JAW 36MM-18CM | LF4418 | 7006010Y | 1/5/2020 | 8 |
| | | | | |

| | | |
|---|---|---|
| CL CATHETER EXT SET/LUER ACT.V | 2N8378 | 200 |
| 0.9% SODIUM CHL IRRIGATION,500 | | 192 |
| Y-TYPE TUR-BLADDER IRRIGATIONS | 2C4041 | 384 |
| CONTINU-FLO SOLN. SET, 3 LUERA | 2C8537 | 408 |
| CL NON-DEHP EXT SET 43",2 CLSI | 2H8631 | 576 |
| CLEARLINK DUO-VENT C-FLO SET10 | 2C8541 | 351 |
| CLEARLINK EXTENSION SET, 2INJ | 2C8612 | 372 |
| CLEARLINK EXTENSION SET, 2INJ | 2C8931 | 1584 |
| DUAL LUER LOCK CAP, PACKAGED - | 2C6250 | 1006 |
| DUAL LUER LOCK CAP, PACKAGED - | 2c8720 | 1104 |
| IV FAT EMULSION ADMINISTRATION | 2c1145 | 125 |
| 1.2 MICRON EXTENSION SET | 2c1103 | 226 |
| CL SECONDARY MED SET, LUERLOCK | 2C8720 | 768 |
| 0.9% SOD CHL INJ, USP VIAFLEXP | 2b1324x | 615 |
| LACTATED RINGER INJECTION, USP | 2B2324X | 222 |
| 1.2 MICRON EXTENSION SET | 7n8399 | 700 |
| 0.9% SOD CHL IRRIG, USP, 3000M | 2b7477 | 104 |
| CL SECONDARY MED SET, LUERLOCK | 2C7462 | 716 |
| SOLUTION SET LUER VALVE 60 DPM | 2C8402 | 96 |
| EXTENSION SET CLEARLINK 4 WAY STOPCOC | 2C8607 | 144 |
| SOLUTION SET INTERLINK N-DEHP | 2H6490 | 48 |
| 1.5% GLYCINE FOR IRRIG USP, 30 | 2b7317 | 48 |

**The Miami Medical Center - OR/SPD Core Inventory 10/27/2017**

| Description | Cat # | QTY EA |
|---|---|---|
| PENCIL BOVIE CAUTERY | E2350H | 35 |
| BLADE ELECTRODE 6.5" | E1450-6 | 91 |
| BLADE ELECTRODE 6.5" | E1450-6 | 34 |
| BLADE ELECTRODE 3" | E1450G | 63 |
| CATHETER RED RUBBER 10FR | 0094010 | 50 |
| CATHETER TRAY W/16FR CATH LATEX-FREE | 907316 | 22 |
| CATHETER 2-WAY SILICONE 20FR/30CC | 0166V20S | 11 |
| DRAINAGE BAG 2000ML | 154102 | 10 |
| DRAPE ARTHROSCOPY | 9414 | 15 |
| TABLE COVER | 8377 | 50 |
| DRAPE BEACH CHAIR SHOULDER | 29369 | 12 |
| DRAPE BILATERAL EXTREMITY | 29417 | 8 |
| DRAPE C-ARMOR | 5523 | 45 |
| DRAPE IMPERVIOUS SPLIT | 89331 | 35 |
| IOBAN 2 DRAPE 23" X 17" | 6650EZ | 100 |
| DRAPE LAVH | 29474 | 10 |
| STERI-DRAPE IRRIGATION POUCH 1016 | 1016 | 75 |
| STERI-DRAPE U-DRAPE 1015 | 1015 | 50 |
| STERI-DRAPE INSTRUMENT POUCH 1018 | 1018 | 40 |
| STERI-DRAPE 1010 | 1010 | 80 |
| SHEET EXTREMITY | 29405 | 17 |
| DRAPE HAND | 29427 | 25 |
| DRAPE HIP | 29439 | 10 |
| DRAPE LAP CHOLECYSTECTOMY | 9428 | 10 |
| SHEET LAPAROTOMY | 9412 | 15 |
| MAYO STAND COVER REGULAR | 8337 | 88 |
| MAYO STAND COVER X-LARGE | 8339 | 45 |
| DRAPE MINOR PROCEDURE | 29496 | 15 |
| LEGGINGS | 8430 | 42 |
| SHEET THRYROID | 89258 | 10 |
| SHEET SPLIT | 29440 | 30 |
| BANDAGE WRAP ACE STERILE LATEX FREE 4" | 23593-14LF | 58 |
| BANDAGE WRAP ACE STERILE LATEX FREE 6" | 23593-16LF | 70 |
| BANDAGE STRETCH 3" | 2232 | 50 |
| BANDAGE STRETCH 6" | 2238 | 15 |
| STERI-STRIP 1/2" X 4" | R1547 | 75 |
| DRESSING NON-ADHERENT STRIP 3" X 3" | 6112 | 50 |
| DRESSING NON-ADHERENT STRIP 3" X 8" | 6113 | 50 |
| DRESSING XEROFORM 1" X 8" | 8884433301 | 75 |
| DRESSING XEROFORM 5" X 9" | 8884433605 | 20 |
| DRESSING SPONGE 2" X 2" | 1806 | 65 |
| MASTISOL | 0523 | 50 |
| VAGINAL PACKING | 31-140 | 20 |
| DRESSING TELFA 4" X 3" | 1050 | 75 |
| DRESSING TELFA 8" X 3" | 1238 | 50 |
| CAST PADDING WEBRIL 4" | 2502 | 52 |
| SPONGE IV DRAIN 4 X 4 | 441407 | 75 |
| DRESSING SPONGE 4 X 4 (10 EACH PER TRAY) | 6939 | 65 |
| DRESSING KERLIX | 441106 | 40 |
| STOCKINETTE 8" X 48" | 9608-48 | 25 |
| STOCKINETTE 10" X 48" | 23646-960 | 23 |
| STERI-STRIP BENZOIN TINCTURE .5ML | C1544 | 10 |
| DRESSING OPSITE 11-3/4" X 11" | 4987 | 25 |
| ATHLETIC SUPPORTER LARGE | 02570 | 5 |
| WET SKIN SCRUB PACK | 4468 | 21 |
| BANDAGE WRAP COBAN LATEX-FREE 6" | 1586S | 42 |
| GLOVE SMT STERILE SIZE 6-1/2 | 2D72PT65X | 50 |
| GLOVE SMT STERILE SIZE 6 | 2D72PT60X | 50 |
| GLOVE SMT STERILE SIZE 7-1/2 | 2D72PT75X | 100 |
| GLOVE SMT STERILE SIZE 7 | 2D72PT70X | 100 |
| GLOVE SMT STERILE SIZE 8-1/2 | 2D72PT85X | 100 |
| GLOVE SMT STERILE SIZE 8 | 2D72PT80X | 100 |
| LIGACLIP CLIP APPLIER LARGE | MCL20 | 15 |
| ENDO CLIP APPLIER 5MM | 176620 | 7 |
| LIGACLIP CLIP APPLIER 10MM | ER320 | 6 |
| COTTON BALL STERILE | C15000-300 | 60 |
| NEEDLE COUNTER 60/100 | 4FM100SBBL | 30 |
| SUCTION HANDLE MEDI-VAC | K61 | 10 |
| FRAZIER SUCTION 10FR CONTROL VENT TIP | 0033100 | 36 |
| FRAZIER SUCTION 10FR OLIVE TIP | DC3311 | 100 |
| SUCTION POOLE | K770 | 10 |
| SURGIFOAM 100 | 1974 | 2 |
| SURGICEL HEMOSTAT 4" X 8" | 1952 | 20 |
| LIGACLIP CLIP APPLIER MEDIUM | MCM20 | 10 |
| LIGACLIP CLIP APPLIER SMALL | MCS20 | 7 |
| BAG DECANTER | 2002S | 40 |
| SURGI-BRA BREAST SUPPORT MEDIUM | 46518-02LF | 3 |

| | | |
|---|---|---|
| VACURRETTE CURVED 8MM | 20317 | 8 |
| VACURRETTE CURVED 10MM | 21553 | 10 |
| VACURRETTE CURVED 11MM | 21554 | 11 |
| VACURRETTE CURVED 12MM | 21555 | 14 |
| VACURRETTE CURVED 7MM | 21853 | 9 |
| RELOAD PROXIMATE BLUE 75MM | TCR75 | 12 |
| CAUTERY TIP CLEANER | 300-2SS | 220 |
| CERIFY VISUALIZATION SYSTEM | 21-345 | 23 |
| COLLECTION TUBING SET | 23116 | 10 |
| SPONGE X-RAY | 441002 | 25 |
| EVACUATOR 100CC | 0073310 | 20 |
| DRY SKIN SCRUB TRAY | 41523 | 35 |
| LAP SPONGE 18" X 18" | 23250-400A | 75 |
| DRAPE LITHOTOMY | 29455 | 17 |
| CATHETER TRAY W/16FR CATH LATEX | 800361 | 12 |
| TRAY ADULT PUNCTURE | 4301C | 2 |
| SPONGE NEURO 1/2" X 1/2" | 30-054 | 28 |
| SPONGE NEURO 1" X 1" | 30-059 | 56 |
| PEANUT SPONGE | 30-106 | 24 |
| BLADE #15 | 371115 | 100 |
| EVACUATOR 100CC | 0070740 | 30 |
| PEN SURGICAL MARKING STERILE | 250PRL | 50 |
| MASK SURGICAL BLUE ANTI-FOG | AT54535 | 6 |
| O.R. TOWEL BLUE | 704-B | 53 |
| LIGASURE IMPACT OPEN INSTRUMENT 36MM-18CM | LF4418 | 2 |
| SHEET TRANSVERSE LAP | 89281 | 10 |
| WET SKIN SCRUB PACK | 4420 | 18 |
| TROCAR BLADELESS 5MM X 100MM | B5LT | 12 |
| MAXILOOP RED | 30-742 | 13 |
| ULNAR FOAM PROTECTOR PINK | 31143095 | 36 |
| ARM SLING LARGE | 8017-53 | 10 |
| ARM SLING MEDIUM | 8017-52 | 10 |
| ARM SLING X-LARGE | 8017-54 | 10 |
| SURGI-BRA BREAST SUPPORT LARGE | 46518-03LF | 4 |
| ALCOHOL 16-OZ | | 5 |
| ACE SHEARS HARMONIC CURVED 5MM X 36CM | HAR36 | 5 |
| STAPLER SKIN 35 WIDE | PXW35 | 24 |
| NEEDLE TRU-CUT 14GA X 15CM | 2N2704X | 7 |
| NEEDLE HYPODERMIC 18GA X 1-1/2" | 305196 | 150 |
| SYRINGE CONTROL 10ML | 309695 | 30 |
| NEEDLE HYPODERMIC 25GA X 1-1/2" | 305127 | 100 |
| NEEDLE HYPODERMIC 22GA X 1-1/2" | 305159 | 50 |
| NEEDLE SPINAL 18GA X 3-1/2" | 405184 | 40 |
| NEEDLE SPINAL 22GA X 3-1/2" | BF405181A | 25 |
| SYRINGE 10ML LUER LOCK | 309604 | 25 |
| SYRINGE 20ML LUER LOCK | 302830 | 25 |
| SYRINGE 60ML LUER LOCK | 309653 | 15 |
| SYRINGE ASEPTO BULB 60CC | 0035280 | 16 |
| TUBING SUCTION 10' | N510 | 42 |
| TUBING CONNECTOR 5-IN-1 | 501 | 50 |
| ELECRODE MEGADYNE 2.5" | 0012 | 10 |
| INTERPULSE HANDPIECE | 0210-114-000 | 15 |
| HOOD FLYTE PEEL AWAY | 0408-800-100 | 75 |
| DRAPE THREE QUARTER | 29350 | 50 |
| GLOVE BIOGEL SIZE 7 | 30470-01 | 50 |
| GLOVE BIOGEL SIZE 7-1/2 | 30475-01 | 50 |
| GLOVE BIOGEL SIZE 8 | 30480-01 | 50 |
| GLOVE BIOGEL SIZE 8-1/2 | 30485-01 | 50 |
| DERESSING ABD | 7196D | 72 |
| PAD MAGNETIC INSTRUMENT | 200-16B | 53 |
| SUCTION COAGULATOR 10FR / CH-6" | E3310 | 25 |
| PIN CASPAR DISTRACTION 14MM | FF904SB | 15 |
| COVER LIGHT HANDLE | LB53 | 100 |
| HAND PODIATRY PACK | SOP22HAMMA | 12 |
| NEEDLE INSUFFLATION ULTRA VERESS 120MM | UV120 | 12 |
| HYDROGEN PEROXIDE 16-OZ | | 4 |
| CHLORAPREP 26ML | 260815 | 50 |
| D AND C PACK | SMA22DIMMA | 25 |
| BLADE #11 | D2865-11 | 50 |
| GLOVE BIOGEL SIZE 6-1/2 | 304650 | 50 |
| CULTURE SWAB RED CAP | | 46 |
| LIMB HOLDER | M2029 | 10 |
| RETINA CUSTOM PACK | 16921-01 | 8 |
| ROBOTIC CUSTOM PACK | SBA22GRBAB | 2 |
| NEEDLE INSUFFLATION 150MM | PN150 | 8 |
| HEMOVAC SUCTION KIT 400CC / 15FR | 0043630 | 16 |
| SEAL MYOSURE | 40-902 | 15 |
| BUR FLUSHCUT OVAL 6-FLUTE 5.5MM X 13CM | AR-8550FOS | 5 |
| BLADE DOUBLECUT 4.0MM | AR-8400DC | 2 |

| | | |
|---|---|---|
| FLOSEAL 5ML | 1503350 | 12 |
| ALCOHOL 4-OZ | | 10 |
| HIBICLENS 4-OZ | | 10 |
| BASIN SETUP PACK | SUT22BAMMA | 6 |
| OSTEOCELL MEDIUM | 5016005 | 7 |
| CANNULA LOW PROFILE 5MM X 7CM | AR-6548 | 5 |
| SHAVER SABRETOOTH STRAIGHT 4.0MM | AR-8400ST | 10 |
| GENERAL LAPAROTOMY CUSTOM PACK | SLC22GLMMA | 4 |
| NEURO CUSTOM PACK | SNE22NPMMA | 6 |
| EVICEL 2ML | 3902 | 8 |
| EVICEL 5ML | 3905 | 3 |
| CANNULA TWIST-IN 7MM X 7CM | AR-6570 | 5 |
| SHAVER SABRETOOTH STRAIGHT 5.5MM | AR-8550ST | 5 |
| ABLATOR ASPIRATING COOLCUT 90 | AR-9803A-90 | 6 |
| BUR CLEARCUT OVAL 8-FLUTE 5.5MM X 13CM | AR-8550COE | 5 |
| ZIP 16 CLOSURE DEVICE | PS1160 | 5 |
| CANNULA TWIST-IN NOTCHED | AR-6530N | 5 |
| MILL BLADE STRYKER | 5400-701-000 | 6 |
| MIXER CEMENT MIXEVAC 3 BIONE | 0206-015-000 | 10 |
| MASK SURGICAL GREEN ANTI-FOG | 49215 | 15 |
| MYOSURE X-LARGE | 50-503XL | 4 |
| DEVICE MYOSURE X-LITE | 30-403LITE | 2 |
| TUBE SET AQUILEX INFLOW | AQL-110 | 15 |
| TUBE SET AQUILEX OUTFLOW | AQL-111 | 15 |
| RELOAD ECHELON VASCULAR 2.5MM | VASECR35 | 12 |
| STAPLER VASCULAR ECHELON POWERED FLEX 35MM | PVE35A | 6 |
| LINEAR STAPLER PROXIMATE GREEN 30MM | TX30G | 3 |
| RELOAD ECHELON 3.8MM GOLD | GST60D | 2 |
| RELOAD ECHELON 4.1MM GREEN | GST60G | 12 |
| BALL TIP PROBE NIM SPINE | 9450015 | 5 |
| BONE CUTTER 4.0MM | AR-8400BC | 5 |
| BONE CUTTER 5.5MM | AR-8550BC | 5 |
| TUBING INFLOW | AR-6410 | 10 |
| SHAVER SABRETOOTH STRAIGHT 5.0MM | AR-8500ST | 10 |
| SHAVER TORPEDO CURVED 4.0MM X 13CM | AR-8400CTD | 5 |
| STARSLEEVE | AR-1606C | 10 |
| CEMENT SIMPLEX P WITH TOBRAMYACIN | 6197-9-010 | 11 |
| CEMENT SIMPLEX HV WITH GENTAMICIN | 6195-1-010 | 15 |
| FALOPE-RING | FRB-30 | 25 |
| TUBE SET AIRSEAL TRI-LUMEN | ASM-EVAC | 10 |
| OBTURATOR AIRSEAL BLADELESS 12MM X 120MM | iAS12-120LPi | 15 |
| POWERPICK 30-DEGREE 1.5MM X 13CM | AR-8150PP-30 | 5 |
| ANTI-FOG SOLUTION WITH FOAM PAD FRED | CF1001 | 30 |
| SURGIFOAM POWDER | 1978 | 15 |
| LEG BAG | 150103 | 10 |
| MIDAS REX ATTACHMENT BALL DIAMOND 5MM | 14BA50D | 1 |
| HEMOVAC SUCTION KIT 400CC / 10FR | 0043610 | 15 |
| MIDAS REX BUR MATCH HEAD FLUTED 3.0MM X 14CM | 14MH30 | 3 |
| MIDAS REX ATTACHEMENT METAL CUTTNG CARBIDE 1.6MM | MC16 | 5 |
| CEMENT SIMPLEX P | 6191-1-010 | 17 |
| BANDAGE WRAP COBAN LATEX-FREE 4" | 2084S | 52 |
| CONTAINER SPECIMEN STERILE 4-OZ | 13594-130 | 50 |
| MASK SURGICAL BLUE | AT51035 | 6 |
| STERI-DRAPE 125" X 83" | 1014 | 15 |
| SYRINGE TOOMEY | 041170 | 20 |
| CATHETER LUB-TIP 3-WAY LATEX 22FR/30CC | 0167SL22 | 5 |
| SCULPS CEMENT | 0206-716-000 | 6 |
| BUTTTON ELECTRODE HF-RESECTION 24-28FR | WA22557C | 8 |
| ELECTRODE HF-RESECTION LOOP MEDIUM 24FR / .2MM WIRE | WA22302D | 10 |
| BLADE SYSTEM 6 / 13MM X 90MM X .05MM | 6113-127-090 | 10 |
| CEMENT PALACOS | 00-1112-140-01 | 5 |
| DRAPE MICROSCOPE | 306071-0000-000 | 3 |
| DRAIN FLUTED HUBLESS ROUND 15FR | 072228 | 10 |
| IRRISEPT WOUND DEBRIDEMENT | IRRISEPT403 | 14 |
| DRESSING AQUACEL AG 3.5" X 10" | 412011 | 2 |
| STENT URETERAL PERCUFLEX PLUS 6FR X 24CM | M0061752620 | 2 |
| BIPOLAR CORD | 135166 | 50 |
| STERI-DRAPE 23" X 17" | 1050 | 10 |
| BLADE ELECTRODE INSULATED 6.5" | E1455-6 | 48 |
| SUCTION COAGULATOR 10FR CANNULA | 050-005 | 8 |
| PROBE COVER TIP | 934402 | 25 |
| PRINEO 22CM | CLR222US | 3 |
| DRAPE UNDER BUTTOCKS | 8487 | 15 |
| ROBOTIC CUSTOM DRAPE | SMA22GRKMA | 2 |
| BLADE ELECTRODE INSULATED 4" | E1455-4 | 75 |
| CEMENT PALACOS WITH GENTAMIACIN | 00-1113-140-01 | 5 |
| 1/2 DRAPE UNIVERSAL WITH BAND | 5233345 | 36 |
| DRESSING LEUKOMED CONTROL 1" X 5" | 73230-05 | 5 |
| DRESSING SORBACT LEUKOMED 4" X 10" | 76199-04 | 3 |

| | | |
|---|---|---|
| BLADE DOUBLECUT 5.5MM | AR-8550DC | 5 |
| HERNIA SYSTEM PROLENE | PHSE | 3 |
| EVICEL SEALANT APPLICATOR 35CM | 3908 | 22 |
| BUR ROUND FLUTED SOFT TOUCH 4.0MM | 5820-010-140 | 10 |
| ABDOMINAL BINDER 9" | 13663008 | 5 |
| LIGASURE LAPAROSCOPIC BLUNT TIP 5MM-37CM | LF1637 | 8 |
| DISSECTOR SONICISION ULTRASONIC 39CM | SCD396 | 5 |
| TROCAR BLADELESS 5MM X 100MM OPTIVIEW | 2B5LT | 12 |
| TROCAR SLEEVE 5MM X 100MM | CB5LT | 6 |
| TROCAR BLADELESS 12MM X 100MM OPTIVIEW | 2B12LT | 12 |
| TROCAR SLEEVE 12MM X 100MM | CB12LT | 6 |
| OSTOMY KIT 1-3/4 POUCH AND WAFER | 401920 | 3 |
| OSTOMY KIT 2-3/4 POUCH AND WAFER | 401921 | 2 |
| DRAPE INSTRUMENT ARM | 470015 | 15 |
| TROCAR Kii FIOS 5MM X100MM | CFF03 | 5 |
| SURGICEL HEMOSTAT SNOW 4" X 4" | 2083 | 15 |
| ACE 7 SHEARS HARMONIC CURVED 5MM X 36CM | HARH36 | 6 |
| TUBE SET PNEUMO SURE | 0620-040-660 | 10 |
| CANNISTER HOLOGIC GREEN LID | AQL-BEMIS | 17 |
| TROCAR Kii SHIELDED BLADED Z-THREAD 12MM X 100MM | CTB73 | 3 |
| TOURNIQUET CUFF STERILE 34" | 5921-034-135 | 5 |
| FILSHIE CLIP | AVM-851J | 2 |
| TROCAR Kii SHIELDED BLADED Z-THREAD 5MM X 100MM | CTB03 | 5 |
| CANNULA SEAL 5-8MM | 470361 | 45 |
| BERKELY SAFETOUCH COLLECTION SYSTEM | 003984-901 | 16 |
| CANNULA CRYSTAL PARTIAL THREAD 5.75MM X 7CM | AR-6564 | 5 |
| STRYKEFLOW II SUCTION IRRIGATOR | 250-070-520 | 8 |
| TOURNIQUET CUFF STERILE 18" | 5921-018-135 | 15 |
| URINE METER | 153202 | 15 |
| BLADE DOUBLECUT CURVED 4.0MM | AR-8400CDC | 5 |
| CONTAINER SPECIMEN UNSTERILE 32-OZ | C8842-32B | 30 |
| CONTAINER SPECIMEN UNSTERILE 190-OZ | C8842-190A | 20 |
| SHUNT BARD JAVID CAROTID BYPASS | 007714 | 8 |
| SPONGE TONSIL MEDIUM | 7201 | 50 |
| SPONGE TONSIL LARGE | 7202 | 20 |
| TROCAR BLADELESS 5MM X 150MM OPTIVIEW | 2B5XT | 6 |
| BONE CUTTER 3.8MM | AR-8380BC | 5 |
| CATHETER PLUG | 000076 | 5 |
| TUBE SET INSSUFLATION HIGH FLOW | 0620-040-690 | 9 |
| CATHETER COUDE LUB-TIP 2-WAY 16FR/5CC | 0102L16 | 12 |
| CATHETER COUDE LUB-TIP 2-WAY 18FR/5CC | 0102L18 | 12 |
| CATHETER LUB-TIP 2-WAY COUNCIL 20FR/5CC | 0196L20 | 12 |
| CATHETER LUB-TIP 2-WAY COUNCIL 22FR/5CC | 0196L22 | 6 |
| CATHETER HEMATURIA 2-WAY 22FR/30CC | 2556H22 | 6 |
| CATHETER HEMATURIA 3-WAY 22FR/30CC | 2557H22 | 6 |
| DRESSING WOUND VAC MEDIUM | M82575096/5 | 5 |
| SYRINGE SALINE FLUSH 10ML | 14011-240 | 50 |
| MIDAS REX ATTACHEMNT BALL 5MM | 14BA50 | 15 |
| CATHETER HEMATURIA 3-WAY 24FR/30CC | 2557H24 | 6 |
| SINGLE ACTION PUMPING SYSTEM | M0067201001 | 10 |
| SHEATH ACCESS NAVIGATOR HD 11FR X 28CM | M0062502210 | 5 |
| STENT URETERAL CONTOUR PERCUFLEX 6FR X 22CM | M0061802210 | 4 |
| ABLATOR PROBE APOLLP RF | AR-9811 | 6 |
| ANNULEX X-CLOSE | XC-201-01 | 3 |
| FORCEPS TRICEP MINI-THROW 120CM X 30FR | M0063701010 | 2 |
| RELOAD ECHELON 4.2MM BLACK | GST60T | 12 |
| RELOAD ECHELON 3.6MM BLUE | GST60B | 12 |
| CUTTER LINEAR POWERED ECHELON FLEX 60MM X 440MM | PLEE60A | 2 |
| SUTURE ENDO STITCH SURGIDAC 48" ES-9 TAPER | 173023 | 12 |
| ENDO PADDLE RETRACT 12MM | 173046 | 9 |
| ENDOSTITCH DEVICE 10MM | 173016 | 4 |
| PUNCTURE CLOSURE DEVICE | PCD10 | 11 |
| CLIP LIGATING HEM-O-LOK EXTRA LARGE | 544250 | 10 |
| O.R.TABLE PAD | 31163457 | 8 |
| LIGACLIP CLIP APPLIER 12MM | ER420 | 5 |
| MASK SURGICAL WHITE | AT73035 | 4 |
| STAPLER SKIN 35 REGULAR | PMR35 | 6 |
| NEEDLE ELECTRODE 2.8" | E1452 | 70 |
| CATHETER DUAL LUMEN URETERAL 10FR X 54CM | M0064051000 | 4 |
| TROCAR Kii OPTICAL Z-THREAD 8MM X 100MM | C0Q19 | 5 |
| SLEEVE TROCAR Kii Z-THREAD 12MM X 100MM | CTS22 | 12 |
| SLEEVE TROCAR Kii Z-THREAD 5MM X 100MM | CTS02 | 12 |
| SCISSORS EPIX LAPAROSCOPIC 5MM X 35CM | CB030 | 5 |
| GLOVE SMT STERILE SIZE 9 | 2D72PT90X | 50 |
| GLOVE BIOGEL SIZE 9 | 30490-01 | 50 |
| SHEARS HARMONIC FOCUS CURVED 9CM | HAR9F | 12 |
| TUBING HI-VAC MENTOR | B5558 | 10 |
| CUTTER LINEAR POWERED ECHELON FLEX 60MM X 340MM | PSEE60A | 3 |
| CYSTO PACK | SPP99CY1AA | 6 |

| | | |
|---|---|---|
| BLADE SYSTEM 6 / 18MM X 90MM X .05MM | 6118-127-090 | 5 |
| ELECTROLUBE | MLEL101A | 30 |
| HEAD REST FOAM ROUND PURPLE | FP-HEADM | 36 |
| SKIN PREP GEL TRAY | 11-7011 | 65 |
| BANDAGE ESMARK 4" | 99302 | 35 |
| LAP SPONGE 4" X 18" | SM-0418-PS | 50 |
| IOBAN DRAPE 125" X 83" | 6617 | 15 |
| STENT URETERAL POLARIS ULTRA 6FR X 22CM | M0061921310 | 3 |
| RELOAD ECHELON 2.5MM WHITE | GST60W | 12 |
| ACE 7 SHEARS HARMONIC CURVED 5MM X 45CM | HARH45 | 12 |
| TUR PACK | SPP99TU2AA | 6 |
| ABDOMINAL BINDER 12" | 79-89091 | 13 |
| CATHETER SILICONE 2-WAY 16FR/5CC | 165816 | 12 |
| CATHETER SILICONE 2-WAY 18FR/5CC | 165818 | 12 |
| CATHETER SILICONE 2-WAY 20FR/5CC | 165820 | 12 |
| CATHETER COUDE LUB-TIP 2-WAY 14FR/5CC | 0102L14 | 12 |
| CATHETER COUDE LUB-TIP 2-WAY 12FR/5CC | 0102L12 | 12 |
| CATHETER LUB-TIP 2-WAY 12FR/5CC | 0165L12 | 12 |
| CATHETER LUB-TIP 2-WAY 14FR/5CC | 0165L14 | 12 |
| CATHETER LUB-TIP 2-WAY 16FR/5CC | 0165L16 | 12 |
| CATHETER LUB-TIP 2-WAY 18FR/5CC | 0165L18 | 12 |
| STAPLER SKIN INSORB | 2030 | 26 |
| CAST PADDING STERILE 4" | 23626-540 | 40 |
| CAST PADDING STERILE 6" | 23626-560 | 40 |
| BONE CUTTER 5.0MM | AR-8500BC | 10 |
| BUR OVAL 8-FLUTE 4.0MM X 13CM | AR-8400OBE | 5 |
| BUR OVAL 8-FLUTE 5.0MM X 13CM | AR-8500OBE | 2 |
| SHAVER SABRE SJ | AR-7300SR | 17 |
| CONTAINER SPECIMEN UNSTERILE 86-OZ | C8842-86A | 25 |
| LOOP CUTTING MONOPOLAR ANGLED 24FR | 27050G-S | 2 |
| ELECTRODE BALL MONOPOLAR COAGULATING 5MM 24FR | 27050NK-S | 5 |
| KNIFE SACHSE STRAIGHT COLD | 27069K-S | 3 |
| TRIMANO BEACH CHAIR KIT | AR-1644 | 8 |
| SPONGE NEURO 1" X 1-1/2" | 30-056 | 56 |
| SPONGE NEURO 1/2" X 1" | 30-055 | 40 |
| RETRACTOR SYSTEM TLC MALE UROLOGY | TLC5042-0 | 1 |
| BLADE ELECTRODE INSULATED 2.75" | E1455 | 60 |
| STANDARD PREP BLADE | CAH4406D | 50 |
| STOCKINETTE 12" X 48" | 1587 | 50 |
| THE PINK PAD | 40580 | 10 |
| TUBING Y-TYPE TUR/BLADDER | 2C4041 | 12 |
| PIN CASPAR DISTRACTION 12MM | FF912SB | 15 |
| PIN MAYFIELD | A1083 | 48 |
| TROCAR Kii OPTICAL Z-THREAD 15MM X 100MM | C0R37 | 9 |
| TROCAR BLUNT TIP 12MM X 100MM | C0R85 | 8 |
| TROCAR BALLOON BLUNT TIP 12MM X 100MM | C0R47 | 7 |
| TROCAR CONE | C0707 | 20 |
| RETRIEVAL SYSTEM 10/15MM | CD004 | 5 |
| DISSECTOR EPIX LAPAROSCOPIC 5MM X 35CM | CY010 | 10 |
| WOUND PROTECTOR/RETRACTOR X-SMALL | C8312 | 2 |
| CANNULA GEMINI SR8 | AR-6572 | 5 |
| CANNULA TWIST-IN 8.25MM X 9CM | AR-6540 | 5 |
| BANANA KNIFE 254MM | AR-6527-05 | 9 |
| POWERPICK 45-DEGREE 1.5MM X 13CM | AR-8150PP-45 | 5 |
| POWERASP 4.0MM X 13CM | AR-8400PR | 11 |
| POWERASP 5.5MM X 13CM | AR-8550PR | 5 |
| TUBING OUTFLOW | AR-6430 | 20 |
| MESH 3D MAX LARGE RIGHT | 0115321 | 1 |
| MESH 3D MAX MEDIUM LEFT | 0115310 | 1 |
| MESH PLUG LARGE | 0112770 | 2 |
| MESH PLUG XLARGE | 0112780 | 2 |
| DRAINAGE BAG 4000ML | 153509 | 15 |
| CATHETER RED RUBBER 8FR | 0094080 | 40 |
| GLOVE ENCORE SIZE 7 | 5787003 | 50 |
| GLOVE BIOGEL OPTIFIT ORTHO SIZE 8 | AC31080 | 50 |
| GLOVE BIOGEL OPTIFIT ORTHO SIZE 8-1/2 | AC31085 | 120 |
| GLOVE ENCORE ORTHO SIZE 7-1/2 | 5788004 | 25 |
| GLOVE ENCORE ORTHO SIZE 8 | 5788006 | 25 |
| MASK SURGICAL WITH EYE SHIELD | AT54635 | 8 |
| ARM SLING SMALL | 8017-51 | 10 |
| HEAD HALTER | 6102-00 | 15 |
| OPTHALMIC CUSTOM PACK | SPP99EY2AA | 15 |
| U-DRAPE | 8475 | 35 |
| IOBAN 2 DRAPE 23" X 23" | M6648EZ | 50 |
| DRAPE ORTHO BAR | KM89381 | 12 |
| DRESSING AQUACEL AG 3.5" X 4" | 412009 | 1 |
| DRESSING AQUACEL AG 3.5" X 6" | 412010 | 12 |
| DRESSING AQUACEL AG 3.5" X 12" | 420670 | 14 |
| GLOVE RADIATION ANSELL SIZE 7-1/2 | 20873075 | 3 |

| | | |
|---|---|---|
| GLOVE RADIATION ANSELL SIZE 8-1/2 | 20873085 | 8 |
| J-HOOK ELECTRODE | E2772-36 | 3 |
| EZ CLEAN BALL ELECTRODE MEGADYNE 5" | 0009 | 5 |
| NEEDLE HYPODERMIC 27GA X 1-1/2" | 88-827112 | 10 |
| NEEDLE HYPODERMIC 30GA X 1/2" | 305106 | 100 |
| NEEDLE TUOHY 20GA X 3.5" | 183A12 | 8 |
| STERI-DRAPE 23" X 33" | M1051 | 12 |
| BANDAGE ESMARK 6" | 99303 | 5 |
| CONNECTOR SIMS 3/16 X 3/16 | 8888270207 | 35 |
| MAXILOOP BLUE | D30-723B | 25 |
| MINILOOP BLUE | D30-713A | 38 |
| CATHETER URETERAL 5FR X 70CM | M006400201 | 20 |
| UROMAX ULTRA KIT 18FR X 4CM | M0062251220 | 3 |
| UROMAX ULTRA KIT 18FR X 10CM | M0062251370 | 3 |
| ADAPTOR UROLOK II | M0067301400 | 10 |
| NITINOL WIRE STRAIGHT TIP 150CM X 0.035" | M0066703080 | 5 |
| NITINOL WIRE STRAIGHT TIP 150CM X 0.038" | M0066703210 | 15 |
| GUIDEWIRE AMPLATZ SUPER STIFF 145CM X 0.038" | M00664010900 | 4 |
| BASKET NITINOL STONE RETRIEVAL ZERO TIP 1.9FR X 120CM | M0063901050 | 2 |
| BASKET NITINOL STONE RETRIEVAL ZERO TIP 2.4FR X 120CM | M0063901010 | 2 |
| STENT URETERAL POLARIS ULTRA 6FR X 26CM | M0061921330 | 3 |
| URETEROSCOPE DIGITAL FLEXIBLE SINGLE-USE | M0067913500 | 20 |
| CATHETER RED RUBBER 14FR | 0094014 | 40 |
| CATHETER RED RUBBER 16FR | 0094016 | 20 |
| GLOVE PERRY ORTHO SIZE 8 | 100648 | 40 |
| GLOVE PERRY ORTHO SIZE 9 | 100650 | 5 |
| GLOVE PERRY SIZE 7 | 5711103 | 60 |
| GLOVE PERRY SIZE 7-1/2 | 5711104 | 30 |
| MAXIFIRM LITE STAFF VEST | 300 | 1 |
| INSTRUMENT INTRODUCER 8MM | 342562 | 10 |
| NEEDLE SPINAL 24GA X 3-1/2" | BF405133 | 2 |
| NEEDLE SPINAL 25GA X 3-1/2" | BF405180 | 20 |
| LIGACLIP CLIP APPLIER MEDIUM SHORT | MSM20 | 5 |
| TAPE MEDIPORE UNSTERILE 4" | M2964 | 15 |
| TAPE MEDIPORE UNSTERILE 6" | M2966 | 15 |
| COTTON TIP APPLICATOR 8" | SMC-37603 | 250 |
| CATHETER TAUT CHOLANGIOCATH 4.5FR | 20018-M55 | 10 |
| CATHETER TAUT CHOLANGIOCATH 7.5FR | 20018-010 | 10 |
| DRAPE TOWEL | 7553 | 30 |
| DRESSING PRIMAPORE 2-7/8" X 2 | 7133 | 60 |
| DRAIN PENROSE 1-1/4" X 12" | GR101 | 7 |
| NEEDLE JAMSHIDI 11GA X 10CM | DJ4011X | 6 |
| DRESSING VASELINE GAUZE 1" X 36" | 8884412600 | 50 |
| CAST PADDING WEBRIL 3" | KC2394 | 25 |
| CAST PADDING WEBRIL 2" | KC2666 | 55 |
| HEMOVAC SUCTION KIT 400CC / 19FR | 0043620 | 18 |
| DRAIN J-P FLUTED 19FR WITH TROCAR | JP-2191 | 35 |
| DRAIN FLAT 10FR | SU130-1311 | 7 |
| DRAIN ROUND HUBLESS 19FR | 2232 | 10 |
| DRAIN FLAT HUBLESS 7MM | 0070430 | 10 |
| ABLATOR ASPIRATING COOLCUT 50 | AR-9803A-50 | 5 |
| ABLATOR HOOK COOLCUT 90 | AR-9801 | 3 |
| CERVICAL RIPENING BALLOON | G48149 | 29 |
| OPEN-END FLEXI-TIP URETERAL CATHETER | 021305 | 10 |
| BALLOON STENT UTERINE | G17562 | 5 |
| FALLOPIAN TUBE CATH SET | G10992 | 2 |
| MIXTER CHOLOANGIOGRAPHY SET 5FR | G09331 | 5 |
| ELECTRODE LEEP 2CM X 1CM | R2010 | 8 |
| ELECTRODE LEEP 2.5CM X 1CM | R2510 | 5 |
| ELECTRODE LEEP 1.5CM X .7CM | R1507 | 10 |
| ELECTRODE LEEP 2CM X .8CM X 12CM | R2008 | 5 |
| ELECTRODE LEEP TONGSTUN 1CM X 1CM | R1010 | 5 |
| ELECTRODE LEEP TONGSTUN 1CM X .7CM | R1007 | 5 |
| ELECTRODE LEEP BALL 5MM DIA / 5.5CM SHAFT | B0555 | 2 |
| ELECTRODE LEEP BALL 5MM DIA / 12CM SHAFT | B0512 | 5 |
| ELECTRODE LEEP BALL 3MM DIA / 12CM SHAFT | B0312 | 5 |
| PLUG ULTRAPRO SMALL | UPPS | 2 |
| PLUG ULTRAPRO MEDIUM | UPPM | 7 |
| RELOAD ENDOWRIST STAPLER 45 BLUE | 48645B | 12 |
| RELOAD ENDOWRIST STAPLER 45 GREEN | 48445G | 8 |
| SHEATH FOR ENDOWRIST STAPLER | 410370 | 10 |
| TIP COVER ACCESSORY | 400180 | 5 |
| 12MM STAPLER CANNULA SEAL | 470380 | 6 |
| OBTURATOR BLADELESS LONG 8MM | 470358 | 20 |
| REDUCER 8MM-12MM | 470381 | 15 |
| SURGICEL HEMOSTAT FIBRILLAR 4" X 4" | 1963 | 15 |
| CLIP LIGATING HEM-O-LOK MEDIUM LARGE | 544230 | 20 |
| CUTTER LINEAR ECHELON FLEX POWERED 45MM X 340MM | PSE45A | 4 |
| RELOAD ECHELON 4.1MM GREEN | ECR45G | 12 |

| | | |
|---|---|---|
| RELOAD ECHELON 3.5MM BLUE | ECR45B | 14 |
| RELOAD ECHELON 2.0MM GRAY | ECR45M | 9 |
| LINEAR CUTTER PROXIMATE 75MM | TLC75 | 6 |
| LINEAR CUTTER PROXIMATE 55MM | TLC55 | 6 |
| LINEAR STAPLER PROXIMATE BLUE 60MM | TX60B | 6 |
| LINEAR STAPLER PROXIMATE GREEN 60MM | TX60G | 12 |
| RELOAD PROXIMATE GREEN 30MM | XR30G | 12 |
| RELOAD PROXIMATE GREEN 60MM | XR60G | 12 |
| RELOAD PROXIMATE BLUE 60MM | XR60B | 12 |
| RELOAD PROXIMATE BLUE 55MM | TCR55 | 12 |
| SEALER SUPER JAW TISSUE ENSEAL G2 | NSEALX22L | 4 |
| SEALER TISSUE CURVED G2 5MM X 35CM | NSLG2C35A | 4 |
| DISSECTOR BLUNT TIP 5MM | BTD05 | 12 |
| MESH PROLENE SOFT 6" X 6" | SPMH | 5 |
| MESH PROLENE 3" X 6" | PMII | 4 |
| MESH PROLENE 1.8" X 4" | PMSK | 7 |
| MESH PROLENE 2.4" X 5.4" | PMLK | 12 |
| STRATTICE BPS | CON1006 | 1 |
| ALLODERM CONTOUR MEDIUM THIN | CM1516 | 5 |
| ALLODERM CONTOUR MEDIUM THICK | CM1520 | 1 |
| NEEDLE QUINCKE 20GA X 8" | 183142 | 18 |
| MIDAS REX IRRIGATING TUBING SET | IRD300 | 13 |
| STYLET MALLEABLE SUCTION MEDIUM ANGLE TIP | 9735017 | 2 |
| PROBE PRASS STANDARD MONOPOLAR STIMULATOR | 8225101 | 10 |
| CARPAL TUNNEL SELECT RELEASE SYSTEM | 81010-6 | 26 |
| HANDPIECE MINERVA ABLATION | MIN9770 | 5 |
| MISONIX BONE SHAVER MICRO HOOK | MXB-SI | 5 |
| MISONIX BONE SCALPEL 25MM BLUNT | MXB-25 | 4 |
| MISONIX BONE SCALPEL 20MM BLUNT | MXB-20 | 4 |
| MISONIX BONE SCALPEL 10MM BLUNT | MXB-10 | 4 |
| MISONIX IRRIGATION TUBE SET | MXB-T | 5 |
| WAND REFLEX ULTRA PTR | EICA4835-01 | 1 |
| WAND PRECISE MAX | EICA8898-01 | 2 |
| WAND TURBINATOR | EIC6895-01 | 1 |
| WAND TOPAZ EZ MICRODEBRIDER | 96006-01 | 1 |
| MICRO CLAW SPETZLER SUPER LONG | 5450-800-303 | 6 |
| BUR STRAIGHT MICRO | 5450-800-309 | 2 |
| BUR SPETZLER LARGE BARRACUDA | 5450-800-306 | 4 |
| KNIFE SONIC CONTROL SERRATED AGGRESSIVE | 5450-815-114 | 9 |
| TUBING SET SONOPET | 5450-850-003 | 3 |
| BUR ROUND TAPERED EXTENDED 3.0MM | 5820-010-330 | 10 |
| BLADE SAGITAL SAW PRECISION THIN 9 X .38 X 25 | 2296-003-111 | 5 |
| BLADE SAGITAL SAW PRECISION THIN 9 X .38 X 18.5 | 2296-003-105 | 5 |
| BLADE RECIPROCATING SAW PRECISION THIN 27 X .38 | 5100-137-233 | 5 |
| BLADE RECIPROCATING SAW HEAVY DUTY LONG | 0277-96-325 | 5 |
| BUR ROUND TAPERED EXTENDED 3.0MM | 5220-010-230 | 8 |
| BUR MEDIUM 5.5MM X 9.9MM X 47.8MM | 5300-10-903 | 10 |
| BUR MEDIUM 4MM X 7.7MM X 48MM | 5300-10-901 | 10 |
| BLADE SYSTEM 4 48.5MM X .64MM X 61MM | 2108-197-000 | 10 |
| BLADE DUAL-CUT 1.27MM X 25MM X 90MM | 4125-127-090 | 10 |
| BUR ZYPHER ROUND FLUTED 2.0MM | 5820-10-620 | 10 |
| BUR ROUND SJ 8-FLUTE 3.0MM | AR-7300RBE | 5 |
| SHAVER TORPEDO SJ 4.0 X 7CM | AR-7400TD | 5 |
| BONE CUTTER HL 4.2MM X 19CM | AR-6420BC | 5 |
| BUR ROUND 8-FLUTE 4.0MM X 13CM | AR-8400RBE | 5 |
| BUR ROUND HL 8-FLUTE 4.0MM X 19CM | AR-6400RBE | 5 |
| BUR ROUND 8-FLUTE 5.0MM X 13CM | AR-8500RBE | 10 |
| BUR CLEARCUT ROUND 8-FLUTE 5.5MM X 13CM | AR-8550CRE | 11 |
| BUR ROUND HL 8-FLUTE 5.0MM X 19CM | AR-6500RBE | 5 |
| BUR ROUND CONCAVE CURVED HL 8-FLUTE 5.0MM X 19CM | AR-6500VBE | 3 |
| BUR PAYNER 360 | 5450-800-312 | 6 |
| BUR ROUND FLUTED SOFT TOUCH 5.0MM | 5820-010-150 | 10 |
| BLADE SAGITAL SAW PRECISION THIN 9 X .38 X 31 | 2296-003-125 | 5 |
| BUR ZYPHER ROUND FLUTED 2.5MM | 5820-10-625 | 10 |
| TOURNIQUET CUFF STERILE 24" | 5921-024-135 | 12 |
| TOURNIQUET CUFF STERILE 44" | 5921-044-135 | 14 |
| KIT BIOPREP BONE | 0206-710-000 | 5 |
| SUTURE ANCHOR MINI CORKSCREW FT | AR-1319FT | 8 |
| SUTURE ANCHOR MINI CORKSCREW FT | AR-1318FT | 8 |
| SPONGE NEURO 1/2" X 3" | 30-057 | 20 |
| PEAK PLASMA BLADE TnA | PS300-002 | 6 |
| ELECTRODE MONOPOLAR COAGULATING POINTED 24FR | 27050L-S | 5 |
| ELECTRODE BIPOLAR COAGULATING BALL 24FR | 27040NB-S | 5 |
| MESH ULTRAPRO ADVANCED | UPA37615 | 1 |
| KYPHON BONE CEMENT KIT | C01B | 2 |
| KYPHON CURETTE TIP | A13A | 2 |
| KYPHON BALLOON EXPRESS II | KEX152EB | 1 |
| TRIGGER-FLEX BIPOLAR SYSTEM 40CM RICHARD WOLF | DTF-40 | 3 |
| CANNULA SPINAL 1.25MM X 150MM RICHARD WOLF | 4792.803 | 5 |

| | | |
|---|---|---|
| CANNULA SPINAL 1.25MM X 250MM RICHARD WOLF | 4792.802 | 7 |
| BURR DIAMOND ROUND 3MM X 250MM RICHARD WOLF | 40990.3930 | 2 |
| INSERT CARDINAC BURR RICHARD WOLF | 499751704 | 20 |
| DRAPE COLUMN | 470341 | 30 |
| DRESSING PRIMAPORE 4" X 3-1/8" | 66000317 | 30 |
| MANIPULATO.R. UTERINE SMALL | UE-TVPRO-32 | 5 |
| MANIPULATO.R. UTERINE MEDIUM | UE-TVPRO-35 | 6 |
| MANIPULATO.R. UTERINE LARGE | UE-TVPRO-40 | 1 |
| UTERINE MANIPULATOR ZAMI | AI-6003 | 10 |
| TROCAR BLADELESS 12X100MM | 2B12XT | 6 |
| AQUAMANTYS | 23-112-1 | 2 |
| GUIDEWIRE J-CURVED | M001491180 | 4 |
| GUIDEWIRE BENTSON | M001491750 | 5 |
| GUIDEWIRE AMPLATZ | M001465090 | 5 |
| GUIDEWIRE V18 | M001468600 | 5 |
| JOURNEY | M001391280 | 5 |
| SHEATH PINNACLE CROSS-CUT STRAIGHT 6FR 45CM | RSR01 | 5 |
| GLIDEWIRE ANGLED .038"X180CMX3CM | GR3508 | 4 |
| GLIDEWIRE STRAIGHT .038"X180CMX3CM | GR3503 | 5 |
| SHEPHERD FLUSH 5FR 65CM | 565365SHP-NB | 4 |
| CATHETER RIM BRAIDED 5FR 65CM | 56535RIM | 5 |
| CATHETER BRAIDED 5FR 100CM HH 1 | 510038HH1-H | 5 |
| CATHETER IMPRESS BERENSTEIN 4FR 100CM | 410035BER | 5 |
| CATHETER QUICK-CROSS .035X150CM | 518-038 | 5 |
| CATHETER QUICK-CROSS .018X150CM | 518-035 | 5 |
| SOLUTION 0.9% SODIUM CHLORIDE 3000ML BAG | 2B7477 | 65 |
| SOLUTION 0.9% SODIUM CHLORIDE 1000ML BAG | 2B1324 | 60 |
| SOLUTION LACTATED RINGERS 3000ML BAG | 2B7487 | 5 |
| SOLUTION LACTATED RINGERS 1000ML BAG | 2B2324 | 75 |
| SOLUTION 0.9% SODIUM CHLORIDE 1000ML BTL | 2F7124 | 2 |
| SOLUTION 0.9% SODIUM CHLORIDE 500ML BTL | 2F7123 | 40 |
| SOLUTION 1.5% GLYCINE 3000ML BAG | 2B7317 | 15 |
| COAPTITE 1CC | M0068903000 | 5 |
| SIDEKICK NEEDLE | M0068903040 | 1 |
| OBTRYX II HALO SLING SYSTEM | M0068505110 | 1 |
| SUTURE CAPIO | M0068331241 | 26 |
| CAPIO DEVICE | M0068318260 | 11 |
| TISSUE RESECTION DEVICE 9FR | R9-3X | 2 |
| TISSUE RESECTION DEVICE 5FR | R5-3X | 3 |
| DERMATOME BLADE | 00-8800-000-10 | 12 |
| DERMACARRIER | 00-2195-012-00 | 12 |
| HTA GENESYS PROCEDURE SET | M006580210 | 4 |
| ACELL 5CC | ABS-2009-05 | 1 |
| AVANCE NERVE GRAFT 1-2MM | 111230 | 3 |
| AVANCE NERVE GRAFT 2-3MM | 211230 | 2 |
| ALLOGRAFT ACHILLES TENDON | 893 | 1 |
| ALLOGRAFT GRACILIS TENDON | FRGRACILIS | 2 |
| ALLOGRAFT HUMERAL HEAD | FHH | 1 |
| ALLOGRAFT ANTERIOR TIBIALIS TENDON | FANT/TIB/T | 1 |
| GRAFTLINK | FGL | 4 |
| ALLOGRAFT PERONEOUS LONGUS TENDON | 0336 | 1 |
| ALLOGRAFT EXTENSOR TENDON | 2163 | 1 |
| STIMUBLAST DBM GEL 5CC | ABS-2002-05 | 1 |
| BIOCARTILAGE 1CC | ABS-1010-BC | 1 |
| AXOGUARD NERVE PROTECTOR 7X40MM | AG0740 | 2 |
| AXOGUARD NERVE CONNECTOR 2X15MM | AGX215 | 4 |
| AXOGUARD NERVE CONNECTOR 3X15MM | AGX315 | 2 |
| AXOGUARD NERVE CONNECTOR 5X15MM | AGX515 | 1 |
| FIBULA SHAFT 100MM | 425 | 1 |
| CORTICAL CANCELLOUS STRUT | 404 | 2 |
| DURAGEN PLUS MATRIX 2X2" | DP-1022 | 1 |
| ILIAC CREST WEDGE 10 | ICW1 | 1 |
| ILIAC CREST WEDGE 12 | ICW2 | 1 |
| ARTHROFLEX DERMIS 4.0X7.0CM | AFLEX301 | 3 |
| FIBULA SHAFT 15CM | 0049 | 1 |
| CORTICAL POWDER 15CC | 1620 | 2 |
| MAXCORE BIOPSY INSTRUMENT 18GAX20CM | MC1820 | 5 |
| CLIP GUN KIT | GS8900 | 1 |
| LENS INTRAOCULAR 1.0D | MA60MA | 2 |
| LENS INTRAOCULAR 4.0D | MA60MA | 1 |
| LENS INTRAOCULAR 18.5D | MTA3U0 | 2 |
| LENS INTRAOCULAR 18.5D | MTA4U0 | 2 |
| LENS SOFPORT 18.0D | LI61AO | 2 |
| LENS SOFPORT 18.5D | LI61AO | 2 |
| LENS SOFPORT 21.5D | LI61AO | 2 |
| LENS AKREOS | AO60 | 1 |
| KIT ACCESSORY 4-ARM DRAPE | 420291 | 6 |
| **TOTAL** | | |

**The Miami Medical Center - Pre-Op PACU Inventory 10/27/2017**

| Description | Cat # | QTY EA |
|---|---|---|
| MASK O2 NON-REBREATHER ADULT | 001211 | 35 |
| BEDPAN CONVENTIONAL | CBEDPANGRY | 7 |
| SCE SLEEVE MEDIUM | 74022 | 15 |
| SCD SLEEVE LARGE | 74023 | 7 |
| CAP TEMP THERMOMETER EXERGEN | 134203A | 10 |
| CATHETER PLUG | 000076 | 5 |
| KIT FOLEY CATHETER 16FR | 710016S | 1 |
| STRAINER URINE | 1211 | 16 |
| LEG BAG LARGE | 150103 | 4 |
| URINARY DRAINAGE BAG 2000ML | 154102 | 1 |
| TRAY FOLEY CATHETER 16FR | 800361 | 4 |
| BOUFFANT CAPS | 3274 | 5 |
| SHOE COVERS X-LARGE | 4854 | 200 |
| PAPER EKG MORTARA | 9100-026-52 | 12 |
| TISSUE/KLEENEX | 48550 | 10 |
| CAVI WIPES | 13-5100 | 14 |
| CHLORAHEXIDINE WIPES | 9707 | 21 |
| PROBE COVER SMART TEMP | M090A-30-6212830 | 23 |
| CANNULA NASAL 7FT | 001325 | 42 |
| TEGADERM 2-1/4 X 2-3/4" | 1624W | 94 |
| TONGUE DEPRESSOR | 25-705-ALL | 86 |
| ELECTRODE RED DOT | 2259-50 | 5 |
| PAD SANITARY | 2022A | 3 |
| INCENTIVE SPIROMETER | 001902A | 3 |
| SYRINGE INSULIN 1CC W/29GA X 1/2" NEEDLE | 329464 | 54 |
| SLIPPER MEDIUM | 68123-BLU | 3 |
| SLIPPER LARGE | 68123-TAN | 18 |
| SLIPPER XLARGE | 68123-GRY | 11 |
| DRESSING GAUZE STERILE 4X4 | 3033 | 61 |
| TUBING IV PRIMARY | 2C8537 | 54 |
| TUBING IV SECONDARY | 2C7462 | 50 |
| HANDLE YANKAUER SUCTION | K86 | 50 |
| I.V. START KIT | 01-9000A | 27 |
| COTTON TIP APPLICATOR | C15053-006 | 71 |
| CUFF BLOOD PRESSURE ADULT | 9.89803E+11 | 87 |
| EMESIS BAG GREEN | NS30835CARD | 100 |
| MARKER SKIN SURGICAL UNSTERILE | 2715BN | 100 |
| NEEDLE BLUNT FILTER 18GA | 305180 | 138 |
| MARKER SKIN SURGICAL STERILE | 250PRL | 10 |
| SENSOR O2 PULSE OX | 2317 | 108 |
| BAG AMBU RESUSCITATION | 2K8005 | 43 |
| CANNISTER SUCTION 1200ML | 65651-212 | 30 |
| AIRWAY ORAL 90MM | 311090 | 26 |
| AIRWAY ORAL 100MM | 311100 | 35 |
| AIRWAY NASOPHARYNGEAL SIZE 32 | | 9 |
| AIRWAY NASOPHARYNGEAL SIZE 34 | | 43 |
| AIRWAY NASOPHARYNGEAL SIZE 28 | | 31 |
| TUBING SUCTION | CFN510 | 40 |
| ICE PACK | 11300-100 | 28 |
| INFUSOR PRESSURE 1000ML | IN900012 | 3 |
| RESTRAINT WRIST | M2029 | 10 |
| CATH I.V. 20GA X 1.16IN | 381534 | 52 |
| CATH I.V. 18GA X 1.16IN | 381544 | 11 |
| CATH I.V. 22GA X 1IN | 381523 | 10 |
| BAND BLOOD | 2436-16-PDB | 2 |
| CONTAINER SPECIMEN STERILE 4-OZ | 13594-130 | 9 |
| STERILE WATER FOR IRRIGATION 1000ML | 2F7114 | 14 |
| ARM SLING | 8017-52 | 5 |
| BABY WIPES | 2BWPU-42 | 2 |
| UNDERPAD BLUE | H-3030/5 | 7 |
| ALCOHOL PREP PAD | PHX1007 | 1 |
| CUP DENTURE | DCUPMAV | 16 |
| BAG BIOHAZARD 6X9 | CH6X9BIO | 50 |
| STATLOCK CATH HOLDER DEVICE | FOL0102 | 1 |
| ABDOMINAL BINDER | 13530007 | 3 |
| DRESSING KERLIX | 441106 | 1 |
| MASK SURGICAL | 51035 | 150 |
| PAD ABD | 7196D | 36 |
| GLOVE UNSTERILE SMALL | 8811NB | 25 |
| GLOVE UNSTERILE MEDIUM | 8812NB | 25 |
| GLOVE UNSTERILE LARGE | 8813NB | 24 |
| GLOVE UNSTERILE X-LARGE | 8814NB | 1 |
| **TOTAL** | | |

| SUTURE TYPE | SIZE | CODE | Qty |
|---|---|---|---|
| Vicryl | 4-0 | J496H | 55 |
| BONEWAX | | W31G | 32 |
| Chromic Gut | 2-0 | G123H | 65 |
| PLAIN GUT | 5-0 | 1915G | 30 |
| ETHIBOND | 0 | CX21D | 17 |
| ETHIBOND | 0 | X424H | 108 |
| PROLENE | 2-0 | 8423H | 48 |
| PROLENE | 2-0 | 8411H | 55 |
| Vicryl | 0 | VCP112G | 9 |
| Vicryl | 0 | J608H | 85 |
| PROLENE | 0 | 8412H | 60 |
| PROLENE | 0 | 8834H | 68 |
| Vicryl | 1 | J977H | 30 |
| Vicryl | 1 | J947H | 45 |
| Vicryl | 0 | J978H | 42 |
| Vicryl | 0 | J270H | 46 |
| PDS | 2-0 | Z339H | 25 |
| ETHILON | 2 | 490T | 50 |
| ETHILON | 2-0 | 1697H | 60 |
| ETHILON | 3-0 | 1663H | 48 |
| ETHILON | 4-0 | 699H | 85 |
| ETHILON | 3-0 | 1669H | 45 |
| ETHILON | 5-0 | 698H | 38 |
| ETHILON | 8-0 | 2815G | 50 |
| PROLENE | 3-0 | 8687H | 70 |
| PROLENE | 3-0 | 8522H | 46 |
| PROLENE | 3-0 | 8622H | 70 |
| PROLENE | 3-0 | 8422H | 68 |
| PROLENE | 4-0 | 8557H | 60 |
| PROLENE | 5-0 | 8556H | 40 |
| PROLENE | 6-0 | 8709H | 65 |
| PROLENE | 6-0 | 8711H | 50 |
| PERMAHAND SILK | 2 | SA8H | 50 |
| PERMAHAND SILK | 0 | A186H | 50 |
| PERMAHAND SILK | 3-0 | A184H | 55 |
| PERMAHAND SILK | 2-0 | A185H | 65 |
| STRATAFIX PDO | 2-0 | SXPD2B414 | 20 |
| Surgical Steel | 6 | M654G | 12 |
| Monocryl | 1 | Y399H | 100 |
| ETHIBOND | 2-0 | X523H | 62 |
| ETHILON | 5-0 | 1666H | 50 |
| Strata Fix | 0 | SXPD1B400 | 36 |
| ETHIBOND | 5 | MB46G | 24 |
| Chromic Gut | 0 | 904H | 40 |
| Chromic Gut | 0 | SG14T | 18 |
| Chromic Gut | 1 | 925H | 48 |

| Chromic Gut | 1 | 813H | 30 |
|---|---|---|---|
| Chromic Gut | 1 | SG15T | 20 |
| Chromic Gut | 1 | 945H | 55 |
| Chromic Gut | 1 | S115H | 50 |
| Chromic Gut | 2 | GL31G | 12 |
| Chromic Gut | 2-0 | SG13T | 20 |
| Chromic Gut | 2-0 | 903H | 55 |
| Chromic Gut | 2-0 | 811H | 58 |
| Chromic Gut | 3-0 | G122H | 48 |
| Chromic Gut | 4-0 | G121H | 36 |
| Dermabond | | DNX12 | 45 |
| ETHIBOND | 0 | CX31D | 15 |
| ETHIBOND | 1 | X865H | 108 |
| ETHIBOND | 1 | X518H | 72 |
| Ethibond | 2 | 519H | 62 |
| ETHILON | 4-0 | 1667H | 66 |
| ETHILON | 10-0 | 9033G | 5 |
| Fiber Wire | 5 | AR-7211 | 10 |
| Fibertape | | AR-7237 | 8 |
| Fiberwire | | AR-7200B | 12 |
| Fiberwire | | AR-7242 | 13 |
| Fiberwire | | AR-7227-01 | 36 |
| Fiberwire | | AR-7230-01 | 11 |
| Goretex | | CV8 | 12 |
| MERSILENE | 5MM | RS22 | 12 |
| Monocryl | 2-0 | Y417H | 36 |
| Monocryl | 3-0 | Y427H | 12 |
| Monocryl | 4-0 | Y494G | 24 |
| Monocryl | 4-0 | Y426H | 12 |
| Monocryl | 2-0 | Y339H | 50 |
| PDS | 1 | Z341H | 36 |
| PDS | 1 | PDP371T | 48 |
| PDS | 1 | 880G | 30 |
| PERMAHAND SILK | 0 | K834H | 58 |
| PERMAHAND SILK | 0 | 580H | 48 |
| Permahand Silk | 2-0 | 583H | 45 |
| PERMAHAND SILK | 2-0 | K833H | 57 |
| PERMAHAND SILK | 2-0 | 623H | 42 |
| PERMAHAND SILK | 2-0 | 1588H | 56 |
| PERMAHAND SILK | 3-0 | C013D | 24 |
| PERMAHAND SILK | 4-0 | A183H | 60 |
| PLAIN GUT | 2-0 | 853H | 48 |
| PLAIN GUT | 3-0 | 852H | 36 |
| PROLENE | 0 | 8424H | 56 |
| PROLENE | 0 | C845G | 17 |
| PROLENE | 0 | C821G | 16 |
| PROLENE | 0 | C841G | 24 |

| PROLENE | 1 | 8425H | 50 |
|---|---|---|---|
| PROLENE | 2-0 | 8523H | 61 |
| PROLENE | 2-0 | C822G | 12 |
| PROLENE | 2-0 | C826G | 12 |
| PROLENE | 4-0 | 8682H | 48 |
| PROLENE | 4-0 | 8699G | 22 |
| PROLENE | 5-0 | 8720H | 72 |
| PROLENE | 6-0 | M8706 | 24 |
| PROLENE | 7-0 | M8702 | 22 |
| PROLENE | 9-0 | 1754G | 14 |
| Strata Fix | 1 | SXPDB401 | 23 |
| Strata Fix | | SXPDB405 | 37 |
| Strata Fix | 4-0 | SXMD2B409 | 12 |
| Strata Fix | 2-0 | SXMD2B402 | 30 |
| Strata Fix | 1 | SXPP1A404 | 72 |
| STRATAFIX SYMM | 1 | SXPP1A400 | 24 |
| Surgical Steel | 7 | M655G | 12 |
| Tiger link | | AR-7275 | 6 |
| Vicryl | 0 | VCP260H | 24 |
| Vicryl | 0 | VCP603H | 50 |
| Vicryl | 1 | VCP335H | 36 |
| Vicryl | 1 | J913G | 12 |
| Vicryl | 1 | VCP814D | 12 |
| Vicryl | 1 | VCP702D | 12 |
| Vicryl | 2-0 | VCP111G | 12 |
| Vicryl | 2-0 | VCP762D | 36 |
| Vicryl | 2-0 | J785G | 24 |
| Vicryl | 2-0 | J775D | 36 |
| Vicryl | 2-0 | JJ42G | 24 |
| Vicryl | 2-0 | VCP839D | 24 |
| Vicryl | 2-0 | VCP789D | 36 |
| Vicryl | 2-0 | VCP417D | 12 |
| Vicryl | 2-0 | J269H | 65 |
| Vicryl | 2-0 | J459H | 36 |
| Vicryl | 2-0 | J602H | 40 |
| Vicryl | 3-0 | J285G | 36 |
| Vicryl | 3-0 | VCP864D | 24 |
| Vicryl | 3-0 | J683H | 48 |
| Vicryl | 3-0 | VCP427H | 55 |
| Vicryl | 3-0 | VCP416H | 62 |
| Vicryl | 3-0 | J944H | 36 |
| Vicryl | 4-0 | J109T | 24 |
| Vicryl | 4-0 | J935H | 36 |
| Vicryl | 4-0 | J214H | 44 |
| Vicryl | 4-0 | J494H | 56 |
| Vicryl | 5-0 | J493H | 36 |
| Vicryl | 7-0 | J546G | 12 |

| Vicryl | | J232 | 12 |
|---|---|---|---|
| Vicryl | | VCP945G | 12 |
| Vicryl Rapide | 4-0 | VR496 | 20 |
| Vicryl Rapide | 5-0 | VR493 | 12 |
| | | | |
| | | | |

| | | |
|---|---|---|
| FB APPLICATOR WOOD 6IN 864/PK | A5000-1 | 1000 |
| NDL REG BEVEL 18GX1 .5 | 305196 | 43 |
| BLADE TONGUE 6IN ST SR | 25-705-ALL | 7 |
| KIT ARTERIAL BLOOD GAS HEPARIN | 4599P-1 | 5 |
| SOLUTION SKIN PREP PROVIDONE | BSWS1S | 8 |
| SPONGE GAUZE 4X4IN 12-PLY 2'S | 3033 | 16 |
| SYR 3ML LL STER | 309577 | 2 |
| SYRINGE 1ML SLIP TIP | 309659 | 2 |
| NDL BLUNT FILL 18G X 1-1/2 | 305180 | 91 |
| SYRINGE 5CC LUER-LOK TIP STERILE | 309646 | 3 |
| SYRINGE 5ML LUER-LOCK | 309646 | 10 |
| PAD ABD | 7196D | 11 |
| PAD ABD 5X9 | KC7196D | 143 |
| SYRINGE 3ML LUER-LOK W/BLUNT FILL NEEDLE 18GX1 | 305060 | 2 |
| NEEDLE HYPO 22GX1.5 IN | 309626 | 52 |
| SYRINGE/NEEDLE COMBI 21G X 1-1/2 5CC | 309633 | 7 |
| TOURNIQUET STRAP 1X18IN BLUE | PC279T1-CH-5060 | 15 |
| UNDERPAD 23X24" | 1547 | 42 |
| SYR INSLN 1CC 29GX1/2 SFTYLOK | 329464 | 16 |
| SYRINGE INSULIN 1CC 29GX1/2 | 329464 | 12 |
| DRESSING TEGADERM TRANSPARENT W/LABEL | 1634 | 9 |
| SYRINGE 60M LUER-LOCK | 309650 | 15 |
| NEEDLE FILTER 18GA X 1-1/2" | 8881305117 | 50 |
| GLV EXAM NITRILE SINGLE PF STRL MED TEXTURED FINGER TIPS | N8821 | 10 |
| GLOVE EXAM NITRILE STERILE MEDIUM | N8821 | 75 |
| SPONGE DERMACEA 4X4IN 12PLY STERILE STERILE | 442214 | 15 |
| SPONGE DERMACEA 4X4IN | 442214 | 12 |
| SYRINGE 30ML LUER LOCK | 302832 | 62 |
| 30ML LUER-LOK SYRINGE | 302832 | 200 |
| NEEDLE 25GA X 1-1/2" | 305127 | 10 |
| NEEDLE BLUNT FILL 18GA X 1-1/2" | 305180 | 10 |
| NEEDLE 22GA X 1-1/2" | 305900 | 10 |
| NEEDLE 25GA X 5/8" | 305901 | 6 |
| NEEDLE 23GA X 1" | 305902 | 5 |
| NEEDLE 18GA X 1-1/2" | 305918 | 9 |
| NEEDLE HYPODERMIC 27X5/8IN | 305921 | 3 |
| NEEDLE 27GA X 5/8" | 305921 | 7 |
| NEEDLE FILTER 18GA X 1-1/2" | 8881305117 | 10 |
| DRESSING TEGADERM 2 1/4 -2 3/4 | 1624W | 9 |
| NEEDLE HYPODERMIC 27X5/8IN GA SFTY GLIDE | 305921 | 3 |
| DRS VENI GARD ADULT IV STABI | 705-4431 | 49 |
| CONTAINER PLASTIC 32 OZ GRADUA | H972-01 | 7 |
| CATHETER SUCT W/CONTROL 10FR | T61C | 20 |
| CLAMP UMBIBLICAL CORD | 6833 | 4 |
| SYRINGE 12ML LUER-LOCK | 118120077 | 45 |
| CANNULA CRVD N-FLAIR TIP W/7FT | *001325 | 12 |
| SYRINGE 1ML LUER LOCK | 309628 | 30 |
| CONTAINER SPECIMEN 4OZ STERILE TYVCK BLISTER POUCH SCREW TOP | 13594-130 | 85 |
| SYR SALINE FLUSH 10ML | 14011-240 | 202 |
| CAP CATHETER PLUG STER | 76 | 13 |
| SPONGE GAUZE 4X4IN 12-PLY TRAY | 6939 | 9 |
| VASELINE 1.0 OZ TUBE WHITE PETROLEUM | 4430200 | 200 |
| SUCTION YANKAUER CLEAR BULB TP | K86 | 34 |
| GAUZE VASELINE PETROLATUM | 8884417601 | 26 |
| BNDG ELAS 2INX5.8YD NS LF SELFCLOSE | 23593-02LF | 14 |
| RAZOZR DISP GOOD NEWS | 4417GN | 6 |
| DERMACEA X-RAY 4X4 16 | 441002 | 2 |
| MASK N95 MED LARGE | N95ML | 350 |
| MESH PANTS LARGE | MP71040 | 350 |
| SWAB STERILE DOUBLE&TRANSPORT | 4320135 | 33 |
| CATH-N-GLOVE SET 2-GLOVE | 4893T | 109 |
| CATHETER SUCT 2GLOVE | 4895T | 11 |
| BANDAGE ROLL KERLI STERILE LARGE | 6716 | 2 |
| GAUZE PETRO XERFRM 5X9IN STRIP | 8884433605 | 5 |
| BANDAGE  KERLIX 4X4 | 441106 | 14 |
| TAPE SURG MEDIPORE 2INX10YD | 2862 | 5 |
| TUBE MICROTAINER SST MICROGARD | 365978 | 9 |
| TAPE SURGICAL DURAPORE 1IN X 1 | 1538-1 | 5 |

| | | |
|---|---|---|
| BLOOD TRANSFER DEVICE | 364880 | 10 |
| DRESSING TEGADERM TRANS IV | M1620 | 8 |
| BANDAGE SPOT 7/8IN STERILE | 44107 | 100 |
| BDG STRETCH CONFORD 6X82IN, ST | KC2238 | 29 |
| K-SHIELD ADVANTAGE WINGED BLOOD | DBMA-21G | 123 |
| K-SHIELD ADVANTAGE SAFETY BLOOD COLLECTI | DBMA-25G | 22 |
| DEVICE BD LUER-LOK ACCESS PACKG | 364902 | 21 |
| NDL BD ULTRA FINE 5MM STER | 320119 | 1 |
| PEDI URINE COLLECTOR | 145501 | 2 |
| APPLICATOR FREPP CHLORAPREP 1.5ML | 260299 | 40 |
| FOOTWEAR PATIENT MEDIUM BLUE | 68123-BLU | 6 |
| DRSG TEGADERM 4 X 4 3/4 | 1626W | 16 |
| LOWER BODY PLUS BLANKET | MA2250PM | 35 |
| SLEEVE STERILE | 599 | 25 |
| ICE BAG, LARGE, 6.5X13IN | 11300-100 | 5 |
| SUCTION TUBING 6' | N612 | 30 |
| STAPLE REMOVAL KIT | *06-6700 | 56 |
| COVER PROBE SURETEMP THERM | 05031-125 | 140 |
| IV START 1624 FREPP | 01-9000a | 4 |
| COVER MAYO STAND | 8337 | 1 |
| STERI-STRIP SKIN 1/2 X 4 | MR1547 | 11 |
| EMESIS BAG PLASTIC BIODEGRADEA | NS30835CARD | 11 |
| PEROXIDE HYDROGEN 3 PRCT 16 OZ | D0012 | 3 |
| BANDAGE FABRIC FLEX 3/4IN STER | 44100 | 50 |
| TUBE ENDOTRACHEAL UNCUFFED 2.5MM | 211025U | 3 |
| TUBE ENDOTRACHEAL UNCUFFED 3.5MM | 211035U | 3 |
| BLUE UNDERPAD | H-3030/5 | 26 |
| TUBE ENDOTRACHEAL UNCUFFED 5.5MM | 21105U | 1 |
| TUBE ENDOTRACHEAL UNCUFFED 2.5MM | ETT211025U | 2 |
| SANITARY PAD | 2022A | 9 |
| MASK NON-REBREATHER ADULT | *001211 | 6 |
| TUBING O2 VINYL TIP 25FT | *001305 | 45 |
| MASK NON-REBREATHER ADULT | 001211 | 18 |
| DRESSING PRIMAPORE 11-3/4X4 | 66000321 | 13 |
| DRESSING PRIMAPORE 11-3/4X4 | 66000321 | 12 |
| DRESSING PRIMAPORE 11-3/4 X 4" | 66000321 | 10 |
| FAN-FOLDED HALF SHEET, ASTOUND | 9358 | 12 |
| PISTON SYRINGE 70 CC IRRIGATION | *0038470 | 4 |
| UNDERGLOVE BIOGEL SIZE 7 | 31270-01 | 150 |
| TUBE TRACH UNCUFFED 3.0 MURPHY TIP | 86223 | 2 |
| TUBE LO PRO UNCUFFED 4. | 86225 | 6 |
| ET TRACH TUBE 3.0 | 86225 | 1 |
| TUBE TRACH UNCUFFED 3.0 MURPHY TIP | 86223 | 5 |
| TUBE LO PRO UNCUFFED 4.0 | 86225 | 6 |
| PAD PREP ALCOHOL 70% ISOPROPYL | PHX1007 | 50 |
| SUTURE REMOVAL | 7196 | 2 |
| SHIELD FACE LF 3/4 FOAM TP ELA | NONFS400 | 2 |
| SECURLINE BLOOD WRISTBAND | 2436-16-PDB | 16 |
| TUBE 2.5MM UNCUFF TRACH MURPHY | 5-10405 | 16 |
| TUBE 3.0MM UNCUFF TRACH MURPHY | 5-10406 | 30 |
| TUBE NASOGASTRIC 16FR STERILE | *0042160 | 13 |
| ABG KIT | 4640P-1 | 12 |
| SPONGE GAUZE CURITY 2X2IN 2 | 1806 | 2 |
| SPONGE GAUZE CURITY 2X2IN | 1806 | 1 |
| EXTENSION SET MICROBE 60 | 2C9203 | 60 |
| GLOVE STERILE BLUE SIZE 6 | 2D73EB60 | 50 |
| SPECIMAN TRAP STERILE 40CC | 8884724500 | 17 |
| SUTURE SILK 2/0 30IN BLACK KS | 623h | 2 |
| CANNULA CUSHION INFANT W/7FT TB | *002601 | 144 |
| CLEANSING ENEMA SET | 2562 | 20 |
| CONNECTOR STERILE 5 IN 1 | 501 | 16 |
| SPONGE LAP 18" X 18" | 23250-400A | 12 |
| SPONGE GAUZE 2X2IN 200PK | 2252 | 4 |
| TRAY SYRINGE PISTON IRRIGATION W/60CC | 750301 | 1 |
| CUFF BLOOD PRESSURE NEONATE 4 20EA/CS | *011445 | 36 |
| CUTTER CORD CLAMP | 72-700 | 25 |
| IV START 1620 PVP PAD | ST010 | 2 |
| SUTURE VICRYL 2-0 CT-1 27" | J339H | 6 |

| | | |
|---|---|---|
| SUTURE VICRYL 2-0 SH 27" | J417H | 32 |
| TAPE SURG DURAPORE 3IN X 10YD | 1538-3 | 1 |
| SUTURE VICRYL 3-0 SH 27" | J416H | 8 |
| CATH IV 22GA X 1.16" | 381523 | 1 |
| CATH IV 20G 1.16IN WNGD SFTY | 381534 | 30 |
| CATH IV 20GA X 1.16" | 381534 | 3 |
| CATH IV 18G 1.16IN WGND SFTY | 381544 | 14 |
| CATH IV 18GA X 1.16" | 381544 | 3 |
| CATH IV 16GA X 1.16" | 381554 | 1 |
| CATH IV ANGIOCATH 20G X 1.88 | 381704 | 1 |
| CATH IV ANGIOCATH 18G X 1.16 | 381705 | 12 |
| CATH IV 22G 1IN WNGD SFTY | | 49 |
| CATH IV ANGIOCATH 18G X 1.16 | | 9 |
| CATHETER INFANT KIT 5FR | *0035630 | 6 |
| SUTURE VICRYL 1 CT-1 27" | J261H | 12 |
| SUTURE VICRYL 4-0 SH 27" | J415H | 20 |
| CATHETER SUCTION 6FR PEDIATRIC | 36626 | 15 |
| ELECTRODE PUPPY DOG 1041PTS | 31424780 | 7 |
| SUTURE VICRYL 0 CT-1 36" | J946H | 10 |
| SUTURE VICRYL 3-0 CTX 36" | J980H | 30 |
| AIRWAY PVC SOFT NASOPHARYNGEAL 20FR | NA20FR | 2 |
| AIRWAY PVC SOFT NASOPHARYNGEAL | NA24FR | 2 |
| AIRWAY PVC SOFT NASOPHARYNGEAL 36FR | NA36FR 2 | 2 |
| SUTURE VICRYL 0 CTX 36" | J370H | 58 |
| CANNULA CUSHION NEONATE W/7FT | *002611 | 145 |
| SUTURE VICRYL 2-0 CTX 36" | J369H | 24 |
| SUTURE VICRYL 1 CTX 36" | J371H | 20 |
| BLOOD COLLECTION SET SAF-T HOLDER | 96000 | 17 |
| MASTISOL | 0523 | 30 |
| ARWY NASOPHARYN 32F | 888247056 | 2 |
| TAPE HYTAPE PLASTIC 1/2INX5YD | 5LF | 24 |
| BP CUFF ADULT | 30503313SA | 27 |
| DUAL LUER LOCK CAP, PACKAGED - | 2C6250 | 509 |
| MASK FACE INFANT ANESTHESIA 20EA | 5220 | 3 |
| MASK FACE INFANT ANEST | 5220 | 1 |
| MASK INFANT | 5220 | 15 |
| MASK FACE SNGLE USE NEONATAL | 5210 | 28 |
| ARWY NASOPHARYN 24 FR | 888247015 | 2 |
| ARWY NASOPHARYN 28 FR | 888247031 | 2 |
| MASK NEONATE SIZE 1 | 1012 | 4 |
| BLADE, SURGICAL CLIPPER | CAH4406D | 31 |
| FACIAL TISSUE 8"X8.33 | 10325-100 | 27 |
| EXTENSION SET CLEARLINK 44IN CLEARLINK | 2C8612 | 260 |
| WRIST RESTRAINT-UNIV | M20209 | 8 |
| BAG ENEMA DISP W/ TUBE | 145540 | 14 |
| SOLUTION SET LUER VALVE 60 DPM CLEARLINK SYSTEMS | 2c8402 | 138 |
| MASK BUBBLE GUM INFANT SIZE 2 ANESTHESIA | K1122 | 27 |
| KIT STANDARD DELIVERY APPAREL | GS90MAT4A | 12 |
| GROUNDING PAD | E7507 | 13 |
| SUTURE PDS II 1 36IN CTX | Z371 | 18 |
| STOCKING TED ANTIEMB SML KNEE | 7071 | 8 |
| SPIROMETER INC DISP ADULT 4000 | 001902A | 8 |
| PACKING VAGINAL STERILE 2X72 | 31-140 | 36 |
| EXTENSION SET MICROBORE Y-TYPE | 2N8371 | 53 |
| BAG URINE DRAINAGE 2000ML LATEX-FREE | 154102 | 4 |
| BAG URINE DRAINAGE 200ML | 154102 | 6 |
| CONTAINER SPECIMEN BULK PACK NON-STERILE | C8827-14 | 4 |
| SUTURE CHROMIC GUT 0 CT-1 27" | 812H | 10 |
| STOCKING TED ANTIEMB MED KNEE | 7115 | 2.59 |
| STOCKING TED ANTIEMB XLRG LONG | 7802 | 4.53 |
| SUTURE PLAIN GUT 3-0 CT 27" | 852H | 36 |
| LEGGINGS, IN-VIEW, CLEAR POLY | 8430 | 8 |
| LEGGINGS, IN-VIEW, CLEAR | 8430 | 10 |
| SOLUTION SET CONTINU-FLO 3 LUER | 2c8537s | 1 |
| CHLORAPREP ORG SM 10.5ML | 260715 | 17 |
| DRAPE UNDER BUTTOCKS W/FLUID COLLECTION POUCH | 8482 | 8 |
| SUTURE CHROMIC GUT 4-0 SH 27" | G121H | 24 |
| SUTURE CHROMIC GUT 3-0 SH 27" | G122H | 15 |

| TUBE LO PRO UNCUFFED 3.5 MURPHY | 86224 | 3 |
|---|---|---|
| TUBE LO PRO UNCUFFED 3.5 MURPHY | 86224 | 3 |
| TUBE LO PRO UNCUFFED 3.5 MURPHY | 86224 | 2 |
| SUTURE CHROMIC GUT 0 CT-1 36" | 924H | 5 |
| SUTURE PLAIN GUT 0 STRAND 54" | L104G | 20 |
| SUTURE CHROMIC GUT 3-0 CT-1 | 922H | 32 |
| SUTURE CHROMIC GUT 2-0 CT-1 36" | 923H | 15 |
| COVER INSTR EQUIP 10INX16IN ST | 31140570 | 14 |
| SUTURE CHROMIC GUT 1 CT-1 36" | 925H | 5 |
| PAD, NURSING 36 DISP | NPAD36 | 7 |
| ELECTRODE FETAL SCALP SINGLE SPIRAL | 989803137631.00 | 2 |
| SUTURE CHROMIC GUT 0 CTX 36" | 904H | 1 |
| SUTURE CHROMIC GUT 1 CTX 36" | 905H | 18 |
| ET TRACH TUBE 2.5 | ETT2110250 | 1 |
| ET TRACH TUBE 3.5 | ETT2110350 | 1 |
| BANDAGE 4 IN X 5.5 YD | 31140 | 56 |
| PAD TEMPERATURE THERAPY 13X18IN PLASTIC | 8002-062-012 | 11 |
| WIPE CLEANSING BULK 9X13 | 3101 | 5 |
| BAG SPECIMEN 6X9 | CH6X9BIO | 10 |
| FOLEY CATHETER KIT 5CC 16FR | 710016S | 4 |
| NDL HYPODRMIC SAFETY 22GX1.5 | 305900 | 1 |
| NDL HYPODRMIC SAFETY 25GX5/8 | 305901 | 1 |
| NDL 23 X 1 SFTY | 305902 | 1 |
| NDL HYPODRMIC SAFETY 21GX1 | 305915 | 1 |
| NDL HYPODRMIC SAFTY 18G X 1.5 | 305918 | 1 |
| STOCKING TED ANTIEMB LG KNEE | 7203 | 3 |
| CHLORAPREP 10.5ML | 260715 | 2 |
| STOCKING ANTI-EMB THIGH XL | 23640-680 | 17 |
| CATHETER LEGBAND ADULT | 316 | 12 |
| STOCKING ANTI EMB THIGH XL/REG | 23640-680 | 4 |
| LINE GAS SAMPLING | *0523 | 41 |
| TRAP DELEE MUCUS 8 FR CATH VACUUM BREAKER | 8888257477 | 11 |
| SINGLE-USE VAGINAL SPECULUM BUILT-LIGHT | c020310 | 1 |
| CL NON-DEHP EXT SET 43",2 CLSI | 2H8631 | 175 |
| MEDICINE CUP 2 OZ | mcup2 | 2 |
| TIP BOVIE TEFLON | 12 | 33 |
| TIP BOVIE TEFLON 12EA | *0012 | 41 |
| IV FAT EMULSION ADMINISTRATION | 2c1145 | 48 |
| FILTERED HEAT AND MOISTURE EXCHANGE | 2866 | 6 |
| AMBU BAG ADULT | 2K8005 | 3 |
| DISK BIOPATCH 1IN 7MM | 4152 | 8 |
| GLOVE UNSTERILE SMALL | 8811NB | 3 |
| GLOVE UNSTERILE MEDIUM | 8812NB | 1 |
| GLOVE UNSTERILE LARGE | 8813NB | 2 |
| PENCIL ELECTROSURG ROCKER SWITCH EDGE COATED | E2350H | 17 |
| HYPERINFLATION SYSTEM | 900-000-607 | 5 |
| TRAP DELEE MUCUS 10 FR CATH | 8888257469 | 100 |
| SOLUTION SET BLOOD Y-TYPE | 2c8750s | 3 |
| STOCKING TED ANTIEMB LG KNEE | 7203 | 5 |
| NEBULIZER SIDESTREAM W/TEE FLEX TB 50/CS | *002175 | 1.06 |
| APPLICATOR 26ML 2 PERCENT | 260815 | 17 |
| NEWBORN BILI-BONNET PHOTOTHERAPY | 01B | 3 |
| SYRINGE 10CC LUER-LOK TIP | 309604 | 3 |
| CKT FLITER DEP W/FILTER 10 PK | 1065832 | 24.68 |
| DEVICE STATLOCK CATH STABILZAT | FOL0102 | 7 |
| STAPLER PROXIMATE SKIN | PXW35 | 3 |
| STAPLER SKIN 35 WIDE | PXW35 | 2 |
| SPINDLE FOR THERMAL PAPER | 420400 | 1 |
| DRESSING PRIMAPORE 11-3/4X4 DO | 66000321 | 5 |
| ASPIRATOR MECONIUM | N10101 | 92 |
| CATH REPLOGLE 10 FR | 256503 | 5 |
| SUCTION CATHETER 10FR | 8888256503 | 5 |
| CL CATHETER EXT SET/LUER ACT.V | 2N8378 | 71 |
| HOLDER TUBEENDO NEO PEDI 2.5MM | H4051 | 7 |
| SET, ADMIN, CADD | 21-7339-24 | 12 |
| DRESSING TRANS THUMB 4.0X4.75 | TD-26C | 0.55 |
| CATH TRAY WITH 16FR CATHETER | 800361 | 6 |
| CHART PAPER, MARQUETTE | 1272335 | 23 |

| | | |
|---|---|---|
| STOCKINGS TED THIGH MED REG | 3416LF | 2 |
| SENSOR LNCS ADTX-3 ADULT | 2317 | 10 |
| CANN CRVD N-FLAIR TIP W/7FT | 1325 | 0.25 |
| KIT, DRESSING CHANGE | 03-400 | 6 |
| T-PIECE NEONATAL PATIENT CIRCUIT KIT, | 1091335VS | 7 |
| SUTURE VICRYL 0 CTX 36" UNDYED | J724D | 10 |
| CIRCUIT KIT NEONATAL | M10191335VS | 14 |
| PAPER RECORDER 80MM FAN FOLD | 8000-0300 | 2 |
| FLOW STD WITH EXTENSION | 24250 | 1 |
| PAD NON ADH TELFA 3INX8IN STER | 1238 | 0.06 |
| FILTER EXHALATION SPU DX800 | DX800 | 9 |
| SLEEVE SCD KNEE MEDIUM | 74022 | 23.19 |
| SHOECOVER, IMPERVIOUS HIGH-TOP UNIVERSAL | 8457 | 5 |
| STATC02 END TIDAL C02 | 10-55371 | 7 |
| RESUS,INFANT,NEO MSK,RESV BAG,PEEP | 2K7201 | 41 |
| 4% CHG E-Z SCRUB IMPREGNATED SCRUB BRUSH W/4% CHG | 371073 | 2 |
| JOHNSON'S BABY LOTION 3OZ | 103005 | 3 |
| 20 GA. X 4" STIM ULTRA | 333648 | 14 |
| BLADE B-P SURGICAL CARB S STER SZ 10 | 371110 | 4 |
| BLADE B-P SURGICAL CARB S STER SZ 20 | 371120 | 5 |
| B-P CARBON RIB-BACK BLADES, SIZE 22 | 371122 | 2 |
| SPONGE COUNTER BAG | 31144127 | 1 |
| RAM CANNULA - NEWBORN | N4902 Newborn | 10 |
| CATHETER SUCTION 8FR PEDIATRIC | 36826 | 7 |
| CO2 DETECTOR | CO2 DEC | 30 |
| KIT SUCTION CLOSED 14FR | 2205 | 5.95 |
| TUBE ENDO TRACH UNCUFFED REINFO 3.0MM | 86542 | 2 |
| MASK LRG EXHALATION ELBOW LEAK 1 CAPSTRP | 1072629 | 84.5 |
| TUBING CONNECTING 6MM 20FT | N620A | 1.11 |
| 16FRBARDEXI.C. COMPLETE CARE 350ML METER | A303316A | 2 |
| LITHOTOMY DRAPE PACK WITH SCREEN | 44214 | 5 |
| CENTRAL LINE DRESSING TRAY | 6853 | 10 |
| L AND D PACK CUSTOM | SMA22LDMMA | 28 |
| PAPER THERMAL | M4816A | 2 |
| DRESSING LEUKOMED SORBACT STER | 7619904 | 12 |
| DEVICE BLOOD TRANSFER PACKAGING | 364880 | 2 |
| DRESSING MEPILEX AG 8X8 | 287400 | 4 |
| BLOOD COLLECTION SET SAF-T HOLDER | 96000 | 2 |
| SYR 10CC LL | 309604 | 0.07 |
| BAG INFUSOR 1000ML | IN900012 | 1 |
| DRESSING AG AQUACEL SURGICAL 3.5 X 9.75 | 412011A | 4 |
| LANCET SAFE-T-PRO STERILE | *03136752001 | 1 |
| TUBE 2.0ML FLAT TOP BLUE POLYPROPYLENE | 4053 | 3 |
| DRESSING AQUACEL AG | 412012 | 1 |
| SYR 3ML LL STER | 309657 | 0.04 |
| SPECULA FOR OTOSCOPE 3MM | 52133 | 1 |
| BOPPY DISPOSABLE SLIPCOVERS | 1348102K | 4 |
| GLOVE BIOGEL SURG PF SZ 8.0 | 30480-01 | 1 |
| TUBE TRACH SZ 6 SHILEY ADULT REG | 6LPC | 1 |
| ELEC RED DOT FOAM MONITORING | 2259-50 | 5.61 |
| CENTRAL VENOUS CATHETER SET | G03117 | 1 |
| VACUUM DELIVERY KIWI | VAC-6000M | 46 |
| SUTURE MONOCRYL 2/0 27IN | Y339H | 1 |
| KIWI OMNICUP VACUUM DELIVERY SYSTEM | VAC-6000C | 9 |
| SUTURE MONOCRYL 1 36IN VIOLET CTX | Y399h | 2 |
| SUTURE VICRYL 2-0 STRAND 12X18" | J911T | 1 |
| HEMOSTAT 3X4 NU-KNIT STRL ABSORBABLE | 1943 | 10 |
| SUTURE MONOCRYL 0 4X27IN | YY31G | 1 |
| MASK LRG EXHALATION ELBOW LEAK | 1072629 | 20 |
| SUTURE MONOCRYL 3/0 2 | Y523H | 1 |
| STAPLER SKIN ABSORB WOUND CLOSURE STERIL | 2030 | 6 |
| SUTURE PLAIN GUT 2-0 CT 27" | 853H | 1 |
| SUTURE CHROMIC GUT 2-0 SH 27" | G123H | 1 |
| COVER PROBE | *05031 | 1 |
| RAM CANNULA - INFANT | N4903 Infant | 1 |
| HEMOSTAT 2X4 FIBRILLAR | 1962 | 5 |
| SUTURE MONOCRYL 4/0 27IN UNDYED P-2 | Y426H | 1 |
| SUTURE MONOCRYL 4/0 18IN UNDYED P-2 | Y946H | 1 |

| HEMOSTAT ABSORBABLE SURGICEL STERILE SNOW | 2083 | 6 |
|---|---|---|
| BABY SHAMPOO/BODYWASH 1OZ DYE FREE, FRAGRANCE FREE | 3712 | 2 |
| ELECTRODE EDGE COATED BLADE EXT 6.5IN | E1450-6 | 1 |
| ONE-LINK NEEDLE-FREE IV CONNECTOR | 7N8399 | 1 |
| 1 45CM STRATAFIX SYMMETRIC | SXPP1A400 | 1 |
| INTRAN PLUS TRANSDUCER IUPC | IUP-500 | 1 |
| RETRACTOR ALEXIS  L&D LARGE | G6313 | 11 |
| RETRACTOR C-SECTION X-LARGE | G6314 | 1 |
| COOK BAKRI POSTPARTUM BALLOON | G24237 | 3 |
| SPONGE GAUZE 2X2 | 1806 | 0.12 |
| TI-CRON™ Polyester Suture, Penetrating Taper, Size 4-0, | 31073 | 8 |
| SCALPEL 11 PROTECTED | 372611 | 10 |
|  |  |  |

|  | IV Solution | Quantity |
|---|---|---|
| 2B0062Q | 5% Dextrose 250 mL inj | 35 |
| 2B7177 | Sodium Chloride 0.9% 3000 mL inj | 56 |
| 2B7074X | Lactated Ringer's and 5% Dextrose 1000 mL inj | 143 |
| 2B1064X | 5 % Dextrose and Sodium chloride 0.9% 1000 mL inj | 42 |
| 2B1074X | 5% Dextrose and 0.45% Sodium Chloride 1000 mL inj | 67 |
| 2B2073Q | 5% Dextrose 500 mL inj | 24 |
| 2B1323Q | Sodium Chloride 0.9% 500 mL inj | 70 |
| 2B1322Q | Sodium Chloride 0.9 250 mL inj | 151 |
| 2B2324X | Lactated Ringer's 1000 mL inj | 765 |
| 2F7124 | Sodium Chloride 0.9% 1000 mL inj | 324 |
| 2B1307 | Sodium Chloride 0.9% 100 mL inj | 326 |
| 2B0040 | Dextrose 5% inj 50 mL inj | 99 |
| 2B1308 | Sodium Chloride 0.9% 50 mL inj | 152 |
| 2B0063Q | Dextrose 5% inj 500 mL inj | 41 |
| 2B7487 | Lactated Ringer's 3000 mL | 70 |
| 2B1314X | Sodium Cholirde 0.45% 1000 mL inj | 45 |
| 2B7117 | Sterile Water 3000 mL inj | 28 |

| | | |
|---|---|---|
| COLLAR MIAMI SUPER SGORT | 79-83201 | 1 |
| SHOE POST-OP FEM | D2044-08 | 4 |
| FOAM ABDUCTION PILLOW LARGE | FP-ABDUCTL | 10 |
| SHOE POST OP MALE LRG | D2044-03 | 4 |
| COLLAR CERVICAL | D2044-03 | 9 |
| SHOE  POST OP | B3-013-03-D | 2 |
| PILLOW ABDUCTION SHOULD SUP | D2044-03 | 2 |
| ALUMINUM WALKER STANDARD W/ WHEELS | DWLK02-W | 3 |
| CRUTCH AXILLARY TALL 70-78 300LB PUSH BUTTON | CA901TL | 3 |
| CRUTCH AXILLARY ADULT 62-70 300LB PUSH | CA901AD | 6 |

| Item | Code | Qty |
|---|---|---|
| WIPE SANI-CLOTH SUPER LRG | Q55172 | 10 |
| BLOOD COLLECTION SET 23X.75 SAFETY LOK | 368653 | 6 |
| BLOOD COLLECTION SET 21X.75 | 368652 | 6 |
| 1/2 DRAPE UNIVERSAL WITH BAND | 1000-0100 | 18 |
| PROBE COVER TIP | 9344408 | 10 |
| COVER CASSETTE XRAY | 8720 | 6 |
| KIT ANGIOGRAPHY 200mL | SDS-CTP-SCS | 36 |
| Y TUBING CONTRAST | 801106 | 98 |
| CATH IV VIALON SFTY 22G 25MM S | 381423 | 12 |
| CATH IV 18G 1.16IN WGND SFTY | 381544 | 18 |
| CATH IV 20G 1.16IN WNGD SFTY | 381534 | 31 |
| 1.2 MICRON EXTENSION SET | 7n8399 | 36 |
| BORE CATHETER EXTENSION SET NEEDLE-FREE | 783601 | 26 |
| PAD PREP ALCOHOL 70% ISOPROPYL | PHX1007 | 2 |
| CATH IV ANGIOCATH 20G X 1.88 | 381704 | 3 |
| URINAL WITH HANGING HANDLE | H140-01 | 13 |
| BEDPAN FRACTURE MAUVE | FBEDPANMAV | 6 |
| DENTURE CUP 8OZ MAUVE | DCUPMAV | 34 |
| H/S CATHETER WITH BALLOON 5 FR | UA61-5005 | 9 |
| TRAY/HSG/6-CS | 600701 | 11 |
| APPLICATOR RAYON OBGYN POLYSTYRENE 8IN STERIL | 57603 | 50 |
| SOLUTION BETADINE 4 OZ | BSOL04 | 2 |
| BANDAGE CURITY FAB 2X3.75 XL S | 44102 | 73 |
| SPONGE GAUZE 2X2 | 1806 | 24 |
| SPONGE GAUZE 4X4IN 12-PLY 2'S | 3033 | 178 |
| DRESSING TEGADERM 2 1/4 -2 3/4 | 1624W | 91 |
| MASK, SURGICAL | AT71035 | 6 |
| MASK, SURGICAL SOFT-TOUCH SENSITIVE | AT73035 | 1 |
| GLOVE SURGICAL PROTEXIS PI 8.5 | 2D72PT85X | 9 |
| GLOVE SURGICAL PROTEXIS PI 7.5 | 2D72PT75X | 30 |
| GLOVE SURGICAL PROTEXIS PI 7.0 | 2D72PT70X | 36 |
| TUBING 60 INCH COILED 300 PSI | 601195 | 48 |
| LUBRICANT JELLY 4OZ SURGILUBE | 281020537A | 10 |
| E-Z GAS II | 793 | 5 |
| CATHETER IV WITH REM PRN BL | 383322 | 6 |
| CATHETER IV SAF-T-INTIMA 24X | 383312 | 4 |
| CATHETER IV WITH REM PRN BL | 383335 | 1 |
| PROBE COVER 6" X 48" WITH BAND | PC-0648 | 1 |
| EARPLUGS PILLOW PACK | 310-1001 | 39 |
| GLV NITRILE II LT BLUE S | 8811NB | 5 |
| GLV NITRILE II LT BLUE L | 8813NB | 6 |
| GLV NITRILE II LT BLUE M | 8812NB | 1 |
| NEEDLE SPINAL 24G TW X 3 1/ | 405133 | 2 |
| NEEDLE SPINAL S/SU 22G 3-1/2 | 405181A | 1 |
| NEEDLE SPINAL S/SU 18G | 405184 | 1 |
| NDL REG BEVEL 18GX1 .5 | 305196 | 49 |

| | | |
|---|---|---|
| NDL BLUNT FILL 18G X 1-1/2 | 305180 | 1 |
| SOLUTION TRANSEPTIC 250ML | 43003 | 6 |
| GEL AQUASONIC 100 | 12420 | 27 |
| BORE CATHETER EXTENSION SET NEEDLE-FREE | 7N8301 | 1 |
| CATHETER INFANT KIT 5FR GLOVES IODOPHOR SWABS | 35630 | 1 |
| SYRINGE 30ML LUER LOCK | 302832 | 33 |
| SYRINGE 20ML LUER LOCK | 302830 | 17 |
| SYR 2 OZ CATHETER TIP | 309620 | 50 |
| SYR 10CC LL | 309604 | 57 |
| KIT IV START 1624 FREPP | 01-9000A | 19 |
| CANN CRVD N-FLAIR TIP W/7FT | 1325 | 20 |
| SYR SALINE FLUSH 10ML | 14011-240 | 66 |
| EMESIS BAG PLASTIC BIODEGRADEA | NS30835CARD | 11 |
| NDL HYPODRMIC SAFETY 25GX5/8 | 305901 | 1 |
| GEL AQUASONIC 100 SINGLE USE PACKETTES | *01-20 | 6 |
| GEL AQUASONIC 100 | *01-10 | 2 |

| | | |
|---|---|---|
| SPIROMETER INC DISP ADULT 4000 | 001902A | 22 |
| CATH IV ANGIOCATH 16GA X 3.25 | 382258 | 23 |
| CATH IV ANGIOCATH 20G X 1.88 | 381704 | 127 |
| CATH IV 18G 1.16IN WGND SFTY | 381544 | 212 |
| CATH IV 20G 1.16IN WNGD SFTY | 381534 | 160 |
| CATH IV VIALON SFTY 22G 25MM S | 381423 | 11 |
| ELEC RED DOT FOAM MONITORING | 2259-50 | 5 |
| CATHETER INFANT KIT 5FR | 35630 | 44 |
| BAG URINE DRAINAGE 200ML | 154102 | 15 |
| GOWN ISOLATION PPSB/SMS MEDIUM | SMS100-25 | 40 |
| BANDAGE CURITY FAB 2X3.75 XL S | 44102 | 350 |
| BANDAGE FABRIC FLEX 3/4IN STER | 44100 | 200 |
| BANDAGE SPOT 7/8IN STERILE | 44107 | 50 |
| BDG STRETCH CONFORD 6X82IN, ST | KC2238 | 24 |
| STERI-STRIP SKIN 1/2 X 4 | MR1547 | 53 |
| DRSG TEGADERM 4 X 4 3/4 | 1626W | 150 |
| DRESSING TEGADERM 2 1/4 -2 3/4 | 1624W | 205 |
| DRS VENI GARD ADULT IV STABI | 705-4431 | 46 |
| GAUZE PETRO XERFRM 5X9IN STRIP | 8884433605 | 74 |
| SPONGE GAUZE 2X2 | 1806 | 700 |
| PAD NON ADH TELFA 3INX8IN STER | 1238 | 75 |
| DRAIN SPONGE 4X4 6PLY | 441407 | 65 |
| SPONGE GAUZE 2X2IN 200PK | 2252 | 19 |
| SPONGE GAUZE 4X4IN 12-PLY  2'S | 3033 | 450 |
| SPONGE GAUZE 4X4IN 12-PLY TRAY | 6939 | 109 |
| BANDAGE  KERLIX 4X4 | 441106 | 76 |
| STOCKING TED ANTIEMB LG KNEE | 7203 | 13 |
| STOCKING TED ANTIEMB MED KNEE | 7115 | 6 |
| STOCKING TED ANTIEMB SML KNEE | 7071 | 4 |
| STOCKING TED ANTIEMB XL KNEE | 23640-580 | 21 |
| STOCKING TED ANTIEMB XLRG LONG | 7802 | 7 |
| GAUZE CONFORM 4 X 75"" STER"" | FBEDPANMAV | 7 |
| DRESSING TRANS THUMB 4.0X4.75 | TD-26C | 13 |
| TRAY SKIN PREP PVP-1 SCRUB | 4468 | 33 |

| | | |
|---|---|---|
| GLV NITRILE II LT BLUE L | 8813NB | 32 |
| GLV NITRILE II LT BLUE M | 8812NB | 26 |
| GLV NITRILE II LT BLUE S | 8811NB | 22 |
| GLV NITRILE II LT BLUE XL | 8814NB | 18 |
| GLOVE SURGICAL PROTEXIS PI BLU | 2D73EB80 | 50 |
| GLOVE SURGICAL PROTEXIS PI BLU | 2D73EB75 | 150 |
| GLV SURIGCAL PROTEXIS PI 7.5 | 2D72PL75X | 86 |
| GLV SURGICAL PROTEXIS PI BLUE | 2D72PL70X | 74 |
| GLOVE SURGICAL PROTEXIS PI 6.5 | 2D72PT65X | 100 |
| GLOVE SURGICAL PROTEXIS PI 6.0 | 2D72PT60X | 100 |
| GLOVE SURGICAL PROTEXIS PI 7.5 | 2D72PT75X | 200 |
| GLOVE SURGICAL PROTEXIS PI 7.0 | 2D72PT70X | 150 |
| GLOVE SURGICAL PROTEXIS PI 8.5 | 2D72PT85X | 100 |
| GLOVE SURGICAL PROTEXIS PI 8.0 | 2D72PT80X | 100 |
| SHOECOVER DURA FIT XL 200/PR | 4854 | 800 |
| CAP SURGEON W/TIE UNISEX ONE S | 4359 | 800 |
| KIT ARTERIAL BLOOD GAS HEPARIN | 4599P-1 | 50 |
| APPL COTTON TIP 6 ST"" | C15053-006 | 200 |
| BAG ENEMA DISP 60IN TUBE 1400M | 145540 | 46 |
| BAG POST MORTEM CURVE ZIPR WHI | 9070 | 6 |
| uNDERPAD 30X30 SUPERABSORB | 42411-01 | 49 |
| LUBRICANT JELLY 4OZ SURGILUBE | 281020537A | 20 |
| MASK N95 MED LARGE | N95ML | 45 |
| MASK CONE CERT SMALL N95 | N95 | 855 |
| CAVICIDE 1-MIN DISINFENCTANT | 13-5024 | 13 |
| PAD ADHESIVE REMOVER | B16400 | 18 |
| PAD PREP ALCOHOL 70% ISOPROPYL | PHX1007 | 20 |
| BLADE TONGUE 6IN ST SR | 25-705-ALL | 100 |
| BLADE TONGUE 5 1/2 JR | 711-ALL | 500 |
| FB APPLICATOR WOOD 6IN 864/PK | A5000-1 | 100 |
| CAP BOUFFANT 24IN BLUE | 3274 | 11 |
| FOLEY CATHETER KIT 5CC 16FR | 710016S | 31 |
| CATHETER LEGBAND ADULT | 316 | 3 |

| | | |
|---|---|---|
| STRAP LEG BAG DRAIN DELUX FABR | 150507 | 52 |
| STOCKING ANTI EMB THIGH XL/REG | 23640-680 | 7 |
| STOCKINGS TED THIGH MED REG | 3416LF | 6 |
| CONTAINER PLASTIC 32 OZ GRADUA | H972-01 | 36 |
| DENTURE CUP 8OZ MAUVE | DCUPMAV | 75 |
| DERMACEA X-RAY 4X4 16 PLY STRL | 441002 | 1375 |
| GOWN POLY-COATED W/THUMB BLUE | 4211PG | 50 |
| FOLEY CATHETER TRAY 16F STATLK | 800361 | 14 |
| MEDICINE CUP 2 OZ | mcup2 | 11 |
| MEDICINE CUP 2 OZ | MCUP2 | 86 |
| KIT MINI TRACH 4MM INTRO | 500100 | 30 |
| SHIELD FACE LF 3/4 FOAM TP ELA | NONFS400 | 3 |
| SPECIMEN PAN URINE HAT | SPECPAN01 | 50 |
| BAG SPEC BIOH 6X9 PRINTED M/CS | CH6X9BIO | 453 |
| SPECIMAN TRAP STERILE 40CC | 8884724500 | 37 |
| BLADE #15 CARBON STEEL | 371115 | 100 |
| MASK SURG DUCKBILL | 1054535 | 300 |
| SCALPEL PROTECTED DISPO SZ 10 | 372610 | 24 |
| SCALPEL SURGICAL #11 | 371611 | 10 |
| TOWEL OR 17X24 BLUE STER 4/PK | 28700-004 | 750 |
| TRAY URETHRAL CATH RUBBER 15FR | 772415 | 9 |
| TRAY SKIN SCRUB W 2OZ PVP | 4420 | 33 |
| BABY WIPES SENSITIVE FRAG FREE | S-WTB042 | 32 |
| BEDPAN FRACTURE MAUVE | FBEDPANMAV | 33 |
| DEODORANT ANTIPERS ROLLON SCNT | B01K752CA | 51 |
| EMESIS BASIN 500ML/16 OZ MAUVE | EBASINMAV1 | 132 |
| TISSUE FACIAL 5.7X7IN 2PLY 40E | 48550 | 240 |
| DIAPER NEWBORN SWAD TO 10LB | 30374 | 27 |
| PAD NAIL POLISH REMOVER | 10551101 | 100 |
| BAG BELONGING PERSONAL | 75-834-190 | 325 |
| FOOTWEAR HIGH RISK YELLOW LG | 90381 | 48 |
| PITCHER 28 OZ MAUVE | CARAFEMAV | 109 |
| PAD SANITARY OVERNIGHT | 2022A | 20 |
| SHAVE CREAM 1.5OZ | AG-SC1 | 15 |

| | | |
|---|---|---|
| TOOTHBRUSH ADULT X-SOFT | OC-TBADXS1 | 92 |
| TOURNIQUET STRAP 1X18IN BLUE | PC279T1-CH-5060 | 299 |
| UNDERPAD 30X30 SUPERABSORB | H-3030/5 | 240 |
| WASH BASIN MAUVE | DYND80347A | 31 |
| ARWY NASOPHARYN 24 FR | 8888247015 | 8 |
| ARWY NASOPHARYN 28 FR | 8888247031 | 20 |
| ARWY NASOPHARYN 32F | 8888247056 | 18 |
| NASOPHARYNGEAL AIRWAY 20FR | 321050 | 8 |
| NASOPHARYNGEAL AIRWAY 24FR | 321060 | 8 |
| NASOPHARYNGEAL AIRWAY 36FR | 321090 | 8 |
| MASK RESUS AD MAN W/TUBE 40 | 2K8005 | 7 |
| CANN CRVD N-FLAIR TIP W/7FT | 1325 | 68 |
| MASK O2 NON-REBREATH ADULT 7FT | 1211 | 76 |
| ALCOHOL ISOPROPYL RUBBING 16OZ | D0022 | 12 |
| APPLICATOR SEPP CHLORAPREP 0.6 | 260449 | 180 |
| CHLORAPREP ORG SM 10.5ML | 260715 | 54 |
| SOLUTION SKIN PREP PROVIDONE | BSWS1S | 54 |
| SUTURE REMOVAL KIT TRAY | 1899414 | 54 |
| NDL BLUNT FILL 18G X 1-1/2 | 305180 | 476 |
| NDL FILTER 18GX1-1/2 | 8881305117 | 103 |
| NDL REG BEVEL 18GX1 .5 | 305196 | 100 |
| NDL REG BEVEL 19X1.5 | 305195 | 100 |
| NDLSHORT BEV 20GX1.5 | 305187 | 200 |
| NDL SHORT BEVEL 22GX1.5 | 305159 | 104 |
| NDL REG BEVEL 25G X 1 1/2 | 305127 | 100 |
| NDL HYPODRMIC SAFTY 18G X 1.5 | 305918 | 437 |
| NDL HYPODRMIC SAFETY 21GX1 | 305915 | 325 |
| NDL HYPODRMIC SAFETY 22GX1.5 | 305900 | 132 |
| NDL 23 X 1 SFTY | 305902 | 130 |
| NDL HYPODRMIC SAFETY 25GX5/8 | 305901 | 4 |
| SYR 10CC LL | 309604 | 58 |
| SYR 10CC SLIP TIP | 301604 | 328 |
| SYR 2 OZ CATHETER TIP | 309620 | 37 |
| SYRINGE 20ML LUER LOCK | 302830 | 71 |

| | | |
|---|---|---|
| SYRINGE 20ML LUER SLIP | 302831 | 46 |
| SYRINGE 30ML LUER LOCK | 302832 | 230 |
| SYRINGE BD 60ML LUER-LOK TIP G | 309653 | 25 |
| SYRINGE 60ML LUER-SLIP | SY35060LS | 90 |
| SYR 2 OZ CATHETER TIP | 35280 | 44 |
| SYRINGE LUER LOCK WOUT TIP 35C | 1183500777 | 150 |
| SYR PISTON IRRIGATION | 38470 | 17 |
| SYR 1CC TB 27G X 1/2 | 8881501368 | 350 |
| SYR TB SYR ONLY 501 | 81-501400 | 45 |
| SYR 3ML LL STER | 309577 | 199 |
| NEEDLE HYPO 22GX1.5 IN | 309626 | 186 |
| SYR INSLN 1CC 29GX1/2 SFTYLOK | 329464 | 188 |
| TUBING  SUCTION CONNECTING 10' | CFN510 | 90 |
| TAPE ADHESIVE 3 | 2950-3 | 4 |
| TAPE SOFT CLOTH MEDIPORE 1IN | 2861 | 20 |
| TAPE SURGICAL DURAPORE 1IN X 1 | 1538-1 | 13 |
| TAPE DURAPORE 2INX10YD | 1538-2 | 8 |
| TAPE SURG DURAPORE 3IN X 10YD | 1538-3 | 16 |
| TAPE SURG MEDIPORE 2INX10YD | 2862 | 39 |
| TAPE MICROFOAM 3 INCH | M1528-3 | 6 |
| TAPE SURG MICROPORE 1INX10YD | M1528-3 | 49 |
| TAPE SURG TRANSPORE 1IN X 10YD | 1530-1 | 27 |
| ICE BAG 6.5X13 | 11300-100 | 81 |
| ICE BAG SM/TIES 5'' X 12'' | 11400-100 | 7 |
| 12ML SYRINGE REGULAR LUER TIP | 1181200555 | 475 |
| 12ML SYRINGE LUER LOCK TIP | 1181200777 | 475 |
| DRESSING TEGADERM TRANS IV | M1620 | 100 |
| GLOVE BIOGEL SIZE 7 | 30470-01 | 100 |
| GLOVE BIOGEL SIZE 7-1/2 | 30475-01 | 100 |
| GLOVE BIOGEL SIZE 8 | 30480-01 | 100 |
| GLOVE BIOGEL SIZE 8-1/2 | 30485-01 | 150 |
| SYR 3ML LL STER | 309657 | 209 |
| PAD ABD 5X9 | KC7196D | 202 |
| CLOSURE SKIN STERI-STRIP 1/4X4 | R1546 | 98 |

| | | |
|---|---|---|
| PEROXIDE HYDROGEN 3 PRCT 16 OZ | D0012 | 7 |
| SUCTION YANKAUER CLEAR BULB TP | K86 | 86 |
| APPLICATOR 26ML 2 PERCENT | 260815 | 75 |
| NEEDLE HYPO 22GX1.5 IN | 4288 | 80 |
| RAZOZR DISP GOOD NEWS | 4417GN | 65 |
| SYRINGE 60 CC TOOME | 8881560265 | 20 |
| 16 FR EXI.C. COMPL CARE 350ML | A303316A | 11 |
| BOTTLE PERI FOR IRRIGATION | 20338-305A | 36 |
| SYRINGE BULB 3OZ STER SINGLE | 35830 | 95 |
| PACK COLD BASIC PERINEAL | 11500-010 | 14 |
| CATH SUCTION 6FR PEDIATRIC | 36626 | 50 |
| CATH SUCTION 8FR PEDIATRIC | 36826 | 5 |
| GLOVE SURGICAL SIZE 8 STER PER | 5711105 | 100 |
| KIT IV START 1624 FREPP | 01-9000A | 176 |
| RESUS BAG PEDIATRIC MANUAL 6/C | 2K8008 | 6 |
| SWAB STERILE DOUBLE&TRANSPORT | 4320135 | 50 |
| CANNISTER SUCTION 1200CC | 65651-212 | 80 |
| CANNISTER SUCTION 3000CC | 65651-230 | 60 |
| SOLUTION BETADINE 4 OZ | BSOL04 | 12 |
| EMESIS BAG PLASTIC BIODEGRADEA | NS30835CARD | 301 |
| BANDAGE STRETCH CONFORM 2X75IN | 2231 | 20 |
| AMNIHOOK | D9601 | 54 |
| MESH PANTS LARGE | MP71040 | 150 |
| ULTRASOUND GEL 250ML BTL | 5010 | 98 |
| KIT STANDARD DELIVERY APPAREL | GS90MAT4A | 28 |
| CAVIWIPES1, REGULAR-160 WIPES, | 13-5100 | 8 |
| CATH IV 16GA 1.16IN WNGD SFTY | 381554 | 450 |
| CATH IV 24G 0.75IN WNGD SFTY | 381512 | 170 |
| CATH IV 22GA 1IN WNGD SFTY | 381523 | 100 |
| LIP BALM | MSC092915 | 13 |
| SENSOR LNCS INFANT DISP | 2319 | 118 |
| MASK O2 PED TODDLER SIZE 3 | KS1032 | 20 |
| LUBRICATING JELLY 3GM FOIL PK | LJ33107 | 468 |
| MASK SUG FOG WITH EYESHIELD | 1074635 | 100 |

| | | |
|---|---|---|
| BATTERY AA | PC1500 | 90 |
| BATTERY C 1.5V | PC1400 | 24 |
| SENSOR LNCS ADTX-3 ADULT | 2317 | 103 |
| SPECULA OTOSCOPE 4.25MM ADULT | 52434-U | 5100 |
| DISK BIOPATCH 1IN 7MM | 4152 | 56 |
| CLOTH CHLORHEXIDINE GLUCONATE | 9707A | 82 |
| WASHCLOTH COMFORT MOIST ADULT | 7900 | 166 |
| ALCOHOL ISOPROPYL 70% 4OZ | I0020 | 10 |
| FOOTWEAR PATIENT XL GREY | 68123-GRY | 54 |
| FOOTWEAR PATIENT LARGE TAN | 68123-TAN | 84 |
| FOOTWEAR PATIENT MEDIUM BLUE | 68123-BLU | 38 |
| KIT SUCTION CLOSED 14FR | 2205 | 20 |
| BATTERY PROCELL AAA PK/4 | LINERPL | 12 |
| NDL BD ULTRA FINE 5MM STER | 320119 | 1600 |
| CATH-N-GLOVE 5FR | 4893T | 75 |
| CATH SUCTION 8FR | 4897T | 75 |
| CATH SUCTION 10FR | 4895T | 100 |
| STRAINER URINE CALCULI | 4712 | 96 |
| AIRWAY NASOPHARYNGEAL 14FR | 123314 | 10 |
| HIBICLENS 4 OZ | 57504 | 15 |
| BAG SPONGE COUNTER BLUE BACK | 5096 | 50 |
| MOUTHWASH 4OZ ALCOHL FREE MINT | B01I9220WDL | 68 |
| RAZOR TWIN BLADE STD BLUE | CH-RAZ2 | 75 |
| CONDITIONER HAIR 1 OZ | B252CD010 | 14 |
| CUFF PHILIPS SMALL  ADULT DISP | 989803182291 | 32 |
| COVER PROBE SURETEMP THERM | 05031-125 | 40 |
| WASHCLOTH PAPER SGL USE 13X10 | 2503 | 12 |
| BEDPAN CONVENTIONAL MAUVE | CBEDPANGRY | 75 |
| BELT LIFE TRACE AB | 56101 | 150 |
| CUFF PHILIPS ADULT X-LG DISP | 989803182311 | 16 |
| KIT SYMPHONY DBL BREAST PUMP | 67099 | 11 |
| SLEEVE SCD KNEE LARGE | 74023 | 40 |
| SLEEVE SCD KNEE MEDIUM | 74022 | 45 |
| PACK C-SECTION | SMA22CPMMB | 10 |

| | | |
|---|---|---|
| TUBING MAIN PUMP ARTHREX | AR-6410 | 20 |
| BEANIE UNISEX NEWBORN | 52000010 | 150 |
| BAG URINARY LEG STERILE LARGE | 150103 | 10 |
| COVER PROBE SMARTEMP | M09A-30-6212830 | 95 |
| CIRCUIT ANES ADULT 72IN LIMBO | AMN520X4 | 20 |
| CANNULA NASAL CRVD 14FT | CF1326 | 94 |
| MASK SURG DUCKBILL | AT51035 | 224 |
| BINDER ABD 8IN MED 32-38 | D13530006 | 2 |
| CIRCUIT NEONATAL T-PIECE | M1091335VS | 50 |
| SITE-SCRUB | 3882025 | 50 |
| CUTTER CORD CLAMP | 72-7000 | 18 |
| SET COMB AND BRUSH BABY | BBRCMSET | 46 |
| BATH SITZ 2000ML | BSITZGRY | 3 |
| DRESSING LEUKOMED SORBACT STER | 7619904 | 20 |
| PAPER RECORDER DEFIB ZOLL | 8000-0301 | 5 |
| ELECTRODE DEFIB ADULT ZOLL | 8900-0214-01 | 6 |
| BACTEC PEDS PLUS/F | 4402194A | 50 |
| BACTEC LYTIC/10 ANAER | 442021 | 50 |
| BINDER ABD 8IN LARGE | D13530007 | 2 |
| PAD THEMP THERAPY | 8002062012 | 20 |
| RESUSCITATOR BAG NEONATE | 2K7201 | 38 |
| CAP CATHETER PLUG STER | 76 | 26 |
| TAPE TRANSPORE 2IN | 1527-2 | 9 |
| DEVICE STATLOCK CATH STABILZAT | FOL0102 | 20 |
| CLAMP FOLEY CATH PLASTIC | 3913-2 | 80 |
| SYR SALINE FLUSH 10ML | 14011-240 | 450 |
| DRESSING MEPILEX AG 8X8 | 287400 | 20 |
| BRIEF QUILTED LARGE WINGS | 66034 | 36 |
| PACK CENTRAL LINE DSG CHANGE | 03-0400 | 24 |
| HOLDER BLOOD COLLECTION SAF-T | 96000 | 20 |

| TRX Date | Originating Docun | Originating Master Name | Description |
|---|---|---|---|
| 6/30/2016 | | Advanced Electronics | TV for conference room |
| 12/31/2015 | 1257 | Greenline Home Theater | TV's |
| 1/31/2015 | 25691 | MAVICOR LLC | Ipads (20) |
| 3/11/2015 | 25902 | MAVICOR LLC | Air Mac book |
| | 26600 | MAVICOR LLC | Phones (10) |
| | 26598 | MAVICOR LLC | Mcbook Pro |
| 6/30/2016 | 24809 | MAVICOR LLC | Network Hardware |
| 11/30/2015 | 1 | MIAMI CHILDREN'S HEALTH SYS | EQUIPMENT PURCHASE |
| 11/30/2015 | 2 | MIAMI CHILDREN'S HEALTH SYS | CABLING, PHONES, PC EQUIP |
| | 9 | MIAMI CHILDREN'S HEALTH SYS | CABLING, PHONES, PC EQUIP |
| 11/30/2014 | NH3119 | NUETERRA HOLDINGS | Macbook |
| 12/31/2015 | 27293, 27294 | Oppor | SERVERS |
| 12/31/2015 | P5339 | Security 101 | Security equipment |
| | P5288 | Security 101 | Security equipment |
| 1/31/2016 | IN71963 | Strategic | 128 Motorola systems |
| 12/31/2015 | K01366920102 | Zones | Scanners (10) |
| 10/14/2015 | 0176167-001 | Business Essentials | Commercial Brewer |

**SCHEDULE 1.1(ii)**

**EQUIPMENT FROM UCC_3**

Schedule 1.1(ii)

# EXHIBIT "A"

## Assigned Assets List

| 1 | Furniture & Fixtures | BENSONWEDD, LLC | Misc Furniture |
|---|---|---|---|
| 2 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - 2nd floor ptnt room |
| 3 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - 3rd floor ptnt rm |
| 4 | Furniture & Fixtures | MIZUHO | Control, Imaging TOp |
| 5 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - 1st Floor |
| 6 | Furniture & Fixtures | BENSONWEDD, LLC | Final Payment |
| 7 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture Purchase |
| 8 | Furniture & Fixtures | BENSONWEDD, LLC | Signage |
| 9 | Furniture & Fixtures | Pedigo | Carts, hampers, stools |
| 10 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture installation |
| 12 | Furniture & Fixtures | BENSONWEDD, LLC | Installation |
| 13 | Furniture & Fixtures | MIZUHO | Table and Traction Boot |
| 14 | Furniture & Fixtures | BENSONWEDD, LLC | 50% Deposit furniture |
| 15 | Furniture & Fixtures | ASR | Keypad Control |
| 16 | Furniture & Fixtures | ADVANCED ELECTRONICS | TV (56) and Cables |
| 17 | Furniture & Fixtures | Direct Supply | Frigerators (49), Microwaves (14) |
| 18 | Furniture & Fixtures | Schaerer Medical | Surgery Table |
| 19 | Furniture & Fixtures | Datex Ohmeda, Inc | Infant warmer system |
| 20 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - 1st Floor Furn |
| 21 | Furniture & Fixtures | BENSONWEDD, LLC | Mirrors and Plexi Glass |
| 22 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - 3rd floor support |
| 24 | Furniture & Fixtures | BENSONWEDD, LLC | furniture - Mirror/Evac |
| 25 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture sales tax paid |
| 26 | Furniture & Fixtures | Maquet | Universal Core and Freight |
| 27 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - 2nd floor |
| 28 | Furniture & Fixtures | Leica | Microtome, Crystat |
| 29 | Furniture & Fixtures | Future Health Concepts Inc | Cabinet and Shelving (9) |
| 30 | Furniture & Fixtures | Aramark, BensonWedd | Smallwares |
| 31 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - 2nd floor support |
| 32 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture - patient room |
| 33 | Furniture & Fixtures | GE Healthcare | File Holder Cabinets |
| 34 | Furniture & Fixtures | Grainger | Trash Cans, fire blanket |
| 35 | Furniture & Fixtures | Direct Supply | Side by Side Fridge |
| 36 | Furniture & Fixtures | BENSONWEDD, LLC | Furniture- 1st Floor |

| 38 | Furniture & Fixtures | BENSONWEDO, LLC | Furniture | |
|----|---------------------|-----------------|-----------|---|
| 39 | Furniture & Fixtures | Network | Roll Towel Dispenser (400) | |
| 40 | Furniture & Fixtures | BENSONWEDO, LLC | Moulding Supplies | |
| 41 | Furniture & Fixtures | BENSONWEDO, LLC | QS Recliners | |
| 42 | Furniture & Fixtures | BENSONWEDO, LLC | Furniture | |
| 43 | Furniture & Fixtures | BENSONWEDO, LLC | Signs in Braille | |
| 44 | Furniture & Fixtures | BENSONWEDO, LLC | Interior Design, IKEA furniture | |
| 45 | Furniture & Fixtures | BENSONWEDO, LLC | Furniture - 3rd floor add on | |
| 46 | Furniture & Fixtures | BENSONWEDO, LLC | Conference Room Chairs | |
| 47 | Furniture & Fixtures | Hill-Rom | Contract Invoice | |
| 48 | Furniture & Fixtures | Office Furniture Warehouse | Conference Table | |
| 49 | Furniture & Fixtures | Cort Business | | 0 |
| 50 | Furniture & Fixtures | Hill-Rom | 2nd FLoor ICU | |
| 51 | Furniture & Fixtures | JE & SON SUPPLY | tankless Water Heater | |
| 52 | Hardware | MIAMI CHILDREN'S HEALTH SYSTEM | Cerner Startup and Testing | |
| 53 | Hardware | MIAMI CHILDREN'S HEALTH SYSTEM | CABLING, PHONES, PC EQUIP | |
| 54 | Hardware | MIAMI CHILDREN'S HEALTH SYSTEM | Final payment to $5M contract | |
| 55 | Hardware | GHX | Trading Partner Acceleration Provider Exchange | |
| 56 | Hardware | Strategic | 128 Motorola systems | |
| 57 | Hardware | MIAMI CHILDREN'S HEALTH SYSTEM | EQUIPMENT PURCHASE | |
| 58 | Hardware | Security 101 | Security equipment and install | |
| 59 | Hardware | MAVICOR LLC | Network Hardware | |
| 60 | Hardware | Mindray | BOM SOFTWARE | |
| 61 | Hardware | Greenline Home Theater | TV's | |
| 62 | Hardware | Oppor | SERVERS | |
| 63 | Hardware | Smith's Medical | Medication Safety Software | |
| 64 | Hardware | AB&A | Website development | |
| 65 | Hardware | MAVICOR LLC | Ipads (20) | |
| 66 | Hardware | Zones | Scanners (10) | |
| 67 | Hardware | MAVICOR LLC | Phones (10) | |
| 68 | Hardware | Security 101 | Security equipment | |
| 69 | Hardware | Advanced Electronics | TV for conference room | |
| 70 | Hardware | MAVICOR LLC | Installation and Air Mac book | |
| 71 | Hardware | MAVICOR LLC | Mcbook Pro | |
| 72 | Hardware | NUETERRA HOLDINGS | Macbook for L. Huntley | |
| 73 | Instruments | Intuitive Surgical | Misc Instruments- forceps, graspers, endoscope assy | |

| 74 | Instruments | Arthrex | Shoulder instrument set |
| 75 | Instruments | Arthrex | Tenodesis instrument set |
| 76 | Instruments | Applied Medical | reusable grasper handle |
| 77 | Instruments | Carefusion | Puis machine |
| 78 | Instruments | Karl Storz | flexible cystoscope |
| 79 | Instruments | Olympus | Vacuum curettage system |
| 80 | Instruments | Alcon | forceps, scrappers |
| 81 | Instruments | Arthrex | coupler, zoom, hd, c mount (2) |
| 82 | Instruments | Mindray | Ultasonic Transducer |
| 83 | Instruments | Labsco | nerve Stimulator (3) |
| 85 | Instruments | network | mounting bracket |
| 86 | Instruments | 3m | 2 attest auto reader |
| 87 | Instruments | Steris | Install Sonic Console |
| 88 | Instruments | steris | Extron USB extender Plus |
| 89 | Instruments | Arthex | metal cannula |
| 90 | Instruments | Aesculap | Micro Pituitary Rongeur |
| 91 | Instruments | Aesculap | Tenaculum Grasper (2) |
| 92 | Instruments | Olympus | Optical Urethrotome Sheath |
| 93 | Instruments | Aesculap | Right Angle Dissector (2) |
| 94 | Instruments | Arthex | Con OBT Sheath w/ handle (7) |
| 95 | Instruments | cardinal | Holder triple glove box stainless steel (14) |
| 96 | Instruments | Aesculap | Henly Retractor Set w/ accessories |
| 97 | Instruments | CLAFLINMedical Equipment | LED Exam lamp (2) |
| 98 | Instruments | Aesculap | OR instruments |
| 99 | Instruments | CLAFLINMedical Equipment | Wis-Hipple fiber optic blades |
| 100 | Medical Equipment | Intuitive Surgical | IS4000 Da Vinci System |
| 101 | Medical Equipment | Steris Corporation | OR EQUIPMENT |
| 102 | Medical Equipment | Stryker Instruments | Misc drills, saws, laproscopes |
| 104 | Medical Equipment | GE Healthcare | 12 Anesthesia Machines |
| 105 | Medical Equipment | Hill-Rom | Equipment of beds |
| 107 | Medical Equipment | PHILIPS HEALTHCARE | Patient Monitor Station |
| 108 | Medical Equipment | Aesculap | Medical Instruments |
| 110 | Medical Equipment | Steris Corporation | SURG LIGHT W MONITOR MOUNT(14) |
| 111 | Medical Equipment | Stryker Endoscopy | Cameras |
| 112 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Hill-Rom Lexmark RoundTower |
| 113 | Medical Equipment | Carl Zeiss, Meditec, Inc | Kmat opmi Lumera 700 |

| 114 | Medical Equipment | GE Healthcare | Precision 500 D Used |
| 115 | Medical Equipment | Stryker Sales | Equipment |
| 116 | Medical Equipment | Covidien | Equipment |
| 117 | Medical Equipment | Datex Ohmeda, Inc | Infant warmer, care system |
| 118 | Medical Equipment | Steris Corporation | VPRO, AMSCO- PLUS TAX |
| 119 | Medical Equipment | Zoll | Advisory R Series |
| 120 | Medical Equipment | Olympus | Equipment |
| 121 | Medical Equipment | PHILIPS HEALTHCARE | Patient Monitor |
| 122 | Medical Equipment | Steris Corporation | V-Pro Max |
| 123 | Medical Equipment | PHILIPS HEALTHCARE | Installation and quipment- OB |
| 124 | Medical Equipment | Baxter Healthcare Corp | IV Connector |
| 125 | Medical Equipment | Steris Corporation | OR LIGHTS (3) |
| 126 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Cerner Hill-Rom Greenline |
| 127 | Medical Equipment | Help | Equipment Planning |
| 128 | Medical Equipment | Edward Don & Company | Equipment 2nd Deposit |
| 129 | Medical Equipment | OEC Medical | 9900 Elite motor driven |
| 130 | Medical Equipment | OEC Medical | 9900 Elite motor driven |
| 131 | Medical Equipment | Smith's Medical | Pump kits |
| 132 | Medical Equipment | Steris Corporation | Installation of Equipment |
| 133 | Medical Equipment | Alcon Laboratories, Inc | Constellation LXT |
| 134 | Medical Equipment | Medtronic USA Inc | Balloon Seeker |
| 135 | Medical Equipment | Steris Corporation | VISION, PLUS TAX |
| 136 | Medical Equipment | Edward Don & Company | Diswasher, Trash collector |
| 137 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Hill-Rom IT outlet RoundTower |
| 138 | Medical Equipment | Steris Corporation | CAVIWAVE PRO SONIC CONSOLE |
| 139 | Medical Equipment | Amico | AHM Falcon station (65) |
| 140 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Cerner, Computer, and Zone inv |
| 141 | Medical Equipment | Steris Corporation | Installation of Equipment |
| 142 | Medical Equipment | Hill Rom | clinical training |
| 143 | Medical Equipment | OrthoScan | Mini-Arm |
| 144 | Medical Equipment | GE Healthcare | Trade In |
| 145 | Medical Equipment | GE Healthcare | GS Logiq |
| 146 | Medical Equipment | GE Healthcare | Wireless Connectivity |
| 147 | Medical Equipment | GE Healthcare | Brivo System |
| 148 | Medical Equipment | Smith's Medical | Medfusion pump (16) |
| 149 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Elecom System and Hill-Rom Com |

4

| | | | | |
|---|---|---|---|---|
| 150 | Medical Equipment | GE Healthcare | | 0 |
| 152 | Medical Equipment | Amico | Bassinets | |
| 153 | Medical Equipment | Medtronic USA Inc | Foot Control Console | |
| 154 | Medical Equipment | PHILIPS HEALTHCARE | Patient Monitor | |
| 155 | Medical Equipment | Hill-Rom | Versacare Beds | |
| 156 | Medical Equipment | Hill Rom | clinical training | |
| 157 | Medical Equipment | Stryker Sales | Equipment Drill | |
| 158 | Medical Equipment | Stryker | CLEAR OUT GP ACTIVITY | |
| 160 | Medical Equipment | Aesculap | Medical Equipment | |
| 161 | Medical Equipment | Steris Corporation | HARMONY AIR | |
| 162 | Medical Equipment | Aesculap | Medical Equipment | |
| 163 | Medical Equipment | Medtronic USA Inc | Instrument kit | |
| 164 | Medical Equipment | Bayer Healthcare | Solarius | |
| 165 | Medical Equipment | Medtronic USA Inc | Equipment | |
| 166 | Medical Equipment | Carefusion Solutions | pharmogistics | |
| 167 | Medical Equipment | Integra Lifescience | Light Source | |
| 169 | Medical Equipment | Hill Rom | clinical training | |
| 170 | Medical Equipment | OEC Medical | 12" Vascular 9800 upgrade kit | |
| 171 | Medical Equipment | Edward Don & Company | Ice Dispenser | |
| 172 | Medical Equipment | Olympus | Ultra-Light Camera | |
| 173 | Medical Equipment | Mindray | Equipment | |
| 174 | Medical Equipment | GE Healthcare | Procedure Table | |
| 175 | Medical Equipment | Steris Corporation | 4 CEILING LIGHT | |
| 176 | Medical Equipment | Medtronic USA Inc | Instruments | |
| 177 | Medical Equipment | Stryker Endoscopy | Medical Equipment | |
| 178 | Medical Equipment | Allen Medical Systems, Inc | Medical Equipment | |
| 179 | Medical Equipment | CLAFLINMedical Equipment | Equipemnt | |
| 180 | Medical Equipment | Hill-Rom | Versacare Bed Accessories | |
| 181 | Medical Equipment | Hill Rom | clinical training | |
| 182 | Medical Equipment | PHILIPS HEALTHCARE | Equipment and Installation | |
| 183 | Medical Equipment | Hologic | MySource Control Unit | |
| 184 | Medical Equipment | Baxter Healthcare Corp | pump implementation | |
| 185 | Medical Equipment | Aesculap | | 0 |
| 186 | Medical Equipment | 3M | Coding System | |
| 187 | Medical Equipment | InterMetro | Equipment | |
| 188 | Medical Equipment | Medtronic USA Inc | Tables and Frames | |

| 189 | Medical Equipment | Hill Rom | clinical training | |
| 190 | Medical Equipment | Stryker Endoscopy | Video Cart | |
| 191 | Medical Equipment | Carl Zeiss, Meditec, Inc | Microscope | |
| 192 | Medical Equipment | Bayer Healthcare | MARK 7 ARTERION PEDESTAL SYS | |
| 193 | Medical Equipment | Arthrex | Positioners | |
| 194 | Medical Equipment | GE Healthcare | Logiq Required Items | |
| 195 | Medical Equipment | Amico | Oxygen Flowmeters | |
| 196 | Medical Equipment | Medtronic USA Inc | AEX Generator | |
| 197 | Medical Equipment | DB Surgical | Table Clamp - Equipment | |
| 198 | Medical Equipment | Hill-Rom | Patient Monitors | |
| 200 | Medical Equipment | Olympus | Instruments | |
| 201 | Medical Equipment | Hill Rom | clinical training | |
| 202 | Medical Equipment | GE Healthcare | Wireless Connectivity | |
| 203 | Medical Equipment | Verathon | Laryngoscope cart | |
| 204 | Medical Equipment | Verathon | Equipment - Minor | |
| 205 | Medical Equipment | Medtronic USA Inc | Instrument Kit | |
| 206 | Medical Equipment | Medtronic USA Inc | Equipment | |
| 207 | Medical Equipment | Cosman Medical Inc | Generator - Radiofrequency | |
| 208 | Medical Equipment | Help | | 0 |
| 209 | Medical Equipment | Covidien | monitors | |
| 210 | Medical Equipment | ADVANCED ELECTRONICS | 42" and 55" TV | |
| 211 | Medical Equipment | Olympus | Medical Equipment | |
| 212 | Medical Equipment | Hill Rom | clinical training | |
| 213 | Medical Equipment | Mortara Instruments, Inc | EKG with Cart | |
| 214 | Medical Equipment | GE Healthcare | | 0 |
| 215 | Medical Equipment | Hill Rom | clinical training | |
| 217 | Medical Equipment | Verathon | Equipment | |
| 218 | Medical Equipment | MOPEC | Equipement | |
| 219 | Medical Equipment | Natus | Endo Screen Equipment | |
| 220 | Medical Equipment | Natus | Papoose Board | |
| 221 | Medical Equipment | Olympus | Cart | |
| 222 | Medical Equipment | Keeler Instruments | Equipment | |
| 224 | Medical Equipment | Amico | Falcon workstation accessories | |
| 225 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Sales Tax | |
| 226 | Medical Equipment | Steris Corporation | Water Control Sensor | |
| 227 | Medical Equipment | Olympus | Instruments | |

6

| 228 | Medical Equipment | Hill-Rom | Patient Monitors |
| 229 | Medical Equipment | Aesculap | Medical Equipment |
| 230 | Medical Equipment | Jeffrey Allen Inc | 8 Passenger Vehicle |
| 231 | Medical Equipment | InterMetro | Equipment storage |
| 232 | Medical Equipment | Aesculap | Supplies: Instruments |
| 233 | Medical Equipment | Alcon Laboratories, Inc | Equipment Medical |
| 234 | Medical Equipment | Zones | 45 desks |
| 235 | Medical Equipment | InterMetro | Assembly Charge |
| 236 | Medical Equipment | Hill Rom | clinical training |
| 237 | Medical Equipment | Olympus | airway mobilscope intubation s |
| 238 | Medical Equipment | Pedigo Products, Inc | Cart with Casters |
| 239 | Medical Equipment | CLAFLINMedical Equipment | Miller fiber optic blades |
| 240 | Medical Equipment | CLAFLINMedical Equipment | Supplies: Medical Equipment |
| 241 | Medical Equipment | InterMetro | Shelving Assembly Charge |
| 242 | Medical Equipment | Hologic | Hysteroscope Equipment |
| 243 | Medical Equipment | Southern Medical | Dose Packing Machine |
| 244 | Medical Equipment | MOPEC | Disposal and Foot Pedal |
| 245 | Medical Equipment | Aesculap | 0 |
| 246 | Medical Equipment | Steris Corporation | Connector Kit |
| 247 | Medical Equipment | Steris Corporation | CONNECTOR KITS (14) |
| 248 | Medical Equipment | Olympus | Medical Equipment |
| 249 | Medical Equipment | Zones | wristbank printers and radios |
| 250 | Medical Equipment | Alcon Laboratories, Inc | Constellation 3 kits |
| 251 | Medical Equipment | OEC Medical | Spectre footswitch |
| 252 | Medical Equipment | Olympus | Equipment |
| 254 | Medical Equipment | CLAFLINMedical Equipment | Instruments |
| 255 | Medical Equipment | Steris Corporation | Harmony Equipment |
| 256 | Medical Equipment | CLAFLINMedical Equipment | Pediatric Scale Weighting Cart |
| 257 | Medical Equipment | Stryder Endscopy | Arthoscope |
| 258 | Medical Equipment | Allen Medical Systems, Inc | Leg Holder System |
| 259 | Medical Equipment | Zones | image scanner |
| 260 | Medical Equipment | Medtronic USA Inc | Hydrodebrider |
| 261 | Medical Equipment | Hill-Rom | Versacare Beds asseccories |
| 262 | Medical Equipment | Innovative Medical Products, Inc | MorphBoards |
| 263 | Medical Equipment | Arthrex | HD C Mount |
| 264 | Medical Equipment | CLAFLINMedical Equipment | Miller fiber optic blades |

| 265 | Medical Equipment | Alcon Laboratories, Inc | Occular Implants |
| 266 | Medical Equipment | InterMetro | Back Panel of Equpment |
| 267 | Medical Equipment | Merry X-Ray, Inc | Wheelchair equipment |
| 268 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Security and Items for Build |
| 269 | Medical Equipment | Steris Corporation | Medium Sterilizer |
| 270 | Medical Equipment | CLAFLINMedical Equipment | Miler fiber optic blades |
| 271 | Medical Equipment | Steris Corporation | Install Chamber Washer |
| 272 | Medical Equipment | Steris Corporation | install washer |
| 273 | Medical Equipment | Allen Medical Systems, Inc | Chair Cart |
| 274 | Medical Equipment | Stryker Sales | Surgi Stool (2) |
| 275 | Medical Equipment | Arthrex | Medical Equipment |
| 276 | Medical Equipment | Southern Medical | Thermal label printer |
| 277 | Medical Equipment | Steris Corporation | HARNESS ASSEMBLY |
| 278 | Medical Equipment | Steris Corporation | HARNESS ASSEMBLY |
| 280 | Medical Equipment | Arthrex | Prep Board |
| 281 | Medical Equipment | Amico | Adjustable Arm |
| 282 | Medical Equipment | Smith's Medical | Supplies: Medical |
| 283 | Medical Equipment | Steris Corporation | Carts |
| 284 | Medical Equipment | Steris Corporation | MEDVAC |
| 285 | Medical Equipment | Steris Corporation | Universal Port Connection |
| 286 | Medical Equipment | CLAFLINMedical Equipment | MRI & CT transfer Boards |
| 287 | Medical Equipment | Arthrex | trimano adapter (2) |
| 288 | Medical Equipment | Steris Corporation | INstall Sonic Console |
| 289 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Sales Tax for equipment |
| 290 | Medical Equipment | Steris Corporation | wire case with power |
| 291 | Medical Equipment | CLAFLINMedical Equipment | Malignant Hyperthermia Deluxe Cart |
| 292 | Medical Equipment | Arthrex | Metal Cannula instruments |
| 293 | Medical Equipment | INtegrated Medical Systems | Medium Autoclave |
| 294 | Medical Equipment | Olympus | Optical Sheath |
| 295 | Medical Equipment | Edward Don & Company | Medical Stand |
| 296 | Medical Equipment | steris | V Pro installation |
| 297 | Medical Equipment | Steris Corporation | Installation |
| 298 | Medical Equipment | Arthrex | Scope Sheath |
| 299 | Medical Equipment | Steris Corporation | Specialty Billing |
| 300 | Medical Equipment | Hill-Rom | Affinity Mattress |
| 301 | Medical Equipment | GE Healthcare | Printer paper and Chem indicat |

8

| | | | | |
|---|---|---|---|---|
| 302 | Medical Equipment | Olympus | taxes- 7% | |
| 305 | Medical Equipment | Arthrex | Ankle Arthoroscopy | |
| 306 | Medical Equipment | MIAMI CHILDREN'S HEALTH SYSTEM | Taxes for Dell Hardware | |
| 307 | Medical Equipment | Steris Corporation | Funnel and cap assembly | |
| 308 | Medical Equipment | Covidien | Monopolar Adapter | |
| 309 | Medical Equipment | Hill-Rom | Wireless Bed | |
| 310 | Medical Equipment | Alcon Laboratories, Inc | Supplies; Medical | |
| 311 | Medical Equipment | Steris Corporation | Double Sink | |
| 312 | Medical Equipment | Steris Corporation | Double Sink | |
| 313 | Medical Equipment | Arthrex | Supplies; Medical | |
| 314 | Medical Equipment | Arthrex | Offset Guide | |
| 315 | Medical Equipment | Covidien | Platform | |
| 316 | Moveable Med Equipment | Arthrex | | 0 |
| 317 | Moveable Med Equipment | Stryker | | 0 |
| 318 | Moveable Med Equipment | Carl Zeiss, Meditec, Inc | | 0 |
| 319 | Moveable Med Equipment | Intuitive Surgical | Endoscopes (4) | |
| 320 | Moveable Med Equipment | Arthrex | instrument sets (6) | |
| 321 | Moveable Med Equipment | Olympus | Cam head (3), telescope (5) | |
| 322 | Moveable Med Equipment | | Recl Assets after sale | |
| 323 | Moveable Med Equipment | Arthrex | ACL instrument set | |
| 324 | Moveable Med Equipment | InterMetro | Cart with Casters | |
| 325 | Moveable Med Equipment | Johnson & Johnson | CMC-V Generator System | |
| 326 | Moveable Med Equipment | Conmed | Airseal IFS, 110V | |
| 327 | Moveable Med Equipment | Intuitive | Instrument Starter Kit | |
| 329 | Moveable Med Equipment | InterMetro | Lifeline Code Response cart | |
| 330 | Moveable Med Equipment | Intuitive Surgical | IS3000 sealer | |
| 331 | Moveable Med Equipment | Verathon | laryngiscope Cart | |
| 332 | Moveable Med Equipment | Steris Corporation | Camera and Supplies | |
| 333 | Moveable Med Equipment | Stryker | Eye Surgery Stretcher | |
| 334 | Moveable Med Equipment | Smith's Medical | 16 pumps | |
| 335 | Moveable Med Equipment | Carefusion | | 0 |
| 336 | Moveable Med Equipment | The Bimeco | Transport Incubator | |
| 337 | Moveable Med Equipment | Network | | 0 |
| 338 | Moveable Med Equipment | InterMetro | LINEN TRUCKS (7) | |
| 339 | Moveable Med Equipment | Intermetro | Chrome Med carts | |
| 340 | Moveable Med Equipment | M&B Factory Systems Installations Inc | Linen Trucks installation | |

9

| 341 | Moveable Med Equipment | Medtronic | | 0 |
| 342 | Moveable Med Equipment | Medtronic | | 0 |
| 343 | Moveable Med Equipment | Claflin | Mobile floor lift | |
| 344 | Moveable Med Equipment | Aesulap | Misc drills, distractors | |
| 345 | Moveable Med Equipment | Bausch and Lomb | Instrument Tray | |
| 346 | Moveable Med Equipment | Claflin | Laryng blades | |
| 347 | Moveable Med Equipment | Allen Medical Systems | Pal Pro Stirrups with clamp | |
| 348 | Moveable Med Equipment | Allen Medical | Allen Bow Frame | |
| 349 | Moveable Med Equipment | Arthrex | | 0 |
| 350 | Moveable Med Equipment | Claflin | | 0 |
| 351 | Moveable Med Equipment | Pedigo | IV Stands (20) | |
| 352 | Moveable Med Equipment | Arthrex | Ankle Arthroscopy Case | |
| 353 | Moveable Med Equipment | Arthrex | | 0 |
| 354 | Moveable Med Equipment | Alcon | Passive Dr Filter (2) | |
| 355 | Moveable Med Equipment | Intuitive | Mega Suturecut ND, IS4000 | |
| 356 | Moveable Med Equipment | intermetro | | 0 |
| 357 | Moveable Med Equipment | Steris | | 0 |
| 358 | Moveable Med Equipment | Philips | Fetal monitoring system | |
| 359 | Moveable Med Equipment | DB Surgical | Kennison Rongeur Micro (4) | |
| 360 | Moveable Med Equipment | Steris | | 0 |
| 361 | Moveable Med Equipment | Conmed | IFS Cart with Valve | |
| 362 | Moveable Med Equipment | Philips | | 0 |
| 363 | Moveable Med Equipment | Arthrex | C-mount AR Scope | |

10

**SCHEDULE 1.1(iii)**

**PERSONAL PROPERTY LEASES**

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| CareFusion Solutions, LLC | Master Agreement | Lease | Pyxis Pharmaceutical Services Unit Dose Vending Machines | TBD |
| De Lage Landen Financial Services, Inc. - Lessor<br>Carl Zeiss Meditec - Vendor | Microscope Lease | Lease | Operating Microscope Lease | TBD |
| DEX Imaging, Inc. | Lease Agreement (assigned to U.S. Bank) | Lease | Printer and Copier Lease from Dex but through US Bank | TBD |
| GE HFS, LLC (General Electric) | | Lease | 64 Slice LiteSpeed CT Lease | TBD |
| General Electric Capital Corporation | Master Lease Agreement dated as of 08/13/2015 | Lease | 1.5 Tesla MRI Lease | TBD |
| General Electric Capital Corporation | Equipment Schedule Dated as of 08/13/2015 to Master Lease Agreement Dated as of 08/13/2015 | Lease | CT Table Lease | TBD |
| HealthTronics Mobile Solutions, L.L.C. | Equipment and Service Rental Agreement- (Per Click Arrangement) | Lease | Litho, Cryo, HIFU rental vendor | TBD |
| Intuitive Surgical, Inc. | Use, License & Service Agreement | Lease | Lease of the older Si DaVinci Robot | TBD |
| Medtronic Surgical Technologies | Medtronic Surgical Technologies Capital Placement Program | Lease | Lease program to allow for equipment needed to do Medtronic placement | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| Olympus America, Inc. | | Lease | Master Lease Agreement for leased Olympus Equipment | TBD |
| Olympus America, Inc. | Fixed Periodic Payment Schedule No. 001 to Master Lease Agreement No. 0016716 | Lease | Periodic Payment Schedule 001 | TBD |
| Olympus America, Inc. | Fixed Periodic Payment Schedule No. 002 to Master Lease Agreement No. 0016716 | Lease | Periodic Payment Schedule 002 | TBD |
| Olympus America, Inc. | Fixed Periodic Payment Schedule No. 003 to Master Lease Agreement No. 0016716 | Lease | Periodic Payment Schedule 003 | TBD |
| Piramal Critical Care, Inc. | Sevoflurane Vaporizer Agreement | Lease | Lease Agreement for SevoFlurane Vaporizers | TBD |
| Pitney Bowes | Pitney Bowes Lease Agreement | Lease | Agreement to lease and intermittently fill postage machine with U.S. postage. | TBD |
| Stericycle, Inc. | Exhibit H-4 Premier National Master Lease Agreement (Hazardous Waste Disposal) as part of GPO Agreement effective 6/1/13 b/w Premier and Stericycle | Lease | Lease for Medical Waste Disposal Equipment | TBD |
| U.S. Bank | See Dex Imaging Lease above which was assigned to U.S. Bank per WD 2071709 | Lease | Lease for copiers and printers from Dex Imaging | TBD |
| Variety Children's Hospital, Inc. | Amended and Restated Lease Agreement (assignment of Lease between HC-5959 and Variety Children's Hospital) | Lease | Real Estate Building and Property Lease | TBD |

**SCHEDULE 1.1(iv)**

**INTANGIBLE PROPERTY**

**[See Schedule 1.1(iii), Schedule 3.9, Schedule 3.13, Schedule 3.14(a) and (b)]**

**SCHEDULE 1.2(iii)**

**EXCLUDED ASSETS**

Excluded Assets defined in Section 1.2(iii)*

| Creditor | Contract/Lease | UCC No. | Specific Equipment Listed |
|---|---|---|---|
| U.S. Bank Equipment Finance, A Division of U.S. Bank National Association | Lease | 20150596748 | Thirtyone (31) M3540IDN Copiers; Two (2) 3051CI Copiers; One (1) M6530 CDN Copier |
| General Electric Capital Corporation | Lease | 201504722157 | One (1) GE Healthcare VCT 64 1700 Table Internal Order Ref. # 4306479 |
| General Electric Capital Corporation | Lease | 20150472173X | One (1) GE Healthcare Signa HDxT 1.5T 16ch System Internal Order Ref. # 4306488 |
| GE HFS, LLC (General Electric) | Lease | 201606393047 | One (1) GE Healthcare Lightspeed VCT Installed Base Options and Signa HDxt 1.5 IB Options Inrernal Reference #4377028 |
| Intuitive Surgical, Inc. | Lease | 201701051476 | One (1) Certified Pre-owned da Vinci Si with Firefly Fluorescence Imaging Surgical System (with single console) |
| Olympus America, Inc. | Lease | 201609273662 | Two (2) A4674A A4674A 3MM Telescope 30Deg Wide Angle; Two (2) A4673A A4673A 3mm Telecscope 12Degree Autoclav; Two (2) WA05970A WA05970A HIQ+ STERILIZATION TRAY W/ LID; Two (2) A5976 A5976 TRAY INSERT UROLOGY PRE- MOLDED; Two (2) A4825 A4825 SEMI-RIGID FOREIGN BODY GRASP 5Fr; Two (2) A4826 A4826 SEMI-RIGID SCISSORS 5FR; Two (2) A4827 A4827 SEMI-RIGID GRASP FORECEPS RAT 5Fr; Two (2) A4770 A4770 Single Flow 4MM HYS-Sheath for 3MM |
| Olympus America, Inc. | Lease | 201609178724 | A4674A A4674A 3MM Telescope 30Deg Wide Angle 762124 1 1009225 A4674A A4674A 3MM Telescope 30Deg Wide Angle 762132 1 1009225 A4673A A4673A 3mm Telecscope 12Degree Autoclav 725668 1 A4673A A4673A 3mm Telecscope 12Degree Autoclav 727484 1 WA05970A WA05970A HIQ+ STERILIZATION TRAY W/ LID 2 A4825 A4825 SEMI-RIGID FOREIGN BODY GRASP 5Fr NA 2 A4826 A4826 SEMI-RIGID SCISSORS 5FR NA 2 A4827 A4827 SEMI-RIGID GRASP FORECEPS RAT 5Fr NA 2 A5976 A5976 TRAY INSERT UROLOGY PRE- MOLDED NA 2 A4770 A4770 Single Flow 4MM HYS-Sheath for 3MM NA 2 |
| Olympus America, Inc. | Lease | 201609273670 | One (1) A4772 5.5 MM CF HYS-SHEATH 5FR FOR 3MM |
| Olympus America, Inc. | Lease | 201701247133 | One (1) 777000 GYRUS, G400 GENERATOR; One (1) 700000 CART,SP/G400 GENERATOR; One (1) 744010 Gyrus, PK-SP FOOTSWITCH; One (1) 560085-002 CORD ANGLE CONNECTOR HOSPITAL |

*The items listed herein are leased by the Debtor and therefore not subject to sale.
However, the leases identified below may be subject to assumption pursuant to 11 U.S.C.
§ 365.

**SCHEDULE 1.5**

**AHCA PAYMENTS**

Schedule 1.5

**<u>Payments due AHCA:</u>**

Current liabilities to AHCA totals $239,647 for the PMATF and HCTF assessments combined.

At the start of each quarter (beginning April 1, 2018), the Debtor shall make a payment of $59,911.75 to pay down the $239,647 currently due to AHCA for the PMATF and HCTF combined assessments.

The current inactive license expires on October 29, 2018.   No later than 60 days before, an application to extend the inactive license must be filed.  The fees to AHCA to extend the inactive license will be $2,308.74

The Debtor currently owes the Florida Birth-Related Neurological Injury Compensation Association (NICA) $11,450 for the year 2016 and $19,450 for the year 2017.  The Debtor is currently attempting to negotiate a payment plan with NICA, which payment plan (if accepted by NICA and approved by the Bankruptcy Court) will pay down a portion of the foregoing amounts.

# SCHEDULE 3.8

# TAXES

`Schedule 3.8`

**<u>Taxes Due and Owing</u>**

Florida Department of Revenue
5050 W Tennessee St
Tallahassee, FL 32399
in the amount of $187,321.70
for Sales and Use Tax: Voided Stipulation Agreement 923321544

Department of the Treasury – Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346
in the amount of $22,206.32
for taxes per 11 U.S.C. § 507(a)(7) forWT-FICA and FUTA
See *Proof of Claim No. 4* – all "unassessed-No Return" and subject to objection by Debtor

**SCHEDULE 3.9**

**REGULATORY COMPLIANCE**

The Miami Medical Center

Schedule 3.9                          Current Licenses and Permits

| Permit / Action | Agency | License Number |
|---|---|---|
| National Provider Identifier | NPPES | 1427470418 |
| Medicare Number | CMS | 100328 |
| Hospital License- Inactive | AHCA | 4008 |
| Hospital Accreditation Program | Det Norski Veritas | 200496-2016-AHC-USA-NIAHO |
| Pharmacy License - Institutional Class II (Board of Pharmacy) | Board of Pharmacy | PH 29506 |
| Sterile Compounding Permit | Board of Pharmacy | PH 29742 |
| Controlled Substance Registration Certificate | D.E.A. | FM5654466 |
| Radiation Machine Registration [Hospital Facility] | **Department of Health –** Bureau of Radiation Control | Reg No. JR 02671000 |
| Alarm System Permit | City of Miami | 82348 |
| Industrial Waste 5 -Annual Operating Permit | Miami Dade County | IW5-000616-2017/2018 |
| Stratospheric Ozone Protection Annual Operating Permit | Miami Dade County | APCF-002143-2017/2018 |

The Miami Medical Center

Current Licenses and Permits

| | | |
|---|---|---|
| Air Pollution Annual Operating Permit (Regulatory and Economic Resources- Environmental Resources Management | Miami Dade County | AP003013-2017/2018 |

**SCHEDULE 3.10**

**INSURANCE POLICIES**

**Schedule 3.10**

### CONFIRMATION OF INSURANCE

| Agent and/or Carrier | Phone Number | Policy Number | Coverage Type | Expiration Date |
|---|---|---|---|---|
| Marsh USA Risk & Insurance Services/Affiliated FM | 913-387-0504 | SX682 | Property | 6/1/2018 |
| Marsh USA Risk & Insurance Services/Tokio Marine Specialty Ins. Co. | 913-387-0504 | PSD1247466 | Directors & Officers | 6/1/2018 |
| Marsh USA Risk & Insurance Services/The First Liberty Ins. Corp. | 913-387-0504 | AS6-Z11-B6P63V-017 | Automobile Liability - Hired Autos & Non-Owned Autos | 6/1/2018 |
| Marsh USA Risk & Insurance Services/Tarian Ins Co. | 913-387-0504 | PH1700689 | Cyber | 6/1/2018 |
| Marsh USA Risk & Insurance Services/Allied World Surplus Lines Ins. Co. | 913-387-0504 | 0310-0011 | Health Care Facility Professional/General Liability- 1 yr ERP | 2/21/2019 |
| Marsh USA Risk & Insurance Services/Liberty Mutual Fire Ins Co. | 913-387-0504 | TB2-Z11-B6P63V-027 | Medical Office Bldg General Liability | 2/21/2019 |
| Marsh USA Risk & Insurance Services/Liberty Mutual Fire Ins Co. | 913-387-0504 | TH7-Z11-B6P63V-037 | General Liability-Excess | 6/1/2018 |
| Marsh USA Risk & Insurance Services/Allied World Surplus Lines Ins. Co. | 913-387-0504 | 3105837 | Environmental Legal Liability | 3/1/2019 |

**SCHEDULE 3.12**

**EMPLOYEE MATTERS**

Schedule 3.12

## Client Services Agreement

This Client Services Agreement (Agreement) is entered into by and between Creative Staffing (Agency) and Miami International Medical Center, LLC d/b/a The Miami Medical Center (Client). This Agreement is effective as of 12:01 a.m. on February __, 2018 (the Effective Date). Before entering into this Agreement, Client provided Agency with information to assess whether Client was an appropriate candidate for Agency's services. Client represents that the information provided was and continues to be accurate and complete as of the Effective Date.

(1) **The Parties' Relationship with Each Other and with the Worksite Employees.** The parties intend to create an arrangement so that Agency, as the Employer of Record (EOR), can provide human resources Services (defined in Section (4)) to Client (the EOR Relationship). In the EOR Relationship the parties share in certain responsibilities and allocate such responsibilities among each other as described in this Agreement. With respect to the allocation of responsibilities regarding the Worksite Employees (Worksite Employees is defined in Section (2)), Agency will have sufficient authority so as to maintain a right of direction and control over Worksite Employees assigned to Client's location. Client will, however, retain sufficient direction and control over the Worksite Employees as is necessary to conduct Client's business and without which Client would be unable to conduct its business, discharge any fiduciary responsibility that it may have, or comply with any applicable licensure, regulatory, or statutory requirement of Client. Client's authority includes the right to accept or cancel the assignment of any Worksite Employee. Additionally, Client will have sole and exclusive control over the day-to-day job duties of Worksite Employees and over the Job site at which, or from which, Worksite Employees perform their services. Client expressly absolves Agency of liability which results from control over the Worksite Employee's day-to-day job duties and the job site at which, or from which, Worksite Employees perform their services. Further, Client retains full responsibility for its business, products, and services, worksite premises, property, and any actions by any third party, contractor, independent contractor or non-Worksite Employee.

(2) **Employment of the Worksite Employees.** The Term "Worksite Employees" means individuals hired by Agency and assigned to Client's worksite. During this Agreement, both Client and Agency will employ each Worksite Employee. This Agreement does not change the underlying employment relationship between any Worksite Employee and Client that existed prior to or may be created after the Effective Date. Further, this Agreement does not create any rights for any Worksite Employee that did not previously exist (e.g., creating an employment contract with the Worksite Employee). Any responsibility and/or liability with regard to any employment contracts, including agreements for severance, commissions, vacation, paid time off accruals, bonus payments (Employment Agreements) between Client and any Worksite Employee remains the exclusive responsibility and liability of Client (such as negotiation, performance compliance, interpretation, renewal, enforcement, and termination of such Employment Agreements). Agency's involvement with respect to any Employment Agreement is limited to processing Worksite Employee payroll in conformity with information provided by Client.

(3) **Responsibilities of the Parties; Mutual Duty to Cooperate. (3)(A) General Provisions.** In recognition of the effort necessary to provide the services described in this

1

Agreement, both parties agree to cooperate with each other. The parties acknowledge that the duty to cooperate is a material term of this Agreement. Agency agrees to inform Client about potential and actual employee issues as they arise to the extent Agency knows about the issues. The duty to cooperate survives the termination or expiration of this Agreement if there is an employment related claim, demand or litigation based on a cause of action that arose during this Agreement. The duty to cooperate does not apply to any claim in which the parties are litigation against each other.

**(3)(B) Reporting to Agency.** Promptly upon the occurrence or discovery of the information, Client agrees to accurately inform Agency about issues relating to the Worksite Employees, including hours worked; complaints, allegations, threats, or incidents of tortious misconduct, or workplace safety violations; work-related injuries or accidents; change in job functions and duties; any misclassifications regarding workers' compensation; change in worksite safety exposure; union organizational activities; claims of harassment or unfair treatment; or any employment-related claims (whether oral or written), charges, lawsuits, governmental investigations or audits, etc., involving the Worksite Employee(s) whether threatened or filed against Agency, Client, or both parties. Client also agrees to timely and accurately inform Agency about Worksite Employee changes in status such as leaves of absences, reduction in hours from full time to part time, new hires, and terminations.

**(3)(C) Consulting with Agency.** Client agrees to consult with Agency before taking any employment action, including but not limited to, hiring, firing, promoting, etc. (whether oral or written) regarding any Worksite Employee.

**(4) Agency's Services and Responsibilities.** Agency will provide Client and the Worksite Employees with human resource Services, maintenance of Worksite Employee records, and related administrative Services described in this Section (4) Services. To provide the Services and fulfill the responsibilities described in this Section, Client agrees that it must provide Agency with the necessary information and ability to furnish such Services or fulfill such responsibilities as required in Sections (3), Mutual Duty to Cooperate and (5), Clients Responsibilities. Client acknowledges that Agency's provision of its Services is dependent upon the completeness, accuracy and timeliness of the information that Client provides to Agency.

**(4)(A) Agency's Responsibility Regarding the Payment of Wages.** As the EOR, Agency assumes responsibility for paying wages to Worksite Employees. Agency also assumes full responsibility for the collection and payment of payroll taxes on the Worksite Employees' compensation. Notwithstanding anything in this Agreement to the contrary, Agency will not be responsible for paying wages to Worksite Employees that relate to severance, bonuses, commissions, vacation, time off accrual programs, incentives, or other comparable forms of compensation (Nonstandard Wages) in the event Client fails to make payment to Agency for the appropriate amounts of the Nonstandard Wages.

**(4)(B) Workers' Compensation Coverage.** During this Agreement, Agency will maintain workers' compensation coverage for each Worksite Employee in accordance with the laws of the states in which Agency provides services under this Agreement. Agency is also responsible for the management of workers compensation claims, claims filings, and related procedures.

**(4)(C) Employment Practices Liability Insurance.** Agency agrees to provide an Employment Practices Liability (EPL) insurance policy with an endorsement that extends coverage to Client for claims brought by a Worksite Employee against Client alleging wrongful employment practices, as defined in the policy. Client's coverage is subject to annual aggregate limits (including limits applicable to claims in the aggregate made by all Agency clients and against Agency) and deductibles, among other terms and conditions contained in the policy. The terms of the EPL insurance policy govern the rights of the parties in the event there is a conflict between this Agreement and the policy. Agency reserves the right to change the EPL policy terms, cancel, and/or to decide to self-insure any EPL coverage after notifying Client.

**(4)(D) Health Insurance.** Worksite Employees must meet the eligibility requirements (and governing law) under any group health and other related benefits (e.g. dental, vision) the parties decide to offer the Worksite Employees through an Agency sponsored plan.

**(5) Client's Responsibilities.** Client agrees that it is responsible for complying with the laws affecting or regulating its business. Worksite Employees, Independent contractors, etc. Client recognizes that Agency's provision of Services does not relieve Client of responsibility and liability for those matters over which it has control. Client also understands that there may be laws that apply because of the EOR arrangement with which Client must now comply (e.g., FMLA). Given that possibility, Client agrees to comply with those laws.

**(5)(A) Wage and Hour Laws.** Client is responsible for setting the level of wages to be paid at or above the applicable minimum wage and/or salary requirements. Client agrees to (i) provide Agency with complete and correct information regarding hours worked, job classifications, exempt and non-exempt status, and other data needed to compute accurately wages, taxes, etc.; (ii) collect, verify and transmit to Agency's administrative office not less than three (3) business days before each payroll date any information required to determine accurately the amount due to the Worksite Employee and Agency, and (iii) promptly make any necessary corrections to correct a violation of the FLSA or comparable state laws. Client acknowledges that it remains responsible for compliance with the FLSA.

**(5)(B) Compliance with the ADA and Other Comparable Laws.** Because the ADA and comparable laws impose affirmative obligations on employers to provide a reasonable accommodation to a qualified individual with a disability and to make a public facility reasonably accessible, Client is responsible for complying with these laws and associated costs. Client acknowledges that it, and not Agency, is responsible for complying with Title III of the ADA (i.e., public access to facilities).

**(5)(C) Workers' Compensation.** Client agrees to immediately inform Agency of all workplace accidents, injuries, and workers' compensation code misclassifications. To contain the cost of workers' compensation insurance, Client agrees to participate in a modified duty program. Modified duty, light duty, or transitional work are terms that used to describe the type of work an injured employee is able to perform within the physical limitations set by an authorized treating physician. Client agrees that, during this Agreement, it will not employ anyone not covered by this Agreement (e.g., non-Worksite Employees) without Agency's

3

knowledge. Client agrees that, if its hires non-Worksite Employees, it will obtain full workers' compensation coverage (or in the case of contracting with independent contractors, Client will require its independent contractors to enter into independent contractor agreements with Client and to maintain workers' compensation coverage). Under these circumstances, Client also agrees to provide Agency with a certificate naming it as a certificate holder, obtain a labor contractor endorsement (or the equivalent) in favor of Agency, and require that Client's insurer notify Agency in advance of any termination of coverage.

(6) **Payment.** Client agrees to deposit $20,000.00 with Agency upon the execution of this Agreement, which amount will be used to fund the initial weekly payment required under this Agreement. Thereafter, Client will pay all invoices from Agency upon receipt, which invoices will be for payments required under this Agreement the following week. The markup for all PTP (Payroll Transfer Plan) employees will be 35%. The bill rate includes all payroll taxes, unemployment taxes, general liability insurance, workers compensation insurance, etc. for our employees. The Agency will additionally add a 2% surcharge onto its total invoice to pass an at cost charge for ACA. Agency agrees that it will not adjust the pricing for the first year of this Agreement, except for the portion of the fee relating to employee benefits and the portion of the fee relating to state and federal taxes. With respect to the benefits portion of the fee, benefits will always adjust in accordance with the benefit plan or insurance policy renewal or anniversary date, if any. With respect to the state and federal tax portion of the fee, (e.g., state unemployment insurance). the fee may be adjusted in accordance with state and federal increases, as applicable. Thereafter, the pricing may be adjusted with thirty (30) days' written notice. Client acknowledges that Agency retains any Section 125 savings as part of its service fee. Client acknowledges that, if Agency consents to the hiring of new individuals who should be classified in workers' compensation codes not previously listed, the pricing will be adjusted accordingly. Agency retains the discretion to adjust the price if the information Client gave before executing this Agreement (e.g. gross payroll, workers' compensation classification codes, etc.) changed from the time Agency gave a Client a quote. In the event a Worksite Employee is discovered to be misclassified by either Agency of Client, Agency will adjust the price in accordance with the appropriate class code change on a prospective basis only. If a misclassification is due to the gross negligence or willful misconduct of either party, Agency will adjust the price in accordance with the appropriate class code change retroactive to the beginning of the policy year in effect at the time of the misclassification correction.

(7) **Miscellaneous Provisions, (7)(A) The Parties' Authority to Execute this Agreement.** The parties represent that each is a legal entity authorized to conduct business in the state where the services of this Agreement will be performed and that the officers who sign on behalf of the party are duly authorized to enter into this Agreement.

(7)(B) **The Scope of Client's Authority.** The parties acknowledge that neither is an agent of the other. Each agree that it will not hold itself out as an agent of the other, directly or indirectly. Neither party is authorized to bind the other in any fashion (either through representations or actions) unless such act is specifically authorized and ratified by the other in writing. However, Client acknowledges and agrees Agency may act on the behalf of Client as contemplated by this Agreement.

**(7)(C) Integration; Modification; Waiver.** This Agreement constitutes the entire agreement between the parties regarding the subject matter contained in this Agreement and supersedes any other agreement between them, whether oral or written. Any modification to this Agreement must be in writing and signed by the party against which enforcement is to be sought. Failure by either party to act when required or to claim a breach of any provision of this Agreement will not be construed as a waiver of any subsequent breach.

**(7)(D) Governing Law.** This Agreement is governed by, and shall be construed in accordance with, the laws of Florida, both substantive and remedial, without reference to the choice of law principles. All suits and special proceedings arising out of this Agreement must be brought in the courts in and for Miami-Dade County, Florida. Each party agrees to the exercise of personal jurisdiction by any court of competent jurisdiction described above.

**(7)(E) Attorney's Fees and Costs.** In the event of any litigation arising out of or related to this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs incurred at all trial and appellate levels.

**(7)(F) Attachment; Counterparts; Notice; Captions.** Any addendum described in this Agreement is specifically incorporated into and made a part of this Agreement. This Agreement may be executed in two or more counterparts, each of which will constitute an original but taken together constitute an entire agreement. Any notice by this Agreement shall be delivered to Agency and to Client at the respective address and person designated below. The captions in this Agreement are provided for convenience only and are not part of the terms and conditions of this Agreement.

**(7)(G) Survival.** No termination or expiration of this Agreement affects or impairs any obligations, duties, indemnities, and liabilities shall not terminate or expire, but rather survive such termination or expiration and continue in full force and effect until the longer of (i) such time as all the obligations have been paid in full, or (ii) such time as is expressly provided in this Agreement.

**(8) Agency's Indemnification.** Agency agrees to indemnify, protect, defend, release, and hold harmless Client, its parent(s), subsidiaries, affiliates, directors, officers, and agents from and against any and all liability, expenses, losses, and claims for damages arising from or in connection with (i) any actions or inactions of the Worksite Employees, Agency's Corporate Employees, officers, directors, agents or independent contractors while under Agency's direction, supervision, or control; (ii) Agency's breach of this Agreement; or (iii) Agency's negligent, fraudulent, willful, or reckless performance or non-performance of any of its responsibilities described in this Agreement.

**(9) Term; Termination.** This Agreement has an initial one (1) year term starting on the Effective Date. After the first year, this Agreement renews automatically on its anniversary date for successive one year terms. Either party may terminate this Agreement by giving the other party thirty (30) days' written notice or may terminate it immediately and without prior notice for Cause, as defined below. Cause includes non-payment of any amount when due; a material violation of law; a breach of a material term of this Agreement; or Client's assigning Worksite

Employees to operations which contain a workers' compensation code different from that disclosed prior to executing this Agreement without Agency's prior consent. Upon termination, Agency has all rights and remedies available under law, whether in law or in equity, including but not limited to, and without further notice or demand to Client: (i) acceleration of all obligations, together with all accrued, unpaid charges, so that they are immediately due and payable and may be collected immediately regardless of the due date; and (iii) to set off and deduct any amount due from any account or deposit that Client may have with Agency or other monies to which Agency may be entitled from Client (including a letter of credit). Any termination shall not relieve Client of any obligation, including but not limited to, its payment obligation to Agency.

**(10) Notices.** All notices must be in writing and will be deemed to have been duly given and received 1). on the day delivered by hand to the addresses indicted below, 2). on the day delivered if delivered by overnight mail, or 3). On the day of transmission to the facsimile number provided by each party to the other or to such changed facsimile number as either party may have fixed by notice, provided the receipt of such facsimile is confirmed by telephone by a representative of the receiving party, if delivered by facsimile.

Agency and Client execute this Agreement, in their respective corporate names by their duly authorized officers, on the 26th day of FEBRUARY, 2018.

Creative Staffing

By: _A. Machado_
Name: ANN MACHADO
Title: CEO
Address: 7700 N. KENDALL DR.
City/State/Zip Code: MIAMI FL 33156
Federal I.D. Bar Number: _____

Client Company Name

By: _Jeffrey S. Ma_
Name: JEFFREY S. MASON
Title: CHIEF ADMINISTRATIVE OFFICER
Address: 5959 NW 7th ST.
City/State/Zip Code: MIAMI, FL. 33126
Federal I.D. Bar Number: 37-1744362

6

**SCHEDULE 3.13**

**INTELLECTUAL PROPERTY**

```
Schedule 3.13
```

All Intellectual Property of Seller

**<u>Internet domain names and websites:</u>**
www://miamimedicalcenter.com

**SCHEDULE 3.14(a)**

**EXISTING CONTRACTS**

Schedule 3.14(a)

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| 3E Company Environmental, Ecological and Engineering | Subscription Agreement | Executory Contract | Hotline for Environmental Emergencies | TBD |
| 3M Health Information Systems | | Executory Contract | Health Information Management- (Coding) Software | TBD |
| ABT Medical (Hamandi Corp) | | Executory Contract | Release of Medical Records Services | TBD |
| ACD Sign Language | | Executory Contract | Sign Language Provider for the Deaf Patient | TBD |
| Advanced Clinical Employment Staffing | | Executory Contract | Clinical Staffing Agency | TBD |
| Advanced Medical Resources, LLC | Services Agreement | Executory Contract | Clinical Staffing Agency | TBD |
| Aetna Health, Inc. | Hospital Services Agreement | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Aetna Health, Inc. (Coventry) | Rental Network Amendment to Hospital Services Agreement | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Aetna Health, Inc. (Coventry) | | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Alcon Laboratories, Inc. | Alcon Laboratories, Inc. Custom Pack Sales Agreement | Executory Contract | Vendor for Custom Surgical Packs for Ophthalmology Surgery | TBD |
| Alemany Building Solutions (Fire Alarm) | | Executory Contract | HVAC Controls and Fire Protection | TBD |
| All Better Bracing, LLC and Team Post OP | Partnership Program Service Agreement | Executory Contract | Orthotics and Prosthetics Service | TBD |
| Allied Monitoring Innovations, LLC d/b/a American Monitoring Innovations | Monitoring Services Agreement, (Per-Click Arrangement) | Executory Contract | Intraoperative Neurophysiological Monitoring Services Agreement | TBD |
| Alta Language Services, Inc. | Service Agreement (Per click, Billed by Usage) | Executory Contract | Translation Services | TBD |
| American College of Cardiology Foundation | Pacemaker Registry | Executory Contract | Pacemaker Registry Mandatory to Participate | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| American Horizon Financial | The Miami Medical Center Business Associate Agreement 2017 | Executory Contract | Personal Injury Funding Solution | TBD |
| Aramark (EVS) | Environmental Services Agreement | Executory Contract | Environmental Services Contract | TBD |
| Aramark (Food Services) | Food Services Agreement | Executory Contract | Food Services Contract | TBD |
| Aramark (Valet Services) | Valet Services Addendum | Executory Contract | Valet Services Addendum | TBD |
| Arthrex | | Executory Contract | Vendor Agreement for Orthopedic Total Joint Equipment | TBD |
| AvMed, Inc. d/b/a AvMed Health Plans | Outpatient Medical Services Agreement - Medicare Advantage, Medicare Advantage Prescription Drug Amendment | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Baxter Healthcare Corporation | | Executory Contract | Frozen Premix Tools | TBD |
| Baxter Healthcare Corporation | Temperature Control Equipment Agreement | Executory Contract | Vendor providing Temperature Control Equipment | TBD |
| Baxter Healthcare Corporation | Premier Healthcare Alliance, LP Letter of Participation (Exhibit L) | LOP | Purchasing Cooperative Contract | TBD |
| Bayshore Partners, LLC | | Executory Contract | Investment Banker providing Business Brokerage Services | TBD |
| BCBS of Florida | | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Bella Baby Photography | (Per-Click Arrangement) | Executory Contract | Baby Photography Services for OB Patients | TBD |
| Benefit Management | | Executory Contract | NueHealth Subsidiary which provides Claim Adjudication for Bundled Payment Contracts | TBD |
| Best Doctors | | Managed Care- International | Health Insurer- International | TBD |
| Boca Radiology (Radiologist) | | Executory Contract | Provided Radiology Reads via TeleRadiology, reimbursement for T-1 Line to Hospital | TBD |
| Bone Bank Allografts | Bone Bank Allografts Product Consignment & Service Fee Agreement | Executory Contract | Bone Bank Vendor for surgical allografts | TBD |
| BUPA | | Managed Care- International | Health Insurer- International | TBD |
| Cactus Software | | Executory Contract | Credentialing Software Cloud-based Provider | TBD |
| Cardinal Health 200, LLC | Schedule G Letter of Participation | Executory Contract | Vendor for Pharmaceuticals, Surgical Packs and Supplies | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| Cardinal Health Pharmacy Services, LLC | Pharmacy Services Agreement | Executory Contract | Vendor for night shift Pharmacist Services | TBD |
| CareFusion Solutions, LLC | Amendment to Master Agreement | Executory Contract | Pharmacy Carousel Purchase Agreement | TBD |
| CareFusion Solutions, LLC | Hospital Services Agreement | Executory Contract | BAA | TBD |
| Careplus | | Managed Care | Health Insurer- Domestic | TBD |
| Chemtreat (Boiler & Chiller Treatment) | | Executory Contract | Treats Boiler Water to Minimize Calcification | TBD |
| Cigna Healthcare of Florida, Inc. | Hospital Services Agreement (Managed Care) | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Citadel Outsource Group, LLC | The Miami Medical Center Business Office Services Agreement | Executory Contract | Master Patient Accounts Revenue Collection Agreement | TBD |
| Citadel Outsource Group, LLC | The Miami Medical Center Agreement Addendum | Executory Contract | Addendum to Citadel Master Agreement expanding the Scope of Services | TBD |
| CollectRX | | Executory Contract | Collections Company that specializes in Out of Network (OON) Collections | TBD |
| Comcast | | Executory Contract | Cable Feed for Patient Rooms | TBD |
| Comcast | Business Service Order Agreement | Executory Contract | Cable and Internet for MOB/Casitas | TBD |
| Corvel International Health Plan | | Managed Care- International | Health Insurer- International | TBD |
| Coventry Health Care Inc. (Aetna Subsidiary) | | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Creative Staffing | Creative Staffing Agreement | Executory Contract | Staffing Services for Bankruptcy Period | TBD |
| Digicel Parking Lot Lease | | Executory Contract | To provide Leased Parking space to a local business in need of parking | TBD |
| DP Landauer Medical Physics (Imaging Physics) | | Executory Contract | Physicist Services for radiology equipment calibration | TBD |
| Edge Information Management | | Executory Contract | Background Screening and Drug Testing for Pre-Employment | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| ESR Diagnostic | | Executory Contract | SED Rate Testing | TBD |
| Falck Southeastern Disaster & Evacuation (American Ambulance) | (Per Click Arrangement) | Executory Contract | Ambulance Services for Patient Transportation | TBD |
| Fifth Avenue CVO | | Executory Contract | Credentialing Verification Organization that provided Primary Source Verification Services | TBD |
| Fleishman-Hillard Inc. | | Executory Contract | Public Relations and Advertising Services Provider | TBD |
| Frost - Arnett | | Executory Contract | Collections Agent | TBD |
| Gallagher Bassett Services on behalf of The Florida College System Risk Management Consortium (FCSRMC) | Letter of Agreement | Managed Care- Domestic | Worker's Comp Manager for Miami-Dade Public Schools | TBD |
| Global Excel/Olympus Cost Containment | | Managed Care- International | Health Insurer- International | TBD |
| GMMI | | Managed Care- International | Health Insurer- International | TBD |
| Gregoria Arias Contractor | (Per Click Arrangement) | Executory Contract | Housekeeping Contractor for MOB/Casitas | TBD |
| Guardian Life of the Caribbean | | Managed Care- International | Health Insurer- International | TBD |
| Healthspring (Leon/Cigna) | Provider Services Agreement | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| HealthSun Health Plans, Inc. | Letter of Agreement Physician/Provider | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| Hologic (MA) LLC | Pricing Agreement | Executory Contract | Breast and GYN Surgical Products Vendor | TBD |
| Humana | | Managed Care- Domestic | Humana Insurer- Domestic | TBD |
| Intuitive Surgical, Inc. | Sales, License, and Service Agreement | Executory Contract | Sales and Service Agreement for the newer Xi DaVinci Robot | TBD |
| IPA | | Executory Contract | ScrubEx Linen Controlled Distribution System | TBD |
| KCI V.A.C. | KCI V.A.C. Ready-Care Program and Storage Agreement | Executory Contract | Wound Healing Vac System | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| Laser Surgical of Florida, Inc. | Laser Rental Agreement | Executory Contract | Surgical Laser Rental Agreement | TBD |
| LifeFlight - Nicklaus Children's Hospital | (Per Click Arrangement) | Executory Contract | Critical Condition Children Transport Agreement between NCH and TMMC | TBD |
| MCG Health | Access to Care Guidelines | Executory Contract | Access to Care Guidelines | TBD |
| MCHS Reimbursement Agreement | | Executory Contract | Agreement to reimburse NCH for their expenditures made to set up and maintain TMMC Information System | TBD |
| Mead Johnson Nutrition | | Executory Contract | Enfamil Baby Formula Provider | TBD |
| MedRevenue Solutions, LLC | (Per-Click Arrangement) | Executory Contract | Provider used to collect payment from Insurers using the PPACA and EMTALA regulations approach | TBD |
| Meridian Institute of Surgical Assisting, INC | (Per-Click Arrangement) | Executory Contract | Surgical Assistant Program Clinical Location Agreement- STFA Training | TBD |
| Miami Anesthesia Services | | Executory Contract | To arrange for the exclusive provision of anesthesia services, including overnight in-house call on a 24-7 basis | TBD |
| Miami Dade Ambulance | (Per-Click Arrangement) | Executory Contract | For access to Ambulance, Patient Transportation Services | TBD |
| MidFirst Bank | Assignment of Development and Management Agreement | Executory Contract | To Assign the Development and Management Agreement to MidFirst as the Secured Lender | TBD |
| Miriam Espinosa | (Per-Click Arrangement) | Executory Contract | Housekeeping Contract for MOB and Casitas | TBD |
| Misonix | Purchase Agreement for Bone Scalpel System | Executory Contract | Bone Scalpel System Purchase | TBD |
| Molina In-Patient Services, INC | Hospitalist Services Contract | Executory Contract | Dr. Molina et al Hospitalist Contract | TBD |
| National Distribution Service, Inc. | National Distribution Service Agreement | Executory Contract | Logistics and Warehousing contract | TBD |
| National Healthcare Solutions, Inc. [NHSI (VUMI)] | Participating Provider Agreement | Managed Care- International | Health Insurer- International | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| Neuro Surgical Resources, LLC dba Intact Pathways | Neurodiagnostic Services Agreement- (Per-Click Arrangement) | Executory Contract | Neuromonitoring Services Agreement | TBD |
| Nicklaus Children's Hospital | Information Services Management Agreement | Executory Contract | Management Services Agreement designed to allow NCH to provide TMMC with IT services, EMR (Cerner) and related network development and support. | TBD |
| Nueterra Equity Partners, LLC (Developer) via: Miami Hospital Holdings, LLC (Manager) | Development and Management Agreement | Executory Contract | Management Services Agreement designed to allow NueHealth to provide corporate management services to TMMC to include finance, human resources, managed care contracting, etc. | TBD |
| OneBlood Inc | | Executory Contract | Blood BankingContract with provider of Blood Banking Services | TBD |
| Orkin, LLC | Pest Control National Service Agreement | Executory Contract | Pest Control Services for hospital building and grounds, MOB, and Casitas | TBD |
| Paramount Refreshment Solutions, Inc. | Paramount Refreshment Solutions Equipment Rental Agreement | Executory Contract | Vending Services for the Hospital Deli and Cafeteria | TBD |
| Pershing Yoakley & Associates, P.C. | | Executory Contract | Accounting Firm from Atlanta, GA., who was hired to do a "black box" managed care analysis or contracts between TMMC and University of Miami (Uhealth) | TBD |
| PICC Lines Plus, LLC | (Per-Click Arrangement) | Executory Contract | Contract for PIC Line Placement services for the occasional patient that requires an intravenous PIC line. | TBD |
| Precision Lithotripsy of South Broward, LLC | Provider Service Agreement- (Per-Click Arrangement) | Executory Contract | Vendor who leases lithotripsy mobile equipment and personell. | TBD |
| Precyse (HIM) | | Executory Contract | Vendor who provides Health Information Management services to the facility to include medical records access for patients and coding services for proper billing. | TBD |
| Progressive Waste (Waste Management) | | Executory Contract | Contracted Waste Hauler who disposes of the non-medical waste. | TBD |
| Quality Health Management | | Managed Care- International | Qualit Insurer- International | TBD |
| Redbridge | | Managed Care- International | Redbri Insurer- International | TBD |
| Roche Diagnostics Corporation | Roche Diagnostics Corporation Encompass Agreement | Executory Contract | Vendor providing Laboratory products for the UM lab and pathology contract | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| Rovy Repair (Generator Maintenance) | | Executory Contract | Vendor providing installation and support/maintenance of Power Generators and Transfer Switches | TBD |
| Sanus | | Managed Care- International | Health Insurer- International | TBD |
| Scent Air | | Executory Contract | Provider of aromatherapy scent services for waiting areas of the facility. | TBD |
| Shred-it USA, LLC | Attachment B: GPO End User Agreement | Executory Contract | Confidential document disposal and mobile shredding services | TBD |
| Smith & Nephew, Inc. | Acknowledgement of Participation (to Hip/Knee Implant Pricing Program) | Executory Contract | Vendor for hip and knee total joint implants and related products | TBD |
| Specialty Care | (Per-Click Arrangement with Subsidy) | Executory Contract | Provider of surgical assisting services for surgical cases through PA's, SA's, and House Physicians | TBD |
| SPH Analytics | | Executory Contract | Vendor providing Patient Feedback Survey Services including collection and reporting | TBD |
| SRI Healthcare, LLC | Service Agreement | Executory Contract | Vendor supplying the Quality System Registrar that TMMC used for tracking quality programs. | TBD |
| SSI (Billing) | | Executory Contract | Vendor supplying the Electronic Claims Submission (ECS) of patient claims for payment from the health insurers. | TBD |
| Standard Register, Inc. d/b/a Taylor Communications | | Executory Contract | Marketing, Signs, and Graphics Vendor | TBD |
| Stericycle, Inc. | Premier National Master Service Agreement (Pharmaceutical Waste Disposal) as part of GPO Agreement effective 6/1/13 b/w Premier and Stericycle | Executory Contract | Master Service Agreement | TBD |
| Stericycle, Inc. | Premier National Master Service Agreement (Regulated Medical Waste Disposal) as part of GPO Agreement effective 6/1/13 b/w Premier and Stericycle | Executory Contract | Medical Waste Hauling and Disposal Contract | TBD |
| Stericycle, Inc. | Premier National Master Service Agreement (Sharps Agreement) as part of GPO Agreement effective 6/1/13 b/w Premier and Stericycle | Executory Contract | Containeers and Service Agreement to dispose of sharps contaminated with medical biohazards. | TBD |
| Stryker Instruments | Product Service Plan Agreement | Executory Contract | Service Plan Agreement for Stryker Equipment | TBD |
| Stryker Orthopedics | Acknowledgement of Participation (to Implant Pricing Program) | Executory Contract | Vendor providing total joint implants and instrumentation. | TBD |
| Stryker Sales Corporation | Equipment Usage Agreement | Executory Contract | Usage Agreement for Stryker surgical systems for orthopedics. | TBD |
| Suddath Relocation | National Distribution Service Agreement- (Per-Click Arrangement) | Executory Contract | Moving and Relocation Company | TBD |
| SunMed International | | Managed Care- International | SunMed Insurer- International | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| Surgi-Staff, Inc. | | Executory Contract | Staffing Agent for clinical staffing needs of the hospital. | TBD |
| Sysco, Inc. | | Executory Contract | Food Services Contract for dietary services | TBD |
| Tactical Management (Coding) | | Executory Contract | Vendor for Coding Consultants | TBD |
| Team Post-OP | Partnership Program Service Agreement | Executory Contract | Vendor for home-based DME (durable medical equipment). | TBD |
| The Stroud Group, Inc. | Procurement Agreement | Executory Contract | | TBD |
| TruBridge, LLC | | Executory Contract | Information Tech- EMR used for the Metropolitan medical records connection to the Rad server at TMMC. | TBD |
| UHS- Universal Hospital Services | | Executory Contract | Vendor providing biomedical engineering services for the electronic equipment of the hospital. | TBD |
| United - Neighborhood | | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| UnitedHealthcare Insurance Company, contracting on behalf of itself, United Healthcare of Florida, Inc. | Facility Participation Agreement | Managed Care- Domestic | Health Insurer- Domestic | TBD |
| University of Miami Pathology Services (Lab Service) | | Executory Contract | Laboratory Services for the hospital, outsourced to UHealth Lab | TBD |
| US Lawns (Landscaping) | | Executory Contract | Landscaping | TBD |
| Validity Screening Solutions | (Per-Click Arrangement) | Executory Contract | Background Checking and Drug Testing for HR pre-employment screening. | TBD |
| Variety Children's Hospital (Neonatology) | | Executory Contract | Neonatology Services | TBD |

**SCHEDULE 3.14(b)**

**EXISTING LEASES**

Schedule 1.1(iii) and 3.14(b)

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---|---|---|---|---|
| CareFusion Solutions, LLC | Master Agreement | Lease | Pyxis Pharmaceutical Services Unit Dose Vending Machines | TBD |
| De Lage Landen Financial Services, Inc. - Lessor<br>Carl Zeiss Meditec - Vendor | Microscope Lease | Lease | Operating Microscope Lease | TBD |
| DEX Imaging, Inc. | Lease Agreement (assigned to U.S. Bank) | Lease | Printer and Copier Lease from Dex but through US Bank | TBD |
| GE HFS, LLC (General Electric) | | Lease | 64 Slice LiteSpeed CT Lease | TBD |
| General Electric Capital Corporation | Master Lease Agreement dated as of 08/13/2015 | Lease | 1.5 Tesla MRI Lease | TBD |
| General Electric Capital Corporation | Equipment Schedule Dated as of 08/13/2015 to Master Lease Agreement Dated as of 08/13/2015 | Lease | CT Table Lease | TBD |
| HealthTronics Mobile Solutions, L.L.C. | Equipment and Service Rental Agreement- (Per Click Arrangement) | Lease | Litho, Cryo, HIFU rental vendor | TBD |
| Intuitive Surgical, Inc. | Use, License & Service Agreement | Lease | Lease of the older Si DaVinci Robot | TBD |
| Medtronic Surgical Technologies | Medtronic Surgical Technologies Capital Placement Program | Lease | Lease program to allow for equipment needed to do Medtronic placement | TBD |

| Parties | Name of Contract/Lease | Contract Type | Purpose of Contract | Cure Amount |
|---------|------------------------|---------------|---------------------|-------------|
| Olympus America, Inc. | | Lease | Master Lease Agreement for leased Olympus Equipment | TBD |
| Olympus America, Inc. | Fixed Periodic Payment Schedule No. 001 to Master Lease Agreement No. 0016716 | Lease | Periodic Payment Schedule 001 | TBD |
| Olympus America, Inc. | Fixed Periodic Payment Schedule No. 002 to Master Lease Agreement No. 0016716 | Lease | Periodic Payment Schedule 002 | TBD |
| Olympus America, Inc. | Fixed Periodic Payment Schedule No. 003 to Master Lease Agreement No. 0016716 | Lease | Periodic Payment Schedule 003 | TBD |
| Piramal Critical Care, Inc. | Sevoflurane Vaporizer Agreement | Lease | Lease Agreement for SevoFlurane Vaporizers | TBD |
| Pitney Bowes | Pitney Bowes Lease Agreement | Lease | Agreement to lease and intermittently fill postage machine with U.S. postage. | TBD |
| Stericycle, Inc. | Exhibit H-4 Premier National Master Lease Agreement (Hazardous Waste Disposal) as part of GPO Agreement effective 6/1/13 b/w Premier and Stericycle | Lease | Lease for Medical Waste Disposal Equipment | TBD |
| U.S. Bank | See Dex Imaging Lease above which was assigned to U.S. Bank per WD 2071709 | Lease | Lease for copiers and printers from Dex Imaging | TBD |
| Variety Children's Hospital, Inc. | Amended and Restated Lease Agreement (assignment of Lease between HC-5959 and Variety Children's Hospital) | Lease | Real Estate Building and Property Lease | TBD |

**EXHIBIT 2.1**

**BID PROCEDURES ORDER**

Exhibit 2.1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]          Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                      Chapter 11

        Debtor.
_____/

**ORDER (A) APPROVING BIDDING PROCEDURES;
(B) APPROVING CERTAIN PROTECTIONS TO STALKING HORSE PURCHASER;
(C) APPROVING FORM AND MANNER OF NOTICES; (D) APPROVING
FORM OF ASSET PURCHASE AGREEMENT; (E) AUTHORIZING THE SALE OF
ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (F)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (G)  SCHEDULING DATES**

---

[1]The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

## TO CONDUCT AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE; AND (H) GRANTING RELATED RELIEF

**THIS CAUSE** came before the Court on April ___, 2018 at __:__ _.m., upon the motion (the "Motion") of the above-captioned debtor in possession (the "Debtor") for entry of an order (A) approving  Bidding Procedures,[2] substantially in the form attached hereto as **Exhibit 1**, (B) approving certain protections to Variety Children's Hospital, d/b/a Nicklaus Children's Hospital, a Florida non-profit corporation (the "Stalking Horse Purchaser"), (C) approving form and manner of notices, (D) approving form of asset purchase agreement, (E)   authorizing the sale of substantially all of the Debtor's Assets free and clear of all liens, claims, encumbrances and other interests, (F) authorizing the assumption and assignment of certain executory contracts and unexpired leases, (G) scheduling dates to conduct an auction and hearing to consider final approval of sale, and (H) certain related relief (this "Bidding Procedures Order"); and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is

**FOUND, CONCLUDED AND DETERMINED THAT**:

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

---

[2]Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Asset Purchase Agreement, or the Bidding Procedures, as applicable.

B.     The Court has jurisdiction over the Motion and the transactions contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"); Bankruptcy Rules 2002(a)(2), 6004, and 6006; and Rules 2002-1(C)(2), 6004-1, and 6006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Florida (the "Local Bankruptcy Rules").

D.     Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein with respect to the Sale Hearing.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

E.     The Debtor's proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the sale of substantially all of the Debtor's Assets, the Bidding Procedures to be employed in connection therewith, and the Sale Hearing.

F.     The Cure Notice (defined below) attached hereto as **Exhibit 2** is reasonably calculated to provide all non-Debtor counterparties (the "Contract Parties") to the Debtor's executory contracts and unexpired leases (each a "Contract or Lease" and, collectively, the "Contracts and Leases") with proper notice of the potential assumption and assignment of their executory contract or unexpired lease and any Cure Amounts (defined below) relating thereto, although the mere listing of any executory contract or unexpired lease on the Cure Notice does

3

not require or guarantee that such executory contract or unexpired lease will be assumed and assigned, and all rights of the Debtor with respect to such Contracts and Leases are reserved.

G.    The Debtor has articulated good and sufficient reasons for the Court to: (1) approve the Bidding Procedures; (2) set the Sale Hearing and approve the manner of notice of the Motion and the Sale Hearing; (3) approve the procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assigned Contracts"), including notice of proposed Cure Amounts (defined below); and (4) approve the Break-Up Fee as provided in the Asset Purchase Agreement and in this Bidding Procedures Order.

H.    The Break-Up Fee to be paid under the circumstances described herein to the Stalking Horse Purchaser (1) is an actual and necessary cost of preserving the Debtor's estate within the meaning of Bankruptcy Code section 503(b); (2) is commensurate to the real and substantial benefits conferred upon the Debtor's estate by the entry of the Stalking Horse Purchaser into the Asset Purchase Agreement; and (3) is reasonable and appropriate in light of the size and nature of the proposed transaction, the commitments that have been made and the efforts that have been or will be expended by the Stalking Horse Purchaser.

I.    The Debtor has demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee to the Stalking Horse Purchaser under the circumstances, timing and procedures set forth in the Motion.

J.    The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

K.    The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Assets.

L.    The proposed sale of the Assets is consistent with section 363(b)(1)(A) of the

Bankruptcy Code and the Debtor's existing privacy policy, and no consumer privacy ombudsman is necessary in connection with the sale or sales of the Debtor's Assets.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    The Motion is GRANTED to the extent set forth herein.

2.    Any and all objections and responses to the Motion that have not been withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

3.    The Bidding Procedures, attached hereto as **Exhibit 1**, are hereby approved in all respects and shall govern all bid and bid proceedings relating the sale of the Debtor's Assets. The Debtor is authorized to take any and all actions necessary to implement the Bidding Procedures.

4.    The failure specifically to include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impact the effectiveness of such procedure, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

5.    The Debtor may pursue a sale of the Assets and enter into the transactions contemplated by the Asset Purchase Agreement by conducting an Auction in accordance with the Bidding Procedures.

6.    The Bid Deadline is [_____].    All Potential Bidders are required to provide copies of their bids so as to be received by the following parties on or before the Bid Deadline: [INSERT PARTIES].

7.    The Auction, if necessary under the Bidding Procedures, shall take place on [_____] **at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtor,

5

Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, or such other place and time as the Debtor shall notify all Qualified Bidders, including, without limitation, the Stalking Horse Purchaser, counsel for the Stalking Horse Purchaser and other invitees.  The Auction shall be conducted in accordance with the Bidding Procedures.

8.  The Sale Hearing shall be held before the Court on **[_____ at __:_0 _.m. (prevailing Eastern Time)]**.

9.  Objections, if any, to the sale of the Assets and the transaction contemplated by the Asset Purchase Agreement, or the relief requested in the Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on **[_____]** (the "Sale Objection Deadline"); and be served such that they are actually received by the Sale Objection Deadline to:  (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn:  Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500,  Miami, Florida 33131, Attn: Joshua Kaye, Esq., Thomas Califano, Esq., and Rachel Nanes, Esq.,; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

10. The Stalking Horse shall constitute a Qualified Bidder (as defined in the Bidding Procedures) for all purposes and in all respects with regard to the Bidding Procedures.   The

Stalking Horse is permitted to credit bid the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code.

11. The Debtor is hereby authorized, in the exercise of its sound business judgment, to pay the Stalking Horse, as set forth in the Asset Purchase Agreement and pursuant to the Bidding Procedures, and the Break-Up Fee, subject to the terms of this Bidding Procedures Order and the Asset Purchase Agreement. The payment of the Break-Up Fee shall be conditioned on the consummation of a sale to a party that is not the Stalking Horse Purchaser.

12. The notice of the proposed sale of the Debtor's Assets, substantially in the form attached hereto as **Exhibit 3** (the "Sale Notice), is hereby approved.

13. On or before three (3) business days after entry of this Bidding Procedures Order, the Debtor will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following: (a) all creditors or their counsel known to the Debtor to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Assets; (b) the U.S. Trustee; (c) the creditors listed on the Debtor's list of 20 largest unsecured creditors; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtor or recording offices or any other governmental authorities that, as a result of the sale of the Assets, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Assets or have any known interest in the relief requested by the Motion; (e) counsel to the Stalking Horse Purchaser; (f) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (g) all parties to any litigation involving the Debtor; (h) all Contract Parties of the Debtor; and (i) all potential Bidders previously identified or otherwise known to the Debtor.

14. The notice of potential assumption and assignment of the Contracts and Leases, substantially in the form attached hereto as **Exhibit 2** (the "Cure Notice"), is hereby approved.

15. On or before ten (10) business days after the entry of this Bidding Procedures Order, the Debtor shall serve by first class mail, overnight delivery, facsimile or electronic mail, as the case may be and in the Debtor's sole discretion, the Cure Notice on all Contract Parties.  The Cure Notice shall identify the Contracts and Leases and provide the corresponding cure amounts that the Debtor believes must be paid to cure all prepetition defaults under the Contracts and Leases (the "Cure Amounts").

16. Unless the Contract Party to any Contract or Lease files an objection to its scheduled Cure Amount or to the assumption and assignment of a Contract or Lease, and serves a copy of the such objection so as to be received no later than the Sale Objection Deadline to:  (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn:  Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131, Attn: Joshua Kaye, Esq., Thomas Califano, Esq. and Rachel Nanes, Esq.; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman; such Contract Party shall be forever barred and estopped from objecting (1) to the Cure Amount and from asserting that any additional amounts are due or defaults exist, (2) that any conditions to assumption and assignment must be satisfied under such Contract or Lease before it can be assumed and assigned or that any required consent to assignment has not been given or (3) that the Stalking Horse Purchaser has not provided adequate assurance of future performance.

17. In accordance with the Bidding Procedures, promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall announce the Successful Bid and shall file with the Bankruptcy Court a notice of the Successful Bid and Successful Bidder.  Only if the Stalking Horse Purchaser is not the Successful Bidder for the Debtor's assets, the Contract Parties shall have until the Sale Hearing to object to the assumption and assignment of a Contract or Lease solely on the issue of whether the Successful Bidder (if not the Stalking Horse Purchaser) can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (each an "Adequate Assurance Objection"); provided, however, that if the Stalking Horse Purchaser is the sole Successful Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline.  All objections to the assumption and assignment of Contracts and Leases that do not relate to the issue of whether the Successful Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

18. In the event of a timely filed objection and dispute regarding:  (a) any Cure Amount with respect to any of the Contracts and Leases; (b) the ability of the Successful Bidder (including the Stalking Horse Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under a Contract or Lease; or (c) any other matter pertaining to assumption, the Cure Amount shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Contract of Lease; provided, however, that the Debtor is authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder (including the Stalking Horse Purchaser) without any further notice to or action, order or approval of the Court.

9

19. Within five (5) business days after the Closing Date, the Debtor will file a complete list of the Contracts and Leases that were assumed and assigned as Assigned Contracts, as of the Closing Date, in connection with the sales of the Assets.

20. The Auction and/or Sale Hearing may be continued by the Debtor from time to time, for an aggregate period of up to five business (5) days without further notice to creditors or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for the Sale Hearing.

21. Except as otherwise provided in the Asset Purchase Agreement or this Bidding Procedures Order, the Debtor's rights are reserved, as they may reasonably determine to be in the best interests of its estate, to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtor and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures or implement additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement. Notwithstanding the foregoing, the Stalking Horse Purchaser shall be deemed a Qualified Bidder and shall be entitled to credit bid the Credit Bid Amount in the Sale.

22. To the extent that any Chapter 11 plan confirmed in this case or any order confirming any such plan or any other order in this case (including any order entered after any conversion of this case to a case under Chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding Procedures Order shall control, including, without limitation, provisions related to the payment of the Break-Up Fee to the Stalking Horse Purchaser.  The Debtor's obligations under this Bidding Procedures Order, the provision of this Bidding Procedures Order and the portions of the Asset Purchase Agreement pertaining to the Bidding Procedures (including all obligations to pay the Expense Reimbursement) shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtor, and the reorganized or reconstituted Debtor, as the case may be, after the effective date of a confirmed plan in the Debtor's case (including any order entered after any conversion of this case to a case under Chapter 7 of the Bankruptcy Code).

23. Notwithstanding anything to the contrary contained herein, (1) any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtor under any order approving debtor-in-possession financing (a "DIP Order"), and (2) any claim for which payment is authorized pursuant to this Order that is treated as an administrative expense of the Debtor's estate shall be and is subject and subordinate to any and all claims, liens, security interests, and priorities granted to the Lender (as defined in the DIP Order) in accordance with and subject to the terms of the applicable DIP Order, and payment on any such claim shall be subject to any and all restrictions on payments in the DIP Order and any other order of the Court.

24. The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Bidding Procedures Order shall be effective immediately upon its entry.

25. All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26. The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the motion.

27. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Bidding Procedures Order.

###

**Submitted By:**
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
Attorneys for Debtor-in-Possession
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone:     (305) 358-6363
Telefax:        (305) 358-1221

**Copies Furnished To:**
Peter D. Russin, Esquire, is directed to serve copies of this Order on all parties in interest and to file a Certificate of Service.

## **EXHIBIT 1**

**Bidding Procedures**

## BIDDING PROCEDURES[1]

By the Motion dated March [__], 2018, Miami International Medical Center, LLC d/b/a The Miami Medical Center (the "Debtor"), sought approval of, among other things, the procedures through which it will determine the highest or otherwise best price for the sale of substantially all of its assets (the "Assets") described in the Asset Purchase Agreement by and among, Variety Children's Hospital d/b/a Nicklaus Children's Hospital, as purchaser (the "Stalking Horse Purchaser"), and the Debtor, as seller, dated as of March [__], 2018 (the "Asset Purchase Agreement"), a copy of which is attached as **Exhibit C** to the Motion.

On [_____], 2018 the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtor to determine the highest or otherwise best price for the Assets through the process and procedures set forth below (the "Bidding Procedures").

## Marketing Process

(a)     Contact Parties:  The Debtor, in consultation with Bayshore, will develop a list of parties (in addition to the Stalking Horse Purchaser) who the Debtor and Bayshore believe may potentially be interested in consummating a competing transaction for the Assets (any such transaction, an "Alternative Transaction") and have the financial ability to do so, which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties").  The Debtor and Bayshore will contact the Contact Parties to explore their interest in pursuing an Alternative Transaction. The Contact Parties may include parties whom the Debtor or its advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction.  The Debtor will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b)     Information Package:  The Debtor may distribute to each Contact Party an "Information Package," comprising:

(i)      A cover letter;

(ii)     A copy of these Bidding Procedures and the Motion;

(iii)    A copy of a confidentiality agreement; and

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion for approval of, among other things, these Bidding Procedures or in the Asset Purchase Agreement, as applicable.

1

(iv)     Such other materials as the Debtor and Bayshore deem appropriate under the circumstances including, but not limited to, preliminary "teaser" information.

(c)     <u>Access to Diligence Materials</u>:  To receive access to due diligence information (the "<u>Diligence Materials</u>"), a party must submit to the Debtor an executed confidentiality agreement in the form and substance satisfactory to the Debtor and the Debtor shall have a reasonable basis to believe that the party has the financial capability to consummate an Alternative Transaction. A party who qualifies for access to Diligence Materials shall be a "<u>Preliminary Interested Buyer</u>."  All due diligence requests must be directed to Bayshore.

(d)     <u>Due Diligence from Bidders</u>: Each Preliminary Interested Buyer and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtor or its advisors regarding such Bidder and its contemplated transaction.  Failure by a Preliminary Interested Investor to comply with requests related to due diligence access will be a basis for the Debtor to determine that such bidder is not a Qualified Bidder.  Failure by a Qualified Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access will be a basis for the Debtor to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

## **Auction Qualification Process**

(a)     To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtor to satisfy each of the conditions set forth below.  A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

(i)     <u>Good Faith Deposit</u>:  Each Bid must be accompanied by a deposit in the amount of $1,500,000 to an non-interest-bearing escrow account to be identified and established by the Debtor (the "<u>Good Faith Deposit</u>").  The Stalking Horse Purchaser shall not be required to submit a Good Faith Deposit.

(ii)     <u>Bids for Portions of Debtor's Assets</u>:  A Bid may offer to purchase all or substantially all of the Debtor's Assets or only a portion of the Debtor's Assets; <u>provided</u> that the Debtor determine, in its sole discretion, that the aggregate consideration offered by any Bid or combination of Bids for all or substantially all of the Debtor's assets satisfies the "Minimum Bid" requirements set forth in clause (v) below.

(iii)     <u>Same or Better Terms</u>:  Each Bid must be on terms that, in the Debtor's business judgment, are the same or better than the terms of the Asset Purchase Agreement.

2

(iv)    <u>Executed Agreement</u>:  Each Bid must be based on the Asset Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "<u>Modified Purchase Agreement</u>").  A Bid shall also include a copy of the Asset Purchase Agreement marked against the Modified Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove all provisions that apply only to the Stalking Horse Purchaser).

(v)    <u>Minimum Bid</u>: A Bid or any combination of Bids for all or substantially all of the Debtor's Assets must propose a minimum purchase price equal to or greater than $**[XX]** in cash, which amount would equal the Credit Bid Amount of the Stalking Horse Purchaser and include an additional $150,000, plus any Assumed Liabilities, plus any adjustments required, if applicable, necessary to pay all transaction fees (including to the Debtor's Investment Banker) to the extent the sale to an entity other than the Stalking Horse Purchaser produces insufficient cash to pay such transaction fees.

(vi)    <u>Designation of Assigned Contracts and Leases</u>: A Bid must identify any and all executory contracts and unexpired leases of the Debtor that the Bidder wishes to have assumed and assigned to it at closing pursuant to an Alternative Transaction.

(vii)    <u>Assumption of Liabilities</u>:  A Bid must provide for the payment or assumption of at least all or substantially all of the Assumed Liabilities.

(viii)    <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Alternative Transaction; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternative Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Alternative Transaction by the equity holder(s) of such Bidder.

(ix)    <u>Proof of Ability to Perform</u>: A Bid must include written evidence that the Debtor concludes in its sole discretion (in consultation with its advisors) demonstrates that the Bidder has the ability to close the Alternative Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternative Transaction. Such information must include, inter alia, the following:

3

a. contact names and numbers for verification of financing sources;

b. evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments to close the Alternative Transaction;

c. evidence of the Bidder's ability to satisfy regulatory and licensing requirements;

d. the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtor; and

e. any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Bidder has the ability to close the Alternative Transaction.

(x) <u>Contingencies</u>: Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtor than those set forth in the Asset Purchase Agreement and (b) may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(xi) <u>Irrevocable</u>: Each Bid must be irrevocable through the Auction date, <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid at the Auction, such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(xii) <u>Bid Deadline</u>: The following parties must receive a Bid in writing, on or before **[two business days before the Auction] at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"): (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn: Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131, Attn: Joshua Kaye, Esq., Thomas Califano, Esq. and Rachel Nanes, Esq.; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

*A Bid received from a Bidder before the Bid Deadline that meets the above requirements for the applicable assets shall constitute a "<u>Qualified Bid</u>" for such assets, and such Bidder shall constitute a "<u>Qualified Bidder</u>" for such assets.* Notwithstanding anything

4

herein to the contrary, the Asset Purchase Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder. In addition, the Stalking Horse Purchaser will receive a copy of any Bids submitted to the Debtor, and the Debtor shall inform counsel to the Stalking Horse Purchaser whether the Debtor will consider such Bids to be Qualified Bids no later than three (3) days prior to the Auction.

## Auction

If one or more Qualified Bids for the Debtor's assets (other than the Asset Purchase Agreement submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Debtor will conduct an Auction to determine the highest and best Qualified Bid or combination of Qualified Bids for any of the Debtor's Assets. This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate and may include, among other things, the following: (a) the amount and nature of the consideration; (b) the number, type, and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale or sales of the Debtor's Assets and the cost to Debtor of such modifications or delay; (d) the total consideration to be received by Debtor; (e) the likelihood of the Bidder's ability to close a transaction, obtain necessary regulatory and licensing approvals and the timing thereof; and (f) the net benefit to the Debtor's estate (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtor may determine not to conduct the Auction. Unless otherwise agreed to by the Stalking Horse Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

## Procedures for Auction

The Auction shall take place on **[_____] at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, or such other place and time as the Debtor shall notify all Qualified Bidders, including, without limitation, the Stalking Horse Purchaser, counsel for the Stalking Horse Purchaser and other invitees. The Auction shall be conducted according to the following procedures:

Only the Debtor, Bayshore, the Stalking Horse Purchaser, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction in person, and only the Stalking Horse Purchaser and any other Qualified Bidders will be entitled to make any Bids at the Auction.

(b)    The Debtor Shall Conduct the Auction: The Debtor and its professionals shall direct and preside over the Auction. Other than as expressly set forth herein, the Debtor may conduct the Auction in the manner it determines will result in the highest, best, or otherwise financially superior offer for the Debtor's Assets. At the start of the Auction, the Debtor shall describe the terms of the highest and best Qualified Bid or Qualified Bids received prior to the Bid Deadline (each such highest and best Qualified Bid, the "Auction Baseline Bid"). Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any

5

collusion with respect to the bidding or sale of any of the assets described herein and (b) has reviewed and understands and accepts the Bidding Procedures.

(i) <u>Terms of Overbids</u>:  An "<u>Overbid</u>" is any bid made at the Auction subsequent to the Debtor's announcement of the respective Auction Baseline Bid for such Auction.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(ii) <u>Minimum Overbid Increments</u>:  Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $100,000.  Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration.

(iii) <u>Stalking Horse Purchaser May Credit Bid</u>:  The Stalking Horse Purchaser shall be permitted to bid at the Auction, if any, and shall be permitted to credit bid the Credit Bid Amount pursuant to any Overbid in connection with each round of bidding in the Auction.

(iv) <u>Remaining Terms Are the Same as for Qualified Bids</u>:  Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, <u>provided</u>, <u>however</u>, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtor accept a higher Overbid.

At the Debtor's discretion, to the extent not previously provided (which shall be determined by the Debtor), a Bidder submitting an Overbid at any Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Bidder's ability to close the Alternative Transaction proposed by such Overbid.

(v) <u>Announcement of Overbids</u>:  The Debtor shall announce at the Auction the material terms of each Overbid.

(vi) <u>Consideration of Overbids</u>:  The Debtor reserves the right, in its reasonable business judgment, to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Debtor and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternative Transaction at the prevailing Overbid amount.

6

(c)    <u>Backup Bidder</u>:    Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Bidder or Bidders with the next highest or otherwise best Bid or combination of Bids at the Auction, as determined by the Debtor, in the exercise of its business judgment, will be designated as the potential backup bidder (collectively, the "<u>Potential Backup Bidder</u>").    In the event that a Bidder or Bidders other than the Stalking Horse Purchaser are identified by the Debtor as the Potential Backup Bidder, such Bidder or Bidders shall be required to serve as the backup bidder or backup bidders (collectively, the "<u>Backup Bidder</u>").   Except for the Stalking Horse Purchaser, the Backup Bidder shall be required to keep its initial Bid or combination of Bids (or if the Backup Bidder submitted one or more Overbids at the Auction, the final respective Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the date of the Auction (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder, which is later.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Debtor may designate the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction or transactions, with the Backup Bidder without further order of the Bankruptcy Court.   In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder.   The deposit of the Backup Bidder shall be held by the Debtor until the earlier of 72 hours after (i) the closing of the transaction or transactions with the Successful Bidder and (ii) the Outside Backup Date.

(d)    <u>Additional Procedures</u>:    The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.

(e)    <u>Consent to Jurisdiction as Condition to Bidding</u>:  The Stalking Horse Purchaser, all Qualified Bidders, and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtor, this chapter 11 case, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternative Transaction documents and waived any right to a jury trial in connection with any disputes relating to the Debtor, this Chapter 11 case, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of any Alternative Transaction documents.

(f)    <u>Sale Is As Is/Where Is</u>:  The Assets of the Debtor sold pursuant to the Bidding Procedures, shall be conveyed at Closing in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTIES**

7

**WHATSOEVER, EXPRESS OR IMPLIED,**" as further detailed in the Asset Purchase Agreement.

(g)    <u>Closing the Auction</u>:  The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids for the Assets of the Debtor sold pursuant to the Bidding Procedures that the Debtor determines in its reasonable business judgment, after consultation with its financial and legal advisors, is the highest and best Qualified Bid at the Auction for the Assets.  Thereafter, the Debtor shall select one Qualified Bid, which produces the highest and best recovery to the estate, as the overall highest and best Qualified Bid (the "<u>Successful Bid</u>," and each Bidder submitting such Successful Bid, a "<u>Successful Bidder</u>").  In making this decision, the Debtor, in consultation with its financial and legal advisors, shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder for the Debtor's Assets submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

### Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in one or more non-interest-bearing escrow accounts by the Debtor, but shall not become property of the Debtor's estate absent further order of the Court.  The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing.  The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the respective Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder for the Assets and (b) the Outside Backup Date.  If a Successful Bidder timely closes its winning transaction, its Good Faith Deposit shall be credited towards the purchase price.

### Reservation of Rights

Except as otherwise provided in the Asset Purchase Agreement, the Bidding Procedures or the Sale Order, the Debtor further reserves the right as it may reasonably determine to be in the best interest of its estate, to:   (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtor and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court

8

without further notice; and (i) modify the Bidding Procedures or implement additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.  Notwithstanding the foregoing, the Stalking Horse Purchaser shall be a Qualified Bidder and shall be entitled to credit bid the Credit Bid Amount.

Dated [_____]

<div style="margin-left:40%">

s/ Peter D. Russin
Peter D. Russin, Esquire
Fla. Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Fla. Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Counsel for Debtor in Possession*

</div>

**<u>EXHIBIT 2</u>**

**Cure Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]            Case No. 18--12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                      Chapter 11

    Debtor.

_____/

## NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES[2]

**PLEASE TAKE NOTICE** that on March **[___]**, 2018, Miami International Medical Center, LLC d/b/a The Miami Medical Center (the "Debtor"), filed a motion [ECF No. **[XX]**] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") which seeks approval of key dates, times and procedures related to the sale of substantially all of the Debtor's Assets (the "Assets") to Variety Children's Hospital d/b/a Nicklaus Children's Hospital (the "Stalking Horse Purchaser") contemplated by the Asset Purchase Agreement. On **[_____]**, 2018, the Bankruptcy Court approved the Bidding Procedures. On **[_____]**, 2018, the Debtor intends to seek approval of, among other things, the sale of the Assets, including the assumption and assignment of certain executory contracts and unexpired leases. To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bidding Procedures shall control.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH THE DEBTOR AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.[3]**

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures, the Debtor **may** assume and assign to the Stalking Horse Purchaser the executory contract(s) or unexpired lease(s) listed on **<u>Exhibit A</u>** attached hereto (each, an "Assigned Contract") to which you are a counterparty. The Debtor has conducted a review of its books and records and has determined that the cure amount for unpaid monetary obligations under such Assigned Contract

---

[1]    The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Bidding Procedures Order, as applicable.

[3]    This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases. This Notice is <u>not</u> an admission by the Debtor that such contract or lease is executory or unexpired.

1

is as set forth on **Exhibit A** attached hereto (the "Cure Amount"). **If you disagree with the proposed Cure Amount, object to the proposed assignment to the Stalking Horse Purchaser of the Assigned Contract(s) or object to the Stalking Horse Purchaser's ability to provide adequate assurance of future performance with respect to any Assigned Contracts, you must file an objection with the Bankruptcy Court no later than 4:00 p.m. (prevailing Eastern Time) on [_____](the "Objection Deadline") and serve such objection upon:** (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn: Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, Joshua Kaye, Esq., Thomas Califano, Esq., and Rachel Nanes, Esq., DLA Piper LLP (US), 200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

**PLEASE TAKE FURTHER NOTICE** that the Debtor proposes that if no objection to (a) the Cure Amount(s), (b) the proposed assignment of the Assigned Contract(s) to the Stalking Horse Purchaser or (c) adequate assurance of the Stalking Horse Purchaser's ability to perform is filed by Objection Deadline, (1) you will be deemed to have stipulated that the Cure Amount(s) as determined by the Debtor is correct, (2) you shall be forever barred, stopped, and enjoined from asserting any additional cure amount under the Assigned Contract(s) and (3) you will be forever barred from objecting to the assignment of the Assigned Contract(s) to the Stalking Horse Purchaser.

**PLEASE TAKE FURTHER NOTICE** that, promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder. In the event the Stalking Horse Purchaser is not the Successful Bidder at the Auction, any counterparty to an Assigned Contract shall have the right to object to the Successful Bidder's ability to perform on or before the Sale Hearing scheduled for [_____] at [\_\_\_\_\_] **(prevailing Eastern Time)**. To the extent such counterparty does not object in accordance herewith, the Bankruptcy Court may enter an order forever barring such counterparty to an Assigned Contract from objecting to the adequate assurance of the Successful Bidder's ability to perform.

**PLEASE TAKE FURTHER NOTICE** that with respect to any Assigned Contract assumed and assigned to the Successful Bidder (including the Stalking Horse Purchaser), no assumption and assignment or rejection shall be effective until the filing of a Notice of Closing and Contract Treatment, which shall be filed within two (2) days after Closing. In addition, the assumption of each such Assigned Contract may be conditioned upon the disposition of all issues with respect to such Assigned Contract.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures, with respect to any Assigned Contract, in the event of a dispute regarding: (a) the amount of any Cure Amount; (b) the ability of the Successful Bidder (including the Stalking Horse Purchaser) to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under such Assigned Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Assigned Contract; provided, however, that the Debtor may settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder

(including the Stalking Horse Purchaser) without any further notice to or action, order or approval of the Bankruptcy Court.

**PLEASE THAT FURTHER NOTICE THAT** notwithstanding anything herein, this Notice shall not be deemed to be an assumption, adoption, rejection or termination of the Assigned Contracts. Moreover, the Debtor explicitly reserves its rights, in its sole discretion, to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and nothing herein (a) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority or amount of any claims of a counterparty to an Assigned Contract against the Debtor that may arise under such Assigned Contract, (b) creates a postpetition contract or agreement, or (c) elevates to administrative expense priority any claims of an counterparty to an Assigned Contract against the Debtor that may arise under such Assigned Contract.

Dated [_____]

<div style="text-align:right">

s/ Peter D. Russin
Peter D. Russin, Esquire
Fla. Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Fla. Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Counsel for Debtor in Possession*

</div>

## **EXHIBIT A**

[Counterparty Name]                    [Contract/Lease]                              Cure Amount

## **EXHIBIT 3**

**Sale Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

MIAMI INTERNATIONAL MEDICAL CENTER, LLC[1]          Case No. 18-12741-LMI
d/b/a THE MIAMI MEDICAL CENTER,                      Chapter 11

     Debtor.

_____/

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.  On March **[__]**, 2018, Miami International Medical Center, LLC d/b/a The Miami Medical Center (the "Debtor"), filed a motion for entry of an order (the "Bidding Procedures Order"), among other things, (a) approving Bidding Procedures[2] for the sale of substantially all of the assets owned by the Debtor (the "Assets"), as described in the Asset Purchase Agreement by and between Variety Children's Hospital d/b/a Nicklaus Children's Hospital (the "Stalking Horse Purchaser") and the Debtor, dated as of **[_____]**, 2018 (the "Asset Purchase Agreement"); (b) approving the Asset Purchase Agreement and payments thereunder; (c) approving the form and manner of notice of the Auction on the Assets and the Sale Hearing; (d) approving procedures relating to the assumption and assignment of contracts and leases; and (e) scheduling a sale hearing (the "Sale Hearing") to consider the sale of the Assets and setting objection and bidding deadlines with respect to the Sale. The motion additionally requests entry of an order (the "Sale Order") approving (1) the sale of the Assets free and clear of liens, claims, encumbrances and interests contemplated by the Asset Purchase Agreement; (2) assumption and assignment of certain executory contracts and unexpired leases; and (3) certain related relief.

2.  On April **[_____]**, 2018, the United States Bankruptcy Court for the Southern District of Florida entered the Bidding Procedures Order [ECF No. ___]. Pursuant to the Bidding Procedures Order, the Auction for the Assets shall take place on **[_____]**, 2018 **at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, or such other place and time as the Debtor shall notify all Qualified

---

[1]   The Debtor's current mailing address is 5959 NW 7 St, Miami, FL 33126 and its EIN ends 4362.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion.

Bidders, including, without limitation, the Stalking Horse Purchaser.  Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding Procedures Order as **Exhibit 1**, by no later than **[_____],** 2018 **at 4:00 p.m. (Eastern Time)** (the "Bid Deadline") may participate at the Auction.  Any party that wishes to take part in this process and submit a bid for the Assets must submit a competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.  Parties interested in receiving information regarding the sale of the Assets should contact the Debtor's investment bankers, Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn:  Scott Saunders and Steve Zuckerman, telephone (954) 358-3800 x302 for Scott Saunders and x308 for Steve Zuckerman, and email addresses   ssaunders@farlieturner.com   and szuckerman@farlieturner.com.

3.     The Sale Hearing to consider approval of the Sale of the Assets to the Stalking Horse Purchaser or to a Successful Bidder (as defined in the Bidding Procedures) free and clear of all liens, claims and encumbrances will be held before the Honorable **[_____]**, United States Bankruptcy Judge, **[_____]**, Courtroom No. **[___]** Miami, Florida 33131 on **[_____]**, 2018 **at [_____] (prevailing Eastern Time)**, **[or at such earlier date as counsel may be heard]**. The Sale Hearing may be continued from time to time without further notice to creditors or parties in interest other than by announcement of the continuance in open court on the date scheduled for the Sale Hearing.

4.     Objections, if any, to the sale of the Assets contemplated by the Asset Purchase Agreement, or the relief requested in the motion (including with respect to Cure Amounts and adequate assurance) must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, [_____], Miami, Florida 33131 (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on [_____], 2018, or such earlier date and time as the Debtor may agree and (d) be served, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon: (a) the Debtor, 5959 NW 7 St, Miami, FL 33126, Attn:  Jeffrey Mason; (b) counsel for the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq.; (c) counsel to the Stalking Horse Purchaser, Joshua Kaye, Esq., Thomas Califano, Esq. and Rachel Nanes, Esq., DLA Piper LLP (US), 2500 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131; and (d) Bayshore Partners, LLC, 401 E. Las Olas Blvd, Suite 2360, Fort Lauderdale, FL 33301, Attn: Scott Saunders and Steve Zuckerman.

5.     In the event that the Stalking Horse Purchaser is not the Successful Bidder at the Auction, the non-Debtor party to any Assigned Contract(s) will have until the Sale Hearing to object to the Successful Bidder's ability to perform under such Assigned Contract(s).

6.     This Notice and the Sale Hearing are subject to the fuller terms and conditions of the motion, the Bidding Procedures Order and the Bidding Procedures, which

shall control in the event of any conflict and the Debtor encourages parties in interest to review such documents in their entirety. Copies of the motion, the Asset Purchase Agreement, the Bidding Procedures, and/or the Bidding Procedures Order may be obtained by written request to counsel to the Debtor, Meland, Russin & Budwick, P.A., 3200 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131, Attn: Peter D. Russin, Esq., and Daniel N. Gonzalez, Esq. In addition, copies of the aforementioned pleadings may be found on the Pacer website, http://ecf.flsb.uscourts.gov.

Dated [_____]

<div style="margin-left:40%">

<u>s/ Peter D. Russin</u>
Peter D. Russin, Esquire
Fla. Bar No. 765902
prussin@melandrussin.com
Daniel N. Gonzalez, Esquire
Fla. Bar No. 592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Counsel for Debtor in Possession*

</div>

**EXHIBIT 9.1(iii)(c)**

**FORM OF SALE ORDER**

**[To Be Provided]**

# **APPENDIX I**

## **OPERATIONS TRANSFER AGREEMENT**

**[To Be Provided]**